# Exhibit 1

## Seizure Affidavit

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEIZURE WARRANT

I, Jason Henrikson, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn depose and say:

## PURPOSE OF THE AFFIDAVIT

1. I am the case agent involved in an ongoing criminal investigation of ALLISON BAVER ENTERTAINMENT, LLC (ABE). This affidavit is made in support of an application for a seizure warrant to seize the loan proceeds of a scheme to defraud the Small Business Administration (SBA) and Meridian Bank (Meridian), the SBA loan processor, of $10,000,000 in Payment Protection Program (PPP) funds that were obtained by the owner of ABE, ALLISON MARIE BAVER (BAVER) through the submission of a fraudulent PPP loan application.

2. The United States seeks seizure of the following assets (Target Assets):

## FUNDS IN BANK ACCOUNTS

| Bank | Account No. | Account Owner | Funds to be Seized |
|---|---|---|---|
| Meridian Bank | 4428439 | ALLISON BAVER | Up to $10,000,000 |
| Meridian Bank | 4062022 | ALLISON BAVER | Up to $10,000,000 |
| Meridian Bank | 4064101 | ALLISON BAVER | Up to $10,000,000 |
| First Internet Bank ("FIB") | 301674629 | ALLISON BAVER | Up to $10,000,000 |
| First Internet Bank ("FIB") | 301706521 | ALLISON BAVER | Up to $10,000,000 |

1

| First Internet Bank ("FIB") | 301706539 | ALLISON BAVER | Up to $10,000,000 |

3. For the reasons specified below, there is probable cause to believe that the Target Assets are subject to forfeiture and seizure under the following authorities:

Criminal Seizure and Forfeiture:

a. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the Target Assets were derived from proceeds traceable to a violation of 18 U.S.C. § 1014 (Loan Application Fraud); and 1343 (Wire Fraud).

b. Pursuant to 18 U.S.C. § 982(a)(1) because the assets were involved in a violation of 18 U.S.C. § 1957 or are traceable to such property.

c. Consequently, seizure of the assets for criminal forfeiture is authorized by 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f).

Civil Seizure and Forfeiture:

a. Pursuant to 18 U.S.C. § 981(a)(1)(C) because the assets were derived from proceeds traceable to a violation of 18 U.S.C. §§ 1014 (Loan Application Fraud); and 1343 (Wire fraud).

b. Pursuant to 18 U.S.C. § 981(a)(1)(A) because the assets were involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 or are traceable to such property.

c. Consequently, seizure of the assets for civil forfeiture is authorized by 18 U.S.C. § 981(b).

4. A restraining order for the funds under 21 U.S.C. § 853(e) would likely not adequately protect the assets described in this affidavit. Based on my training and experience, I

know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds in an account are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

5. In tracing funds for civil forfeiture, the United States has relied on 18 U.S.C. § 984, which provides that it is not necessary for the Government to trace fungible property, like funds in a bank account, in connection with forfeiture proceedings commenced within one year of the date of the offense. Section 984 allows the Government to seize the full amount of fraud proceeds originally deposited into an account regardless of whether the government can establish, such as through tracing, that the fraud proceeds remain in the account on the seizure date. As a result, the Government can seize more than just the directly traceable proceeds that remain in the account.

## BACKGROUND OF INVESTIGATORS

6. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed as a federal law enforcement officer for over 9 years. As such, I am an investigative and law enforcement officer the United States, empowered to conduct investigations and make arrests for offenses enumerated in Title 18 of the United States Code. I have worked a variety of criminal investigations to include investigations pertaining to wire fraud, mail fraud, and financial institution crimes. I am also a Certified Public Accountant licensed in the state of Illinois.

7. I am currently assigned to a white-collar crime (WCC) squad in Salt Lake City and I am responsible for investigating financial crimes, money laundering and other WCC violations. I

have executed numerous search warrants, drafted, and reviewed numerous affidavits and made numerous arrests.

8. The statements and evidence in this affidavit are based on the collective investigative efforts, training, and experience of the investigative team assigned to this matter. This team includes me, FBI analysts, FBI forensic accountants, and other law enforcement officers from other federal agencies to specifically include the Small Business Administration Office of Inspector General (SBA-OIG). Since I am submitting this affidavit for the limited purpose of obtaining a seizure warrant, I have not included details of every aspect of the investigation.

