TRINA A. HIGGINS, United States Attorney (7349)
JENNIFER K. MUYSKENS, Assistant United States Attorney (DC 475353)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
(801) 524-5682
travis.elder@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALLISON MARIE BAVER,<br><br>Defendant. | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY ORDER OF FORFEITURE**<br><br>Case No. 2:21-cr-00520-JNP<br><br>Judge Jill N. Parrish |

The United States of America submits this Reply in Support of Motion for Preliminary Order of Forfeiture:

**Ms. Baver's proposed interpretation of "victim" in 18 U.S.C. § 981(a)(2)(C) has no support in the law or reason.**

Common sense and reason dictate that the definition of "victim" under Section 981(a)(2)(C) should not be narrowly defined to exclude from its definition a guarantor like the Small Business Administration (SBA) who has reimbursed the lending bank for its loss. It is no logical leap to conclude that when Congress enacted Section 981(a)(2)(C) it did so to prevent defendants in the loan fraud context from unfairly having to pay back a loan twice. No such unfairness exists in this case because it was the SBA, not the defendant, who paid back the bank on its loan.

Unsurprisingly, restitution is not reduced when victims receive compensation from insurance or other sources. Under 18 U.S.C. § 3664(f)(1)(B), compensation a victim receives from "insurance or any other source" is "not considered in determining the amount of restitution." The SBA is clearly the victim for restitution and should also be under Section 981(a)(2)(C). It would be ludicrous to conclude that Ms. Baver is entitled to credit for the reimbursement made by the SBA to Meridian Bank. *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) ("When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended.").

Even if the plain and ordinary meaning of "victim" was not broad enough to include guarantors, the absurdity doctrine ensures that Ms. Baver does not get credit for the SBA's payment under Section 981(a)(2)(C). Under that doctrine, statutory interpretations that lead to absurd results are rejected if other interpretations are consistent with legislative intent. *In re McGough*, 737 F.3d 1268, 1276 (10th Cir. 2013). However, the doctrine only applies "when it would have been unthinkable for Congress to have intended the result commanded by the words of the statute—that is, when the result would be so bizarre that Congress could not have intended it . . . ." *Chronister*, 435 F.3d at 1241. The idea that Congress could have intended to exclude guarantors as victims and to effectively give a defendant credit on the forfeiture for a guarantor's loan reimbursement is ludicrous. Further argument is unnecessary to conclude the absurdity doctrine is satisfied and the defendant's interpretation should be rejected.

2

**The defendant's hypertechnical application of Rule 32.2(a) elevates form over substance without any showing of prejudice and should be rejected.**

The proceeds forfeiture provisions of 18 U.S.C. § 982(a)(2)(A) and 18 U.S.C.

§ 981(a)(1)(C) are both applicable forfeiture provisions to Ms. Baver's 18 U.S.C. § 1014 offense

that provide for the forfeiture of very similar property:

| Section 982(a)(2)(A) Forfeiture Authority | Section 981(a)(1)(C) Forfeiture Authority |
| --- | --- |
| [A]ny property constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of such violation. | Any property, real or personal, which constitutes or is derived from proceeds traceable to [the offense]. |

Essentially, both statutes require a defendant to forfeit the proceeds of the crime to the United

States. These forfeiture authorities do have some differences:

| Section 982(a)(2)(A) Differences | Section 981(a)(1)(C) Differences |
| --- | --- |
| The Section 1014 offense must have affected a financial institution.<br><br>The United States is entitled to forfeit gross proceeds.[1]<br><br>No deductions from the forfeiture are made based on repayments of a loan in the context of a Section 1014 offense. | The United States may or may not be able to forfeit gross proceeds depending on the applicability of the proceeds definition in 18 U.S.C. § 981(b)(2)(A) or (B).<br><br>The defendant is entitled under 18 U.S.C. § 981(b)(2)(C) to "a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim." |

Rule 32.2(a) should not be read to penalize the United States in seeking forfeiture simply

because a change in circumstances from the time of the indictment's filing has resulted in the

financial institution receiving reimbursement from the SBA's guaranty. Such a result does not

favor justice, nor does it safeguard the defendant from any prejudice. Whether the United States

