```
 1                Tuesday, June 27, 2023; Salt Lake City, Utah
 2                              1:22 p.m.
 3                               -o0o-
 4     (The jury was not present in the courtroom.)
 5               THE COURT:  Okay, Mr. Hunt.
 6               MR. HUNT:  Your Honor, thanks for the time.  We do
 7     not need further time with Mr. Neumeister.  I appreciate the
 8     time.
 9               THE COURT:  Okay.  Well, I just have to say -- and
10     this is for everyone's benefit -- in reflecting over the
11     lunch hour about Mr. Neumeister's testimony, I mean,
12     95 percent of what he said was just talking about documents
13     that have been stipulated into evidence.  I don't even know
14     that we needed a witness to go through those documents.
15               And frankly, I should ask you where we are in
16     terms of getting through the case because, as I said, I
17     think that the relevant -- I think that his entire testimony
18     bordered on not relevant or not that helpful beyond the
19     documents that were in evidence.  And so, I mean, all he did
20     was supervise people who categorized documents.  And so I
21     think that's a good example.
22               Then I look and see that we also have somebody
23     from OnPay.  That seems to me to be completely duplicative
24     of whatever Mr. Neumeister did.
25               MS. MUYSKENS:  We do not, Your Honor.  That was
```

1 the stipulation was entered. So we're not intending to call

2 OnPay.

3 And some of these individuals -- everyone listed

4 here is not necessarily going to be called. For example, we

5 had Jordan Harman on the list, but he was the individual who

6 couldn't travel.

7 THE COURT: Okay. So let's just see where we are.

8 The Mark McGee, OnPay, what --

9 MS. MUYSKENS: Mark McGee of OnPay, that was the

10 stipulation counsel did agreed to.

11 THE COURT: Okay.

12 MS. MUYSKENS: So in terms of timing, Your Honor,

13 the government is still on track. We believe we'll be able

14 to finish our case tomorrow.

15 THE COURT: Okay.

16 MS. MUYSKENS: So we're on track.

17 THE COURT: Okay. Well, then that makes me feel a

18 bit better.

19 But like I said, I think at the end of the day,

20 we're spending a lot of time on how the money was spent, and

21 there's no dispute about that, really. I mean, we've got

22 the 1099s, we've got the payroll records. And so I'm not

23 sure what that's adding to the equation, apart from what can

24 be argued by counsel in closing argument.

25 So I'm glad to know that you don't think you need

him, Mr. Hunt.  And did you excuse him already?  Did he go
to catch his plane?

          MR. HUNT:  I hope so.

          MS. MUYSKENS:  I can let him know.  Thank you.

          THE COURT:  Can someone go tell him he's been
excused?  Okay.  And he can go catch his plane.

          And are we ready for the jury?

          MS. MUYSKENS:  Yes, Your Honor.

          THE COURT:  Okay.

     (The jury entered the courtroom.)

          THE COURT:  Welcome back, Members of the Jury.
And just to fill you in, we had some further discussion with
counsel.  And based on agreement of counsel, Mr. Neumeister
has been excused as a witness.  So he's gone back to
California.

          And the government is ready to call its next
witness.

          MS. THOMAS:  The United States calls Brian
Pinheiro.

          COURTROOM DEPUTY:  Please raise your right hand.

          You do solemnly swear that the testimony you shall
give in the case now before the Court to be the truth, the
whole truth, and nothing but the truth so help you God?

          THE WITNESS:  Yes.

          COURTROOM DEPUTY:  Please have a seat.

```
 1                    BRIAN PINHEIRO,
 2    was called as a witness, and having been first duly
 3    sworn to tell the truth, the whole truth, and nothing
 4    but the truth, testified as follows:
 5              COURTROOM DEPUTY:  Please state your name and
 6    spell it for the record.
 7              THE WITNESS:  Brian Pinheiro, B-R-I-A-N,
 8    P-I-N-H-E-I-R-O.
 9
10                    DIRECT EXAMINATION
11    BY MS. THOMAS:
12    Q.   Where are you currently employed?
13    A.   CFGI.
14    Q.   What is your position there?
15    A.   I am a partner there.
16    Q.   And where were you employed prior to CFIG [sic]?
17    A.   Northeast Bank.
18    Q.   How long were you employed at Northeast Bank?
19    A.   Approximately seven years.
20    Q.   In April of 2020, what was your position at Northeast
21    Bank?
22    A.   I was the chief risk officer.
23    Q.   And in April of 2020, was Northeast Bank a federally
24    insured financial institution?
25    A.   Yes.
```

1   Q.    Where is Northeast Bank located?

2   A.    They have corporate headquarters in Boston; Lewiston,

3   Maine; and Portland, Maine.

4   Q.    Is it considered a small financial institution?

5   A.    Yes.

6   Q.    As part of your duties with Northeast Bank in April of

7   2020, did you oversee or have involvement with the PPP loan

8   program?

9   A.    Yes.

10  Q.    What is Lendio?

11  A.    Lendio is a third-party fintech that Northeast Bank

12  used to help source PPP loans.

13  Q.    So correct me if I'm wrong, but if you had someone who

14  wanted to apply for a PPP loan, rather than contacting

15  Northeast Bank directly, they would use Lendio?

16  A.    Correct.

17  Q.    And then Lendio would pass along the applications to

18  Northeast Bank; is that correct?

19  A.    Yes.  Lendio had a system to source the deals and

20  gather all the documentation for the bank's review of PPP

21  loans.

22  Q.    Did Northeast Bank receive a PPP loan application

23  through Lendio from Allison Baver Entertainment in April of

24  2020?

25  A.    Yes.

Q.   Did Northeast Bank have any communications with Allison Baver about the PPP loan application?

A.   I don't believe so.

Q.   Did Northeast Bank receive multiple PPP loan applications from Lendio for Allison Baver Entertainment?

A.   I believe so.

Q.   Is that because when Allison Baver Entertainment would make an update to the application, a new DocuSign would be created and it would generate a new application to the bank?

A.   Correct.  It would generate an updated application.

Q.   But from Northeast Bank's perspective, it's basically just one application?

A.   Yes.

Q.   They all have the same application ID on them; is that correct?

A.   I'd have to look at the documents.

Q.   Okay.  Well, we will look at the documents.

         If I can have you just take a look quickly at Exhibits 13(a) through 13(l).

         THE COURT:  Have these been received?

         MS. THOMAS:  They have not.

         THE WITNESS:  What was it, 13...?

BY MS. THOMAS:

Q.   13(a) through 13(l).

A.   Okay.

1  Q.   Are those official Northeast Bank records?

2  A.   Yes.

3  Q.   And are they true and accurate records?

4  A.   Yes, I believe so.

5       MS. THOMAS:  I move for the admission of

6  Government Exhibits 13(a) through 13(l).

7            THE COURT:  Any objection?

8            MS. ANGELOS:  No objection.

9            THE COURT:  They are received.

10     (Government Exhibits 13(a) through 13(l) were received

11  into the record.)

12  BY MS. THOMAS:

13  Q.   All right.  We're going to do this a little bit

14  backwards because of the dates.  Let's start with

15  Exhibit 13(l).  And if we can look at -- I'm sorry, the page

16  with the date and signature, please.

17            Was this submitted on April 13th of 2020 and

18  signed by Allison Baver?

19  A.   Based on the time stamp, yes.

20  Q.   And then going back to the first page, please.

21            What was the number of employees listed on this

22  application?

23  A.   One hundred.

24  Q.   And then let's move to 13(k), second page on this one.

25            And was this also submitted on April 13th and

1  signed by Allison Baver?

2  A.   Yes, based on the time stamp.

3  Q.   And I am not going to force everyone to go through all

4  of these, but there is a series of applications,

5  Exhibits 13(a) through 13(l); is that correct?

6  A.   Correct.

7  Q.   And let's go to 13(a).  If we can look at the date,

8  please.

9        When was this submitted?

10  A.   April 26th, 2020.

11  Q.   And is this considered the actual application, even

12  though there were numerous prior drafts?

13  A.   If it was the most recent date, then yes.

14  Q.   And on the front page, what is the average monthly

15  payroll listed?

16  A.   4,770,583.

17  Q.   And the number of employees?

18  A.   430.

19  Q.   Let's take that blowup part down now.

20        I notice on here that there are initials

21  confirming responses, and then a signature on the last page

22  of Allison Baver.

23        Was the signature and the initials confirming

24  responses important to the bank?

25  A.   Yes.

Q.   Why is that?

A.   It was a requirement under the PPP program to certify certain information that would qualify the individual.

          MS. ANGELOS:  Your Honor, I'm going to object to in line of questioning until foundation is laid with regards to it being her signature.

          THE COURT:  All right.

BY MS. THOMAS:

Q.   Did you understand the DocuSign system that Lendio had in place with Northeast Bank?

A.   Yes.

Q.   And can you explain how that worked?

A.   The system would allow the individual to e-sign their documents.  It would provide a time stamp of the time in which they signed off and would also -- you'll see there on the left -- provide an IP address.

          THE COURT:  So there were, as you said, multiple drafts of this.  So if someone opened up a screen and started an application and didn't finish it because they wanted to go look up information or come back to it later, was there a mechanism for saving it without signing it, or how did that work?

          THE WITNESS:  I believe so.  So the way the system was set up, from my understanding, is if you made any -- so if you went through, updated the information and wanted to

proceed with signing, you could sign it.  It would have a

time stamp.  If there were any updates subsequent to that

that you made that would change the application, you would

have to go back and re-sign it.

THE COURT:  All right.  And so if an individual

started an application but didn't think that it was final

and wanted to maybe check on some information, was there a

mechanism for saving it that didn't require signing it?

THE WITNESS:  I believe so.

THE COURT:  Okay.

BY MS. THOMAS:

Q.   So to follow up on that, though, every time the

applicant made any change to the application, it would just

generate a new application that was sent to Northeast Bank

system; is that correct?

A.   Correct.

Q.   And if I can have you look at Exhibits 14(a) through

14(k).

Are you done?

A.   Yes, sorry.

Q.   Were those documents submitted in connection with

Allison Baver Entertainment's application for a PPP loan?

A.   I believe so, yes.

Q.   Were those documents in Northeast Bank's system?

A.   It would have been within the Lendio system.

1  Q.   But Northeast --

2  A.   But we had access to them.

3  Q.   Northeast Bank had access to those?

4  A.   Correct.

5       MS. THOMAS:  I move for the admission of 14(a)

6  through 14(k).

7       MS. ANGELOS:  Your Honor, we're fine with that, as

8  long as the other admissions are also admitted at this time

9  based on....

10       THE COURT:  Okay.  And what are those other

11  exhibit numbers?

12       MS. ANGELOS:  Trying to figure that out, Your

13  Honor, because the government's is different than ours.  And

14  so maybe if she can go through each one, then I can tell you

15  which ones they are.

16       THE COURT:  Well, I suppose the alternative is to

17  just admit yours as one exhibit and hers as one exhibit, and

18  then we'll make sure that all of the relevant exhibits are

19  going to the jury.

20       MS. ANGELOS:  Perfect, Your Honor.

21       THE COURT:  What number is yours?

22       MS. ANGELOS:  Your Honor, mine are going to be

23  437-A through -Y.

24       THE COURT:  Okay.  I will, at this time, admit

25  Exhibits 14(a) through 14(k) and 437-A through 437-Y.

1          And understand, Members of the Jury, one may be a

2     subset of the other.

3          (Government's Exhibits 14(a) through 14(k), and

4     Defendant's Exhibits 437-A through 437-Y were received into

5     the record.)

6     BY MS. THOMAS:

7     Q.   Now, these documents in Exhibits 14(a) through 14(k),

8     are those documents that Northeast Bank or Lendio would have

9     requested that the applicant provide?

10    A.   Some may have; some may have not been.

11    Q.   Let's look at Exhibit 14(c).  This document appears to

12    be 7a program calculations with Allison Baver Entertainment.

13          Is there anything on this document that is of

14    significance to you?

15    A.   Yes.

16    Q.   Can you tell me what that is?

17    A.   The piece that would be significant would be any

18    payroll calculations regarding salary, wages, or any other

19    expenses related to payroll.

20    Q.   So does this document show to you that for the month

21    ending March 31st of 2020, Allison Baver Entertainment had

22    $2.9 million in salary?

23    A.   Yes.

24    Q.   And the same for the month ending April 30th of 2020?

25    A.   Yes.

1    Q.    And now, if we could take a look at Exhibit 14(e).

2    This is titled (as read), "Allison Baver Entertainment

3    Seasonal Payroll Audit April 20th, 2022."

4          Does this document have any significance to you?

5    A.    Yes.

6    Q.    Can you explain what it is?

7    A.    It appears to be payroll-related information.

8    Q.    And does it appear that the individual had paid payroll

9    as of April 20th of 2020?

10   A.    The top left indicates a PE date, which typically would

11   represent a payroll ending date, and a check date.

12          THE COURT:  Can you blow up the top part of it?

13   I'm really struggling to read any of it.  Thank you.

14   BY MS. THOMAS:

15   Q.    So Exhibits 14(a) through 14(k), were they all

16   documents pertaining to Allison Baver Entertainment?

17   A.    I believe so, yes.

18   Q.    Would there be any reason in the bank's mind that there

19   would be a dispute over who signed the application for the

20   PPP loan, given that all of these supporting documents were

21   for Allison Baver Entertainment?

22   A.    Not to my knowledge.

23   Q.    Can we look at Exhibit 15, please.

24          Can you explain what this document is.

25          THE COURT:  Has this been received?

```
 1          MS. THOMAS:  It has not.

 2          THE COURT:  Okay.

 3          THE WITNESS:  This is the screenshots from an

 4   application within the Lendio system.  This would be how

 5   Northeast Bank would view a particular application.

 6   BY MS. THOMAS:

 7   Q.   So essentially, does this document just show that

 8   Northeast Bank received the application from Lendio for

 9   Allison Baver Entertainment?

10   A.   Yes.

11   Q.   And you, yourself, actually viewed this on Northeast

12   Bank's computer system; is that correct?

13   A.   It may have been an underwriter that viewed this

14   particular one.

15   Q.   But are you familiar with this appearance and

16   everything on it being from a Northeast Bank system?

17   A.   Yes.

18          MS. THOMAS:  I move for the admission of

19   Government's Exhibit 15.

20          MS. ANGELOS:  No objection.

21          THE COURT:  It's received.

22      (Government's Exhibit 15 was received into the record.)

23   BY MS. THOMAS:

24   Q.   Did Northeast Bank approve Allison Baver

25   Entertainment's $10 million PPP loan request?
```

```
1   A.    No.
2   Q.    Did Northeast Bank rely on Allison Baver's statement
3   that she had 430 employees as of April 26th, 2020?
4   A.    Based on the application, yes.
5   Q.    Did Northeast Bank rely on her statement that she had
6   4.77 million in average monthly payroll when she submitted
7   it on April 26th, 2020?
8   A.    Yes.
9   Q.    Did Northeast Bank rely on her certifications that she
10  was eligible for a PPP loan?
11  A.    Yes.
12        MS. THOMAS:  May I have just a minute, Your Honor?
13        THE COURT:  Yes.
14        MS. THOMAS:  No further questions, Your Honor.
15        THE COURT:  You may cross-examine.
16
17                    CROSS-EXAMINATION
18  BY MS. ANGELOS:
19  Q.    Good afternoon.
20  A.    Good afternoon.
21  Q.    So I think you've already talked about it, but
22  basically you received submissions from Lendio regarding
23  Allison Baver Entertainment?
24  A.    Correct.
25  Q.    And I think we talked about it.  There appear to be
```

1  multiple dates of submission, but you basically treat it as

2  one application?

3  A.   Correct.

4  Q.   So from your perspective, it is essentially the same

5  application that's being updated?

6  A.   Correct.

7         THE COURT:  So just as a practical matter,

8  obviously you got one first.  Did you start looking at that

9  one before the second one came in, or did they all come in

10 such quick succession that you didn't even get to them at

11 all until the last one, last update had been submitted?

12        THE WITNESS:  So any submission would be put in a

13 queue.  So whether or not someone had reviewed a prior

14 version or so on, I'm unsure, but....

15        THE COURT:  So you don't know if anyone reviewed

16 the first --

17        THE WITNESS:  Correct.

18        THE COURT:  -- seven of them, for example?

19        THE WITNESS:  Correct.

20        THE COURT:  Okay.

21 BY MS. ANGELOS:

22 Q.   And can I ask with regards to submissions in the month

23 of April 2020, is it fair to say that a lot of individuals

24 that were applying for bank loans may have adjusted their

25 applications after learning about -- more information about

how to calculate and those kind of things? Was that
something that was happening as people were learning?

A.   Potentially, yes.

Q.   After receiving the submission package, you never
reached out to Ms. Baver with her about her submissions, did
you?

A.   I did not personally, no.

Q.   And you didn't send any correspondence from yourself or
on behalf of Northeast to Ms. Baver, asking her to contact
you about her submission?

A.   No.

Q.   And never sent any correspondence regarding whether she
had been denied or approved?

A.   I don't believe so. Whether there was something
automatically generated and sent to her, I don't know. But
I don't believe so.

Q.   So you, yourself, never reached out to her to try and
find out why she was submitting the way she was submitting
and the documents she was submitting?

A.   Correct.

Q.   You just made a determination without ever talking to
her?

A.   I may not have made that determination. The bank would
have, whether -- yeah.

Q.   Okay. But you didn't reach out and say, These

1  documents, could you explain these documents to me?

2  A.    Not that I'm aware of.

3  Q.    Did you understand that somebody from Lendio was

4  working with Ms. Baver directly?

5  A.    I am not aware.

6  Q.    Lendio is basically the middleman between the customer

7  and Northeast, right?

8  A.    They would have been the one sourcing it and receiving

9  all of the documents.

10 Q.    Did you ever call anyone at Lendio to inquire about the

11 circumstances surrounding Ms. Baver's loan to try and

12 understand her submissions?

13 A.    Not that I'm aware of.

14 Q.    And did you ever email anyone with Lendio to inquire

15 about the circumstances surrounding Ms. Baver's loan to try

16 and understand her submissions?

17 A.    Not that I'm aware of.

18 Q.    Did anyone at Lendio ever reach out to you to discuss

19 the circumstances surrounding Ms. Baver's submissions?

20 A.    Not that I'm aware of.

21 Q.    So if Ms. Baver provided information to Lendio that

22 gave context to her submission to the bank, that would have

23 been important information for you to have?