## RELEVANT LEGAL AUTHORITY

9. Title 18 U.S.C. § 1014 states in relevant part:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . the Small Business Administration in connection with any provision of that Act . . . (or) any institution the accounts of which are insured by the Federal Deposit Insurance Corporation . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor.

10. Title 18 U.S.C. § 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures . . . for the purpose of executing such scheme or artifice.

11. Title 18 U.S.C. § 1957 states:

> Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subjection (b).

## FACTS SUPPORTING PROBABLE CAUSE

The Paycheck Protection Program

12. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). Around April 2020, Congress authorized over $300 billion in additional PPP funding. The PPP is administered by the U.S. Small Business Administration (SBA), which is an executive agency of the United States.

13. To obtain a PPP loan, a qualifying business must submit a PPP loan application (SBA Form 2483), which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. Three such certifications require the applicant (through its authorized representative) to affirm them by placing his/her initials next to them:

- *"The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.";*

- *"The [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges.";*

- *"I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000"*

14. In the PPP loan application, the small business (through its authorized representative) must state, among other things, the following: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

15. A PPP loan application must be processed by a participating lending financial institution. If a PPP loan application is approved by the participating financial institution, that institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Participating financial institutions require that the information provided in PPP loan applications be truthful, including information about the applicant business's employees and payroll expenses.

16. Information from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lending financial institution to the SBA in the course of processing the loan.

17. PPP loan proceeds must be used by the business for payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be forgiven if the business spends the loan proceeds on these items within a designated period of time (usually within twenty-four weeks of receiving the proceeds) and uses at least 60% of the PPP loan proceeds for payroll expenses.

ABE's PPP Loan Application

18. On July 9, 2020, the U.S. Attorney's Office, District of Utah advised the affiant's office that it had received a press inquiry regarding ABE's receipt of a SBA-guaranteed PPP loan in the amount of five million dollars ($5,000,000) to ten million dollars ($10,000,000) and its claim to have saved 430 jobs. Notable at the time, ABE had registered in the State of Utah in October 2019 and its website listed only three people, and there were no indicators of any ongoing business activities.

19. FBI Special Agent James Malpede contacted Special Agent Samuel Huynh (SA Huynh) of the SBA Office of Inspector General (SBA-OIG) in Federal Way, WA to determine if BAVER had submitted a loan application to the SBA to obtain a PPP loan. SA Huynh confirmed that BAVER had submitted an SBA PPP loan application to and had obtained a loan of $10,000,000 from the PPP lender, Meridian Bank.

20. I thereafter received from SBA-OIG a copy of the of the lender-provided ABE's loan file, among which included (1) State of Utah Certification of Organization, (2) EIN Issuance Letter from the IRS, (3) Borrower Application Form dated April 25, 2020, (4) ABE Updated-PPP Loan Amount Calculator UPDATED, (5) Certification of Beneficial Owner(s), (6) BAVER's email to an individual named Carl Kruelle dated April 24, 2020, (7) and Meridian Bank Underwriting Memo dated April 25, 2020. I also obtained ABE's Meridian Bank records

7

pertaining to PPP loan proceeds and subsequent transfers to other bank accounts.

21. State of Utah Certification of Organization showed ABE was formed on October 9, 2019. EIN Issuance letter from the IRS showed ABE had been assigned an EIN 84-3318720 on October 9, 2020.

22. The top section of the Borrower Application Form asks for "Average Monthly Payroll" and "Number of Employees." This is a self-reporting figure by the applicant and page 3 of the Borrower Application Form provided instructions to the applicant as how to calculate the average monthly payroll, which states

> For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

23. BAVER's response to the "Average Monthly Payroll" was "$4,770,583," and her response to the "Number of Employees" was "430." These responses appear to be false because on July 9, 2020, Utah Department of Workforce Services advised the FBI that ABE had no reported payroll or employee in 2018, 2019 or 2020.