---

[1] *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010) (Section 982(a)(2) provides for "broad" forfeiture authority; the word "any" means all).

obtains forfeiture under Section 982(a)(2)(A) or Section 981(a)(1)(C), it gets the proceeds of the crime. The defendant can claim no surprise, injustice, or prejudice here. In reality, a forfeiture under Section 981(a)(1)(C) is often more advantageous for a defendant because of the more favorable proceeds definition and the repayment allowance. Again, no prejudice here. *Cf. United States v. Joseph*, 185 F. Supp. 3d 1290, 1293-94 (D. Utah 2016) (rejecting argument that the court and the United States had failed to follow Rule 32.2(b)(1)(A)'s requirement of entering a forfeiture order as soon as practical after a guilty verdict in part because the defendant had "suffered no prejudice."), *aff'd*, 705 F. App'x 711 (10th Cir. 2017).

Although not binding Tenth Circuit authority, the logic and reasoning of the cases cited by the government on this issue are sound and should be adopted by the Court. In *Silvious*, the United States cited 18 U.S.C. § 982 and § 2314, and 21 U.S.C. § 853 as its forfeiture authorities in the indictment. *United States v. Silvious*, 512 F.3d 364, 367 (7th Cir. 2008). After the defendant pled guilty, the United States sought forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because it conceded that 18 U.S.C. § 982 only authorizes forfeiture for mail fraud offenses that affect a financial institution, which did not apply to the defendant's mail fraud offense. *Id*. at 368-69. The district court held that the defendant would not suffer any prejudice by "correcting the statutory basis of the forfeiture" because the indictment had a forfeiture notice. *Id*. at 368. In affirming this decision, the Seventh Circuit rejected the defendant's argument that Rule 32.2(a) barred the court from entering a forfeiture order because the government had not listed the "applicable statute" in the indictment's forfeiture notice. *Id*. at 369. The circuit did not agree with the defendant's reading of Rule 32.2(a) because the

"'essential purpose' of notice is to inform the defendant that the government seeks forfeiture so the defendant can marshal evidence in his defense." *Id*. Since the indictment informed the defendant of the United States' intent to seek forfeiture and listed the target assets, "the wrong forfeiture statute did not prevent Silvious from receiving notice under Rule 32.2(a)."

The government also cited *United States v. Joel*, No. 8:11CR89, 2012 WL 2499424, at *5-6 (M.D. Fla. June 5, 2012) (unpublished). In addition to relying on the reasoning of *Silvious*, Joel also relied on *United States v. Wall,* 285 Fed. Appx. 675, 684 (11th Cir.2008). These cases, which follow the majority view, describe similar situations to this case involving offenses that turned out not to have affected a financial institution. Ms. Baver cites outlier *United States v. Annabi*, 746 F.3d 83 (2nd Cir. 2014) in support of her argument. However, *Annabi* is distinguishable. In that case, the government cited 18 U.S.C. § 981(a)(1)(C) instead of 18 U.S.C. § 982(a)(2). *Id*. at 85. Both statutes could have applied to the defendant's offense and the district court ordered forfeiture of the gross proceeds of the loan amount even though the defendant had repaid the associated loan. *Id*. The Second Circuit reversed so that Annabi would get credit for the loan repayment under the forfeiture statute cited by the government. *Id*. at 86. Given the equities, the *Annabi* court's decision is understandable, but those equities were not present in *Silvious*, *Joel*, or *Wall*, nor are those equities present here. Instead, the equities favor reading Rule 32.2(a) consistent with its purpose to ensure a defendant receives notice of the forfeiture and can marshal a defense. The defendant received such notice here and proceeding under 18 U.S.C. § 981(a)(1)(C) presents no prejudice to Ms. Baver as it did to the defendant in *Annabi* when the district court utilized 18 U.S.C. § 982 instead of the cited provision of Section

981(a)(1)(C). Consequently, under the circumstances of this case where no prejudice inures to the defendant, ordering forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) does not violate Rule 32.2(a).