24 A.    Can you repeat that again.

25 Q.    Sure.  If Ms. Baver had provided information to Lendio

```
 1  that gave some context to some of Ms. Baver's submissions,
 2  that would have been important to have?
 3  A.   Potentially, based on the facts and circumstances.
 4  Q.   And it would be on Lendio to provide that information
 5  to you, since they're the middle person?
 6  A.   Potentially.
 7  Q.   Well, do you have any information to suggest that
 8  Ms. Baver knew that her application went to Northeast from
 9  Lendio?
10  A.   I believe it would have been disclosed as part of the
11  application process.
12  Q.   Later, but not at the time, correct?
13  A.   As part of the application process, there's certain
14  disclosures required.  I'd have to revisit to pinpoint those
15  specific disclosures.
16  Q.   Okay.  And is it fair to say that if Lendio was
17  supposed to provide you some information regarding
18  Ms. Baver's submission that it wouldn't be Ms. Baver's
19  fault, it would be Lendio's fault for not providing that
20  information to you?
21  A.   Without knowing any specifics around the information,
22  difficult to answer yes or no.
23  Q.   You, yourself, just don't have any information because
24  you guys never made contact with her?
25  A.   I'm not aware of us making contact with her.
```

1  Q.   And I think you indicated -- did you basically

2  indicate -- label Ms. Baver's application as "Dead" when you

3  received it?

4  A.   Based on what was shown there, yes, that was the

5  designation.

6  Q.   So you didn't pursue it any further from there?

7  A.   Not that I'm aware of.

8  Q.   And was the reason that you didn't pursue it because

9  her monthly payroll numbers exceeded 8,333 per employee?

10 A.   There were various reasons why it would have been

11 labeled "Dead," you know.  Disqualifying may have been one

12 of them, as you mentioned there.

13 Q.   Okay.  But you didn't pursue any attempt to further

14 communicate with Ms. Baver regarding the numbers?

15 A.   Not that I'm aware of.

16 Q.   And as a result, Ms. Baver's submission never received

17 an SBA number?

18 A.   Correct.

19 Q.   I think you testified that you were working in the

20 capacity in 2020 of receiving and reviewing PPP loan

21 applications on behalf of Northeast, correct?

22 A.   I was -- I oversaw our risk program and built out our

23 underwriting program with the underwriting team.

24 Q.   And you're aware that the PPP loan came out around

25 April 2nd?

1  A.  I'd have to revisit the exact dates.

2  Q.  Does early April sound right?

3  A.  It was certainly up and running at that point in time.

4  Q.  Okay.  The first guidance for lenders was a borrower

5  information sheet put out by the SBA, or a frequently asked

6  questions; do you remember that?

7  A.  At the time, I was very familiar with it, but certainly

8  would have to revisit all of the documentation that came out

9  regarding the rules.

10  Q.  Do you remember those information sheets and frequently

11  asked questions just being simply guidance?

12  A.  Yes.

13  Q.  And is it fair to say that you were receiving hundreds

14  of applications per day?

15  A.  Northeast Bank was, yes.

16  Q.  And talking with multiple borrowers per day?

17  A.  Yes.

18  Q.  And multiple questions from these borrowers?

19  A.  In some instances, yes.

20  Q.  Was the information available to borrowers and lenders

21  that first month, did you think it was sometimes confusing?

22  A.  I'd certainly have to revisit it to be able to opine on

23  that.

24  Q.  Okay.  Is it fair to say that lenders were doing the

25  best they could to try and understand the rules at that

1   time?

2   A.   Yes.

3   Q.   Is it also fair to say that borrowers were doing the

4   best they could trying to understand the rules at that time?

5   A.   Yes.

6   Q.   Do you remember as the PPP program went on in later

7   months that more guidance began to come out and you began to

8   understand the program more?

9   A.   I recall there being continually updated guidance

10  throughout the process.

11  Q.   I want to talk a little bit about some of the

12  submissions that Ms. Baver submitted with her loan.  And I

13  think the government has already pulled up a table of

14  contents, but I will make sure.  If we could please pull up

15  437-A.

16          Do you remember this document?

17  A.   Not specifically as it relates to this loan, but it....

18  Q.   If I told you that it came through with the

19  application, do you have any knowledge to suggest otherwise?

20  A.   No knowledge to suggest otherwise.

21  Q.   Okay.  And then if we could pull up -- oh, if we could

22  publish that to the jury.

23          THE COURT:  Can you maybe blow some of it up?  I'm

24  struggling to read the small print.

25          MS. ANGELOS:  We will ask Ms. Miller.  And then if

we could please pull up 437-B.

BY MS. ANGELOS:

Q.   Do you remember her providing a good faith letter in her submission to Lendio?

A.   Again, similar to the other document, if it was submitted as part of the application, then yes.

Q.   No reason to suggest otherwise?

A.   Correct.

Q.   And if we could pull up 437-K and maybe highlight....

     Do you remember this being submitted?

A.   Similar to the others, if it was submitted as part of the package.

Q.   No reason to suggest it wasn't?

A.   Correct.

Q.   Okay.  And does this seem to be something from, if you look at the top, A&E Network?

A.   On the top left, it shows a -- yeah, "A&E Networks."

Q.   And if we could please look at -- oh, can I publish that to the jury?  I keep forgetting, I think.

     THE COURT:  I think they've all been admitted, so we'll just ask Ms. Miller to publish them as you get to them.

     MS. ANGELOS:  Okay.  And if we could look at 437-O.

BY MS. ANGELOS:

1  Q.   And again, the same question:  Do you have any reason

2  not to believe that this was something that was submitted

3  with the application from Lendio?

4  A.   Again, if it was directly from that Lendio system.

5  Q.   And then 437-P.

6        437-Q.  And this appears to be possibly a script.

7  Is that what it looks like?

8  A.   Yeah, I'm not sure.  Potentially.

9  Q.   And 437-V.

10       MS. MILLER:  437...?

11       MS. ANGELOS:  V.

12  BY MS. ANGELOS:

13  Q.   Does this appear to say, "Monsters, a film by Jessa

14  Zarubica"?

15  A.   Yes.

16  Q.   Okay.  And then 437-W.  And this was a -- if you could

17  maybe scroll a couple of the pages -- possibly a script?

18  A.   Correct.  I think the first page mentioned, "A comedy

19  written by."

20  Q.   If you could pull up 13-1 of the government.  Sorry,

21  13(i).  I just need to read my writing.  Let's try the one

22  before.

23       So I just wanted to point out something, and if

24  you could highlight, Ms. Miller, the number of employees

25  that's listed as 100.  And maybe if you could go down, first

off, and tell me the date that this was submitted -- or show
the date.

     So does this appear to show the date of 4/13/2020?
A.   Based on the time stamp, yes.

     MS. ANGELOS:  And this is admitted, so this is
published to the jury, correct?

     Okay.  If we could go back to the first page.
BY MS. ANGELOS:
Q.   So I'm looking at 100 employees.  Under the rules, was
there a maximum of $100,000 per employee under the SBA
guidelines at the time?
A.   There was a limit in the amount that you could recoup
per employee.
Q.   Okay.  And so looking at this, does it look like the
number of employees at 100 times 100,000 would have been
$10 million.
A.   Trying to see how many zeros are there.  If that....

     THE COURT:  Maybe we could blow up the relevant
part.

     THE WITNESS:  There were separate, you know --

     MS. ANGELOS:  Yes.

     THE COURT:  There we go.

     THE WITNESS:  Maybe if you want to repeat that, I
don't know if I can make that --
BY MS. ANGELOS:

1  Q.   So there's 100,000 max per employee.  And if you times

2  that by the number of 100, that gets to 10 million; is that

3  correct?

4  A.   One hundred times 100,000 is 10 million, I believe,

5  yes.

6  Q.   So this is an early application that Ms. Baver is

7  filling out.  Is it fair to say that she may have not

8  understood how to calculate, based on the number going from

9  100 to 430 simply by --

10        MS. THOMAS:  Objection.  She's asking for her

11  statement --

12        THE COURT:  I understand that.  Let her ask the

13  question.  If he doesn't know the answer, he can tell her

14  that.

15        THE WITNESS:  Yeah, without -- I wasn't the one

16  that applied for it, so certainly I can't suggest one way or

17  another what someone else was thinking.

18  BY MS. ANGELOS:

19  Q.   I think what you can tell us, though, is that as people

20  were applying, they were learning the rules more and may

21  have adjusted their applications or payrolls as they

22  learned.

23  A.   Yeah, there were certainly changes throughout the

24  process that -- based on guidance.

25  Q.   Okay.  Just give me a minute.  No further questions.

267

```
 1              THE COURT:  All right.

 2              Any redirect?

 3              MS. THOMAS:  Just one question.

 4

 5                      REDIRECT EXAMINATION

 6   BY MS. THOMAS:

 7   Q.   Is the formula on the actual PPP loan application how

 8   to calculate the number?

 9   A.   If you want to pull it up, I can certainly....

10   Q.   Page 3 of any of the 13-numbered exhibits.

11   A.   So there is, yeah, "Average Monthly Payroll."  Then

12   there's a -- you can see there times two and a half plus

13   EIDL net advances.

14   Q.   And on page 3, does it specifically tell the applicant

15   how to calculate average monthly payroll?

16   A.   Correct.

17   Q.   Thank you.  No further questions.

18              MS. ANGELOS:  Can you pull that back up for a sec.

19              MS. MILLER:  Which exhibit was that?

20              THE COURT:  It was 13(a).

21              THE WITNESS:  It could be the second page of any

22   one of them, or the -- yeah.

23              THE COURT:  I think it was page 3.

24              MS. ANGELOS:  It's page 3.  And if you could

25   highlight that again, Ms. Miller.  Just "For purposes of...
```

```
 1  monthly payroll."  No, paragraph 3.  No, "For purposes" --
 2           MS. MILLER:  Sorry.
 3           MR. HUNT:  Yeah, you're there.  There we go.
 4           MS. ANGELOS:  There we go.  And are you able to
 5  highlight "most"?
 6  BY MS. ANGELOS:
 7  Q.   And just asking the question:  It does indicate that
 8  most applicants will use the average, correct?
 9  A.   Repeat that.
10  Q.   You can see in the sentence, "For purposes of
11  calculating average monthly payroll" --
12  A.   Correct.
13  Q.   -- it's "most."  So not all, correct?
14  A.   I'm not really sure what, I guess a specific question.
15           MS. ANGELOS:  No further questions.
16           THE COURT:  All right.  May this witness be
17  excused?
18           MS. THOMAS:  Yes, Your Honor.
19           THE COURT:  All right.
20           From the defense's standpoint, may this witness be
21  excused?
22           MS. ANGELOS:  Yes, Your Honor.
23           THE COURT:  Thank you, sir.  You may step down.
24           You may call your next witness.
25           MS. MUYSKENS:  Thank you, Your Honor.  The United
```

1  States calls Michael Buccella.

2          COURTROOM DEPUTY:  Please raise your right hand.

3          You do solemnly swear that the testimony you shall

4  give in the case now before the Court to be the truth, the

5  whole truth, and nothing but the truth so help you God?

6          THE WITNESS:  I do.

7          COURTROOM DEPUTY:  Please take a seat.

8

9                    MICHAEL BUCCELLA,

10  was called as a witness, and having been first duly

11  sworn to tell the truth, the whole truth, and nothing

12  but the truth, testified as follows:

13          COURTROOM DEPUTY:  Please state your name and

14  spell it for the record.

15          THE WITNESS:  Michael Buccella, B-U-C-C-E-L-L-A.

16

17                   DIRECT EXAMINATION

18  BY MS. MUYSKENS:

19  Q.   Mr. Buccella, where do you live?

20  A.   Long Island, New York.

21  Q.   When you said "Long Island," I heard a little accent.

22          How long have you lived there?  How long have you

23  lived in New York?

24  A.   All my life, born and raised.

25  Q.   Where do you work?

1   A.   I work for A&E Television Networks.

2   Q.   How long have you worked for A&E?

3   A.   Twenty-four years this September.

4   Q.   And what are your responsibilities with A&E?

5   A.   I started out on the sales team, and I did advertising

6   sales for about 17, 18 years.  And then I moved into our

7   programming partnership groups, which does sales, as well,

8   in addition to advertising sales.

9   Q.   So you just said promotional partnership?

10  A.   Program partnerships.

11  Q.   Program partnership.

12          And how does program partnership differ than

13  advertisement sales?

14  A.   Program partnerships, we basically partner with

15  producers' brands to distribute -- air their television

16  shows and programs on the A&E Network channels for a fee.

17  Q.   For a fee that A&E pays, or for a fee that they pay to

18  A&E?

19  A.   A&E receives the money to air the program.

20  Q.   Have you ever heard of the term "buy time"?

21  A.   Yes, buy-time/time-buy could be used interchangeably.

22  Q.   And what does that refer to in your industry?

23  A.   In our industry, it refers to when someone has a

24  program that they wish to air on our networks that is not

25  commissioned and developed by the network.  It can be done

1  in a time buy, where we offer a fee along with promotional

2  assets and a place to distribute that program on our

3  networks.

4  Q.    So in the buy time or time-buy relationship, who is

5  responsible for paying to create the episodes for the show?

6  A.    The producers are responsible for creating the

7  episodes.  They will own the episodes.

8  Q.    And who is responsible for paying A&E to get those

9  episodes on the air?

10  A.    The producer is responsible for paying.

11  Q.    Did A&E ever enter into a distribution agreement with

12  Allison Baver Entertainment to put any show on the air?

13  A.    We did not have a signed contract for distribution, we

14  were in talks for distribution.

15  Q.    So you said you were in talks.

16        When you say a "signed contract," what is required

17  at the time of contract signing?

18  A.    Typically, we require a 20 percent deposit to hold the

19  time slot and not sell that time slot to anyone else.

20  Q.    And what else has to be delivered to A&E in advance of

21  putting the show on the air in addition to the money?

22  A.    We need the show delivered two weeks before airing;

23  therefore, we can have the appropriate promotion.  But the

24  show must be in house two weeks before airing before we can

25  air it.

1    Q.   So you mentioned that you were in talks with Allison

2    Baver Entertainment about a show; is that correct?

3    A.   That's correct.

4    Q.   Is this a show that would have been under this buy time

5    or time-buy scenario?

6    A.   Yes.

7    Q.   Now, as part of those discussions, did you and other

8    A&E employees engage in email communications with

9    Allison Baver as part of these talks?

10   A.   Yes.

11   Q.   And does A&E maintain its email communications that are

12   sent to and sent by its employees who are engaged in

13   business?

14   A.   Yes, it does.

15   Q.   And are these communications maintained by A&E as part

16   of its regular course of business?

17   A.   Yes, they are.

18   Q.   I'm going to ask you to take a look in the binder in

19   front of you at Government's 50 through 58.

20        Have you seen these documents before?

21   A.   Yes.

22   Q.   Are these true and accurate copies of email

23   communications with Allison Baver regarding a show,

24   *America's Angels*, and A&E employees, to include yourself?

25   A.   Yes, they are.

1     MS. MUYSKENS:  At this time, the government offers

2  into evidence Government's Exhibits 50 through 58.

3     THE COURT:  Any objection?

4     MS. ANGELOS:  If I may just have a moment, Your

5  Honor.

6     We don't object, Your Honor.

7     THE COURT:  They are received.

8     (Government's Exhibits 50 through 58 were received into

9  the record.)

10  BY MS. MUYSKENS:

11  Q.   Now, I want to show you Government's Exhibit 50, and it

12  will also come up on the screen, so whatever is easiest for

13  you to read.

14     So Government's Exhibit 50, this is an email sent

15  by Allison Baver to you and others on October 22nd of 2019;

16  is that correct?

17  A.   That is correct.

18  Q.   Now, at this time, October 22nd of 2019, had there been

19  any talks with A&E and Allison Baver about a show referred

20  to as *America's Angels*?

21  A.   Yes, there has.

22  Q.   Had there been any signed contract or deal?

23  A.   No signed contract, just talks.

24  Q.   And reading the email, the question is, "...let me know

25  if there is a time you'd like to formally discuss

```
 1  distribution on Lifetime and have any deal points I can
 2  present to my attorney"; is that correct?
 3  A.    That is correct.
 4  Q.    So at this time, no distribution deal.
 5          Now, you said you're with A&E Networks?
 6  A.    Correct.
 7  Q.    We see a reference to Lifetime.
 8  A.    Correct.  A&E Television Networks is A&E, Lifetime,
 9  History Channel.
10  Q.    Thank you.  But for purposes of negotiation --
11  A.    And FYI.
12  Q.    And FYI.  We'll get to FYI in a second.
13          For purposes of negotiation, this is speaking to
14  Lifetime, but you as an A&E employee would be having those
15  discussions with partners?
16  A.    Correct.
17  Q.    Thank you.  If we could pull up Government's
18  Exhibit 51.
19          Government's Exhibit 51, this is an email from
20  Jordan Harman to Allison Baver on December 2nd of 2019.  And
21  I just have a question.
22          Who is Jordan Harman in the A&E employee scheme?
23  A.    Jordan Harman is my counterpart that oversees the
24  creative for the time-buy shows that we work on.
25  Q.    Okay.  So you've used the term "creative."  Before, you
```

1  said you were sales?

2  A.   Umm-hmm.

3  Q.   Is that a yes?

4  A.   Yep, that is a "yes."

5  Q.   So you're the money.  And creative, is that the

6  crayons?

7  A.   Exactly.  I put together the deal structure.  Jordan

8  takes a look at the show that comes in to make sure that the

9  production quality is at a place that we can put it on air

10  and also just gives some friendly advice on how to produce

11  and how to develop programs.

12  Q.   So the email here communicates, and it attaches a

13  series of documents which were also included as Government's

14  Exhibit No. 51.  It says, "FYI At-A-Glance."  There's also

15  "Lifetime At-A-Glance," and Lifetime Digital Q4 with a

16  pricing proposal; is that correct?

17  A.   That is correct.

18  Q.   So this refers to it as "FYI."  Does that mean "For

19  Your Information"?

20  A.   It does not, but it -- it's just the name of the

21  network.  The "I" was supposed to be a creative inspiration,

22  information, whatever you want to perceive it as.

23  Q.   Am I correct in understanding, does this email reflect

24  a pricing proposal for 11 one-hour episodes to be broadcast

25  on the channel FYI on Saturdays at 10:00 a.m., and it would

1  also air as a Digital Original Series on mylifetime.com?