24. On page 2 of the Borrower Application Form, under Certifications, BAVER placed her initials next to the following statements:

- *"The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.";*

- *"The [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges.";*

- *"I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000"*

These certifications also appear to be false as ABE reported no employees or payroll expenses in 2019 or 2020 according to Utah Department of Workforces' information.

25. BAVER also submitted a document named PPP Loan Amount Calculator UPATED, which listed ABE's payroll and payroll-related expenses for months ending March 31; April 30 and May 31, 2020, as $4,770,583. These figures also appear to be false since, according to Utah Department of Workforces' information, ABE had no employees or payroll expenses for these months.

26. In the Certification of Beneficial Owner(s) signed and dated by BAVER on May 9, 2020, she certified she was the sole member and owner of ABE.

9

27. On April 24, 2020, BAVER wrote to an individual named Carl Kruelle in which she admitted she had "only paid at [sic] attorney" for her projects in operation (while touting what appear to be future projects and projected numbers of employees):

> Right now most banks are only accepting existing customers and the ones I have spoken with require the past 12 months or Jan./Feb. 2020 payroll, which does not apply to my new entertainment company because of the timeline, I had only paid an attorney for the projects in operations. You see, we had a TV show and two films scheduled to start production in Spring 2020 and these projects employ 430 people with the PPP loan amount of $8.3M. One of the projects is a TV that we received a distribution offer from A + E Network to air the show Q4 this year! The show is called America's Angels and helps women driven business, employs 80 people and will have a substantial impact for women in closing the socioeconomic gap.

28. SA Huynh's review of Meridian Bank Underwriting Memo showed that Meridian Bank had approved ABE for $10,000,000 in PPP loan on April 25, 2020. Meridian Bank records showed that on May 11, 2020, BAVER opened a Business Money Market Account ending 8439; a PPP Business Checking Account ending 2022; and a Business Operating Account ending 4101 at Meridian Bank. These three accounts were under the business name of ABE and owned solely by BAVER. On the same day, $10,000,000 was deposited into the account ending 2022. On May 12, 2020, $9,999,500 was transferred to the account ending 8439. On June 15, 2020 and July 27, 2020, $5,000,000 and $4,000,000 were transferred from the account ending 8439 to an account at First Internet Bank (FIB). From May 11, 2020 to July 31, 2020, BAVER conducted numerous banking transactions and intra-account transfers on and between these three accounts. As of July 31, 2020, the balance on account ending 2022 was $23,625.77; account ending 4101 was $1; and account ending 8439 was $490,737.74. On or around May 11, 2020, a payroll service account was opened, and Meridian Bank records showed that from June 2, 2020 to June 30, 2020, $60,270.88

was paid out of the account ending 2022 to this payroll service account; and from July 2, 2020 to July 28, 2020, $33,603.35 was paid out of account ending 2022 to this payroll service account.

29. SA Huynh's review of FIB records showed that on or around May 12, 2020, BAVER opened a Business Money Market Account ending 4629; and two Small Business Checking Accounts ending 6521 and 6539 with zero balance on all accounts. All these three accounts were under the business name of ABE and owned solely by BAVER. On June 15, 2020 and July 27, 2020, FIB account ending 4629 received two wires of $5,000,000 and $4,000,000, respectively, from ABE's Meridian Bank account ending 8439.

30. As of August 31, 2020, FIB account ending 4629 had earned accumulative interest of $12,057.80, and its balance was $9,012,040.80. There was no banking or transfer transactions on this account except for two withdrawals of $1 each on August 20, 2020. For the FIB accounts ending 6521 and 6539, there were deposits of $1 to each account on August 20, 2020. As of August 31, 2020, the balance for accounts ending 6521 and 6539 was $1.

## CONCLUSION

31. The evidence detailed above establishes probable cause that the Target Assets are the proceeds of violation of 18 U.S.C. §§ 1014, 1343 and 1957 and subject to seizure as provided

/

/

/

/

/

/

/

above.

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

*[signature]*
Jason Henrikson
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Zoom.

Dated this 9th day of October, 2020.

BY THE COURT:

*[signature]*
Daphne A. Oberg
U.S. Magistrate Judge