**Since the assets sought for forfeiture have the requisite nexus with the relevant offenses, the court must order their forfeiture without regard to ownership.**

At the preliminary order stage, under Rule 32.2(b)(1)(A), courts only makes one determination regarding specific assets sought for forfeiture: whether the government has established the requisite nexus between the property and the offense. If the court finds that the property sought for forfeiture is connected to the crime in the manner provided in the forfeiture statute, then "it must promptly enter a preliminary order of forfeiture . . . directing the forfeiture of specific property[.]" Rule 32.2(b)(2)(A). Consideration of third-party ownership interests are deferred to the ancillary proceeding. *Id*.

For the Section 1014 offense, the court is only deciding whether the $9,014,830.76 seized from FIB 4629; $465,936.99 seized from Meridian Bank account 8439; $33,932.39 seized from Meridian Bank account 2022; and the $22,018.81 seized from Meridian Bank account 4101 have the nexus to the crime as defined by the forfeiture authority. Under 18 U.S.C. § 981(a)(1)(C), these seized funds must be ordered forfeit in the preliminary order of forfeiture if they are "any property, real or personal, which constitutes or is derived from proceeds traceable to" Ms. Baver's Section 1014 offense. As shown at trial and in the United States' motion, these seized funds are traceable to the $10,000,000 PPP loan that Meridian Bank made to Allison Baver Entertainment based on Ms. Baver's false statements. Consequently, the United States has

established the requisite nexus and the Court must order them preliminarily forfeited to the United States.

The same is true for the property involved in Ms. Baver's Section 1957 offense. For that offense, the court is only deciding whether all payments due and owing to Allison Baver Entertainment, LLC by Fintage Collection Account Management B.V. under the terms and conditions of a Collection Account Management Agreement entered between ABE and Fintage Collection on June 6, 2020, have the nexus to the crime as defined by the forfeiture authority. Under Section 982(a)(1), this asset must be ordered forfeit in the preliminary order of forfeiture if it is "any property, real or personal, involved in such offense, or any property traceable to such property." These payments trace directly to the $150,000 payment involved in Ms. Baver's Section 1957 offense. Consequently, the United States has established the requisite nexus and the Court must order this asset preliminarily forfeited to the United States.

> **Ms. Baver "obtained" the PPP loan funds regardless of whether any of the loan proceeds ever reached her personal bank accounts because of her complete ownership and control of the entity that received the PPP loan funds.**

Ms. Baver urges the court to find that it cannot order forfeiture because based on the Supreme Court's decision in *Honeycutt*, but the reasoning of that decision and subsequent cases interpreting it support ordering forfeiture. As this court noted recently in summarizing the *Honeycutt* decision:

> Because the defendant in Honeycutt did not own the hardware store and did not obtain the profits for the chemical sales or otherwise personally benefit from the sales, the government was not entitled to a money judgment against him.

*United States v. Kingston*, No. 2:18-CR-00365-JNP, 2023 WL 2634692, at *3 (D. Utah Mar. 24, 2023) (unpublished). The factual circumstances in *Honeycutt* are obviously not comparable to

7

this case in which Ms. Baver was the sole owner and controller of ABE. Rather, the circumstances here are much closer to the facts in *Kingston* where this Court did order forfeiture. In deciding the *Kingston* forfeiture, this Court considered whether the defendants "exercised a degree of control over the fraudulently obtained funds that would justify holding him responsible for their dissipation." *Id*. at 4. In denying the forfeiture as to one of the defendants the court found the facts did not indicate a sufficient "measure of control over the disposition of the funds fraudulently obtained by the company." *Id*. However, the Court ordered forfeiture as to another defendant, Jacob Kingston, because the facts did indicate a sufficient measure of control. *Id*.

The Court did not require a conviction of the company, Washakie Renewable Energy (WRE), in *Kingston*, nor did it require that the criminal proceeds pass through Jacob Kingston's personal bank accounts before it ordered forfeiture, and it need not here. In fact, Ms. Baver's control of ABE is perhaps even greater than the control Jacob Kingston had over WRE. Whereas it appears Jacob Kingston worked with other employees and principals of (WRE) in *Kingston* (see *Kingston*, 2023 WL 2634692, at *4 (noting that even though Isaiah Kingston "executed many of the wire transfers" it was Jacob who "ultimately decided where to transfer the money")), Allison Baver was the one and only person directing and controlling Allison Baver Entertainment. She opened all the company's bank accounts. She directed every movement of funds. But for Ms. Baver, ABE would not have existed or acted in any manner. Ms. Baver's whole impetus for obtaining the PPP loan was to start her own business, a business that had one principal and one employee at the time the loan was received: Ms. Baver. Numerous post-*Honeycutt* cases have ordered forfeiture under similar circumstances. *See, e.g.*, *United States v.*