2  A.    That is correct.

3  Q.    And FYI as a channel, if we're not familiar with it,

4  where does that stack in the -- you said A&E and Lifetime.

5  Where does it fall?

6  A.    That's our Tier 2 cable channel.  It's not as widely

7  distributed as the A&E, Lifetime, and History networks.  So

8  it's typically on a pay tier or a second tier.

9  Q.    If we could go to the last page of this exhibit.

10         And on the last page of Government's Exhibit 51,

11  is this the kind of snapshot pricing proposal that Jordan

12  Harman and A&E sent to Allison Baver in December of 2019?

13  A.    Yes, this is.

14  Q.    So there's a highlighted portion that says $354,084.

15  What is that?

16  A.    That is the net cost due to A&E for distribution

17  promotion purposes.

18  Q.    That's how much Allison Baver Entertainment would have

19  to pay?

20  A.    Correct.

21  Q.    To air on FYI, the Tier 2?

22  A.    To air 11 weeks on FYI along with the digital

23  mylifetime distribution.

24  Q.    And under "PAYMENTS & SCHEDULES," it reads (as read),

25  "20% nonrefundable at contract signing, the balance of the

1  payment to be paid in equal installments 90, 60, and 30 days

2  prior to premiere."

3  A.    That is correct.

4  Q.    What does that mean?

5  A.    Basically, when we reserve that time slot for our

6  client, we require a 20 percent down payment that we do not

7  distribute -- or resell that time period.

8        The nonrefundable contract is signed just to make

9  sure that the parties that are involved are serious about

10 partnering.  And the rest of the payments are basically due

11 before the airing of the program, so the network does

12 receive all of its money prior to airing any content.

13        THE COURT:  Can I just ask a question?

14        So the producer spends all the money to make the

15 production, and they pay you to put it on the air.

16        What do they get out of the deal?  I'm just really

17 confused why anyone would spend money to make a movie and

18 pay you to air it.

19        THE WITNESS:  Well, right now, when a producer

20 does that, they own the rights inside the program to sell

21 sponsorships.  In addition, when they own the content, they

22 have the rights to sell that in a global content market,

23 especially now, due to Netflix, Hulu, and all these other

24 side distributions.  If the program does well, there's a

25 better deal that could be in hand.  That possibly means that

1  the network would purchase that show.

2        But when the producers own it, they own the IP,

3  and they are able to sell that and monetize it however they

4  think they can.

5        THE COURT:  And they can sell advertising to air

6  in the middle of the show on the program, for example?

7        THE WITNESS:  So there's two types of packages.

8  Some producers don't want to sell any advertising.  They

9  want a lesser rate, and they want to give that up because

10  it's very difficult to sell advertising.  So we offer the

11  option either to sell advertising, commercial spots, or not.

12        Other than that, the primary form of funding your

13  show is sponsorship sales, a brand to be in the show,

14  actively used in the show.  And then a lot of times our

15  production partners use their own digital asset sites to

16  make that deal better.

17        THE COURT:  Okay.  Sorry for the digression.  I

18  was just curious.

19        MS. MUYSKENS:  It was actually on my list of

20  questions.  I'll mark it off.

21  BY MS. MUYSKENS:

22  Q.   The question was:  How does anyone make any money on

23  this?  But you've answered it.

24        But this proposal, you just mentioned, well, the

25  cheaper is with no ad times that they control; the more

1    expensive is with ad times.

2    A.    Correct.

3    Q.    What is this proposal, with ad times or no ad times?

4    A.    This one, in particular, looks like it has five units

5    included per hour.  So it says Friday -- no, it says FYI,

6    Saturdays, 10:00 a.m., 11 weeks, 35,000 viewers in that time

7    period previous, included 35 units per hour.  And then you

8    can buy additional time for 286 per unit.

9    Q.    All right.  So you lost me there.  This is just the

10   pricing proposal.

11          Were there ads included or no ads included in

12   this?

13   A.    Five ads were included.

14   Q.    Five ads?

15   A.    Per week.

16   Q.    Per week.  Okay.

17          So if we could go to Government's Exhibit 52.

18          So this was sent on December 2nd, 2019, and A&E

19   received a response on December 2nd, 2019, from Allison

20   Baver.  It said, Thanks for the proposal, we'll be in touch;

21   is that correct?

22   A.    Yes.

23   Q.    Was a contract signed after this proposal was sent?

24   A.    No contract.

25   Q.    Did ABE ever pay a 20 percent nonrefundable under any

proposal?

A.   A&E did not receive any money.

Q.   Going to Government's Exhibit 53.

     Now, March 6th of 2020, so now we're into March, several months before.  Are there continuing discussions at this point about the possibility of entering into a contract?

A.   Yes, there are.

Q.   And we'll see there are a series of questions back and forth.  This is Jordan, and I believe he's responding in the capitals to the questions posed by Allison Baver on March 6th; is that correct?

A.   That's correct.

Q.   All right.  And one of the questions is a mention of a company called "Six West."  What's Six West?

A.   Six West is our internal, in-house production team at A&E Television Networks.

Q.   Is that a production team that could be used at no cost to Allison Baver Entertainment?

A.   No, the cost of production.  They would pay -- the producer would pay the cost of production to Six West, who would produce the program.

Q.   And also in the last line (as read), "Do you guys have any studio or cameras that could provide any cost savings to my company?"

1          Is that something that A&E provides to these
2     time-buy deals?
3     A.    Not really.  We don't have a very big studio that can
4     take on a full program.
5     Q.    Going to Government's Exhibit 54.
6          So about an hour and a half later, an email that
7     proposes a screenshot of a budget for what's looking like
8     eight episodes for the format, and Allison Baver says
9     shooting one episode per day, although some episodes could
10    be two.  And this transmitted a budget and talked about
11    Googling for salaries and information.
12         Was it typical for A&E to receive a budget from a
13    producer that was doing a time buy?
14    A.    Not typical to receive a budget, but I think just
15    helping out, taking a look at the material.
16    Q.    And at the end, it requests a professional eye to
17    confirm her project budget aligns with Six West.  Asking
18    about resources to lower the start-up cost risks, and help
19    with financing conversations; is that correct?
20    A.    Yes.
21    Q.    Government's Exhibit 55.
22         About two weeks later, is there an exchange back
23    and forth with Jordan Harman and Allison Baver?  I'd like to
24    focus on the bottom email first.
25         It states -- in the "Bondit Media," states, "has

1  offered for my company to debt finance the first season of
2  *America's Angels* against a licensing agreement and I was
3  wondering if you can kindly consider licensing the show?"
4          Those seem to be industry terms.  Do you
5  understand what that's asking?
6  A.    I do.
7  Q.    What is it?
8  A.    "Licensing the show" is when A&E pays to distribute
9  that program and has the rights to distribute that program
10 on its channels.
11 Q.    So this takes it out of the time-buy scenario?
12 A.    This does.  There's money exchanged from A&E networks
13 to a producer and for a program.
14 Q.    And is that something A&E wanted to do with *America's*
15 *Angels*?
16 A.    Our team did not have a budget to produce programs or
17 license programs.
18 Q.    So was the answer no, we don't do that?
19 A.    (No audible response.)
20 Q.    Okay.  Going to Government's Exhibit 56.  I'm asking to
21 go to the last page of that exhibit.  Another string of
22 emails, and the jury will have this in the back.
23         May 4th of 2020 at 1:00 p.m., so about six weeks
24 later after A&E says it won't license.  "Wanted to follow-up
25 and let you know that Allison Baver Entertainment was able

to secure the financing for America's Angels!  I know this
is happening at a historical time.  Please let me know how
we can fast track any agreement."

          Do you recall receiving this?

A.    Yes.

Q.    At that point, May 4th of 2020, was there any agreement
in place?

A.    No signed contract.

Q.    Okay.  I want to go to Government's Exhibit 57.  If we
could go to page 3.  Thank you.  So this is an email that's
sent to A&E on May 7th.

          And did you understand what this email was asking?
It appears to be from an attorney on behalf of Allison Baver
Entertainment.  Do you understand what this email, now sent
on May 7th, is asking?

A.    I do.

Q.    What is it?

A.    They're considering a number of different proposals.
One would be a proposal on FYI and Lifetime linear, meaning
the TV network versus the digital assets in three levels in
prime time; one with all of the commercial inventory to be
sold by the producer, one with 50 percent of the commercial
inventory sold to the producer, and one with none of the
commercial inventory sold to the producer, with the
exception of local avails, which it says, which are

controlled by the local cable networks.  And please include

digital and promotional elements, as we did in the past.

Q.   Now previously, a pricing proposal that was for Q4 of

2020 had about 354,000 that would be paid to A&E to be run

on the second tier, FYI, at Saturdays at 10:00 a.m., right?

A.   Correct.

Q.   Same request but for Lifetime prime time.  What does

that put you at?

A.   Lifetime prime time is very expensive.  It could be

anywhere between 200 to 350 per hour, depending on the day,

time, type, and time of year.

Q.   So that would be per episode?

A.   Per episode per week.

Q.   Did A&E offer a pricing proposal for Lifetime prime

time?

A.   We didn't offer a specific proposal, I think we just

talked about the cost of entry on that.

Q.   And that cost would be in the millions of dollars?

A.   Yeah, over 3 million.

Q.   Was that ever explored further?

A.   No, I don't recall.

Q.   And the final exhibit, Government's Exhibit 58.  Go to

the bottom, the last page, please.

        On September 8th of 2020, does Jordan Harman email

Allison Baver Entertainment, circling back to see what's new

1  on the *America's Angels* side of things?  Is that correct?

2  A.    That is correct.

3  Q.    And as of September 2020, was there any agreement or

4  contract in place to air *America's Angels*?

5  A.    No contract in place.

6  Q.    Has A&E, since 2020, ever signed a contract with

7  Allison Baver Entertainment?

8  A.    No.

9  Q.    Have you ever seen an episode of *America's Angels*

10  presented at A&E?

11  A.    I have not seen one.

12  Q.    And has Allison Baver Entertainment ever paid that

13  20 percent nonrefundable to secure their time to air?

14  A.    No, we did not receive money.

15  Q.    Thank you.

16        MS. MUYSKENS:  Court's indulgence.

17        No further questions.

18        THE COURT:  Ms. Angelos?

19

20                    CROSS-EXAMINATION

21  BY MS. ANGELOS:

22  Q.    Good afternoon.

23  A.    Hello.

24  Q.    So giving proposals to people in the entertainment

25  industry who want to work with A&E is sort of part of your

1  usual course of business, or your job?

2  A.    Yes.

3  Q.    It's something you do on a regular basis?

4  A.    Yes.

5  Q.    And you've been doing this for about 24 years?

6  A.    I've been doing these types of proposals for about six

7  years.

8  Q.    And so you've given a lot of proposals to a lot of

9  people in the entertainment industry?

10  A.    Yes.

11  Q.    It's no big deal to you?

12  A.    Correct.

13  Q.    You're not an individual in the entertainment industry

14  who is on the other side of the receiving end, are you?

15  A.    No.

16  Q.    And not the individual that's seeking a collaboration

17  with A&E?

18  A.    Correct.

19  Q.    And you're not the individual seeking to work with

20  A&E --

21  A.    Correct.

22  Q.    -- correct?

23          You're a big network with a big viewership base.

24  For those on the receiving end of getting a proposal, is it

25  fair to say that's a pretty big deal?

```
1    A.    Big deal?

2    Q.    Big deal.

3    A.    Yes.

4    Q.    Okay.  They get to possibly work with A&E, fair?

5    A.    Yes.

6    Q.    And they possibly get to distribute their film or show

7    on a big network?

8    A.    Correct.

9    Q.    And they get to have something on A&E they worked

10   really hard on prior to even coming to pitch the idea at

11   A&E, correct?

12   A.    Correct.

13   Q.    Because in order to pitch to A&E, you have to have a

14   lot of work on the front end; fair to say?

15   A.    Yes.

16   Q.    So is it fair to say that somebody new to the industry,

17   I imagine getting a proposal from A&E would be an even

18   bigger deal?

19   A.    Yes.

20   Q.    Were you aware that Ms. Baver was new to the

21   entertainment industry?

22   A.    No.

23   Q.    You are aware that Ms. Baver received a proposal from

24   A&E in November or December of 2020, correct?

25   A.    Yes.
```

1   Q.   And if we could pull up Government's Exhibit 51.  And

2   if you could go to the back.  Are you able to pull that out,

3   Ms. Miller?  And I want to focus a little bit in the top

4   left.  If you could highlight "4Q'20, America's Angels."

5   A.   Umm-hmm.

6   Q.   So it was anticipated in this proposal that the airing

7   would happen sometime in the fourth quarter of 2020?

8   A.   Correct.

9   Q.   And so in order to do that, does someone need to be in

10  principal filming sometime before that, for example, spring

11  2020?

12  A.   Yes.  You can get closer, but I don't handle the

13  creative side.

14  Q.   And it looks, if I'm correct, that A&E proposes 11

15  one-hour episodes?

16  A.   Correct.  That was what was requested.

17  Q.   And I think we already talked about it, to be broadcast

18  on Saturdays at 10:00 a.m.?

19  A.   Correct.

20  Q.   And that A&E would promote *America's Angels* by social

21  media and digital?

22  A.   That is correct.

23  Q.   Is it also correct that they were going to assign an

24  executive producer to help with the series?

25  A.   That is correct.

Q.   And assuming principal production had to happen in
spring in order to get this out, there's other work that has
to be done on the back end after principal filming, correct?
A.   Correct.
Q.   There has to be editing before distribution, and there
has to be marketing before distribution?
A.   Correct.
Q.   So for a Q4 distribution, filming in spring 2020 would
be a good goal?
A.   I think so.
Q.   Were you aware that Ms. Baver met with individuals from
A&E in February in New York?
A.   Yes.
Q.   Okay.  And that was to be an introduction to Six West
productions?
A.   Yes.
Q.   Okay.  And that was in order for Six West to
collaborate on *America's Angels* and do an in-house
production?
A.   Yes.
Q.   So let's talk about what happens after May 4th -- on
May 4th.  If you could, please, go to, I think it's
Government's Exhibit 52.  Okay.  Just give me a second.  If
you could do Government's 56.

          So it looks like Ms. Baver reaches out to you and

1  Jordan Harman and a whole bunch of others on May 4th?

2  A.  Yes.

3  Q.  And do you understand from those emails between you and

4  Ms. Baver and others that she wants to involve and hire a

5  production team immediately?

6  A.  Yes.

7  Q.  And she wants to have you assist with locking in the

8  crew and the production schedule?

9  A.  Yes.

10  Q.  And those conversations surround getting Ms. Baver

11  linked up with the Six West production again?

12  A.  Yes.

13  Q.  And your understanding is that she, again, wants to

14  work with Six West, A&E's in-house production crew?

15  A.  Yes.

16  Q.  And do you remember having a Microsoft or Teams meeting

17  with Ms. Baver shortly thereafter on May 6th?

18  A.  I don't remember that one.

19  Q.  Let's see if I can -- is there an individual by the

20  name of Henry Foggo?

21  A.  Yes.

22  Q.  And who is that individual?

23  A.  He's a coordinator in our group that sets up meetings.

24  Q.  And I think that you indicated that you are -- you have

25  all of these emails as part of your business records; is

1  that correct?

2  A.   Correct.

3  Q.   Could you pull up, Ms. Miller, 486-E?

4          MS. MILLER:  E?

5          MS. ANGELOS:  Yes, E.

6  BY MS. ANGELOS:

7  Q.   Does this help give you any information with regards to

8  the possibility of a meeting taking place?  Oh, that's

9  January.  I apologize.  I'm getting my dates mixed up.

10         Actually, let's go back to May 4th a little bit.

11 Can you pull up Defense Exhibit 486-J.

12         And this is, if you're looking at it, this is sort

13 of the email with the discussions about her hiring the

14 production team immediately, correct?

15 A.   Yes.  I'd have to take a closer look at it, yeah.

16         Yes.

17         MS. ANGELOS:  Your Honor, defense counsel moves to

18 admit this exhibit at this time.

19         THE COURT:  Any objection?

20         MS. MUYSKENS:  It's already included in

21 Government's Exhibit 56, so no objections from the

22 plaintiff.

23         THE COURT:  Okay.

24     (Defendant's Exhibit 486-J was received into the

25 record.)

BY MS. ANGELOS:

Q.   And then if we can look at 486-K.

And this is, if you're looking at it, do you recognize this email with regards to conversations between you and Ms. Baver and others?

A.   I don't recognize it, but I'll take a quick look at it.

Q.   Okay.

A.   Yep.

Q.   Does it appear that Mr. Harman is now reaching out, sort of talking about the proposal again and getting up to speed with the proposal again?

A.   Yes.

MS. ANGELOS:  Move to admit this -- is this part of yours already?

THE COURT:  Is it --

MS. MUYSKENS:  No objection.

THE COURT:  All right.  It's received, if it's not already admitted.

(Defendant's Exhibit 486-K was received into the record.)

MS. ANGELOS:  And if we could publish that to the jury.

THE COURT:  And again, maybe my eyes aren't so good, but I don't think they can read that from their seats --

1        MS. ANGELOS:  Okay.  How about we highlight the --

2        THE COURT:  -- so publishing it doesn't help if

3   it's too small to read.

4        MS. ANGELOS:  How about -- thank you -- and if you

5   could pull out the bottom with Mr. Harman.

6   BY MS. ANGELOS:

7   Q.   Okay.  Now, going back to May 6, I'm going to ask for

8   you to look at 486-L to see if this refreshes your memory at

9   all.

10       Does it appear that you had a meeting with her?

11  A.   Yes.

12  Q.   Okay.  So there's also a discussion at this time -- and

13  we already mentioned it -- between A&E -- revisiting the A&E

14  proposal that has now passed; is that fair to say?

15  A.   Yes.

16  Q.   And the understanding between the parties is that you

17  need to begin working on a new proposal?

18  A.   Yes.

19  Q.   And in these discussions between Ms. Baver and A&E, are

20  you aware she's hired an attorney in New York to assist in

21  negotiations with the A&E offer?