8

*Goldstein*, 989 F.3d 1178, 1203 (11th Cir. 2021), *cert. denied sub nom. Bercoon v. United States*,

142 S. Ct. 806, 211 L. Ed. 2d 501 (2022) (*Honeycutt* does not apply where each defendant

personally acquired total amount of fraud proceeds that were deposited into their jointly

controlled bank accounts that each defendant had access to); *United States v. Saccoccia*, 1 F.4th

64, 73 (1st Cir. 2021) ($136 million forfeiture money judgment upheld based on defendant's

joint ownership of business account that tainted funds flowed through, which was "enough to

demonstrate"—even post-*Honeycutt*—that defendant obtained the funds for purposes of

forfeiture under the RICO forfeiture statute); *United States v. Mathieu*, 853 F. App'x 739, 742

(2d Cir. 2021) (unpublished) (forfeiture money judgment affirmed for Medicare healthcare fraud

scheme proceeds that was calculated in part from checks issued from two accounts that

defendant maintained; court rejected *Honeycutt* argument that defendant did not exercise

sufficient control over accounts because evidence at trial showed that defendant was the

signatory on both accounts that he directed Medicare to deposit funds into and used to issue

checks for fraud proceeds and deposit fraud proceeds); *United States v. Fujinaga*, Nos. 19-

10222, 21-10155, 2022 WL 671018, *6 (9th Cir. Mar. 7, 2022) (unpublished) (joint and several

forfeiture money judgment did not violate *Honeycutt*; district court found that defendant had

"full and exclusive authority over [corporate] accounts" that mail and wire fraud scheme

proceeds were deposited in); *United States v. Dotson*, 635 F. Supp. 3d 1326, 1333 (M.D. Fla.

2022) (*Honeycutt* did not prevent holding two co-defendants jointly and severally liable for a

forfeiture money judgment because both were co-owners of the entity used to perpetuate the

fraud and they, not their employees, personally benefited from the fraud by keeping the profits

from the fraudulent transactions). Whether ABE is ever convicted or not and whether any of the

loan funds passed through Ms. Baver's personal bank accounts, as Ms. Baver exclusively

dominated and controlled ABE, she is liable for a forfeiture money judgment for the $10,000,000

PPP loan deposited into ABE's account.

> **Imposing a forfeiture money judgment in the amount of the proceeds Ms. Baver obtained from her offense is exactly proportional to her offense and does not violate the Eighth Amendment.**

Contrary to Ms. Baver's arguments, the requested $10,000,000 forfeiture money

judgment cannot violate the Eighth Amendment because it is exactly proportional to her offense.

Under *United States v. Bajakajian,* 524 U.S. 321, 334 (1998), a forfeiture violates the Eighth

Amendment if it is "grossly disproportionate to the gravity of a defendant's offense." In *Joseph*,

also a case that involved a Section 1014 offense, this Court outlined the factors used to determine

whether a forfeiture is grossly disproportionate:

> Under Tenth Circuit law, proportionality is assessed by:
>
> > considering the nature of the offense, the relationship of the offense to other illegal activity, the value and function of the defendant's property, the culpability of the claimant, the benefit reaped by the claimant, and the maximum sanction authorized by Congress for the offense.

*Joseph*, 185 F. Supp. 3d at 1294–95 (quoting *United States v. Lot Numbered One of the Lavaland*

*Annex*, 256 F.3d 949, 958 (10th Cir. 2001)). *Bajakajian* also directs that "judgments about the

appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*,

524 U.S. at 336. By authorizing the forfeiture of the proceeds of Ms. Baver's Section 1014

offense, Congress has expressed its judgment about the appropriate punishment for that offense.