22  A.   Yes.

23  Q.   And do you recognize the individual by the name of

24  Andrew Velcoff?

25  A.   I believe that was the name that was on the email.

1   Q.   Okay.  Do you need to be -- would you like to be
2   refreshed?
3   A.   Yeah, just to see if I -- it sounds familiar, but I
4   want to be 100 percent sure.
5   Q.   Okay.  Let me see if he is -- if we could pull up
6   486-N.
7   A.   Yes, that's the name.  I just don't remember the first
8   name, which is why I didn't want to....
9   Q.   And let's pull up 486-M also, if we could.  And this is
10  sort of the discussion about the new proposal?
11  A.   Yes.
12       MS. ANGELOS:  Move to admit -- unless it's already
13  been admitted.
14       MS. MUYSKENS:  I believe it's already admitted,
15  but no objection.  We'll work out the numbers later.
16       MS. ANGELOS:  And if we could publish that to the
17  jury.
18  BY MS. ANGELOS:
19  Q.   So this is sort of talking about what you could do in
20  the future.  And if you could highlight, Ms. Miller, where
21  "Primetime" is, right below it, "Q12021."
22       So the new idea was to try and get this proposal
23  and get into distribution in Q1, 2021; is that fair?
24  A.   That's fair.
25  Q.   And in these discussions, it's -- do you remember?

It's ten episodes, it's 60 minutes an episode, correct?

A.    At the time, it changed to ten.  It was 11 before.

Q.    And are there continued discussions through the month of May regarding *America's Angels*' future proposals surrounding distribution?

A.    I believe there are.

Q.    And do you -- are you aware if Ms. Baver eventually received another proposal?

A.    I don't remember the exact proposals that went out from....

Q.    If you could pull up 486-O.  And I'll have you look at that.

A.    Yes.

THE COURT:  Has this one been received?

MS. ANGELOS:  It has not, Your Honor.

MS. MUYSKENS:  No objection.

THE COURT:  All right.  Then let's receive it so we can publish it to the jury.

(Defendant's Exhibit 486-O was received into the record.)

MS. ANGELOS:  Let's publish that to the jury.  And if you could sort of highlight that.

BY MS. ANGELOS:

Q.    So this appears to be a proposal that was given to Ms. Baver on August 13th; is that correct?

1  A.    Yes.

2  Q.    And is it fair to say that Jordan Harman was sort of

3  working with Ms. Baver on this new proposal deal through the

4  summer?

5  A.    She may have been advising him on what they want.  It's

6  all about what the client would like to do, not what we're

7  proposing.

8  Q.    And I think my question -- that was a bad question.

9          Are you aware if Jordan Harman was out at some

10  point in the summer of 2020 for either a baby or surgery?

11  A.    Yes.

12  Q.    Okay.  So he was out a little bit of time during the

13  summer?

14  A.    Correct.

15  Q.    Which explains why the proposal may have not been given

16  until August 13th?

17  A.    Correct.  This is a proposed proposal.  The official

18  proposals typically come in the form that you saw

19  previously.

20                (Court reporter interruption.)

21  A.    That you saw previously, that Excel sheet.

22  Q.    And if we could show 486-P.  And I do not believe this

23  one's been admitted, but if we could blow this up.

24          Does this appear to be the actual proposal?

25  A.    Yes, that is it.

1          MS. ANGELOS:  And may I move to admit this?

2          MS. MUYSKENS:  No objection.

3          THE COURT:  It's received.

4      (Defendant's Exhibit 486-P was received into the

5  record.)

6          MS. ANGELOS:  And publish this to the jury.

7  BY MS. ANGELOS:

8  Q.   So this is the actual proposal that she received from

9  Jordan Harman on August 13th, 2020?

10 A.   That is correct.

11 Q.   As far as proposals, do they have a certain amount of

12 time prior to them expiring, maybe a period of 90 days, 120

13 days?

14 A.   We say that the pricing is good for, I believe, four

15 weeks.  Pricing is in net, subject to change four weeks

16 following submission based upon market conditions.

17          So yeah, four weeks.  But we try to be good

18 partners and help out people, so....

19 Q.   So it could go longer?

20 A.   Yes.

21 Q.   Okay.  And are you aware that Ms. Baver and Jordan

22 Harman reached out and touched base in September of 2020?

23 A.   I am not aware.

24 Q.   Okay.  If we could please show 486-Q.  And that may be

25 one of yours too.  So this is -- this is in as an exhibit.

1  If we could publish this to the jury.  And then if we could

2  go down to the second page of this.  And if we could

3  highlight, "We received."

4          So they're having a conversation, and it appears

5  that Mr. Harman is checking on Ms. Baver, and she's

6  explaining what's happening with regards to A&E; is that

7  fair to say?

8  A.    Yes.  I'd have to read through it, but yes.

9  Q.    Okay.  So COVID happens in spring 2020, right?

10  A.    Yes.

11  Q.    And is it fair to say that the entertainment industry

12  may have gotten word of COVID earlier because of having

13  productions in other countries?

14  A.    I guess so, yeah.

15  Q.    Did A&E get any word of COVID earlier because of the

16  people that you had in other countries?

17  A.    I don't know.

18  Q.    Okay.  COVID threw a wrench in the entertainment

19  industry, didn't it?

20  A.    Certainly did.

21  Q.    It threw a wrench in A&E's planned distributions during

22  that year?

23  A.    It did.

24  Q.    Okay.  Did it throw a wrench in A&E's programming that

25  year, if you had new programming that was supposed to be

1  completed?

2  A.  We had a lot of programs that were already completed

3  and just rolling out.

4  Q.  Okay.  Were planned distributions put on hold?

5  A.  Some, yes.

6  Q.  Was any planned programming put on hold?

7  A.  I can't speak to that.

8  Q.  Okay.  Well, is it fair to say that during the time of

9  COVID that actors couldn't film scenes together?

10 A.  In some cases, yes.  That depends on the length of

11 COVID.

12 Q.  And production crews couldn't really be on set

13 together?

14 A.  It all depends on the show and the situations there.

15 There was a time where they could and a time where they

16 couldn't.

17 Q.  Speaking of a certain time, let's say April to August

18 of 2020.

19 A.  I mean, my shows, I didn't -- I don't remember.  But

20 yes.

21 Q.  In general?

22 A.  In general, yep.

23 Q.  Okay.  And do you remember the entertainment industry

24 sort of starting to open up in September of 2020?

25 A.  I do.

1   Q.   Okay.  Meetings in person with producers couldn't

2   happen during that time?

3   A.   Correct.

4   Q.   And so meetings in person with directors could not

5   happen at that time either?

6   A.   Correct.

7   Q.   Did funding dry up for many of those that A&E was

8   working with?

9   A.   In what capacity are we working with now?

10  Q.   In the time-buy proposals, for example.

11  A.   Yes, we did have a pause in the time-buy space.

12          MS. ANGELOS:  If I may have a moment?

13          THE COURT:  You may.

14          MS. ANGELOS:  No further questions.

15          THE COURT:  Any redirect?

16

17                  REDIRECT EXAMINATION

18  BY MS. MUYSKENS:

19  Q.   So just to pull up Government's Exhibit 58, which is I

20  think the last email you saw about what's going on in

21  September.  Page 2, I believe.

22          And the response from Ms. Baver indicated -- if

23  you want to pull that section out, thank you, Melissa --

24  that -- still working on getting some investors, right?

25  That's what she was working on?

```
 1   A.   Yes, just give me a second to read.

 2   Q.   Okay.  So around this time or shortly before, she was

 3   still asking for pricing proposals and got the 400 -- now

 4   we're up to 407,000 because we switched time spots; is that

 5   right?

 6   A.   Time slots, yes.

 7   Q.   Okay.  And you were asked a lot of questions about

 8   meetings, trying to -- held in May, and the desire to enter

 9   into production agreement.  And A&E facilitated those

10   discussions.  They encouraged meeting with Six West,

11   correct?

12   A.   Correct.

13   Q.   They had made Six West available, correct?

14   A.   Correct.

15   Q.   Did Allison Baver Entertainment ever sign a contract

16   with Six West to do production?

17   A.   I don't believe they did, but I wouldn't have that

18   information.

19   Q.   Do you have any information that she actually paid any

20   money to secure their services or begin production at any

21   point?

22   A.   I don't have any of that information.

23   Q.   Thank you.  No further questions.

24          MS. ANGELOS:  May I ask two questions?

25          THE COURT:  All right.
```

RECROSS-EXAMINATION

BY MS. ANGELOS:

Q.   Just a question with regards to securing production
with Six West.

        If productions were not happening in spring 2020
or summer 2020, would it have been a good business practice
to pay that money for a production that was not going to be
happening during the summer?

A.   I can't answer to the timeline, but I've never been on
that side of the business to....

Q.   Okay.  Fair.

        THE COURT:  All right.  May this witness be
excused?

        MS. MUYSKENS:  Yes, Your Honor.

        THE COURT:  All right.  Thank you very much, sir.
You can head back to -- is it Long Island?

        THE WITNESS:  Yeah, Long Island, New York.

        THE COURT:  Yeah.

        You may call your next witness.

        MS. THOMAS:  The United States calls Rocco Perate.

        COURTROOM DEPUTY:  Please raise your right hand.

        You do solemnly swear that the testimony you shall
give in the case now before the Court to be the truth, the
whole truth, and nothing but the truth so help you God?

        THE WITNESS:  I do.

```
 1              COURTROOM DEPUTY:  Please have a seat.

 2

 3                    ROCCO PERORATE,

 4   was called as a witness, and having been first duly

 5   sworn to tell the truth, the whole truth, and nothing

 6   but the truth, testified as follows:

 7              COURTROOM DEPUTY:  Please state your name and

 8   spell it for the record.

 9              THE WITNESS:  Rocco Perate, R-O-C-C-O, last name

10   P-E-R-A-T-E.

11

12                    DIRECT EXAMINATION

13   BY MS. THOMAS:

14   Q.   What state do you live in?

15   A.   I live in Pennsylvania.

16   Q.   And where are you employed?

17   A.   Meridian Bank.

18   Q.   What is your position at Meridian Bank?

19   A.   I'm EVP of SBA lending.

20   Q.   Was that your position in April of 2020?

21   A.   No.  I was SVP then.

22   Q.   Senior vice president?

23   A.   Senior vice president.

24   Q.   How long have you been with Meridian Bank?

25   A.   It will be just about five years, four.
```

```
 1   Q.    What did you do prior to working at Meridian Bank?

 2   A.    I worked at Beneficial Bank in Philadelphia doing the

 3   same thing.

 4   Q.    How many years -- oh, can you speak into the microphone

 5   a little more, pull it closer?

 6              THE COURT:  That microphone actually moves.

 7              THE WITNESS:  Oh, it moves?  Okay.  I'm sorry.

 8              THE COURT:  If you'd just grab the base and slide

 9   it.

10              THE WITNESS:  I can slide forward.

11              THE COURT:  There we go.  Thank you.

12   BY MS. THOMAS:

13   Q.    How many years have you been involved with lending?

14   A.    Twenty-five or so.

15   Q.    Do you have experience with SBA loans?

16   A.    Correct.

17   Q.    How many years of experience with SBA loans?

18   A.    Probably most of that time, 25, yeah.

19   Q.    Is Meridian Bank a federally insured financial

20   institution?

21   A.    Yes.

22   Q.    And in April of 2020, I assume it was federally insured

23   at that time too?

24   A.    Correct.

25   Q.    Where is Meridian Bank located?
```

A.   It's headquartered in Malvern, Pennsylvania.

Q.   And is it considered a small financial institution?

A.   It is.

Q.   Were you involved with the Paycheck Protection Program,
a loan program, in April of 2020?

A.   I was.

Q.   Can you tell the jury a little bit about what it was
like when the PPP loan program rolled out.

A.   It was total chaos and hecticness of lots of people
panicking to get money that was running out, and lots of
changes to the program that were happening almost on a
weekly basis.

Q.   What was the volume of loan applications that Meridian
Bank was receiving for PPP loans?

A.   I'm not sure I know what the volume was.  In the early
part of that time, it felt extremely overwhelming,
especially for the size of our staff and the bank.

Q.   How many employees did you have assigned to the PPP
loan program?

A.   There were probably anywhere from five to 11.

Q.   Were the employees working typical banker hours during
that time?

A.   No, not at all.  We had people working three shifts, it
was evening shifts, to make sure that we could get
information into the SBA.  And had to train those folks that

1  didn't know how to do that as well.

2  Q.   What responsibility did Meridian Bank have in approving

3  PPP loans?

4  A.   Would you repeat that in a different way, maybe?

5  Q.   Sure.  Let me rephrase the question.

6          When Meridian Bank received a PPP loan

7  application, what did Meridian Bank do?

8  A.   We reviewed the information that was provided by the

9  borrower, or potential borrower, or requested certain

10 information, and just facilitated it to -- on to the process

11 of receiving the PPP loan.

12 Q.   For a PPP loan, was a payroll document something that

13 was supposed to be submitted with the loan applications?

14 A.   It was.

15 Q.   And in your 25 years of lending experience, had you

16 ever had payroll documentation submitted as part of a loan

17 application before?

18 A.   No, never.

19 Q.   What does "self-certification" mean to you?

20 A.   It meant that the -- potential borrower was to tell us

21 the truth of what was being provided.

22 Q.   Were PPP loans different from traditional SBA loans?

23 A.   One hundred percent different.

24 Q.   And with traditional SBA loans, was self-certification

25 required, or was it on the bank to do more investigating?

```
1   A.   A hundred times more.  A lot more.

2   Q.   Why was there so much pressure to get the loans

3   approved quickly?

4   A.   There was a lot of uncertainty of how much money would

5   be available and changes in the rules.  And there were other

6   banks that were not able to process because they were

7   overwhelmed by applications.  It seemed like it was going to

8   run out of money very quickly.

9   Q.   So the government allocated a certain amount of money

10  to the program; is that correct?

11  A.   That's correct.

12  Q.   And then if the funds ran out, then the funds weren't

13  available?

14  A.   Correct.

15  Q.   Does a $10 million PPP loan require anything different

16  than, say, a $100,000 PPP loan?

17  A.   No, not at all.

18  Q.   How long did it take Meridian Bank to process

19  traditional SBA loans?

20  A.   It's usually about 60 to 90 days.

21  Q.   How long did Meridian Bank take to process PPP loans?

22  A.   Within hours.

23  Q.   With PPP loans, the SBA guarantees them, correct?

24  A.   Correct.

25  Q.   So the bank is not on the hook if the funds are not
```

1  repaid; is that correct?

2  A.    There was a 100 percent guarantee.

3  Q.    With traditional SBA loans, the bank does have some

4  liability, though --

5  A.    Yes.

6  Q.    -- correct?

7          How many supporting documents are usually required

8  for a traditional SBA loan?

9  A.    A lot.  How many?  If you don't include the closing

10 documents, you would probably be in the 30 range.  And if

11 you include the closing documents, you'd probably be in the

12 close to 90.

13 Q.    So can you just explain the difference in the bank's

14 process when reviewing a PPP loan application versus a

15 traditional SBA loan?

16 A.    Sure.  When the PPP requests came in, there were really

17 only a few documents to look at.  Most of it, we really had

18 never seen before, like payroll.  And we just really made

19 sure that the document was there.  There wasn't a lot of

20 analysis to be done on those documents because we didn't

21 feel that that was part of the program.  And it was

22 self-certified, which was brand-new to us, so we assumed.

23         And then for a regular loan, we're looking at

24 every line by line.  We're verifying it and

25 cross-referencing it, among many other documents.

1    Q.    So when you say "self-certify," does that mean that the
2    bank is relying on what the applicant states on the
3    application?
4    A.    That's correct.
5    Q.    For traditional SBA loans, is credit worthiness
6    something that you look at?
7    A.    Yes.
8    Q.    What about for PPP loans?
9    A.    Not at all.
10   Q.    Did you provide any training to your employees on PPP
11   loans?
12   A.    Very minimal.
13   Q.    What did Meridian Bank do for their customers as far as
14   giving them information about PPP loans?
15   A.    We tried to do a webinar for anyone that was
16   interested.  And we tried to provide updates.  Mostly it was
17   updates to the individual employees of the whole entire bank
18   so that they might tell people who were looking.
19   Q.    Did the bank provide their customers with an internal
20   payroll calculator?
21   A.    We did.
22   Q.    So for the PPP application, the main things that
23   Meridian Bank required would be the application, the loan
24   calculator, spreadsheet, and supporting payroll
25   documentation; is that correct?

A.   Those were the main -- correct, driver's license,
something like that.

Q.   What is the process when a customer was referred to
Meridian Bank or wanted to apply for a PPP loan?

A.   Mostly it was just passed on to folks to start, you
know, start the process of, do they have those items that
are in the file?

Q.   And so Meridian Bank would give them a list of items
that they needed for the file?

A.   Correct.

Q.   Does the bank then input all of the information
provided by the applicant into the SBA's system?

A.   Yes, or most of it.  Yeah, I'm not sure what goes in
exactly.

Q.   Okay.  What happens once the information is entered
into the SBA system?

A.   You would get an SBA loan number, which was what you
could use for funding, the SBA loan number.

Q.   Did it also mean that the loan was guaranteed?

A.   Correct.

Q.   Was there any underwriting or due diligence performed
by Meridian Bank on PPP loans?

A.   No -- no underwriting.

Q.   Why did Meridian Bank require its PPP loan applications
to have a Meridian Bank account?

A.   I'm not sure exactly why.  It just seemed to be ease of
funding to do that.

Q.   Is it so that you could get the loan proceeds to the
individual --

A.   It was faster.

Q.   -- quicker?

A.   It was faster.

Q.   Okay.  Was there any guidance from the SBA for new
businesses obtaining PPP loans?

A.   SBA, about every Friday, was dropping new rules on --
on -- on how to get it, which was part of the hecticness of
it.  So there probably were some, you know, rules.

     As far as new businesses, do you mean as a
brand-new business?

Q.   Yes.

A.   Yeah, they weren't -- they weren't eligible.

Q.   How did you become familiar with Allison Baver?

A.   She was referred to me by a banker that I had known --
a former banker, I think, I had known in the marketplace.

Q.   And what's his name?

A.   Alex Kruelle, I believe.  You might double-check that
for me.

Q.   Could it be Carl Kruelle?

A.   Carl Kruelle, I'm sorry.  Carl Kruelle.  Thank you.

Q.   Carl Kruelle.

1   A.   I'm old.  What can I tell you?

2   Q.   Do you recall him texting you and asking if you were

3   doing PPP loans?

4   A.   I don't recall that, but it probably happened.

5   Q.   Did he send you an email, introducing Allison Baver to

6   you?