*See United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019) ("In authorizing large forfeiture

judgments for [health care fraud and money laundering] of which Florence and Michael were convicted, Congress determined that the offenses are grave, which carries significant weight in our analysis."); *United States v. Blackman,* 746 F.3d 137, 144 (4th Cir. 2014) ("Because questions of proportionality are reserved primarily to the legislature, the *Bajakajian* test is highly deferential").

Moreover, Eighth Amendment analysis usually applies where the property to be forfeited is not criminally derived or helped to facilitate the crime. For example, in *Bajakajian*, the money at issue "was the proceeds of a legal activity and was to be used to repay a lawful debt" and the defendant was convicted of a single instance of failing to file a Currency Transaction Report, a reporting offense. *Bajakajian*, 524 U.S. at 339. In such a circumstance, it would have been grossly disproportional to the gravity of the offense to forfeit the entire $357,144 that he failed to report. *Id.*

In contrast, where forfeiture represents the proceeds of the crime itself, courts have found either that the *Bajakajian* factors do not apply, or, if they do, that forfeiture of the proceeds of the crime is not grossly disproportional to the gravity of the offense. This is because forfeiture of proceeds "simply parts the owner from the fruits of the criminal activity." *United States v. Alexander* 32 F.3d 1231, 1236 (8th Cir. 1994). *See, e.g.*, *Bikundi*, 926 F.3d at 795 (given that the forfeiture money judgment corresponded exactly to the proceeds the defendants derived from their healthcare fraud and money laundering "the penalties were not 'grossly disproportional' to [the defendant's] crimes"); *United States v. Bentancourt*, 422 F.3d 240, 250-51 (5th Cir. 2005) ("the Eighth Amendment has no application to the forfeiture of property acquired with

proceeds"; the forfeiture of a winning lottery ticket purchased with drug proceeds therefore could not violate the Excessive Fines Clause, regardless of the value of the lottery winnings; that the forfeiture greatly exceeded the maximum statutory fine is irrelevant); *United States v. Peters*, 257 F.R.D. 377, 389-90 (W.D.N.Y. 2009) (questioning whether proportionality analysis even applies to forfeiture of proceeds, but concluding that even if it does, requiring defendant to forfeit gross amount of $23,154,259 in fraudulently obtained loans was not grossly disproportional); *Joel*, 2012 WL 2499424, at *8-10 (forfeiture money judgment of $1,618,000 was not grossly disproportionate for defendant who was guilty of participating in "scheme to induce 10 lenders to fund fraudulent mortgage loans totaling $1.848 million dollars, and employing the mail and wire systems to facilitate the fraudulent conduct."). *See also United States v. Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1395 (10th Cir. 1997) (pre-*Bajikajian* case, holding "as a matter of law that forfeiture of drug proceeds pursuant to § 881(a)(6) can never be constitutionally excessive."). Accordingly, imposing a money judgment against Ms. Baver equal to the proceeds of her Section 1014 offense would not be grossly disproportionate.

Even if the *Bajakajian* analysis applied, imposing a money judgment against Ms. Baver equal to the proceeds she fraudulently obtained would not be constitutionally excessive.

### *Nature of the Offense and Relationship of Offense to Other Illegal Activity*

The offense in this case is nothing like the more technical reporting violation considered in *Bajakajian*. Ms. Baver applied for and obtained the maximum amount available for a PPP loan of $10,000,000. The funds in the PPP loan program were limited and her loan took funding and

support away from others entitled to relief.[2] Before Ms. Baver applied to receive a loan with

Meridian Bank, numerous indicators showed she was not eligible including her experiences

applying for PPP loans with Lendio and Utah First Credit Union, which were not approved.

Micah Stanford, director of credit with Utah First Credit Union, explained to Ms. Baver in very

clear terms on April 21, 2020, that she did not qualify and was not eligible for a PPP loan

because "you have not paid any payroll to date."[3]

> Allison,
> The PPP loan program is very specific in what can be used to determine an eligible loan amount. Your description that you have not paid any payroll to date would make you ineligible.
> From the SBA:
> In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019. An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.
> If you have documented payroll expenses, via IRS 941 forms, from January 2020 to February 29th, 2020, we could look at your request. I know that we cannot, under any circumstance, use future expected payroll to determine a loan amount.
> While we would like to help, your request, shown below, makes us feel that you would not be eligible for the program as it is currently established.
> I would encourage you to apply directly with the SBA for their EIDL loan program as they might have more flexibility in granting requests we cannot.