7   A.   He did.

8   Q.   What did you do when you received the email from Carl

9   Kruelle?

10  A.   I just forwarded it on, like I would have any other

11  referral that came in.

12  Q.   Who did you forward it on to?

13  A.   Probably Nick Patel.

14  Q.   And is he someone on the PPP loan team?

15  A.   He was.

16  Q.   Did you ever communicate with Allison Baver in any way?

17  A.   Not to my knowledge.

18  Q.   Did you do a review of Allison Baver's loan application

19  or documents?

20  A.   Just the lender certification.

21  Q.   How would you describe your job as far as how it

22  pertained to PPP loans?

23  A.   I was the person who set up the program, because there

24  wasn't anybody else to do that, and then just to facilitate

25  the process.

```
 1   Q.   Did you -- well, we can get to this in a minute.

 2              MS. THOMAS:  Your Honor, I'm going to discuss

 3   Exhibits 16 through 28 with this witness and --

 4              MR. HUNT:  No objection, Your Honor.

 5              THE COURT:  Okay.  That's fine.  And at some

 6   point, we need to take our afternoon break.  We can do that

 7   now, or we can let you get through this next group of

 8   exhibits.

 9              Do we have a preference from the jury?

10              Now.  Okay.  Let's take it.

11              MS. THOMAS:  Thank you.

12              COURTROOM DEPUTY:  All rise for the jury.

13         (The jury left the courtroom.)

14              THE COURT:  Let's come back at 3:20.

15         (A break was taken from 3:04 p.m. to 3:25 p.m.)

16              THE COURT:  Are we ready for the jury?

17              MS. THOMAS:  Yes, Your Honor.

18              THE COURT:  All right.

19         (The jury was brought into the courtroom.)

20              THE COURT:  You may continue with your

21   examination.

22              MS. THOMAS:  Thank you, Your Honor.

23              So just prior to the break, I had moved for the

24   admission of Government's Exhibits 16 through 28, and I

25   believe there was no objections to that.
```

1          THE COURT:  All right.  Am I correct, there's no

2   objection?

3          MR. HUNT:  Correct.

4          THE COURT:  All right.  They are received.

5      (Government's Exhibits 16 through 28 were received into

6   the record.)

7          MS. THOMAS:  Let's pull up Exhibit 16(a), please,

8   and let's go to the signature page.

9   BY MS. THOMAS:

10  Q.   Was this a loan application submitted to Meridian Bank

11  on April 24th by Allison Baver?

12  A.   Yes.

13  Q.   Can we go back to the first page, please.

14         And what is the requested loan amount on here?  I

15  believe it's the second box.

16  A.   Second block.  11 million -- is that 11 million 923

17  thousand and 958.

18  Q.   Okay.  And then let's go to Exhibit 16(b).

19         And is this the same -- submitted by Allison Baver

20  on the same day?

21  A.   Yes.

22  Q.   And the first page, please.

23         Appears to be the same numbers as the prior

24  application, but maybe some different boxes checked as far

25  as purpose of the loan?

1   A.    Yes.

2   Q.    And then Exhibit 16(c).  And what is the date that this

3   was submitted?

4   A.    It says 4/25/2020.

5   Q.    Are you aware of why there were three different

6   applications submitted to Meridian Bank?

7   A.    I'm not aware.

8   Q.    Did Meridian Bank consider the last one, the

9   April 25th, the actual application that it reviewed and went

10  off of?

11  A.    I'm not sure I could say it with certainty.

12  Q.    Okay.  Who was it that reviewed Allison Baver

13  Entertainment's loan application at Meridian Bank?

14  A.    It would have been primarily Nick Patel, but there may

15  have been one or two other people.

16  Q.    And so let's pull up page 1 of Exhibit 16(c).

17        Did Allison Baver initial the questions in

18  paragraphs -- yeah, starting with Question No. 5?

19  A.    Yes.

20  Q.    And then let's go to the second page briefly.

21        And did she also sign the application and put her

22  initials under "CERTIFICATIONS"?

23  A.    Yes.

24  Q.    Why were the certifications important?

25  A.    It was really the only thing we had to rely on.

1  Q.   Can we pull up Exhibit 17, please.

2        Can you tell the jury what this document is?

3  A.   Is that a question to me?  I apologize.

4  Q.   Yeah.  Can you tell the jury what this document is?

5  A.   That was the lender's application form.

6  Q.   And what does that mean?  What's the purpose of this?

7  A.   We were supposed to submit this application -- or put

8  it in the file as part of the SBA application.

9  Q.   Can we go to page 2 of this document.

10       Is this your electronic signature?

11 A.   Yes.

12 Q.   And I notice that the date says April 6th of 2020?

13 A.   It must have been an error.  I think it was 26.

14 Q.   And so does this document basically tell the SBA that

15 Meridian Bank is signing off on this loan application?

16 A.   Yes.

17 Q.   Let's look at Exhibit 18.  What is this document?

18 A.   This was an internal document required by banks to,

19 sort of, know your borrower.

20 Q.   And can we go to the second page.

21       And the third page.

22       Is this a promissory note for a $10 million loan?

23 A.   For PPP, yes.

24 Q.   And the next page, please.  Actually, if we can just

25 skip through the promissory note to the loan agreement,

1  which would be the next document.  Oh.  Well, okay.

2          Let's just talk about Government Exhibit 19 here.

3  What is this document?

4  A.    We attempted to maybe do one extra step and have

5  something that looks similar to our typical SBA approval, so

6  it was a shortened version.

7  Q.    Was this an internal Meridian Bank document?

8  A.    Yes.

9  Q.    And how did you come up with the information provided

10  on this document?

11  A.    That would have been provided by the borrower.

12  Q.    Let's move to Exhibit 20.  And can you explain what

13  this document is?

14  A.    I believe this document is the SBA approval e-tran

15  document, but I might be incorrect.  No, it is.  The SBA

16  application number is the one there, yes.

17  Q.    So does this reflect that on April 27th, Meridian Bank

18  inputted the information from ABE's loan into the SBA

19  system, it received an SBA number, and that made the loan

20  guaranteed?

21  A.    Correct.

22  Q.    Let's look at Exhibit 21(a).

23          Let's go to 21(b).  And let's stop here for a

24  minute.  I'm going to show you a series of documents.

25          Were these all documents submitted with ABE's loan

1  application?

2  A.   I don't think I've ever seen this document, so I'm

3  assuming it has been.

4  Q.   Okay.  So are you saying you're unaware of whether this

5  was submitted with her application to Meridian Bank?

6  A.   I'm unaware of that.

7  Q.   Let's go next to 21(c).  Does this document look at all

8  familiar to you?

9  A.   It does.

10  Q.   And what is this document?

11  A.   This is the SBA calculator to determine how much money

12  you would be eligible for.

13  Q.   Would this be submitted with the loan application?

14  A.   Yes.

15  Q.   And what does the applicant list as salary, wages,

16  commissions for March 31st of 2019?

17  A.   Appears to be nothing there.  Zero, I guess.

18  Q.   March?

19  A.   Oh, March, I'm sorry.  You highlighted yellow, so I

20  didn't see that.

21        Two million 951 thousand and 012.

22  Q.   And it's the same for April and May of 2019; is that

23  correct?

24  A.   That's correct.

25  Q.   Let's move to Exhibit 22.

1          Is this -- okay, let's see.  Can we pull up the

2   very first page -- or let's look at this email

3   chronologically, if we can.  Okay.

4          So this is an email from Allison Baver to Carl

5   Kruelle, which I assume you won't have knowledge of.  But

6   let's look at the page preceding that one.

7          Did Carl Kruelle forward you this email and send

8   you an email, indicating that he's writing to you about

9   Allison Baver Entertainment seeking a PPP loan?

10  A.   Yes.

11  Q.   What did you do when you received this email from Carl

12  Kruelle?

13  A.   I forwarded it on to, I guess, Nick, I think at that

14  point.

15  Q.   And let's go to the last page of the email, please.

16  The last page.  The email that was -- okay.  Let's go back,

17  then.  I'm looking for the email from Allison Baver that was

18  sent to Carl Kruelle.

19          Did you read this email that Allison Baver sent to

20  Carl Kruelle that was forwarded to you?

21  A.   I did not.

22  Q.   Why not?

23  A.   Really, I was just forwarding, you know, happy to

24  receive a referral and referring it on to the process.

25  Q.   Okay.  Can we go to page 1 of the exhibit.

```
 1          And did you respond to Carl and tell him the
 2   required documents that you needed?
 3   A.   Yes.
 4   Q.   Can you just read that for the jury, please, starting
 5   with "Carl."
 6   A.   Thanks for making it bigger.
 7          (As read) "Carl - we will need driver's license,
 8   entity docs, the attached calculator completed with all
 9   support docs, date business was formed, and funding
10   instructions.  We generally want a bank account opened at
11   our bank to deposit PPP funds into," and "will that" --
12   "will that he" -- it's supposed to be -- "will that he an
13   issue" should be "will that be an issue?"
14   Q.   Thank you.
15   A.   I'm known for misspellings.
16   Q.   You were working a lot of hours at that time, right?
17   A.   Yep.
18   Q.   Let's look at Exhibit 23.  And can you tell us what
19   this document is.
20   A.   That would have been the document that was used to open
21   the account.
22   Q.   And I believe that it says "Account Agreement."  So
23   it's the -- yeah, so it's Allison Baver opening an account
24   at Meridian Bank?
25   A.   Correct.
```

1   Q.   And let's look at Exhibit 24.  Can we enhance that a

2   little bit, please.

3   A.   Maybe a little bit more even, if that's possible.  Got

4   it.

5   Q.   Is this an internal Meridian Bank document showing

6   wires from Allison Baver Entertainment's account from

7   May 21st, 2020, through July 27th, 2020?

8   A.   Yes.

9   Q.   Let's turn to Exhibit 25.

10           Is this another account agreement between

11  Allison Baver and Meridian Bank?

12  A.   It appears to be, yes.

13  Q.   Let's turn to Exhibit 26.

14           And is this series of documents Meridian Bank

15  statements for Allison Baver Entertainment's checking

16  account, and it appears that it's from April 30th of 2020

17  through May 31st of 2020?

18  A.   Yes.

19  Q.   Okay.

20  A.   Yes.

21  Q.   Let's look at Exhibit 27.

22           Is this a check drawn on Meridian Bank from

23  Allison Baver Entertainment?

24  A.   Yes.

25  Q.   And is it to Company X?

1   A.    Company X.

2   Q.    Yes?

3   A.    Yes.

4   Q.    In the amount of $150,000?

5   A.    Correct.

6   Q.    Is the date on that check July 23rd, 2020?

7   A.    Yes.

8   Q.    And as I understand it, this is an electronic check; is

9   that --

10  A.    It appears to be that, yeah.

11  Q.    Okay.  So does it indicate that the funds were actually

12  taken out on July 29th of 2020?

13  A.    That's -- it would, yes.

14  Q.    Okay.  And let's look at Exhibit 28.

15          Is this the account agreement for Allison Baver

16  Entertainment business checking account?

17  A.    Yes, it is.

18  Q.    Was there anything unusual about Allison Baver

19  Entertainment's PPP loan or loan application?

20  A.    Not that I was aware of.

21  Q.    Did Meridian Bank account -- well, I believe this is

22  answered, but just to make clear:  Did Meridian Bank approve

23  the loan?

24  A.    One more time, I apologize.

25  Q.    Did Meridian Bank approve the PPP loan for Allison

1  Baver Entertainment?

2  A.   Yes, we did.

3  Q.   And it was for $10 million?

4  A.   Yes.

5  Q.   And those funds were disbursed to her?

6  A.   Yes.

7  Q.   At the time Meridian Bank approved the $10 million PPP

8  loan, did Meridian Bank know that Allison Baver

9  Entertainment did not have 430 employees?

10 A.   Not that I'm aware of.

11 Q.   Did Meridian Bank know that Allison Baver Entertainment

12 did not have 4.77 and some change in average monthly

13 payroll?

14 A.   No.  No.  Sorry.

15 Q.   Did Meridian Bank have any reason at the time to

16 believe that Allison Baver was lying about her number of

17 employees or monthly payroll?

18 A.   No.

19         MS. THOMAS:  May I have just a minute, Your Honor?

20         THE COURT:  You may.

21         MS. THOMAS:  No further questions, Your Honor.

22         THE COURT:  All right.

23         MR. HUNT:  I'm going to need a minute, Your Honor.

24         THE COURT:  Okay.

25         MR. HUNT:  To get set up.

CROSS-EXAMINATION

BY MR. HUNT:

Q.   Good afternoon, Mr. Perate.

A.   Good afternoon.

Q.   A minute ago, you were talking about a calculator that you would provide to these PPP investors and that you gave to Ms. Baver, correct?

A.   Correct.

Q.   And the one that you gave her was for 2020; was it not?

A.   Okay.

Q.   And the one you just talked about was for 2019.  Let me show you what's been -- 439-J, and I'll put that up just to you.

        What is this?

A.   What's the date there?  I apologize.  I don't see a date.

Q.   It's asking for -- what months is it asking for?

A.   2020, it appears.

Q.   Would that make sense, that that would be the months that you would ask for?

A.   I don't -- yeah.  It was called the -- there was some name for it, something "period."  Yeah, it was the payroll period or something like that.

Q.   Okay.  So it wouldn't have been '19?

A.   I don't believe so.

```
 1   Q.   It would have been this document?

 2   A.   Okay, yeah.

 3   Q.   It actually goes -- and so I think the government's

 4   exhibit actually -- well, they showed you -- actually is

 5   incorrect, it would appear, correct?

 6   A.   I don't know if I can answer that.  I don't know if

 7   their --

 8              MR. HUNT:  Your Honor, may I publish this --

 9              THE WITNESS:  -- I can only tell you what I can

10   see.

11              MR. HUNT:  -- and submit it to the jury?

12              THE COURT:  You need to just talk one at a time.

13   He was answering.  I didn't hear his answer.

14              THE WITNESS:  I was just saying that I only can go

15   by what I'm seeing here, which says 2020.  I don't know if

16   it's correct or not, yeah.

17   BY MR. HUNT:

18   Q.   You recognize the document?  I think you said that.

19   A.   Say it again.  I apologize.

20   Q.   Do you recognize the document?

21   A.   I do recognize the document, correct.

22              THE COURT:  Has this been admitted?

23              MR. HUNT:  No.

24              THE COURT:  I think it has been.

25              MS. THOMAS:  21(c) was admitted, and it has two
```

1  pages, so it has the 2019 and the 2020.

2          THE COURT:  Okay.  Well, this is on the screen, so

3  I'll admit 439-J as well.

4      (Defendant's Exhibit 439-J was received into the

5  record.)

6  BY MR. HUNT:

7  Q.   Look at this page for a minute.  When did Ms. Baver

8  apply for the loan with you folks?  Do you recall the date?

9  A.   I don't recall the date.

10  Q.   Do you have that date in front of you?  If I were to

11  tell you it was on April 25th -- excuse me, April 25th,

12  2020, does that sound right?

13  A.   Sounds right.

14  Q.   Okay.  And if you look at 439-J, there are two numbers

15  that exceed past the 25th, aren't there?

16  A.   Would you please rephrase that?

17  Q.   In fact, if you look at the columns for income, there

18  is one that's for April 30th?

19  A.   April 30th, correct.

20  Q.   Yep.  And then also it jumps all the way to May 31st.

21  Those would be future; would they not?

22  A.   I don't know who put the numbers in there.  I don't

23  believe we provided those numbers.

24  Q.   So were you also -- I'm going to now ask you to look at

25  21(d), if we can put that up.  It's already been previously

1  entered.

2          And have you ever seen Ms. Baver's payroll budget?

3  A.    I don't believe I have.

4  Q.    Okay.  And so where it says "TOTAL EMPLOYEES" here,

5  where she's articulating 430, if you could mark that on the

6  top there.

7          You've never seen that before?

8  A.    I've never seen this document before.

9  Q.    Okay.  And then when you come down here, did she ever

10 justify to you 430 employees in any fashion, other than just

11 telling you?

12 A.    Are you asking me personally or the bank?

13 Q.    The bank.

14 A.    I believe she did on the application.

15 Q.    Okay.

16 A.    Yeah.

17 Q.    Above and beyond the application?

18 A.    I guess it's right here.

19 Q.    Okay.  And if you'll look down further, they have some

20 totals of budgets for the different projects.  And you'll

21 see *America's Angels*, *Dead Princess*, and *Monsters*.

22         And it looks like, if I can do my math, we are

23 upwards of 13 million in the payroll; do you see that?

24 A.    I don't see the 13 million, but I see the highlighted

25 areas.

1  Q.   I'm adding.  If you come down on payroll on the first

2  column where it says "Total," just come down right below

3  where you've highlighted the next line.

4          MS. THOMAS:  Your Honor, I'm going to object

5  because he says he's never seen this document.

6          MR. HUNT:  Actually, he said that if it had gone

7  to his bank, he's pretty sure it had gone to his bank.

8          THE COURT:  I think there's evidence that it went

9  to his bank.  I guess if he hasn't seen it, then he can

10 indicate he hasn't personally seen it.

11         THE WITNESS:  I haven't personally seen this

12 document.

13 BY MR. HUNT:

14 Q.   Okay.  A minute ago, you stated you also didn't see a

15 good faith letter.  You don't believe one was submitted to

16 your bank.

17 A.   I apologize.  You're --

18 Q.   I'm sorry.  My voice is --

19 A.   Yeah, you're probably getting tired --

20 Q.   Yeah, it's getting --

21 A.   -- my voice is too.

22 Q.   -- it's getting bad today.

23 A.   I'm sorry.

24 Q.   A minute ago you stated that you had not seen the good

25 faith letter, good faith letter with the package, that you

329

1  don't believe one was submitted?

2  A.   You mean the letter that was submitted by...?

3  Q.   Ms. Baver, yes.

4  A.   No, I've never seen that.

5  Q.   Okay.  Would it surprise you to know that that was

6  submitted with the packet of information to your bank?

7  A.   Wouldn't surprise me, but I've never seen it.

8  Q.   Is it common for a good faith letter to be submitted to

9  the bank --

10 A.   I don't --

11 Q.   -- for a PPP loan?

12 A.   I mostly didn't -- I just mostly facilitated.  I

13 wouldn't tell you -- I don't know if it's common or not.