---

[2] During her trial testimony, Kandace Zelaya, an attorney for the SBA, testified that Congress appropriated money to allow the SBA to guarantee PPP loans. The CARES Act originally included an $349 billion appropriation for PPP loans, which was exhausted by April 14, 2020. Once the funds were exhausted, no more loans could be made. Multiple rounds of legislation provided additional funding for the PPP loan program. *See also* Lisa Desjardins, *It took 13 days for the Paycheck Protection Program to run out of money. What comes next?*, Apr. 16, 2020, https://www.pbs.org/newshour/politics/it-took-13-days-for-the-paycheck-protection-program-to-run-out-of-money-what-comes-next.

[3] GX 4.

The PPP application and instructions that Ms. Baver certified numerous times in applying for PPP loans with Lendio, Utah First Credit Union, and Meridian Bank,[4] supported Mr. Stanford's advisements to Ms. Baver. For example:

1. Ms. Baver certified that she read the statements included in the PPP loan application form, understood them, and was eligible to receive the PPP loan under existing rules:

> CERTIFICATIONS AND AUTHORIZATIONS
>
> I certify that:
> - I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
> - The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).

2. Ms. Baver certified that ABE "was in operation on February 15, 2020 and *had* employees for whom it paid salaries . . ." (emphasis added) even though she knew ABE had no employees on that date:

> CERTIFICATIONS
>
> The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:
>
>  The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

3. Ms. Baver certified that the PPP loan would "be used to *retain* workers and *maintain* payroll" (emphasis added) even though ABE had no workers to retain and no payroll to maintain:

>  The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

---

[4] *See, e.g.*, GX 16(c).

14

4. Ms. Baver certified that she would provide the lender "documentation verifying the number of full-time equivalent employees on the Applicant's payroll . . ." even though she knew that the documentation she provided related to hope for payroll:



The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

5. The form's instructions described three time periods to use for calculating "Average Monthly Payroll" depending on the business type: a) 2019 (most businesses); b) the time period between February 15, 2019 and June 30, 2019 (seasonal businesses); or c) the time period from January 1, 2020 to February 29, 2020 (new businesses). This same information was provided to Ms. Baver in Mr. Sanford's email cited above. Ms. Baver knew that her business did not fit into any of those periods because ABE had no employees during those time frames.

For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

This evidence belies the idea Ms. Baver applied for the PPP loan confused about its eligibility requirements. Ms. Baver's lack of eligibility was all over the place and was conveyed to her in plain terms. Ms. Baver's conduct in fraudulently obtaining $10,000,000 in public funds is a serious offense.

***Whether the Property Constitutes Proceeds of Illegal Activity.***

As described above, the $10,000,000 forfeiture money judgment the United States seeks

represents the proceeds of Ms. Baver's Section 1014 crime. Parting Ms. Baver from the proceeds

of her crimes cannot be considered constitutionally excessive.[5]

***Harm Caused by the Illegal Activity***

Given the occurrence of Ms. Baver's crime during a worldwide pandemic that was

wreaking havoc on the economic stability of our country, the harm is significant. The PPP loan

program was enacted to enable the Small Business Administration to quickly get aid to

businesses throughout the country. Due to the emergency nature of the situation, lenders were

permitted to rely on self-certifications made by borrowers to be honest and true and that same