14 Q.   All right.  Let's go now to Mr. Kruelle.

15        How do you know Mr. Kruelle?  You knew him from

16 back in the day somehow?

17 A.   Yeah, banking, you know, in banking.  I believe he was

18 a former banker.

19 Q.   All right.  And he tells you he's got a friend who

20 would like a PPP loan, sends them to you.  You respond back,

21 Great.  And when he sends email, he sends an attachment.  We

22 just heard the story.

23        And you say you never opened it?

24 A.   I don't know about ever opened it, I just passed the --

25 I read maybe a line or two where it said somebody was

1  looking for a loan and passed it on.

2  Q.   Okay.  All right.

3         MR. HUNT:  Your Honor, we would move to admit

4  Exhibit 438.  I do not think that is in yet.

5         THE COURT:  Has it been received?

6         MS. THOMAS:  It is in.  Yes, Your Honor.

7         THE COURT:  It is.

8         MR. HUNT:  The letter?  The email?

9         THE COURT:  So it can be shown to the jury.

10        MS. MUYSKENS:  Yes, it's Government's Exhibit 22.

11        MR. HUNT:  I'm terrible with numbers, aren't I,

12 with which exhibit we're on?

13        THE COURT:  So 438 --

14        MR. HUNT:  Don't need to do it.  It's in a....

15        THE COURT:  Right.  But did you want to show it to

16 the jury?

17        MR. HUNT:  I do.

18        THE COURT:  Okay.  Well, then we can just admit

19 438 as well.

20     (Defendant's Exhibit 438 was received into the record.)

21 BY MR. HUNT:

22 Q.   All right.  Carl is your friend.  And you say that you

23 might have looked at some of this but not all of it.  But

24 let's go ahead and look at some of these words that Allison

25 spoke to your bank before filling out her application.

1          Let's highlight the second paragraph, if we could.
2   Could you read that for me.  Can you highlight -- there you
3   go.
4   A.   (As read):
5               "Right now most banks are only accepting
6               existing customers and the ones I have spoken
7               with require the past 12 months, February to
8               -- Jan./Feb. 2020 payroll, which does not
9               apply to my new entertainment company because
10              of the timeline, I had only paid an attorney
11              for the projects in operation.  You see, we
12              had a TV show and two films scheduled to
13              start production in spring of 2020 and these
14              projects employed 430 people -- employ 430
15              people with PP loan amounts of 8.3 million.
16              One of the projects is a TV -- is a TV that
17              was received a distribution offer from A + E
18              Network to air the show four -- Q4 this year.
19              The show is called American Angels and it
20              helps women driven business, employs 80
21              people and will have -- employs 80 people and
22              would have a substantial impact on women in
23              closing the socioeconomic gap."
24  Q.   To your knowledge, Mr. Perate, did Ms. Baver ever back
25  off of that statement to the bank at all --

```
 1   A.   Not to my knowledge.

 2   Q.   -- that --

 3   A.   Not to my knowledge, yeah.

 4   Q.   And you never saw her say that she was not looking

 5   toward these projects which she believed were underway?

 6   A.   No, I don't -- one more time.  You asked me if -- okay.

 7   You got it.

 8   Q.   It's enough.  It's enough.  Just one moment.  No

 9   further questions.

10            THE COURT:  Any redirect?

11

12                  REDIRECT EXAMINATION

13   BY MS. THOMAS:

14   Q.   If we can pull Exhibit 22 back up.  Let's go to the

15   email portion that was just highlighted.

16            Does this statement say, "...we received a

17   distribution offer from A + E Network"?

18   A.   Yes.

19   Q.   Does it further say, "...employs 80 people"?

20   A.   Yes.

21   Q.   If you had read this statement, would it be entirely

22   clear to you whether or not Ms. Baver had historical past

23   payroll?

24            MR. HUNT:  Objection, Your Honor.  Calls for

25   speculation.  The words are what they are.
```

```
 1              THE COURT:  Well, I mean, he's testified he never
 2      saw or he didn't read this document.  Sustained.
 3      BY MS. THOMAS:
 4      Q.   If you had read this document, would ABE's PPP loan
 5      have been approved?
 6              MR. HUNT:  Again.
 7              THE COURT:  Sustained.
 8              MS. THOMAS:  No further questions.
 9              THE COURT:  Anything further, Mr. Hunt?
10              MR. HUNT:  Nothing further, Your Honor.  Thank
11      you.
12              THE COURT:  All right.  May this witness be
13      excused?
14              MS. THOMAS:  Yes, Your Honor.
15              THE COURT:  Thank you, sir.
16              THE WITNESS:  Sure.  Thank you.
17              THE COURT:  You may call your next witness.
18              MS. MUYSKENS:  Thank you.  The United States calls
19      Blake Hamilton.
20              COURTROOM DEPUTY:  You do solemnly swear that the
21      testimony you shall give in the case now before the Court to
22      be the truth, the whole truth, and nothing but the truth so
23      help you God?
24              THE WITNESS:  Yes, I do.
25              COURTROOM DEPUTY:  Please have a seat.
```

```
1
2                        BLAKE HAMILTON,
3   was called as a witness, and having been first duly
4   sworn to tell the truth, the whole truth, and nothing
5   but the truth, testified as follows:
6               COURTROOM DEPUTY:  Please state your name and
7   spell it for the record.
8               THE COURT:  Blake Hamilton, B-L-A-K-E,
9   H-A-M-I-L-T-O-N.
10
11                      DIRECT EXAMINATION
12  BY MS. MUYSKENS:
13  Q.    Mr. Hamilton, what is your occupation?
14  A.    I'm an attorney.
15  Q.    And where do you practice?
16  A.    I practice at the firm Dentons Durham Jones & Pinegar.
17  Q.    Is that located here in Salt Lake City?
18  A.    It is.  We have an office in Salt Lake.
19  Q.    Yes.  As an attorney, did you represent Allison Baver?
20  A.    I did.
21  Q.    Did you also represent Allison Baver Entertainment,
22  LLC?
23  A.    I did.
24  Q.    Did this representation of Allison Baver and Allison
25  Baver Entertainment include a grand jury subpoena that was
```

1  issued to Allison Baver Entertainment in May of 2022?

2  A.   Yes.

3  Q.   What were the dates you represented Allison Baver and

4  Allison Baver Entertainment?

5  A.   I represented Allison Baver, as I recall, from about

6  middle of January to approximately November 10th, first part

7  of November 2022.

8         And then I represented ABE from approximately

9  middle of February to the same time, first part of November

10  2022.

11  Q.   And you've used -- for ABE -- we'll just refer to the

12  business as "ABE" -- was that February of 2022?

13  A.   Correct.

14  Q.   And for Allison Baver, was that January of 2022?

15  A.   It was, yes.

16  Q.   Just wanted to get the years correct.

17         Did you inform the United States that you were

18  authorized to accept the grand jury subpoena that was issued

19  to ABE for certain financial records and information?

20  A.   Yes, I did.

21  Q.   And did you have the authority from Allison Baver to

22  accept the grand jury subpoena on behalf of ABE?

23  A.   Yes, I did.

24  Q.   At this time, I'm going to show you Government's

25  Exhibit No. 70.  This is a multipage document.

1          Do you recognize the first page, which is an email

2   that has an attachment?

3   A.   I do.

4   Q.   And page 2?

5   A.   I do.

6   Q.   Do you recognize these documents?

7   A.   Yes.

8   Q.   Is this a copy of the email transmitting the grand jury

9   subpoena to you -- transmitted to you, but it was a grand

10  jury subpoena issued to ABE?

11  A.   It does.

12          MS. MUYSKENS:  At this time, the government offers

13  into evidence Government's Exhibit 70.

14          THE COURT:  Any objection?

15          MR. HUNT:  No objection.

16          THE COURT:  It's received.

17     (Government's Exhibit 70 was received into the record.)

18          MS. MUYSKENS:  And if we could publish for the

19  grand jury.

20          THE COURT:  Not for the grand jury.

21          MS. MUYSKENS:  Sorry.  I was looking at the word

22  "grand jury."  Thank you.  If we could publish for the jury.

23  Thank you, Your Honor.

24  BY MS. MUYSKENS:

25  Q.   On the first page -- thank you -- this was sent on

1   May 6th of 2022; is that correct?

2   A.    That is correct.

3   Q.    All right.  Page 2, please.

4         And at the top, it reads that it's sent to Allison

5   Baver Entertainment; is that correct?

6   A.    It does.

7   Q.    And it has a place, a date, and time of June 15th of

8   2022?

9   A.    That's the date and time, yes.

10  Q.    And if we could highlight the part that says, "This is

11  a Subpoena DUCES TECUM," and highlight the requested

12  documents.

13        And as an attorney, do you understand what the

14  term "subpoena duces tecum" means?

15  A.    I do.

16  Q.    What does it mean?

17  A.    It's a subpoena for documents, to produce documents,

18  not to testify.

19  Q.    And what did this subpoena require the production of?

20  A.    It required documents of any bank account besides the

21  bank accounts that were held at Meridian Bank for Allison

22  Baver Entertainment or controlled by Allison Baver

23  Entertainment.

24  Q.    Or used by Allison Baver --

25  A.    Or used by Allison Baver Entertainment.

1    Q.   And it also had a particular time period for the time
2    period of October 2019 through December of 2020, correct?
3    A.   Correct.
4    Q.   And I believe you stated you did receive this subpoena
5    on or about May 6th of 2022?
6    A.   Yes.
7    Q.   Did you provide a copy of the grand jury subpoena to
8    Allison Baver?
9    A.   My office did, yes.
10   Q.   Now, in response to -- thank you, Melissa.
11        In response to the subpoena, did you take the step
12   to file a, what's titled a "Motion to Quash" the Grand Jury
13   Subpoena on behalf of Allison Baver Entertainment in early
14   June of 2022?
15   A.   Yes, I did.
16   Q.   And "motion to quash," that's not a common term.  What
17   does a "motion to quash" mean?
18   A.   It's a motion -- well, it's kind of descriptive.
19   "Quash" means to make it obsolete, or make it so that you do
20   not have to comply with the subpoena for certain reasons.
21   Q.   Did you act on your own, or did you act with the
22   authorization of Allison Baver when you filed the motion to
23   quash?
24   A.   I acted at her direction, yes.
25   Q.   I'm going to show you Government's Exhibit 71.

1          Do you recognize this document?

2   A.    Yes.  This was an order denying that motion to quash.

3          MS. MUYSKENS:  At this time, the government offers

4   into evidence Government's Exhibit 71.

5          THE COURT:  Any objection?

6          MR. HUNT:  No objection.

7          THE COURT:  Received.

8        (Government's Exhibit 71 was received into the record.)

9          MS. MUYSKENS:  If we could publish.  Thank you.

10  BY MS. MUYSKENS:

11  Q.    On or about June 14th of 2022, did you receive from the

12  Court a copy of an order that denied your motion to quash

13  the subpoena duces tecum for documents that had been issued

14  to ABE?

15  A.    Yes, I did.

16  Q.    Did you inform Allison Baver of this order?

17  A.    Yes, my office provided her a copy of this order.

18  Q.    And the denial of the motion to quash meant the

19  subpoena was still in effect, correct?

20  A.    Yes.

21  Q.    On or about June 15th of 2022, a day after this order

22  was issued, did you and your partner, Scott Garrett, who

23  works at your firm, contact the United States to request an

24  extension of time for ABE to comply with the subpoena?

25  A.    Yes, I believe it was an email sent by my law partner,

1   Scott Garrett, and I was cc'd on that email.

2   Q.   Did you receive confirmation from the United States

3   that ABE was granted an extension until June 22nd of 2022 to

4   comply with the grand jury subpoena?

5   A.   Yes, I believe we received an email back from yourself,

6   giving us that extension.

7   Q.   Did you file a motion to intervene and a motion to

8   quash the grand jury subpoena on behalf of Allison Baver on

9   June 22nd of 2022?

10  A.   Yes.

11  Q.   Did you act on your own, or did you act with the

12  authorization of Ms. Baver when you filed that motion?

13  A.   We acted at the authorization of Ms. Baver.

14  Q.   I'm going to show you what's marked as Government's

15  Exhibit 72.  Do you recognize this document?

16  A.   Yes.

17  Q.   We can scroll through it for a few pages.

18       And is this a copy of a court order denying the

19  motion to intervene and the motion to quash the subpoena?

20  A.   Yes, it looks like it's a redacted copy of that order.

21       MS. MUYSKENS:  At this time, the government offers

22  into evidence Government's Exhibit 72.

23       THE COURT:  Any objection?

24       MR. HUNT:  No objection.

25       THE COURT:  Received.

341

1      (Government's Exhibit 72 was received into the record.)

2          MS. MUYSKENS:  If we could please publish.

3  BY MS. MUYSKENS:

4  Q.   So on or about June 28th of 2022, did you receive from

5  the Court a copy of this order?  And it wasn't redacted, but

6  you received a copy, correct?

7  A.   Yes.

8  Q.   Did you read the order?

9  A.   I did.

10 Q.   And if we could go to page 3.

11          Does it state that Allison Baver's motions are

12 denied, and that ABE is ordered to comply with the grand

13 jury subpoena no later than June 30 of 2022?

14 A.   It does state that, yes.

15 Q.   Did you provide a copy of this Court's order to

16 Allison Baver?

17 A.   Yes, my office did.

18 Q.   In your capacity as an attorney, did you produce any

19 records or provide a response to the subpoena on or before

20 June 30th of 2022?

21 A.   No.

22 Q.   On or about September 28th of 2022, did Allison Baver

23 Entertainment and Allison Baver file another motion with

24 respect to the subpoena, this time a motion to stay

25 compliance with the subpoena?

```
1   A.   Yes.

2   Q.   And did you file that motion on their behalf?

3   A.   I did.

4   Q.   I'm going to show you Government's Exhibit 73.  If you

5   could scroll through that.

6            Do you recognize this document?

7   A.   I do.

8   Q.   Is this a copy of the Judge's order denying the motion

9   to stay that you filed in September?

10  A.   It is.

11           MS. MUYSKENS:  At this time, the government offers

12  into evidence Government's Exhibit 73.

13           THE COURT:  Any objection?

14           MR. HUNT:  No objection.

15           THE COURT:  It's received.

16      (Government's Exhibit 73 was received into the record.)

17  BY MS. MUYSKENS:

18  Q.   And did you receive a copy of this order -- if we could

19  publish -- on or about November 21st of 2022?

20  A.   I did.  I did, yes.

21  Q.   Going to Government's Exhibit 73 on page 4, beginning

22  at the -- after the reference to Footnote 9, we're going to

23  highlight, and if you could please read the part that

24  begins, "Ms. Baver and ABE."

25  A.   You said --
```

1  Q.   Starting at that line.

2  A.   It says:

3            "Ms. Baver and ABE have not alleged any

4            particular interests in delay that outweigh

5            the strong interests of a timely and thorough

6            grand jury investigation.  Further, the

7            subpoena at issue was issued to ABE over six

8            months ago.  This Court has continually

9            rejected Ms. Baver and ABE's various requests

10           for orders of the Court allowing

11           noncompliance with the subpoena.  Despite

12           directly ordering ABE to comply with the

13           subpoena, Ms. Bavers [sic] and ABE continue

14           to ignore the subpoena and defy the orders of

15           the Court.  Given the strong public interest

16           in an effective grand jury investigation and

17           Ms. Baver and ABE's repeated delays and

18           ongoing failure to comply with the subpoena,

19           the Court cannot find good cause to stay the

20           subpoena."

21  Q.   And if you could please read the conclusion that begins

22  with the part "Ordered."

23  A.   "It is therefore ORDERED that Defendant's Motion

24  (Docket No. 19) is DENIED.  ABE is ordered to comply with

25  the grand jury subpoena immediately."

1  Q.   Did you provide a copy of this Court's order to

2  Allison Baver?

3  A.   So -- yes.  I did not, but my law partner, Scott

4  Garrett, did, and I was cc'd on that email.

5  Q.   While representing ABE and Allison Baver, did you

6  provide to the United States any response to the grand jury

7  subpoena in your capacity as an attorney?

8  A.   No.

9  Q.   To your knowledge, was any response to the grand jury

10 subpoena ever provided to the United States?

11 A.   No.

12 Q.   No further questions.

13          THE COURT:  Mr. Hunt?

14

15                  CROSS-EXAMINATION

16 BY MR. HUNT:

17 Q.   Mr. Hamilton.

18 A.   Mr. Hunt.

19 Q.   You withdrew from representing Ms. Baver on the 22nd of

20 December; is that right -- October 22nd?

21 A.   We filed our motion on October 22nd.  I believe it was

22 granted by Judge Stewart on November 10th.

23 Q.   Okay.  And had you filed any appeals around that time?

24 A.   We had.  We'd filed an appeal to the Tenth Circuit.

25 Q.   Okay.  And what's the status of that?

A.   The Tenth Circuit decided that the decision was not
ripe, meaning it wasn't -- we didn't have standing to move
forward in front of the Tenth Circuit at that point in time.

          MR. HUNT:  And was the motion to withdraw admitted
into evidence?  Was that the last exhibit?

          THE COURT:  I don't believe so.

          MR. HUNT:  Okay.  We're going to move -- put up
Exhibit 474.

BY MR. HUNT:

Q.   When you say -- when you say "the motion to withdraw"
here, I heard that you -- and I didn't understand this
before -- but you actually withdrew for both ABE and
Allison Baver at the same time?

A.   That's correct, yes.

Q.   Okay.  Even though they had retained you separately at
different times, but you withdrew at the same time?

A.   That is correct.

Q.   All right.  And during the process of this, quite a
lengthy process, quite a lot of activity on the docket,
wasn't there?

A.   I believe there was activity on the docket.  I don't
have it in front of me, but....

Q.   I'll pull up 483 for you to look at that.

          THE COURT:  480- -- wait, 474.

          MR. HUNT:  483.

1          COURTROOM DEPUTY:  What you just had up, 474, was

2    not admitted.

3          MR. HUNT:  Oh, it was not.  Sorry.

4          I need to move to admit that last document.

5          THE COURT:  Is there an objection to that?

6          MS. ANGELOS:  Was that the order or the motion?

7          MR. HUNT:  It was the order.

8          THE COURT:  It's the order granting leave to

9    withdraw as counsel.

10          MS. MUYSKENS:  No objection.

11          THE COURT:  It's received.

12      (Defendant's Exhibit 474 was received into the record.)