---

[5] It should be noted that at the outset of their entry, the forfeiture money judgment for the money laundering offense will most likely be reduced to zero and the forfeiture money judgment for the false statement offense will most likely be reduced to $463,281.05. The United States has seized $9,536,718.95 of the $10,000,000 in PPP loan proceeds. As indicated in its motion, the United States intends, upon successful forfeiture of the $9,536,718.95 to apply those funds to the forfeiture money judgments. Whatever the government obtains from the forfeiture of ABE's contractual interest related to the No Man of God film, will also be applied to reduce the forfeiture money judgment. The seized funds will also help reduce the restitution order. Pursuant to DOJ policy, unless it finds that Ms. Baver can pay both forfeiture and restitution, the U.S. Attorney's Office will recommend as part of the restoration process that the Department of Justice permit application of the net value obtained from forfeited property to the restitution order. In this way, the forfeited property will help satisfy both the forfeiture money judgment and the restitution order. The authority to apply forfeited property to satisfy a restitution order is granted to the Attorney General under 21 U.S.C. § 853(i)(1). The return of forfeited assets to victims is one of the primary goals of the Department's asset forfeiture program. *Asset Forfeiture Policy Manual* (2023), 14.I. Consequently, the Attorney General routinely grants such requests. The DOJ approves restoration requests if (1) both restitution to compensate victims and a related forfeiture (either civil, criminal, or administrative) have been ordered; (2) the victims and amounts listed in the restitution order essentially conform to the victims and amounts that would have been paid through the remission process; and (3) other property is not available to fully satisfy the order of restitution. *Asset Forfeiture Policy Manual* (2023), 14.II.B. So, while in theory forfeiture is on top of any restitution ordered, practically, forfeiture is rarely pursued in that manner and it is unlikely to be so pursued in this case.

self-certification was relied upon to obtain the SBA's 100% guarantee of the loan.[6] Ms. Baver took advantage of this situation in fraudulently obtaining the maximum amount available under the PPP program. Instead of going to an eligible business that needed the funds, the PPP funds went to an ineligible company with zero employees to retain and no payroll to maintain. Consequently, Ms. Baver's offenses were no mere technical violations like the ones in *Bajakajian*, but serious offense that took advantage of an emergency.

### *Ms. Baver's Culpability and The Benefit Reaped by Ms. Baver*

As the sole owner and operator of ABE, Ms. Baver is entirely culpable for her offenses. She certified the application to Meridian Bank and solely orchestrated ABE's obtaining the PPP loan. She caused the loan proceeds to be deposited into and moved through ABE's bank accounts. The entire purpose of the crime was to help Ms. Baver start a business that but for the illegally obtained loan monies she would not have had.

### *The Maximum Sanction Authorized by Congress*

For Ms. Baver's false statement to a bank conviction (Count Six), the maximum penalties include 30 years in prison and a $1,000,000 fine under 18 U.S.C. § 1014, and forfeiture of the

---

[6] At trial, Kandace Zelaya testified that he PPP application process allowed applicants to self-certify their eligibility for PPP loan when they submitted their application to the lender. The lender was able to rely on the self-certifications by the applicant in reaching an approval decision. Lenders had minimal underwriting obligations because the PPP was designed to get money out the door as fast as possible to keep workers employed and receiving their paychecks. The loan applications and supporting documents were not submitted directly to or reviewed by the SBA; rather they were submitted to the lender who made the decision to approve the loan. To obtain the 100% guarantee, the lender had to certify to the SBA that they received the information from the applicant and performed a review of the application and approved the loan based on the criteria established by the SBA. The lender entered information into the SBA electronic system, which generated an SBA loan number. Once the loan number was generated, the SBA's 100% guarantee attached to the loan.

proceeds of Ms. Baver's offense under 18 U.S.C. § 981(a)(1)(C). As indicated, the forfeiture money judgment is tied directly to the proceeds Ms. Baver obtained from her offense. Furthermore, the money judgment is likely to be reduced to only $463,281.05 or less if the United States is successful in forfeiting the specific assets sought for forfeiture. This hardly represents a disproportional penalty. *See, e.g.*, *United States v. Pocelli*, No. 10-14777, 440 Fed. Appx. 870, 879 (11th Cir. 2011) (unpublished) (forfeiture of gross amount of a bank fraud scheme without an offset for what it cost to keep the scheme going was not excessive, even though difference between the gross receipts and the net proceeds was three times the maximum fine).

Consequently, all the factors support imposing a forfeiture money judgment equal to the proceeds Ms. Baver obtained from her offense.

**Conclusion**

Ms. Baver has failed to provide any valid reason why this court should not enter the forfeiture order requested by the United States. Accordingly, the United States requests that the Court enter the order as requested.

Respectfully submitted,

TRINA A. HIGGINS
United States Attorney


*/s/ Travis K. Elder*
Travis K. Elder
Assistant U.S. Attorney

18