13   BY MR. HUNT:

14   Q.   Now, look at that docket.  Will you turn the pages.

15   Keep going.  Okay.

16          So does this look accurate to you about kind of

17   what was going on with the case, what you saw and

18   participated in yourself?

19   A.   Yes.

20          MR. HUNT:  Your Honor, we would move to admit the

21   docket, 483.

22          MS. MUYSKENS:  Your Honor, we would object.  It's

23   actually confusing without context, the docket is.

24          MR. HUNT:  I can ask some further questions.

25          THE COURT:  All right.  Why don't you ask some

1    further questions.

2    BY MR. HUNT:

3    Q.   Can you explain what a "docket" is?  I should have

4    asked you that question.

5    A.   Sure.  With every case that's filed in the court,

6    there's a record kept of all the activity in the court, like

7    all the court filings, so all the motions that are filed;

8    all the orders that are entered; all the pleadings that are

9    filed, like oppositions to motions.  And that's what a court

10   docket shows, is that activity in the case.

11   Q.   So when you're looking at this docket, you're seeing

12   all the activity in the civil docket for the case against

13   Allison Baver and ABE?

14   A.   What I'm seeing is the -- specifically just the

15   activity.  I represented Allison Baver and ABE in multiple

16   different cases.  This was just the case regarding the

17   motion to quash the subpoena.

18   Q.   Okay.

19        MR. HUNT:  I would move to admit.  I think that's

20   a good explanation, Your Honor.

21        THE COURT:  Do you have specific objections?

22        MS. MUYSKENS:  No, Your Honor.

23        THE COURT:  It's received.

24   (Defendant's Exhibit 483 was received into the record.)

25   BY MR. HUNT:

```
 1   Q.    Thank you, Mr. Hamilton.  Oh, wait.  Wait.

 2             That's all.  Thank you.

 3             THE COURT:  All right.

 4

 5                    REDIRECT EXAMINATION

 6   BY MR. MUYSKENS:

 7   Q.    Briefly, Mr. Hamilton, you were asked about an appeal

 8   to the Tenth Circuit and activity, correct?

 9   A.    Yes.

10   Q.    That appeal was filed in July of 2022, early July of

11   2022, correct?

12   A.    I believe -- I believe so.  I -- to the best of my

13   recollection, it was filed at the end of July.

14   Q.    And the Tenth Circuit issued a decision in late August

15   of 2022, in or around late August of 2022, denying the

16   appeal, correct -- dismissing for lack of jurisdiction, I

17   should say?

18   A.    Dismissing for lack of jurisdiction, and that sounds

19   about right, that time frame.

20   Q.    So the motion to stay and the November 21st order of

21   2022 all postdate any activity at the Tenth Circuit,

22   correct?

23   A.    That's correct.

24   Q.    Thank you.

25             MR. HUNT:  One more.  Thank you.
```

BY MR. HUNT:

Q.   Could you, then, have filed motions to continue or kept fighting subpoenas if you had been on the case, if you had been able to stay on the case?

MS. MUYSKENS:  Objection, Your Honor.

MR. HUNT:  I think that they just -- we're not -- we're discussing what the stay meant.

THE COURT:  Overruled.  Let him explain.

THE WITNESS:  Sorry, could you repeat your question?

BY MR. HUNT:

Q.   Yeah.  I was just going to ask you, if you stayed on the case and if you were able to stay on the case, could you have filed more motions to continue fighting to quash?

A.   Yeah, so in the Tenth Circuit's decision, as I recall, there was some reference -- I mean, yes.  To answer your question, yes.

Q.   And what were you relying on to make that conclusion?

A.   In the Tenth Circuit's decision, it talked about the fact that we didn't have standing at that point in time, so there was lack of jurisdiction, that Ms. Baver would have had to show that she'd been held in contempt to be able to move forward with an appeal.

Q.   And why did you withdraw?

```
 1  A.   There were multiple reasons.  But the main reason was
 2  that communication had broken down between me and Ms. Baver.
 3  Q.   Okay.
 4  A.   And my firm and Ms. Baver.
 5  Q.   Okay.
 6  A.   And made it impossible for us to continue to further
 7  represent her.
 8  Q.   Were you paid?
 9  A.   We were not paid for a substantial amount of time, as
10  well, yes.
11  Q.   Was that a factor?
12  A.   That was one of the factors listed, yes.
13  Q.   And where did she go to after you?
14            MS. MUYSKENS:  Objection, Your Honor.
15            THE COURT:  Sustained.
16            MR. HUNT:  Thank you, Mr. Hamilton.
17            THE COURT:  May this witness be excused?
18            MS. MUYSKENS:  Yes, Your Honor.
19            THE COURT:  Thank you, Mr. Hamilton.
20            THE WITNESS:  Thank you, Your Honor.
21            THE COURT:  You may step down.
22            You may call your next witness.
23            MS. MUYSKENS:  The United States calls Nick Patel.
24            COURTROOM DEPUTY:  Please raise your right hand.
25            You do solemnly swear that the testimony you shall
```

```
 1   give in the case now before the Court to be the truth, the

 2   whole truth, and nothing but the truth, so help you God?

 3              THE WITNESS:  I do.

 4              COURTROOM DEPUTY:  Please have a seat.

 5

 6                        NIKHIL PATEL

 7   was called as a witness, and having been first duly

 8   sworn to tell the truth, the whole truth, and nothing

 9   but the truth, testified as follows:

10              THE CLERK:  Please state your name and spell it

11   for the record.

12              THE WITNESS:  Nikhil Patel, N-I-K-H-I-L, last name

13   P-A-T-E-L.

14

15                     DIRECT EXAMINATION

16   BY MS. MUYSKENS:

17   Q.   Good afternoon, sir.  Where do you live?

18   A.   I live in Pennsylvania.

19   Q.   Where are you employed currently?

20   A.   First Bank of the Lake.

21   Q.   If it helps, if you want to move the microphone towards

22   you, that way you don't have to lean forward every time.

23              Back in April of 2020, where were you employed?

24   A.   Meridian Bank.

25   Q.   And what was the location of Meridian Bank where you
```

worked?

A.   Philadelphia.

Q.   How long have you worked for Meridian Bank?  During what time period did you work for Meridian Bank?  It was a bad question.

A.   Okay.  Started late 2019 and -- until last May, so May of 2022.

Q.   When you started at Meridian Bank in late of 2019, what was your title?  What was your role?

A.   A credit analyst.

Q.   And as a credit analyst, what did you do?

A.   I was helping -- when I was coming on, I was focusing on franchise lending.  And as a credit analyst, I was helping kind of analyze deals.

Q.   As a credit analyst, what experience did you have at that point with SBA loans?

A.   I had no -- I had minimal SBA loan experience at that time.

Q.   I want to jump to April of 2020.

       Did your responsibilities change?

A.   They did, yeah.

Q.   What happened?

A.   PPP came around.

Q.   That happened to you?

A.   Yeah, that was -- I guess our worlds flipped upside

1  down.

2  Q.   So what changed in terms of your responsibilities at

3  the bank?

4  A.   I was then focused on processing PPP loans.

5  Q.   And prior to processing PPP loans, can you describe the

6  extent of your experience working with any sort of SBA 7a

7  loan program?

8  A.   No experience prior to Meridian Bank, yeah.

9  Q.   So when you were assigned to process PPP loans, how

10  many people at Meridian Bank were doing the processing?

11  A.   I don't know the exact number, but the whole bank was

12  trying to focus on that.

13  Q.   What kind of process or steps did you have set up in

14  place at Meridian Bank?

15  A.   So we would basically collect documents.  We had, like,

16  checklist items that we would collect.  We would put a memo

17  together and write up a memo for the loans or applications

18  that are coming in, and we would send those to review.

19  Q.   And did you have a sort of checklist of items that you

20  needed to receive from the applicant to move their

21  application forward?

22  A.   Yes.  We had a general checklist.

23  Q.   And what was included in that general checklist?

24  A.   That was the application, entity docs, payroll

25  documents.

Q.   So I want to take your attention to later in May -- or later in April of 2020.

Did you participate in the processing of a PPP loan application for $10,000,000 for Allison Baver Entertainment?

A.   Yes.

Q.   And what was your responsibility in that loan application?

A.   That was to collect the documents, write up a memo, and send it for review.

Q.   So I'm going to show you what's been entered into evidence as Government's Exhibit 16, and there's three: 16(a), (b), and (c).

So 16(a), does this look familiar?

A.   Yeah, this is the application form.

Q.   Okay.  So 16(b), is this also the application form with the numbers a little different?

A.   Yeah, it looks like the application form as well.

Q.   Okay.  And 16(c), does this also look like the application form?

A.   Yes.

Q.   Okay.  Do you recall receiving multiple application forms from Allison Baver Entertainment in connection with her request for a $10 million loan?

A.   I don't recall.  I believe there may have been multiple

1   applications.

2   Q.   Okay.  So looking at 16(c), page 2, please.  This has a

3   date of April 25th of 2020.  So if 16(a) and 16(b) had a

4   date of April 24th, 2020, what would have been your process?

5   Which one would you have relied upon?

6   A.   Could you repeat that question?

7   Q.   This has a date of April 25 of 2020, correct?

8   A.   Yeah.

9   Q.   If the other two applications we looked at have a date

10  of April the 24th, 2020, which document would you have been

11  relying upon?  Which application?

12  A.   The latest one.

13  Q.   Now, in processing the request for a loan for Allison

14  Baver Entertainment, did you have communications with

15  Allison Baver?

16  A.   Yes.

17  Q.   Do you recall what those communications were about?

18  A.   Not all of them.  It was -- yeah, it was largely to, A,

19  here's our ShareFile link.  These are the checklist items

20  that we need, and here's how to get them over.

21  Q.   And you said, Here's a checklist of items that we need.

22        Did you routinely provide a checklist of items

23  that were needed?

24  A.   Yeah.  So we had a generic checklist of items for every

25  application, so I would send that out in the email form.

1   Q.   I'm going to pull up 21(c), which has been admitted
2   into evidence.
3            Did you also have what was titled, "7a Program
4   Calculations"?
5   A.   Yes.
6   Q.   So looking at Government's Exhibit 21(c) -- and this is
7   actually a two-page document, but we'll focus on the first
8   page -- does this document look familiar?
9   A.   Yes.
10  Q.   Okay.  And who sent out or who created the format for
11  this spreadsheet?
12  A.   The spreadsheet was created by someone at the bank.  I
13  can't recall.  But that's the one we used for every
14  application.
15  Q.   Now, Government's Exhibit 21(c) has a period of months
16  for program calculations for salary that begin in January of
17  2019 and continue through December of 2019; is that correct?
18  A.   Can you repeat that?
19  Q.   Is 2019 the year of the months that are reflected?  Is
20  that the year?
21  A.   Yes.
22  Q.   And was that the format of the 7a program calculator
23  spreadsheet that you would have sent Ms. Baver?
24  A.   Yes.
25  Q.   Okay.  Going to page 2, do you recall this document,

```
 1   which has the dates changed to 2020?

 2   A.   I do, yeah.

 3   Q.   You recall the document, or you changed the document?

 4   A.   I just recall -- so the payroll calculator, we were

 5   looking for basically the average, what the average monthly

 6   payroll was.  So we were looking to get a number there.

 7   Q.   And going back to page 1.  Sorry, Melissa.

 8        Who input these numbers in the March, April, and

 9   May blocks of salary of 2.95 million and then a total of

10   about 5.4 million per month?  Who input that?

11   A.   That was provided from Allison.

12   Q.   Did you put these numbers in?

13   A.   No.

14   Q.   And if we look at page 2, we see some variation in the

15   number on the second category of the 58,333.

16        Do you know why it was changed from 700,000 to

17   58,333?

18   A.   That, I don't recall at this time.

19   Q.   Would you have changed the numbers in the spreadsheet,

20   or was it always provided by the applicant?

21   A.   Always provided by the applicant.

22   Q.   And the numbers here reflect a salary and wages for the

23   month of March 31 of 2020 of 2.951 and 12 dollars; is that

24   correct -- million, 2.9 million?

25   A.   Yes.
```

1  Q.   Did you input these numbers in?

2  A.   No.

3       THE COURT:   Just so that I'm clear:   Did you get

4  both sheets?   In other words, did the packet that came to

5  you have the sheet with the 2019 numbers and the 2020

6  numbers?

7       THE WITNESS:   The -- so first, I can't recall, but

8  so we got one version and then another version as well.   So,

9  like, the numbers changed.

10       THE COURT:   And do you know which came first?

11       THE WITNESS:   I believe the 2019 came first.

12  BY MS. MUYSKENS:

13  Q.   And did that come in as part of the application package

14  submitted by Allison Baver?

15  A.   Yes.

16  Q.   So from Allison Baver you received two spreadsheets,

17  one numbered from -- or containing months for the year 2019,

18  and one for the months 2020; is that correct?

19  A.   Yes.

20  Q.   Did Allison Baver explain to you what that was all

21  about?

22  A.   I don't recall.

23  Q.   Did you also receive a series of other documents?   I'm

24  going to show you 21(a).

25       Do you recall seeing this table of contents with

1   the application?

2   A.   Yeah.

3   Q.   What did you do with this information?

4   A.   I just put it in the file.  This wasn't something -- it

5   was just something that was provided from -- from the

6   applicant.

7   Q.   When you say "the applicant," are you referring to

8   Allison Baver?

9   A.   That's Allison.

10  Q.   And in this part that we have pulled out here, it says,

11  "PPP Loan Request" for $8.3 million; do you see that?

12  A.   Yeah.

13  Q.   Did you notice that being different than her request

14  for $10 million?

15  A.   I don't remember.

16  Q.   Did you -- you didn't ask for this document; is that

17  correct, it was just provided?

18  A.   Correct.

19  Q.   Did you understand what this table of contents was for?

20  A.   No, I didn't.

21  Q.   So when you were looking at payroll -- we just showed

22  you the 7a calculator.  If we could go to 21(e).

23        Was this also a document that was provided by

24  Allison Baver Entertainment?

25  A.   Yes.

1  Q.   And it says, "Season Payroll Audit," dated 4/22/2020;
2  is that correct?
3  A.   Yeah.
4  Q.   And there's a date and time on the left that indicates
5  the dates and the check dates, check for payroll, correct,
6  4/22 of 2020?
7  A.   Yes.
8  Q.   Okay.  And is this a document that was provided by
9  Allison Baver, an audit, claiming season payroll on 4/22 of
10 2020?  Was that provided to you in connection with the loan
11 application?
12 A.   Yes.
13 Q.   And I'm going to show you Government's Exhibit 21(b).
14 Do you recall receiving this letter?
15 A.   Yes.
16 Q.   And is this something you requested or asked for?
17 A.   This was not.  It was also just provided with the
18 application.
19 Q.   Okay.  And in the fourth paragraph, it states that,
20 "Allison Baver Entertainment is applying for the PPP loan
21 for $8.3M to continue our operations and finance employment
22 lost due to COVID-19."
23          Do you recall reading this, or did you even read
24 this letter?
25 A.   I quickly glanced over it at the time.

1  Q.   Did you ask Allison Baver about the 8.3 million versus
2  the $10 million request, or what were you relying upon for
3  your numbers?
4  A.   I was relying on what was provided in the application.
5  Q.   So you say, "what was provided."  Well, there was a lot
6  provided; is that right?
7  A.   Yeah.  Yeah.
8  Q.   Was there a script provided?
9  A.   What was that?
10 Q.   A movie script, do you recall receiving one of those?
11 A.   No.
12 Q.   Okay.  How about what's called a "pitch deck" or some
13 slides, do you recall receiving any of those?
14 A.   No.
15 Q.   So you were relying upon the application.
16           And we looked at the 7a calculator; is that what
17 you were relying upon?
18 A.   Yes.
19 Q.   And what about that season audit that said payroll
20 season audit for April 22 of 2020.  Were you relying on
21 that?
22 A.   Yeah, that was viewed as supporting payroll docs.
23 Q.   When you were processing the loan application, at the
24 time you were processing it, did you understand or know that
25 Allison Baver Entertainment had zero employees at that time?

A.    Could you repeat the question?

Q.    When you were processing the Allison Baver PPP loan application --

A.    Yeah.

Q.    -- the application says, How many employees?  Do you remember?  Do you need me to pull up it up?  16(c), please.

A.    430, I believe.

Q.    Did you know that at the time that was submitted to you, Allison Baver Entertainment had zero employees?

A.    No.

Q.    Did you know at the time you were reviewing the documents that Allison Baver Entertainment had no monthly payroll, let alone 4.7 million?

A.    No.

Q.    When you talked with Ms. Baver through the application process, was that told to you by her?

A.    No, not that I recall.

Q.    If you had learned that, what steps would you have taken?

A.    I would have taken a step back at that time.

Q.    Now, I want to pull up Government's Exhibit No. 22, please.  And this has been admitted into evidence.

      It's a string of emails, and it looks like you were copied on this, maybe on the tail end by Rocco Perate.

      And do you know who Rocco is?

1   A.   That used to be my manager.

2   Q.   And were you -- did you read the entirety of this

3   email, or what did you understand when you received this

4   email?

5   A.   Yeah, I definitely probably did not read the whole

6   email chain.  But I believe somewhere on the email it was

7   like a, We spoke with SBA, and they told us we're good to

8   go.

9   Q.   Okay.  Upon receiving this email, did you begin to

10  collect and gather the documents from Allison Baver

11  Entertainment?

12  A.   Yes.  So after the intro was made, I sent out the

13  checklist email and started collecting documents.

14  Q.   Okay.  And what -- going to Government's Exhibit 16(c).

15       What numbers and information did you rely upon in

16  processing and moving this application forward?

17       MR. HUNT:  Your Honor, object to the relevance at

18  this point.  What's the value of what he relied on when

19  we're talking about a false statement case about what the

20  defendant's intent was?  Are we talking a fraud case here?

21  At this point, I don't know.

22       MS. MUYSKENS:  Your Honor, the defense has made

23  arguments that the bank was at fault.  Those were the words

24  used by --

25       MR. HUNT:  I have not --

```
 1              THE COURT:  I'll allow it.

 2              MS. MUYSKENS:  Thank you.

 3    BY MS. MUYSKENS:

 4    Q.   What numbers did you rely upon?

 5    A.   The average monthly payroll, as well as number of

 6    employees.

 7    Q.   So upon receiving and reviewing the application and

 8    supporting documents to include the payroll audit, I want to

 9    pull up Government's Exhibit 19.

10              What is this document?

11    A.   This is the memo that we would put together and send to

12    review.

13    Q.   Okay.  And it's a two-page -- you don't have to pull it

14    up.  Is it a two-page document?

15    A.   I believe so, yeah.

16    Q.   Can you show the full document.  Thanks.

17              And this states that the date prepared was on

18    April 25th of 2020; is that correct?

19    A.   Yes.

20    Q.   And you were the preparer?

21    A.   Yes.

22    Q.   And that was the same date as the date of the

23    application, 16(c), the last application, correct?

24    A.   Yeah.

25    Q.   Okay.  And so was this an internal document or an
```

external document?  Would you send this to anyone, or was
that internal only?

A.   This was internal.

Q.   So once you received the materials, what was your
responsibility in the process?  Who did you move things on
to?

A.   I moved it on to Numan.

Q.   Is that Numan Rizvi?

A.   Yeah.

Q.   And is that when your responsibility ended?

A.   Yeah.

Q.   Did you have any further responsibility or
communications with Allison Baver with respect to the
$10 million PPP loan?

A.   No, not after it was processed.

Q.   And how did you receive -- you mentioned links.  How
did you receive all of the documents that were sent by
Allison Baver?  How did that get transmitted to you?

A.   It was a ShareFile, so it was a secure upload link
and/or possibly piecemeal of other items.  But the majority
was probably through ShareFile.

Q.   And you had also email communications and also a
telephone call with Allison Baver during that process to
gather the documents?

A.   Yes.

1  Q.   And the person you were speaking to identified

2  themselves as Allison Baver; is that right?

3  A.   Yes.

4           MS. MUYSKENS:  No further questions.

5           THE COURT:  Mr. Hunt.

6           MR. HUNT:  I'm sorry, my turn?

7           THE COURT:  Your turn.

8

9                    CROSS-EXAMINATION

10  BY MR. HUNT:

11  Q.   Okay.  Hi.  Go ahead and take your drink.

12           Mr. Patel, when you first heard of the PPP loan

13  program, who first told you about that program?

14  A.   About the PPP loan program?

15  Q.   Yeah.

16  A.   I can't recall if it was -- probably Rocco or someone

17  from the bank.

18  Q.   It would have been one of your superiors?

19           Was Rocco your immediate superior?

20  A.   He was my manager.

21  Q.   Okay.

22  A.   Boss, yeah.

23  Q.   Okay.  And you said that it was pretty crazy.

24           You were new to the industry at that time?

25  A.   I was, yeah.

```
 1   Q.    And not a lot of experience?

 2   A.    I was probably five to six months in.

 3   Q.    Okay.

 4   A.    Probably five months, I think.

 5   Q.    And you didn't receive any training on the PPP program

 6   from Mr. Perate, did you?

 7   A.    There was no formal training.  The program came out

 8   super quickly.

 9   Q.    What did you rely on, then, to try and -- when you were

10   talking to these people about how to do it, how to get

11   involved?

12   A.    Do you -- repeat that question.

13   Q.    If someone came to you and said, Hey, I want to

14   participate in this.  I want a PPP loan, what -- would you

15   know how to explain that to them, what it was?  Or how would

16   you handle that if you were never trained?

17   A.    I would send the checklist that we had.

18   Q.    That we just looked at?  Or was there another one?

19         Can I pull up 457?

20         THE COURT:  Has that been admitted?

21         MR. HUNT:  Has it?

22         THE COURT:  I don't know.

23         Has that been admitted?

24         MS. MUYSKENS:  It has not, but no objection.

25         THE COURT:  Okay.  It's received.
```

1         (Exhibit 457 was received into evidence.)

2    BY MR. HUNT:

3    Q.    What is this?

4    A.    This is the checklist.

5    Q.    Okay.  This is what you would send?

6    A.    Yeah.

7    Q.    So if any questions were asked to you, you really

8    didn't know the answers to their questions about the PPP

9    loan, correct?

10   A.    Ask that question again.

11   Q.    You didn't have any training on it?

12   A.    No, there was no formal training.

13   Q.    Okay.  And Rocco hadn't trained you on it?  No internal

14   training?

15   A.    There was -- I mean, there were FAQs.  You were trying

16   to keep up as best as possible.

17   Q.    Okay.  There were a lot of FAQs, and that's what you

18   relied on.  I think we've heard earlier that the FAQ was,

19   like, the main source of information for you all; is that

20   correct?

21   A.    From what I remember, yeah.  They were -- they were

22   being rolled out quite often.

23   Q.    Look down this list here on 457.  This is what you

24   would have liked to have received from any applicant to the

25   PPP program; not really explaining to them much what the

1   program is, rather it's what you would like to receive from

2   them, correct?  Correct?  My voice is terrible.  I apologize

3   again.  I'll get some more water up here.

4           But do you -- this seems to me to be a document

5   asking for information, not giving information about the PPP

6   program; is that a fair statement?

7   A.    Yeah.  I mean, we were processing --

8   Q.    Okay.

9   A.    -- applications, yeah.

10  Q.    Okay.  And one of the things at the bottom I see -- if

11  we could highlight right where 457 is -- it says,

12  "Supporting Payroll Documentation," and it says, "whatever

13  is applicable."

14          What do you think that means?

15  A.    So that's like whatever -- what would apply to the

16  business.

17  Q.    So if this loan is not forgiven, then is your bank --

18  your bank is still not on the hook; is that correct?

19  A.    That, I don't know.

20  Q.    Okay.

21  A.    Yeah.

22  Q.    But you're trying to give out a $10 million loan here,

23  correct?

24  A.    Well, I'm not approving, I'm just processing.

25  Q.    Well, you're certainly trying to get information enough

1  to get someone to at least apply for a $10 million loan,

2  aren't you?

3  A.   They, I mean the applicants, would come to us.

4  Q.   You were the contact -- for example, let's just jump to

5  Ms. Baver.

6        You were the contact person for Ms. Baver; were

7  you not?

8  A.   Rocco had -- yeah, had copied me on the email to

9  collect documents.

10  Q.   And so you took over.  In fact, the email -- doesn't

11  the email say, I'm handing you over to one of my best

12  salesmen, Nick Patel, and he'll take care of you?

13  A.   I mean, I don't recall what the --

14  Q.   Did you ever -- I'm not trying to trip you up here, I

15  promise.

16        Were you in charge of Ms. Baver's loan or trying

17  to help her?  Were you the person?

18  A.   I was -- my job was to collect the documents and put

19  together the memo.

20  Q.   Okay.  When I look at "whatever is applicable," it

21  seems to me that I might want to know either a little bit

22  about what the person is going to use the money for, or a

23  little bit about her business; is that a fair statement to

24  you?

25  A.   We're relying on the application --

1  Q.   Okay.

2  A.   -- itself.

3  Q.   But your document, it has, "whatever is applicable,"

4  and you put a long list of documents down there; yet, you're

5  aware that there are two documents that suggest that

6  Ms. Baver doesn't have any employees, correct?  I mean

7  sitting here today, as you're sitting here today, you're

8  aware of that, right?

9  A.   Well, what was the question?

10 Q.   You're aware, as you're sitting here today, that there

11 are two documents at least that explain that Ms. Baver

12 didn't have any employees at the time, correct?

13 A.   Is that, like, looking back or at the time --

14 Q.   At the time when she was applying for the loan with

15 Meridian Bank.

16 A.   Yeah.

17 Q.   Okay.  And you're aware, also, that both of those

18 documents were provided to Meridian Bank at the time the

19 loan was being processed -- or before the loan was

20 processed?

21 A.   Correct, along with the application, yeah.

22 Q.   And so she, when she filled out that document that

23 we've been talking about over and over again, she'd informed

24 you that, Help, I need a loan.  I don't have any employees

25 right now.  I have a business that's got things up and

going, but I have no concept of how to save jobs.  And your

response is to send out the checklist and just say, Go for

it.  Please give me the checklist documents back, correct?

MS. MUYSKENS:  Objection.  Compound question.

There are multiple layers in there.

THE COURT:  Well, do you understand the question,

Mr. Patel?

THE WITNESS:  No.

THE COURT:  Okay.  Well, maybe you can break it

down, Mr. Hunt, into discrete parts.

MR. HUNT:  I will.  All right.

BY MR. HUNT:

Q.   So at the time Ms. Baver -- we just established that at

the time Ms. Baver came to Meridian Bank, she came to

Meridian Bank, so to speak, with a couple documents

explaining that she didn't have any employees at the time.

We've already established that.

A.   (Inaudible).

MS. MUYSKENS:  Objection.  Mischaracterizes the

evidence.

MR. HUNT:  No, he answered yes.

THE COURT:  Well, why don't you phrase that as a

question.

MR. HUNT:  Okay, but he did answer yes to that

question.

BY MR. HUNT:

Q.   Let's start with question No. 1, Mr. Patel.

     The purpose of what I'm doing is to establish what was going on with Ms. Baver at the time she was working with you, okay?  That's what we're doing.  I'm trying to help you out, I'm not trying to trip you up, I promise, okay?  Do you need a break?

A.   Was that a question, or ...?

Q.   No.  You have this look on your face.  You've got morbid fear of looking at me, and I'm trying not to be scary.  I don't want to be.

     Are you comfortable?  Are you okay right now?

A.   Yeah.

Q.   All right.  So when Ms. Baver came to you, there were two documents that we've talked about that explained that she didn't have any employees, and she was looking to fund the business, moving forward, hopefully to save some gigs, some movies that she had going; were you aware of that?

A.   That ...?

Q.   At the time.

A.   At the time?

Q.   Yeah.

A.   I was not, because --

Q.   Okay.

A.   -- she was providing the application.

1  Q.   Okay.  So it looks like that you -- that she sent you

2  that information and it went to Meridian Bank.  I think that

3  it's clear that both of those documents went to Meridian

4  Bank.  One was in an email from Mr. Kruelle, and another one

5  was in a good faith letter, okay?  Do you agree with that?

6  Do you understand the two documents I'm talking about?

7  A.   The good faith letter --

8  Q.   Yeah.  And also the email from Mr. -- it was from

9  Allison Baver, but from Mr. Kruelle.

10  A.   The long email chain?

11  Q.   Yeah.

12  A.   Do I recall the full email?

13  Q.   No, not do you recall it, do you just recall receiving

14  it?

15  A.   Receiving it, yeah.  I believe that's how the intro was

16  made.

17  Q.   Okay.

18  A.   But I didn't read through the full email at the time.

19  I mean, there was a lot going on.

20  Q.   It was too long to read?  It's a paragraph.  It's this

21  long.  You guys were that busy?

22  A.   It was pretty -- yeah, it was pretty busy.

23  Q.   Okay.  460 billion busy, I think is what it was.

24          So then these documents are in the possession of

25  Meridian Bank, okay?  Can we go that far and safely say that

1  you understand at that time the documents are in the

2  possession of Meridian Bank?

3  A.    Yeah, they're in a folder.

4  Q.    Whether you've read them or not, I'm not sure.

5  A.    Yeah.

6  Q.    Okay.  But your response to whatever inquiry Ms. Baver

7  makes is to send out what's in front of us now as

8  Exhibit 457, correct?  This is what you'd do?

9  A.    That's -- yeah, I would send this generic checklist

10 out.

11 Q.    All right.  Thank you.  And then again, now I'm going

12 to jump ahead, jump into a little extra area of seasonal

13 businesses.

14         Are you aware of that term?

15 A.    Just -- seasonal wasn't operational for the full year.

16 Q.    So did you understand how the seasonal business

17 applications worked?

18 A.    I had a general understanding.

19 Q.    Okay.

20 A.    I mean, at that time, too, it was -- a lot was

21 changing.

22 Q.    Now, Ms. Baver described her business to you as a

23 business where she had some movies and a TV show; do you

24 recall that?

25 A.    There were -- yeah, I viewed that as her saying there

1    were projects going on.

2    Q.    So there were projects that were going on.

3          Did this fit squarely into your concept of even

4    what a seasonal business might be?

5    A.    I mean, I don't know a lot of seasonal businesses, or

6    my view of seasonal businesses is they're not operational

7    for the full year.

8    Q.    Okay.  Projects, not -- may be or not be operational

9    for a full year, correct?

10   A.    Yeah.

11   Q.    Okay.  Moving along.

12         When you received information back, do you send

13   out -- or describe the timing for me of when you send out

14   the application or the little calculator.

15   A.    That was probably with the checklist email.

16   Q.    Okay.  And it would be with this email here?

17   A.    Yeah.  If I had to guess, yeah, it would.

18   Q.    Now, on that application, it identifies that there's

19   information that is put on there that is generated and then

20   used by you to create the document that is sent to SBA,

21   correct?

22   A.    Could you repeat that question?

23   Q.    The calculator that you used is the information that

24   you used to create the documents that you sent up to the SBA

25   for the PPP program?

                                                          377

```
 1   A.   So we use the application and what's provided --
 2   Q.   Uh-huh.
 3   A.   -- to put together the memo.
 4   Q.   Okay.
 5   A.   And the memo gets inputted into the SBA system.
 6   Q.   And do you ever stop -- and I guess that's, as I
 7   understand, that you really never stop and look more at the
 8   company at all or what the individual tells you at all
 9   that's not on that list that you've given them, correct?
10   A.   No.  I mean, we're just relying on what's provided.
11   Q.   Okay.  That's fine.  I mean, you're not asked to, are
12   you?  The PPP program is not requiring you to do any more
13   than what you did right there, correct?  I mean, you --
14   A.   Yeah.
15   Q.   -- feel like you were following the program correctly?
16   A.   Yeah.
17   Q.   And we've heard from a few banks, and you know that
18   there were these FAQs, and you felt you were following the
19   FAQs and the rules for the applications that were sent to
20   you, correct?
21   A.   To the best of my ability.
22   Q.   Right.  And so anything else that might have come to
23   you wouldn't have been considered.
24   A.   Well, is that a question?
25   Q.   Yes, I'm sorry.  I just kind of assumed that those
```

1  questions are dropped, so ...

2          Does that sound right, anything else beyond the

3  realm of the application itself or your questionnaire,

4  that's not something that you had time to consider, that you

5  could consider in the chaos of these first couple weeks of

6  PPP?

7  A.   Yeah, I mean, there was a lot going on.  We were trying

8  to process as quickly as possible.

9  Q.   And let's look up 458, if we could.

10         MR. HUNT:  I don't think this is entered either,

11 Your Honor.

12         THE COURT:  Well, if we're going to launch into a

13 new subject matter, it's about one minute to 5:00.

14         MR. HUNT:  Let's see what we've got here.

15         THE COURT:  So, I mean, we can break for the

16 evening, and then hopefully you can hone the rest of your

17 examination down tonight.  We'll finish him up in the

18 morning.

19         MR. HUNT:  Okay.

20         THE COURT:  Okay.  I told the members of the jury

21 we'd let them go at 5:00, so I want to keep my commitment.

22         All right, Members of the Jury, we will break for

23 the evening.  And I will give you the same admonishment that

24 I gave you last night.  Please don't do any investigating on

25 your own.  Don't go home and start doing Internet searches

on the lawyers, on the parties, on any of the witnesses, on

PPP regulations.

　　　　　Please do not discuss the case with anyone.  It's

important that you keep an open mind until you've heard all

of the evidence.  And also, it's important that you then

hear my legal instructions before you start to try and

figure out where you're going to land on this case.

　　　　　So have a good evening, but don't worry about the

case until you show up tomorrow morning at 8:30.

　　　　　THE CLERK:  All rise for the jury.

　　　　(The jury left the courtroom.)

　　　　　THE COURT:  Mr. Patel, you can step down.

　　　　　Counsel, how are we doing on time?

　　　　　MS. MUYSKENS:  We are ahead of schedule, Your

Honor.  I anticipate we may finish tomorrow by lunchtime, if

not before.

　　　　　THE COURT:  Okay.  That's great.  Can you, just

for my benefit, tell me who's left that you're planning on

calling.

　　　　　MS. MUYSKENS:  For our chase-in-chief, I

anticipate we will call Ethan Hanson, Lisa Whalen --

　　　　　THE COURT:  Just a minute.  I'm trying to -- okay.

Ethan Hanson.

　　　　　MR. HUNT:  Is that the order?

　　　　　MS. MUYSKENS:  I don't know.

```
 1              THE COURT:  Aaila --

 2              MS. MUYSKENS:  Lisa Whalen.  Right below

 3   Mr. Hansen.

 4              THE COURT:  Oh, okay.  There we go.

 5              MS. MUYSKENS:  And Jeff Kirkwood with the IRS.

 6              THE COURT:  Okay.  So you just have three

 7   witnesses left?

 8              MS. MUYSKENS:  Yep, we anticipate that.

 9              THE COURT:  And then the other folks are, what,

10   may-calls or rebuttal witnesses?

11              MS. MUYSKENS:  Correct.

12              THE COURT:  Okay.  All right, then.  Well, that's

13   good news.

14              Did we ever get the jury instruction objection on

15   file?

16              MR. HUNT:  Yes.

17              THE COURT:  Okay.  I will look at that this

18   evening, then.

19              When was that filed?

20              MR. HUNT:  I thought yesterday.

21              THE COURT:  Oh, we got it filed last night.  Okay.

22   All right.  I will take a look at that.  It sounds like we

23   may need to finalize the jury instructions tomorrow evening,

24   or at least that would be a good idea.  All right.

25              Is there anything else we need to address before
```

1  we adjourn for the evening?

2          MR. HUNT:  Nothing further, thank you.

3          MS. MUYSKENS:  Nothing, Your Honor.

4          THE COURT:  Okay.  Thank you.

5      (The proceedings adjourned at 5:02 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    COURT REPORTER'S CERTIFICATE


State of Utah          )
                         ss.
County of Salt Lake  )

            I, Michelle Mallonee, a Registered Professional
Reporter in and for the State of Utah, do hereby certify:

            That the proceedings of said matter was
reported by me in stenotype and thereafter transcribed into
typewritten form;

            That the same constitutes a true and correct
transcription of said proceedings so taken and transcribed;

            I further certify that I am not of kin or
otherwise associated with any of the parties of said cause
of action, and that I am not interested in the event
thereof.

            WITNESS MY HAND at Salt Lake City, Utah, this
10th day of October 2023.




                              _____
                              Michelle Mallonee, RPR, CCR
                              Utah CCR #267114-7801
                              Expires May 31, 2024