## COLLECTION ACCOUNT MANAGEMENT AGREEMENT

### "No Man Of God"

This Agreement ("Agreement") is made on January 6, 2021 and has effect as of June 21, 2020 ("Effective Date") BETWEEN:

1.  **Fintage Collection Account Management B.V.**,                              , The Netherlands ("**CAM**");

2.  **No Man of God LLC**,                              , West Hollywood, CA 90069, USA ("**SPE**");

3.  **Company X Productions, Inc.**                              West Hollywood, CA 90069, USA ("**CX**") (SPE and CX are jointly and severally referred to herein as "**Producer**");

4.  **XYZ Films, LLC,**                              Los Angeles, CA 90016, USA ("**Sales Agent**");

5.  **RLJ Entertainment, Inc.**                              Silver Spring, MD 20910, USA ("**RLJ**");

6.  **Amber Sealey Films, Inc.**, f/s/o Amber Sealey, c/o MGMT Entertainment,                              West Hollywood, CA 90069, Attn: Cora Olson ("**ASF**")

7.  **Screen Actors Guild-American Federation of Television and Radio Artists**,                              Los Angeles, California 90036, USA ("**SAG-AFTRA**");

8.  **Directors Guild of America, Inc.**,                              Los Angeles, California 90046, USA ("**DGA**"); and

9.  **Writers Guild of America, West, Inc. for itself and on behalf of Writers Guild of America, East, Inc.**,                              Los Angeles, California 90048-4329, USA ("**WGA**").

Severally and collectively, the "Party" or "Parties".


WHEREAS:

The Parties have agreed that the CAM, acting as their representative, shall on their behalf receive all revenues derived from the exploitation of the Project in the Territory and administrate, allocate and pay the same on behalf of the Parties upon the terms and conditions hereinafter appearing.

In this Agreement, the singular includes the plural and vice versa and the neuter shall include the masculine or feminine gender and persons shall include firms and corporations.

NOW IT IS AGREED as follows:

**GOVERNMENT EXHIBIT**

**45**

2:21-cr-00520-JNP

PENGAD 800-631-6989

BR-CXP-01-00002

# 1. DEFINITIONS

In this Agreement, the following definitions shall apply:

"Accounting Currency"   US Dollar ("USD").

"Accounting Period"   One of the individual periods as described in clause 3.1, which is the subject of a Statement produced by the CAM.

"Assumption Agreement"   Any or all of the following, as applicable: a Distributor's Assumption Agreement, a Buyer's Assumption Agreement (in the forms set forth in the applicable Basic Agreements) and a Literary Materials Assumption Agreement (as that term is used in the WGA Basic Agreement).

"Basic Agreements"   Collectively, the DGA Basic Agreement, the SAG-AFTRA Basic Agreement and the WGA Basic Agreement.

"Beneficiaries"   All persons, firms, companies, Guilds, benefit plans and other entities who have the right to receive part or parts of the Collected Gross Receipts (except for CAM Fee and/or CAM Expenses).

"Benefit Plan Contributions"   Any pension, health and welfare contributions that are or may become due to be paid on behalf of Guild-Represented Employees under the applicable Basic Agreements.

"Business Day"   Any day except Saturday, Sunday and any day, which is a public holiday in the place in which any of the Parties has its main place of business.

"CA Bank"   City National Bank, 400 N. Roxbury Drive, 4th Floor, Beverly Hills, CA 90210, USA, being the bank at which the Collection Account is opened, held and maintained.

"CAM Expenses"   All of the bank charges incurred by the CAM in relation to its duties and obligations hereunder, and, to the extent provided for in this Agreement, all of the CAM's audit and legal fees and expenses, costs, related costs, including, but not limited to, those expenses incurred by the CAM on behalf of one or more of the Parties or Beneficiaries. The CAM has a discretionary right to retain monies in the Collection Account, after funding the Residual Set-Aside, in order to create a reasonable reserve for the Term of this Agreement to defray the CAM Expenses.

"CAM Fee"   Remuneration for the CAM, exclusive of CAM Expenses, for its services rendered pursuant to this Agreement, consisting of a recoupable set-up fee of USD4,750, plus a commission of 1.00% of all Collected Gross Receipts up to USD950,000, 0.75% of the next USD1,250,000 of Collected Gross Receipts, 0.50% of the next USD1,250,000 of Collected Gross Receipts and 0.35% of the Collected Gross Receipts thereafter or, alternatively, a minimum commission of USD475 per

Statement, whichever is the highest. The set-up fee shall be recoupable against the commission payable on Collected Gross Receipts in excess of USD950,000.

"Collected Gross Receipts"　　Gross Receipts received in or credited to the Collection Account, including Deemed Collected Gross Receipts.

"Collection Account"　　Bank account at CA Bank, designated to receive those Gross Receipts, which, in accordance herewith, are payable into this account, as described in clause 2.2.

"Collection Account Interest"　　Interest accrued on the Collection Account at CA Bank.

"Deemed Collected Gross Receipts"　　Any Gross Receipts received by any Party or third party during or prior to this Agreement which should have been credited to the Collection Account in accordance with this Agreement. For the purposes of calculating the Residuals Set-Aside and payment of Residuals only, and for the avoidance of doubt, any such Gross Receipts shall be Deemed Collected Gross Receipts.

"DGA Basic Agreement"　　The applicable DGA collective bargaining agreement to which the Producer is bound or otherwise obligated to honor, and any and all applicable present and future amendments thereto and replacements therefore and extensions thereof.

"DGA Final Credits List"　　A summary of the customary details necessary for the Payroll House to process and issue Residuals payments to DGA-Represented Employees in accordance with their respective credits that have been approved by the DGA.

"DGA-Represented Employees"　　All persons whose services in connection with the Project are subject to the DGA Basic Agreement, as further listed on Exhibit E-1 hereto.

"Distribution Agreements"　　Each and every agreement in connection with the Project for the exploitation, distribution, sale, leasing, license, exhibition, transmission, or any other form of exploitation, or any associated rights, merchandising, publishing, allied or ancillary rights of the Project, excluding music publishing rights, in any part of the Territory through any existing or future product, service or platform.

"Distributors"　　Those individuals, firms, companies or other entities, which enter or have entered into Distribution Agreements, including but not limited to, RLJ.

BR-CXP-01-00002.03

| | |
|---|---|
| "Distributor's Assumption Agreement" | An agreement set forth in the Basic Agreements wherein a Distributor assumes the payment of Residuals that have or will become due to Guild-Represented Employees. |
| "Distributor's Report" | A written statement from each Distributor showing Gross Receipts derived from exploitation of the Project by Distributor, the date of the first exhibition (as applicable) on television or in Supplemental Markets (as defined in the applicable Basic Agreements) and whether such exhibition was on network television, and if so, whether in prime time. |
| "Domestic Territory" | United States and Canada and their respective territories, possessions and commonwealths, including without limitation US Virgin Islands and Puerto Rico, and all United States military bases and all US-bound or -originating ships and planes, as well as and the Caribbean Basin Islands. The **Caribbean Basin Islands** are licensed on a non-exclusive basis in the Spanish and Portuguese languages only, and shall specifically exclude Puerto Rico, and the U.S. Virgin Islands, but shall include: Anguilla, Antigua & Barbuda, Aruba, Bahamas, Barbados, Bermuda, Bonaire, the British Virgin Islands, the Cayman Islands, Cuba, Curacao, Dominica, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, Saba, Saint Barthelemy, Sint Eustatius, St. Kitts & Nevis, St. Lucia, Sint Maarten, St. Martin, St. Vincent & Grenadines, Trinidad, Tobago and the Turks and Caicos Islands. |
| "Effective Date" | As described in the heading of this Agreement. |
| "Entitlement" | Such part or parts of the Collected Gross Receipts, payable to a Beneficiary and/or the CAM under the terms and conditions of this Agreement. |
| "Gross Receipts" | All proceeds (exclusive of VAT or similar taxes or duties) derived from Distribution Agreements or from any other source of exploitation relating to the Project in the Territory, including any such proceeds used to finance the Project and revenues paid by any Distributors as deposits, advances, guarantees, license fees, overages or other revenues generated by the Project. For the avoidance of doubt, if the Producer or the Sales Agent (or any other Party having ownership of and/or control over any exploitation of any rights in connection with the Project) elects to distribute or exploit the Project itself in any part of the Territory (in which case of exploitation such shall be notified by the relevant Party to CAM), the proceeds derived from that exploitation shall be considered Gross Receipts. Notwithstanding the above, Gross Receipts, for the purposes of calculating the Residuals Set-Aside or Residuals payable to the Guilds under this Agreement only, shall not exclude any sums unless such exclusion is permitted under the terms of the applicable Basic Agreements. |

| | |
|---|---|
| "Guild" or "Guilds" | SAG-AFTRA, DGA and WGA shall be referenced collectively as the "Guilds" or each individually as a "Guild". |
| "Guild-Represented Employees" | SAG-AFTRA Performers, DGA-Represented Employees and WGA-Represented Employees. |
| "Hagmaier Box Office Bonuses" | The contingent compensation payable to William E. Hagmaier by Producer as follows; |

The one-time amount of US$50,000 at such time (if ever) as the domestic (i.e., US and Canada) theatrical box office receipts from the initial release of the Project as reported by Entertainment Data, Inc. ("DTBOR") reach 2.5 times the "Negative Cost" (which shall mean the total cost of producing the Project, including financing costs and supervisory fees) of the Project or the worldwide theatrical box office receipts of the Project as reported by Entertainment Data, Inc. ("WTBOR") reach 5 times the Negative Cost of the Project, whichever is earlier;

The one-time amount of US$75,000 at such time (if ever) as the DTBOR reach 3 times the Negative Cost of the Project or the WTBOR reach 6 times the Negative Cost of the Project, whichever is earlier;

The one-time amount of US$100,000 at such time (if ever) as the DTBOR reach 3.5 times the Negative Cost of the Project or the WTBOR reach 7 times the Negative Cost of the Project, whichever is earlier;

The one-time amount of US$150,000 at such time (if ever) as the DTBOR reach 4 times the Negative Cost of the Project or the WTBOR reach 8 times the Negative Cost of the Project, whichever is earlier;

The one-time amount of US$200,000 at such time (if ever) as the DTBOR reach 4.5 times the Negative Cost of the Project or the WTBOR reach 9 times the Negative Cost of the Project, whichever is earlier; and

The one-time amount of US$250,000 at such time (if ever) as the DTBOR reach 5 times the Negative Cost of the Project or the WTBOR reach 10 times the Negative Cost of the Project, whichever is earlier.

For the purpose of this Agreement, Producer shall as soon as reasonably possible notify CAM about each Hagmaier Box Office Bonus actually paid to Hagmaier and the source of such funds, whereby CAM may rely on the accuracy of such notifications.

| | |
|---|---|
| "Hagmaier Prize Bonuses" | In the event the Project wins any prize, award or other recognition by any film institute, festival, academy or other |

BR-CXP-01-00002.05

body (a "Prize"), Producer shall pay William E. Hagmaier the sum of US$10,000 for each such Prize, up to a maximum of 4 such Prizes (i.e., a maximum aggregate payment of US$40,000 with respect to Prizes). For the purpose of this Agreement, Producer shall as soon as reasonably possible notify CAM about each Hagmaier Prize Bonus actually paid to William E. Hagmaier and the source of such funds, whereby CAM may rely on the accuracy of such notifications.

"Incoming Payment Notification"

Notification by CAM, informing the Parties about Collected Gross Receipts as and when received by CAM or when CAM has become aware of such Collected Gross Receipts, including the amount, territory, the payor and the date of receipt.

"Irrevocable Instructions and Notice of Acknowledgement"

The irrevocable instructions issued to and notice of acknowledgment by a Distributor, in substantially the same form of Exhibit B attached hereto and incorporated herein by this reference.

"Notice"

As described in clause 8.

"Participations"

The Hagmaier Box Office Bonuses and the Hagmaier Prize Bonuses paid to William E. Hagmaier by Producer.

"Payroll House"

The payroll service company mutually agreed upon by Producer, the Guilds and CAM to provide administrative services in connection with the Residuals pursuant to this Agreement. Producer hereby designates Media Services as the Payroll House for such purpose and whose contact details are Michael Albert, michael@mediaservices.com.

"Payroll House Fees"

The fees to be charged by the Payroll House for the services described herein.

"Producer Payroll Taxes"

Any and all payroll taxes (as applicable) payable to governmental entities for Guild-Represented Employees, in addition to Producer's payment of gross wages to each such employee, including, without limitation, all gross wages that must be withheld for payment of state and/or federal taxes (under U.S. law). The Payroll House shall calculate all amounts payable for such taxes.

"Project"

The film entitled "No Man Of God".

"Qualified Distributor"

As defined in the Basic Agreements.

"Qualified Distributor's Letter of Guaranty"

An agreement in the form set forth in the Basic Agreements, whereby a Qualified Distributor unconditionally guarantees the

BR-CXP-01-00002.06

payment of Residuals that have or will become due to Guild-Represented Employees.

"Residuals"
All additional compensation that is or may become due to Guild-Represented Employees under the Basic Agreements when the Project is exhibited, distributed or otherwise exploited. Residuals as used herein include Benefit Plan Contributions.

"Residuals Set-Aside"
The amount calculated by CAM from time to time in accordance with clause 4.3.

"RLJ Agreement"
The Agreement dated June 22, 2020 between RLJ Entertainment, Inc. and No Man of God LLC, and its subsequent amendment of August 29, 2020.

"RLJ Commission"
A commission of 22.5% of the Collected Gross Receipts derived from the ROW Territory.

"RLJ COVID Loan"
USD250,000 in connection with COVID-related expenses for the Project and payable from the Collected Gross Receipts derived from the ROW Territory.

"ROW Territory"
The Territory excluding the Domestic Territory.

"SAG-AFTRA Basic Agreement"
The applicable SAG-AFTRA collective bargaining agreement executed by Producer, as amended, replaced or extended.

"SAG-AFTRA Final Cast List"
The final SAG-AFTRA payroll cast list detailing customary payee information for the final list of SAG-AFTRA Performers appearing in the Project in a form acceptable to the Payroll House.

"SAG-AFTRA Performers"
All persons whose services in connection with the Project are subject to the SAG-AFTRA Basic Agreement who are further listed on the SAG-AFTRA Final Cast List, which is to be provided by Producer to Payroll House as set forth herein.

"Sales Agency Agreement"
The agreement dated June 21, 2020 pursuant to which the Sales Agent has the right to enter (as agent of the Producer) into Distribution Agreements for the ROW Territory.

"Sales Agent Commission"
The commission payable to Sales Agent in connection with the Project pursuant to and in accordance with the Sales Agency Agreement equal to 12% of the Collected Gross Receipts derived from the ROW Territory.

"Sales Agent Expenses"
The costs and expenses incurred by Sales Agent in connection with the Project. The Sales Agent Expenses shall be as notified by Sales Agent to CAM from time to time, whereby CAM may rely on the accuracy of such notification(s), provided that they

BR-CXP-01-00002.07

may not exceed USD45,000 without prior written approval from Producer.

| | |
|---|---|
| "Sales Agent Market Charge" | A one-time fixed, non-accountable amount of USD45,000 as a contribution toward Sales Agent's customary overhead and other expenses incurred in connection with Sales Agent's sales and marketing activities for the Project, payable from the Collected Gross Receipts derived from the ROW Territory. |
| "Sealey Award Bonuses" | The contingent compensation payable from the Collected Gross Receipts derived from the ROW Territory to ASF hereunder as follows; If Amber Sealey (i) receives an Academy Award nomination, a nomination bonus of US$10,000; (ii) if she wins an Academy Award, an additional bonus of US$10,000; (iii) if she receives a Golden Globe nomination, a nomination bonus of US$10,000; and (iv) if she wins a Golden Globe, an additional bonus of US$10,000. For the purpose of this Agreement, Producer shall as soon as reasonably possible notify CAM about each Sealey Award Bonus due to Amber Sealey hereunder, whereby CAM may rely on the accuracy of such notifications. |
| "Statement" | A written (electronic) accounting statement in the Accounting Currency in respect of an Accounting Period, specifying: |

- the amounts of and the sources from which the (Collected) Gross Receipts and Deemed Collected Gross Receipts have derived;
- the Collection Account Interest;
- the allocation of Collected Gross Receipts to the Beneficiaries (and CAM) of the Entitlements.

| | |
|---|---|
| "Term" | The period of time for which this Agreement is in force and effect and limited to seven (7) years after the Effective Date, unless this Agreement is extended in writing by a majority of the Parties, which majority must include the Producer and the Guilds. Notwithstanding the foregoing, the Agreement will remain in full force and effect if the Guilds request an extension of the Agreement. |
| "Termination" | As described in clause 7. |
| "Territory" | The universe excluding the Domestic Territory. |
| "WGA Basic Agreement" | The applicable WGA collective bargaining agreement executed by Producer, and any and all applicable present and future amendments, replacements and extensions of such agreement. |
| "WGA Notice of Tentative Writing Credits" | The credits notice identified and controlled by Theatrical Schedule A of the WGA Basic Agreement. Such notice is due as soon as practicable following completion of principal photography of the Project. |

BR-CXP-01-00002.08

"WGA-Represented Employees"    All persons whose services in connection with the Project are subject to the WGA Basic Agreement.

© 2020 - Fintage Collection Account Management B.V.

BR-CXP-01-00002.09

## 2. THE CAM, COLLECTION ACCOUNT AND ASSIGNMENT

### 2.1 Appointment of the CAM

**2.1.1** The Parties, excluding the CAM, hereby jointly appoint the CAM during the Term as their sole and exclusive representative, to open and administer the Collection Account in which it is to receive or pay no monies other than Gross Receipts and Collection Account Interest, to calculate the Entitlement(s), to provide Statements to the Parties and to carry out the payment of Entitlement(s) to each of the Beneficiaries in accordance with the terms and conditions hereof. If the CAM receives monies in the Collection Account other than Gross Receipts or Collection Account Interest, it shall forthwith notify the Parties and have such monies transferred out of the Collection Account. If the CAM receives Gross Receipts elsewhere than in the Collection Account, it shall immediately notify the Parties that Gross Receipts are received and immediately transfer such receipts into the Collection Account, without any deduction whatsoever, except for customary and usual bank transfer costs. Pending transfer of such Gross Receipts into the Collection Account, CAM shall hold such Gross Receipts for the benefit of the other Parties (other than CAM) to be applied solely in accordance with the terms of this Agreement. The CAM hereby agrees to this appointment, and the CAM agrees to carry out its obligations hereunder, including, without limitation, payment of Entitlements to Beneficiaries in accordance with Exhibit A, in accordance with and subject to the terms and conditions hereunder.

**2.1.2** Other than as provided for in this Agreement, the Parties shall not, during the Term hereof, authorize or permit any third party to carry out any or all of the services rendered by the CAM for the Project in respect of the Territory hereunder.

**2.1.3** Notwithstanding anything to the contrary contained in this Agreement and for the avoidance of doubt, the CAM acknowledges and agrees that it has no legal title to the Collected Gross Receipts, the Collection Account Interest, and any other monies at any time in or credited to the Collection Account, all of which are actually the property of the Parties (excluding the CAM). The CAM shall only acquire title to monies paid to the Collection Account in respect of the CAM Fee and CAM Expenses upon actual payment thereof to CAM, by withdrawal from and transfer out of the Collection Account of such monies in accordance with Exhibit A hereto. No Collected Gross Receipts, Collection Account Interest or other monies held therein shall constitute the property of the CAM.

### 2.2 All Gross Receipts in Collection Account

The Producer, Sales Agent and, to the extent applicable, all the Parties having ownership of and/or control over the Distribution Agreements and/or the applicable rights and/or the Gross Receipts, shall undertake to separately issue or to insert into the Distribution Agreements an Irrevocable Instructions and Notice of Acknowledgement to the Distributors, in the form of Exhibit B hereto, to pay the Gross Receipts into the following Collection Account and otherwise such Parties shall ensure that the Distributors shall pay the Gross Receipts into the Collection Account.

Account name          Fintage Collection Account Management B.V.
                      re: "No Man Of God"

Account number          4877

| Bank | City National Bank |
|------|--------------------|
|      | 400 N. Roxbury Drive, 4th Floor |
|      | Beverly Hills, CA 90210 |
|      | USA |
| ABA # | 122016066 |
| Swift Code | CINAUS6L |

## 2.3 Interest bearing Collection Account

The CAM shall use all reasonable endeavours to procure that monies standing to the credit of the Collection Account earn Collection Account Interest at the most favorable rate available at the CA Bank for similar accounts and for similar amounts.

## 2.4 Property in Collected Gross Receipts

The CAM agrees to hold, until their distribution, all Collected Gross Receipts standing to the credit of the Collection Account, the Collection Account Interest, the rights vis-à-vis the Collection Account and all rights towards the CA Bank as representative for the Parties (excluding the CAM) for the benefit of the Beneficiaries, who shall be the owners or the deemed owners thereof, to the extent of their respective Entitlements and shall not be subject to, or form any part of the estate of, the bankruptcy of any other Party. The CAM shall not use funds in, pay funds to, withdraw any funds from, or set-off against any funds in, the Collection Account, except as expressly set forth in this Agreement.

## 2.5 No lien over Collected Gross Receipts

**2.5.1** The Parties have not and shall not create any lien, attachment, pledge, charge or any similar legal instrument over the Collection Account, the Collected Gross Receipts, the Collection Account Interest, any other monies standing to the credit of, or rights to, the Collection Account, except for the security interests pursuant to clauses 2.5.3 through 2.5.7.

**2.5.2** The Parties warrant and represent that there will be no deposit account control agreement over the Collection Account or the Gross Receipts.

**2.5.3** Intentionally deleted

**2.5.4** The Parties acknowledge and agree that upon request of Producer to CAM, CAM may sign, has signed or will be signing such documents customarily required by a financing bank, lender, financier, or investor to secure the financing and investment arrangements that Producer has entered into with financiers and investors in order to entirely or partially finance the costs of production of the Project. Producer and CAM agree to forward copies of such documents to all other Parties and represent and warrant that such documents will not contradict, frustrate, prevent or interfere with the payment of Entitlements pursuant to this Agreement.

**2.5.5** The Parties hereto acknowledge that, pursuant to (i) the SAG-AFTRA Security Agreement between Producer and SAG-AFTRA, (ii) the DGA Security Agreement between Producer and DGA, and (iii) the WGA Security Agreement between Producer

BR-CXP-01-00002.11

and WGA dated as of [      ], Producer has respectively assigned to SAG-AFTRA, DGA and WGA by way of a security interest in, among other things, the benefit of the proceeds of the exploitation, exhibition or distribution of the Project (exclusive of the CAM Fee, CAM Expenses and Payroll House Fees) to secure the obligations of Producer to SAG-AFTRA, DGA and WGA under the applicable Basic Agreements with respect to the Project, including, without limitation, the delivery of and the obligations arising under Distributor's Assumption Agreements.

**2.5.6** The Parties agree that each Beneficiary is granted a security interest over the Collection Account and sums standing to its credit from time to time (subject to clauses 2.5.3 through 2.5.5 above), solely to the extent of their respective Entitlement thereto and solely to secure such Beneficiary's rights to receive its Entitlement pursuant to the terms hereof, without prejudice to clause 6 hereof and subject to the applicable laws and regulations.

## 2.6 Collected Gross Receipts and Entitlements in other currencies

**2.6.1** Collected Gross Receipts in a currency other than the Accounting Currency will forthwith be automatically converted by CA Bank into the Accounting Currency, at the exchange rate prevailing at the time of receipt in or credit to the Collection Account.

**2.6.2** Entitlements will be paid out in the Accounting Currency, unless otherwise specified in this Agreement or if the CAM is timely notified otherwise by a relevant Party. In case the CAM is instructed to pay out the Entitlement in another currency than the Accounting Currency, the Entitlement will be converted into the requested currency, at the exchange rate prevailing at the time of such request, to the extent the Entitlement is not available in the Collection Account in such currency and the Collection Account shall be debited with the counter-values in the Accounting Currency. The cost of such conversion shall be borne by the requesting Party.

**2.6.3** Entitlements which are being paid in full or in part in a currency which is not the Accounting Currency, shall be reported in Statements as being the sum of amounts (in the Accounting Currency) actually debited from the Collection Account.

## 2.7 All Deemed Collected Gross Receipts into the Collection Account

Notwithstanding the Parties' obligation (other than the CAM) under clause 2.2 above, it is acknowledged that if Deemed Collected Gross Receipts are received by or credited to any of the Parties (other than the CAM), including those Deemed Collected Gross Receipts received prior to the date of this Agreement, such Party shall forthwith:

- inform the CAM, with a copy concurrently to the other Parties, that Deemed Collected Gross Receipts are received and specifying the source(s)/details of such amounts and simultaneously;
- transfer such Deemed Collected Gross Receipts into the Collection Account without any deduction whatsoever, except for actual, reasonable and verifiable bank transfer costs; and
- provide the CAM with the applicable Distribution Agreement.

© 2020 - Fintage Collection Account Management B.V.

BR-CXP-01-00002.12

Pending transfer of such Deemed Collected Gross Receipts into the Collection Account, such Parties shall hold such Deemed Collected Gross Receipts for the benefit of the other Parties and to be applied solely in accordance with the terms of this Agreement.

## 2.8 Engagement of Payroll House

**2.8.1** Not later than upon the execution of this Agreement, Producer shall execute with the Payroll House an agreement (the "Payroll House Agreement") to administer the calculation and payment of Residuals in cooperation with CAM and the Guilds. The Payroll House Agreement shall include language (or Producer will separately instruct Payroll House to do so in a separate writing with a copy to Guilds and CAM) which requires Payroll House to accept irrevocable instructions and information from CAM for the purpose of calculating Residuals due; provides for simultaneous reporting by the Payroll House to Producer, the Guilds and CAM; and contains provisions consistent with clause 4.3 hereof. Producer shall also promptly provide Payroll House with complete copies of the final SAG-AFTRA Final Cast List, the DGA Final Credits List and the WGA Notice of Tentative Writing Credits and all information deemed reasonably necessary by the Payroll House to determine Residuals payments to Guild-Represented Employees and Producer Payroll Taxes in connection with the payment of Residuals, including, but not limited to, the W-4 form for each individual Guild-Represented Employee, if applicable.

**2.8.2** If Producer has not fully complied with clause 2.8.1 above within twenty (20) Business Days from the date that the CAM receives a fully executed copy of this Agreement, the Guilds, each at their own discretion, shall provide Producer with written notice and a ten (10) Business Days period within which to cure this default (hereinafter, the "Cure Period"). Upon failure by Producer to comply within the Cure Period, and in settlement of Producer's failure to comply with the terms of this Agreement and the applicable Basic Agreement, each Guild is entitled to hire a Payroll House on behalf of its Guild-Represented Employees and to disburse Residuals from their respective Entitlements to its Guild-Represented Employees consistent with Producer's obligations under the terms of this Agreement and the Basic Agreements. Any Payroll House Agreement with the Payroll House under this clause 2.8.2 shall include language requiring Payroll House to accept instructions and information from CAM regarding the calculation and payment of Residuals. Each Guild shall advise CAM and Producer of any Payroll House engaged and of the costs incurred by the Guilds for Payroll House engagement. CAM shall deduct those costs from Producer's Entitlements under this Agreement, to the extent available in the Collection Account.

## 3. STATEMENTS, DISBURSEMENTS, ACCOUNTING AND AUDITING

## 3.1 Statements and disbursements by the CAM

**3.1.1** As soon as the CAM has received written notice from the CA Bank of the first Collected Gross Receipts being received, or from any of the Parties (except the CAM) of the first Deemed Collected Gross Receipts being (deemed) received in the Collection Account, the CAM shall provide the Parties with a Statement once every **quarter**, within twenty (20) Business Days of the end of each Accounting Period to which it relates, through to **12 months** after the issuance of the first Statement, provided that at least USD7,500 of Collected Gross Receipts are available for disbursement, and otherwise

BR-CXP-01-00002.13

the CAM shall provide the Parties with a Statement on a **semi-annual** basis, within twenty (20) Business Days of the end of each Accounting Period to which it relates, provided that for the Accounting Period ending on December 31st, CAM shall provide the Parties with a Statement within thirty (30) Business Days of the end of the Accounting Period.

**3.1.2** Then, for the **next 18 months**, the CAM shall provide the Parties with a Statement on a **semi-annual** basis, within twenty (20) Business Days of the end of each Accounting Period to which it relates, provided that at least USD7,500 of Collected Gross Receipts are available for disbursement, otherwise the CAM shall provide the Parties with a Statement on an **annual basis**, within twenty (20) Business Days of the end of each Accounting Period to which it relates, provided that for the Accounting Period ending on December 31st, CAM shall provide the Parties with a Statement within thirty (30) Business Days of the end of the Accounting Period. Then, **until the Termination** of this Agreement or expiry of the Term, the CAM shall provide the Parties with a Statement on an **annual basis**, within 20 Business Days of the end of each Accounting Period to which it relates, provided that for the Accounting Period ending on December 31st, CAM shall provide the Parties with a Statement within 30 Business Days of the end of the Accounting Period.

**3.1.3** The Parties may request CAM to produce an interim Statement and subsequent disbursement, but no more often than once per calendar month, whereby the CAM Fee shall be increased by (i) 0.25% of the Collected Gross Receipts during that Accounting Period with a maximum increase of USD625, or (ii) USD325 (if the minimum fee per Statement is applicable), whereby such increase shall be borne by the requesting Party(ies), unless requested by the Guilds consistent with the requirements of the Basic Agreements, in which case such increase shall be borne by the Producer. If such interim Statement is requested by the Guilds in a quarter in which no Statement has been provided, the applicable increase will be borne by the Producer, but no more frequently than once per quarter.

**3.1.4** Notwithstanding the foregoing, the CAM shall issue the first Statement no earlier than in the month following receipt by the CAM of a copy of this Agreement, which, subject to clause 9.2 hereof, is binding and in full force and effect.

**3.1.5** The CAM shall pay out Entitlement(s) from the Collection Account to the Beneficiaries hereto within five (5) Business Days after the issuance of a Statement. The content and the form of the first Statement only are subject to the approval by all Parties of a draft of the first Statement, which approval shall be deemed given unless the CAM has received a written notification to the contrary, which must be sufficiently detailed to clarify the reason for the objection (and which notification is to be sent as described in clause 8 (i) hereof) from one or more of the Parties within ten (10) Business Days after issuance of such draft Statement.

**3.1.6** In the event any of the Parties disapproves the content and/or the form of the first Statement, the CAM shall as soon as reasonably possible re-issue the first draft Statement to all Parties. Then, as of the moment the first draft Statement has been re-issued by the CAM, the approval by all Parties of the draft first Statement shall be deemed given unless the CAM has received a written notification to the contrary from one or more of the Parties within five (5) Business Days thereafter.

**3.1.7** An Entitlement standing to the credit of the Collection Account shall be retained therein, until, subject to clauses 3.1.1 and 3.1.2 above, such Entitlement totals at least USD750, but in any event it shall be disbursed at least once per calendar year.

**3.1.8** Notwithstanding anything to the contrary in clause 3.1 or in clause 5.7 below, CAM shall, to the extent available to CAM, accompany each Statement (or concurrently make electronically available) to the Guilds and Payroll House with either (1) a copy of each applicable Distribution Agreement or Distributor's Report based upon which Residuals are then due and payable, or (2) a cover sheet stating the name of each Distributor from whom monies were received, the date of receipt and amount thereof and the territories, media and time period to which said monies pertain, to the extent such information is available to CAM. The Parties expressly agree that nothing in this Agreement shall be deemed a waiver of Producer's obligations to the Guilds with respect to the reporting and paying Residuals pursuant to the timelines and other relevant provisions set forth in the applicable Basic Agreements.

**3.2** **Incoming Payment Notification and Fintage CAM Live**

As soon as the CAM has received written notice from the CA Bank of any Collected Gross Receipts or a notification under clause 2.7.1 hereof, the CAM shall send an Incoming Payment Notification to all Parties. All Parties will, upon their request, be given the opportunity to have access to Fintage CAM Live for this Project, which includes Internet access to all the financial information as and when CAM has it available during the Term on all Distribution Agreements in connection with the Project, as well as the Statements issued under this clause 3.

**3.3** **The CAM shall keep books of account**

The CAM shall keep complete and accurate books of account in the Accounting Currency and records relating to all monies received in the Collection Account until three (3) years after the Termination of this Agreement or after expiry of the Term.

**3.4** **The CAM may be audited**

**3.4.1** Each of the Parties using its own independent auditors has the right to audit the CAM's books relating to the receipt, allocation and distribution of the Collected Gross Receipts of the Project at its own expense, except that costs for audits conducted by the Guilds under this provision shall be borne by the Producer, but no more than once every twelve (12) months during the Term, unless the audit demonstrates an error in disbursement in excess of 5% of an Entitlement, whereupon the Parties shall have a further right of audit during that calendar year.

**3.4.2** If, after conducting any such audit, it is determined that there has been an error in excess of five percent (5%) of an Entitlement for any such audit period, then (provided the excess is greater than USD10,000) the CAM shall reimburse the auditing Party for the reasonable direct costs and expenses of such audit from the CAM's own funds (which shall not be recoupable as CAM Expenses), which would otherwise be borne by the auditing Party.

**3.4.3** This right of audit continues for two (2) years after the issuance of the applicable Statement. The limitation of liability of the CAM in clause 5.8 shall not apply in case an audit under this clause 3.4 shall disclose defaults in payments made by the CAM pursuant to this Agreement, which could not have been ascertained from the

BR-CXP-01-00002.15

Statements, disbursements or other information reasonably available to a Party. Nothing herein shall affect the Guilds' right to audit the Producer and the Distributors of the Project, or their successors in interest.

## 4.    ALLOCATION OF COLLECTED GROSS RECEIPTS

**4.1**    The Collected Gross Receipts and the Collection Account Interest shall be allocated and paid out by the CAM in accordance with Exhibit A to this Agreement.

### 4.3    Residuals

### 4.3.a  Calculation of Residuals.

Producer hereby instructs CAM and CAM accepts that it shall provide information and give an irrevocable instruction to Payroll House to calculate Residuals due and payable in connection with Collected Gross Receipts as follows:

(1)    All Calculations. With respect to all calculations, Payroll House shall apply the applicable rates and formulae contained in the relevant sections of the Basic applicable Agreements.

(2)    Lump Sum Payments. With respect to calculations pertaining to Distributor's advances, minimum guarantees and/or other similar lump sum payments (collectively, "Lump Sum Payments"), unless otherwise agreed upon in writing by Producer and the Guilds and advised to CAM, Payroll House shall allocate Collected Gross Receipts to each market licensed for distribution pursuant to the Producer Allocation (as defined in clause 5.1.g.1) in connection with the relevant Distribution Agreement, subject and pursuant to clauses 5.1.g.1 and 5.1.g.2 below. The Guilds retain the right, in accordance with clause 5.1.g.2, to challenge the fairness and/or reasonableness of any Producer Allocation. If, at the time CAM issues instructions to Payroll House to calculate Residuals pursuant to clause 4.3.b(2), the Producer Allocation is not provided or made available pursuant to clauses 5.1.g.1 and 5.1.g.2, then CAM shall instruct Payroll House to calculate Residuals in connection with the relevant Lump Sum Payment(s) based upon the Default Allocation pursuant to clause 5.1.g.3 below.

(3)    Distributor's Reports

(i)    With respect to calculations pertaining to Distributor's Reports (excluding Distributor's Reports pertaining to Lump Sum Payments), Payroll House shall allocate to theatrical, video, free television, pay television, electronic sell-through, streaming video on demand, and download-to-rent markets consistent with the Collected Gross Receipts as reported in the Distributor's Report.

(ii)   In the event that a Distributor's Report (excluding Distributor's Reports pertaining to Lump Sum Payments) is not provided or contains insufficient information for Payroll House to determine the allocation to each market and if Sales Agent and/or Producer has/have not notified

BR-CXP-01-00002.16

the Guilds and CAM of the market allocation as per clause 5.1 in writing, then CAM shall instruct Payroll House to calculate Residuals in connection with the relevant Lump Sum Payment(s) based upon the Default Allocation contained in clause 5.1.g.3 below.

**4.3.b  Payments of Residuals**

(1)  **Residuals Set-Aside**

(i)  In each Accounting Period (pursuant to clause 3.1 herein), CAM shall retain in the Collection Account nine and eight-tenths percent (9.8%) of all Collected Gross Receipts generated during that Accounting Period ("Periodic Gross Receipts"). This 9.8% consists of a 6.2% Residuals Set-Aside for SAG-AFTRA, a 1.8% Residuals Set-Aside for DGA and a 1.8% Residuals Set-Aside for WGA. Said 9.8% of the Periodic Gross Receipts shall constitute a temporary "Residuals Set-Aside" earmarked for payment of Residuals (including Payroll House Fees and Producer Payroll Taxes, if any, in connection with said Residuals) and Benefit Plan Contributions on those Periodic Gross Receipts, which Residuals shall be paid in the Accounting Period following that in which the Periodic Gross Receipts were generated. CAM may disburse Periodic Gross Receipts not held in such Residuals Set-Aside for that Accounting Period. Upon written notification to the Guilds by CAM of paying Residuals on the Periodic Gross Receipts, CAM shall return any excess funds in the Residuals Set-Aside for that Accounting Period to the general monies in the Collection Account after ten (10) Business Days and distribute said funds to the other Parties hereto as warranted pursuant to this Agreement.

(ii)  Residuals Set-Aside shall not include any Collected Gross Receipts payable by any Distributor(s) if any such Distributor(s) have assumed the obligation to pay Residuals for the Project directly to a Guild pursuant to an unconditional Distributor's Assumption Agreement or an unconditional Qualified Distributor's Letter of Guaranty, provided that such Distributor's Assumption Agreement or Qualified Distributor's Letter of Guaranty delivered to such Guild is from a financially responsible party (as determined in such Guild's sole discretion) and is accepted by such Guild in writing to the CAM ("Guild's Acceptance"). Upon such Guild's Acceptance, if the Collected Gross Receipts from distribution, exhibition or other exploitation of the Project in this assumed Territory are generated, the Residuals Set-Aside may be applied only to the Gross Receipts generated from the un-assumed Territories, so long as such Distributor has timely reported and paid Residuals, whereby CAM may assume such Distributor has timely reported and paid Residuals unless it is notified to the contrary by any of the Guilds. As soon as reasonably possible, the Guild's Acceptance shall be notified to CAM by such Guild, whereby CAM may rely on the accuracy thereof.

(iii)  Upon the written request of any Party hereto at any time after one (1) year from the date the Collection Account is opened, the Parties agree to meet and confer in good faith regarding the adequacy or inadequacy of the percentage of Periodic Gross Receipts, which constitute the Residuals Set-Aside. The

BR-CXP-01-00002.17

Parties further agree that any dispute arising from or relating to this issue shall be subject to the grievance and arbitration procedures pursuant to the applicable Basic Agreements, in accordance with clause 6.8 below.

(2)     **Procedure for Payment of Residuals**

(i)     Residuals payable on Collected Gross Receipts shall be paid consistent with the Statement and accounting schedule pursuant to clause 3.1 herein and consistent with clause 4.3.b(1) above.

(ii)    Upon generation of Collected Gross Receipts (including Lump Sum Payments) and with the same frequency as the Statement described in clause 3.1 above, CAM shall, to the extent available to CAM, forward concurrently to Payroll House and the Guilds (or concurrently make electronically available) copies of all Distributor's Reports, Distribution Agreements, reports of Collected Gross Receipts, Default Allocations, invoices, accounting and any other documentation pertaining to all Collected Gross Receipts, including Lump Sum Payments, which are readily available to CAM.

(iii)   Producer hereby instructs CAM and CAM accepts that it shall give an irrevocable instruction to Payroll House to:

(A)    calculate the Residuals that are due and payable in connection with said Collected Gross Receipts in accordance with clauses 4.3.a(1) and 4.3.a(2) above; and

(B)    concurrently report the following information to the Guilds, Producer and CAM in writing, within ten (10) Business Days of receiving said documentation (which information shall hereinafter be referred to collectively as the "Payroll House Invoice"):

[1]    the allocation used and the amount of monies required to pay Residuals and Benefit Plan Contributions, which are due and payable in connection with the Collected Gross Receipts ("Payable Residuals");

[2]    the amount of the Payroll House Fees, if any, which Payroll House shall incur in connection with preparing the appropriate Residuals checks and the Benefit Plan Contributions; and

[3]    the amount of monies required to pay Producer Payroll Taxes.

Payable Residuals, Payroll House Fees and Producer Payroll Taxes are collectively referred to as the "Payroll House Amount."

(iv)    Upon receipt of the Payroll House Invoice and consistent with clauses 3.1 and 4.3.b(1) herein, CAM shall transfer the Payroll House Amount

BR-CXP-01-00002.18

from the Residuals Set-Aside to Payroll House. If the amount of the Payroll House Invoice exceeds the Residuals Set-Aside ("Residuals Short Fall") and a Statement has been made by CAM, but the applicable Entitlements thereunder have not been disbursed by CAM, the CAM shall revise and reissue the Statement and pay the Residuals Short Fall off-the-top from the Collected Gross Receipts standing to the credit of the Collection Account.  If the balance of such Collected Gross Receipts is insufficient to pay the Residuals Short Fall, then the CAM shall, in the subsequent Accounting Period(s) and after the CAM has retained the Residuals Set-Aside under clause 4.3.b(1) for such Accounting Period, the CAM shall notify Producer and the Guilds in writing or via the applicable Statement and retain and pay the amount of the Residuals Short Fall to the Payroll House prior to disbursing any further Entitlements under this Agreement. Producer hereby instructs CAM and CAM accepts that it shall give an irrevocable instruction to Payroll House to issue Residuals checks payable to Guild-Represented Employees and forward such checks to the attention of each Guild's contacts in Exhibit C for further distribution. Producer hereby instructs CAM and CAM accepts that it shall additionally irrevocably instruct Payroll House to issue checks in the applicable amount of the Benefit Plan Contributions payable in connection with each Guild's Residuals and forward such checks directly (i) for SAG-AFTRA, to the Screen Actors Guild-Producer Pension and Health Plans, 3601 West Olive Avenue, Burbank, California 91510 USA, (ii) for the DGA, to the DGA-Producer Pension and Health Plans, 5055 Wilshire Blvd., Los Angeles, CA 90036 USA, and (iii) for the WGA, to the Producer-Writers Guild of America Pension Plan/Writers Guild-Industry Health Fund, 2900 West Alameda Ave., Suite 1100, Burbank, CA 91505 USA. CAM shall irrevocably instruct Payroll House to pay the Producer Payroll Taxes to the appropriate governmental entities.

(v)     Nothing in this clause 4.3.b(2) shall be deemed to modify CAM's obligation to create a "Disputed Amount Set-Aside" upon receipt of proper notice regarding a Disputed Amount pursuant to clause 5.1.g.2(b)(i) herein.

## 4.4     Obligation to Obtain Qualified Distributor's Letters of Guaranty; No Waiver of Guilds' Rights

If a Distributor or Qualified Distributor, as defined in the Basic Agreements, acquires the right to distribute the Project in the Territory, Producer and the Guilds acknowledge that Producer agrees to obtain and deliver to each Guild either (as applicable) a separate Distributor's Assumption Agreement or a Qualified Distributor's Letter of Guaranty with a copy thereof to the CAM. Additionally, the Parties hereto agree that neither this clause 4.4 nor any other provision of this Agreement shall be interpreted as a waiver of the Guilds' rights or remedies under the applicable Basic Agreements with respect to Assumption Agreements or the timely reporting and payment of Residuals, all of which are expressly reserved and concurrently available to the Guilds. The Parties hereto further agree and acknowledge that any sale of the Project or any rights therein shall be subject to the obligation to obtain appropriate Assumption Agreement(s) pursuant to the applicable Basic Agreements, which obligation, for the duration of this Agreement and as an accommodation to Producer, shall be fulfilled by the Irrevocable Instructions and

Notice of Acknowledgement being executed separately or being included in a Distribution Agreement, unless there is a dispute under this Agreement and the resolution of that dispute under clause 6 results in an arbitration judgment requiring an Assumption Agreement to be entered into by the relevant Distributor. For the avoidance of doubt, nothing contained in this Agreement shall obligate RLJ to execute, deliver and/or otherwise become a party to any Assumption Agreement or Qualified Distributor's Letter of Guaranty in connection with the Project.

## 5.    GENERAL TERMS

### 5.1    All relevant information to the CAM, the Guilds and Payroll House

a.    The Parties (other than the CAM) shall provide the CAM in a timely fashion with all relevant information to enable the CAM to meet its allocation, accounting and payment obligations pursuant to this Agreement, as well as information reasonably required by the CA Bank to meet the applicable "Know Your Client" ("KYC") and "Customer Due Diligence" ("CDD") obligations in connection with this Agreement. The Parties agree that CAM may share the KYC and CDD information with the CA Bank. The same applies to information that CAM is to provide to the CA Bank in connection with the applicable Anti-Money Laundering ("AML") regulations, as well as those applicable to Combating the Financing of Terrorism ("CFT"). The information shall include, but is not limited to:

(i)     provision by the Sales Agent of copies of detailed sales estimates and sales reports;

(ii)    provision by the Sales Agent of copies of each long-form Distribution Agreement and/or copies of all deal memos, and if executed separately to the Distribution Agreement, each executed Irrevocable Instructions and Notice of Acknowledgement;

(iii)   copies of the names, addresses, telephone, fax numbers and bank details of all Beneficiaries;

(iv)   detailed information about agreed expenses, approvals for payment of agreed expenses, etc.;

(v)    information required for payment of Residuals;

(vi)   if requested, and to the extent available, accountings from Distributors;

(vii)  all further information that the CAM may reasonably require to meet its obligations hereunder.

The CAM may at any time review any source of information to verify if the relevant Distributors are meeting or have met with their obligations under the Distribution Agreements or if the Parties hereto are meeting or have met with their obligations hereunder and CAM may elect to formally notify such Party and advise one or more of the other Parties hereto if it is in reasonable doubt if that is indeed the case.

The information shall further include, but is not limited to, information on the Project as described in Exhibit C-1.

b.    Producer hereby irrevocably instructs Sales Agent and Sales Agent agrees to send to CAM a sales summary (including the identity of each Distributor) for

each Distribution Agreement, to be provided with the same frequency as CAM provides Statements under clause 3 hereof. CAM agrees to copy such summaries to the Guilds and to Payroll House.

c.      Intentionally deleted.

d.      CAM agrees to provide the Guilds with a copy of any Distribution Agreement that it receives.

e.      Intentionally deleted.

f.      Intentionally deleted.

**g.1.    Producer Allocation**. Producer or Sales Agent shall ensure that each Distribution Agreement clearly states the amount of the Lump Sum Payment payable in connection with said Distribution Agreement.

(a)      If the Distribution Agreement includes an allocation of the Lump Sum Payment to each market sold, leased or licensed there under, Producer shall be deemed to be in agreement with the allocation contained therein, subject to clause 5.1.g.2.

(b)      Where the Distribution Agreement includes no market allocation or an incomplete market allocation, Producer or Sales Agent shall provide a market allocation to CAM and the Guilds in writing.

(c)      Market allocations pertaining to Lump Sum Payments as described in this clause 5.1.g.1 shall be collectively referred to herein as the "Producer Allocation".

**g.2    Dispute regarding Producer Allocation.** The Guilds shall have forty-five (45) Business Days from receipt of each Payroll House Invoice, to the extent it expressly states the Producer Allocation, to dispute such Producer Allocation (the "Dispute Period").

(a)      In the event the Guilds do not dispute the Producer Allocation in writing within the Dispute Period, the Producer Allocation shall be deemed accepted and shall govern in the calculation and payment of Residuals with respect to the Distribution Agreement at issue.

(b)      In the event the Guilds dispute the Producer Allocation within the Dispute Period, the Guilds shall notify Producer and CAM concurrently in writing of the Disputed Amount and corresponding allocation. (As used herein, the "Disputed Amount" shall mean the difference between the amount of Residuals payable based upon the Producer Allocation on the Lump Sum Payment and the amount of Residuals payable based upon the allocation of the Lump Sum Payment, which the Guilds consider fair and reasonable.)

(i)      Upon receipt of said notice, CAM shall set aside the Disputed Amount, to the extent available in the Collection Account, and hold it pending resolution of the dispute (the "Disputed Amount Set-Aside").

(ii) The Guilds and Producer may resolve the dispute by mutual agreement or through the grievance and arbitration procedures contained in the applicable Basic Agreements. If such dispute is not resolved within thirty (30) days of CAM's receipt of the notice of the Disputed Amount, CAM shall instruct Payroll House to calculate Residuals in accordance with the Disputed Amount allocation in the next succeeding Statement unless either party submits, within such thirty (30) days, a written demand for arbitration of this dispute to the other party per the terms of the applicable Basic Agreements, a copy of which demand shall be timely forwarded to CAM.

(iii) The Guilds agree to provide notice of any grievance or arbitration hereunder to Producer and concurrently to CAM and Sales Agent and to provide CAM and Sales Agent with written notification regarding resolution of any dispute hereunder within ten (10) Business Days of said resolution.

**g.3 Default Allocation.** At the time CAM issues instructions to the Payroll House to calculate Residuals pursuant to clause 4.3.b(2), if the applicable Distribution Agreement or Producer Allocation is not provided, CAM shall instruct Payroll House to calculate Residuals based upon the "Default Allocation" as follows:

(a) If the Project is licensed by a single Distributor for distribution in all media, Payroll House shall allocate the Lump Sum Payment as follows: five percent (5%) to theatrical, five percent (5%) to video, twenty percent (20%) to pay television, twenty percent (20%) to free television, thirty-five-five percent (35%) to SVOD, ten percent (10%) to DTR and five percent (5%) to EST.

(b) If the Project is licensed for distribution by a single Distributor in fewer than those six (6) media, Payroll House shall calculate the media allocation based on the formula exemplified below:

(i) if licensed in one medium only, then (100%) of the Lump Sum Payment shall be attributable to that medium; and

(ii) if licensed in any other combination of media, the resulting allocation of the Lump Sum Payment or Gross Receipts (as applicable) shall be in the same proportion as each of the media bears to the others in the six-media allocation indicated above or as otherwise confirmed by the Guilds.

## 5.2 Information or approval to be provided to the CAM

**5.2.1** If the CAM is to take into account information to be supplied to it by one or more of the Parties, such information shall be provided to the CAM as described in clause 8.(i) within five (5) Business Days after the end of the relevant Accounting Period and CAM shall upon reasonable request provide all Parties with copies of such information provided by each Party.

© 2020 - Fintage Collection Account Management B.V.

BR-CXP-01-00002.22

**5.2.2** If the CAM receives conflicting information, conflicting demands or instructions, or conflicting instructions from two or more Parties with respect to an Accounting Period ("Conflicting Demand"), the CAM shall request in writing that the Parties that provided or should have provided such information, demands, or instructions instead furnish the CAM with accurate and consistent information, demands, and/or instructions (as the case may be) within five (5) Business Days, and the CAM shall postpone the issuance of the Statement relating to such Accounting Period and the consequent payment of any Entitlements for such Accounting Period for five (5) Business Days. If the relevant Parties do not provide such accurate and consistent information, demands, and/or instructions (as the case may be) and/or fail to resolve the conflict within the aforementioned period, the CAM may, at its sole discretion, either (a) notify the Parties in writing, in conjunction with a Statement, that the relevant information, demands, and/or instructions were not provided and that the disputed amounts will be retained in the Collection Account until the conflict is resolved, or (b) suspend the issuance of Statements and consequent payments upon written notice to the Parties and proceed in accordance with clause 6. For the avoidance of doubt, any Entitlements that are not disputed shall not be retained in the Collection Account but shall be paid out in accordance with the terms of this Agreement. The CAM shall immediately notify the Parties upon the occurrence of such event. In the absence of material breach, gross negligence, and/or wilful misconduct on the part of the CAM, the CAM shall have no liability in respect of any decision taken and/or executed by it with respect to this clause 5.2.2.

**5.2.3** If the CAM is supposed to receive a joint notification from two or more of the Parties and one or more of such Parties has/have gone into administration, receivership, liquidation, or any equivalent process in such Party's particular jurisdiction ("Bankrupt Party"), the Bankrupt Party shall be deemed to have waived its joint notification right (to the extent that such a waiver is permitted by applicable law in the Bankrupt Party's particular jurisdiction) and the requisite notification may satisfactorily be made solely by the other Party who was otherwise to jointly notify the CAM. However, if such a deemed waiver of the Bankrupt Party's right of joint notification is not legally permissible in the Bankrupt Party's particular jurisdiction such that the Bankrupt Party must be represented by a liquidator, administrator, receiver, or other person appointed to administer that the Bankrupt Party's assets or business (collectively, the "Administrator"), then the Administrator shall be entitled to represent the Bankrupt Party under this Agreement and to give joint notifications and take similar actions on behalf of the Bankrupt Party. However, if such Administrator does not comply with any time limits applicable to the Bankrupt Party's exercise of its joint notification rights or similar actions (such time limits being specified in the notice to the Administrator), then the Administrator's failure to take action within the requisite time period will have the same legal effects and consequences as if any Party shall have failed to act with an applicable time limit. The same principle shall be binding upon all acts of an Administrator under this Agreement.

**5.2.4** Any third party Beneficiary hereunder is not to receive any Statements, Incoming Payment Notifications or any other Notices unless CAM has received a written request to the contrary from one of the Parties and provided that such a request is accompanied with the contact and (email) address details of the applicable third party Beneficiary.

**5.2.5** In order for CAM to be able to comply with its disbursement obligations hereunder, (i) the Parties agree to timely provide CAM in writing with their bank account details,

in the form of Exhibit D hereto, and (ii) the Producer agrees to timely provide CAM in writing with the contact and bank account details of any third party Beneficiary that is entitled to receive Entitlements under this Agreement, in the form of Exhibit E.

**5.2.6** Subject to clauses 5.2.1 through 5.2.5 above, the CAM shall immediately notify each of the other Parties of any notice received by the CAM from any third party (i) stating that such third party is entitled to receive all or any portion of the Collected Gross Receipts, Deemed Collected Gross Receipts or Collection Account Interest, or (ii) otherwise instructing CAM not to allocate the Collected Gross Receipts in accordance with this Agreement. Notwithstanding any such notice, the CAM shall continue to remit Collected Gross Receipts and Collection Account Interest in accordance with the terms of this Agreement, unless (i) a court order or an injunction issued by a court of competent jurisdiction prevents the CAM from making such payments (but only to the extent of such court order or injunction), or (ii) CAM desires to obtain a legal opinion from a reputable law firm regarding the disputed Entitlements for CAM to avoid any liability in respect of such third party request. CAM shall have not more than sixty (60) days to obtain such legal opinion, during which time the CAM may retain the disputed Entitlements in the Collection Account. The costs incurred by CAM to acquire fore-mentioned legal advice shall be considered CAM Expenses.

**5.3     Reasonable doubt**

In the event that CAM is in reasonable doubt about or unable to carry out the allocation, accounting or payment of Entitlement(s), or conflicting demands are made by any of the Parties, or conflicting instructions or information are given by any of the Parties, CAM may retain such Entitlements (the "Reasonable Doubtful Entitlements") in the Collection Account and CAM shall not be obliged to make any further payments as regards to the amount(s) of the Reasonable Doubtful Entitlements to the Beneficiary(ies), until such situation of uncertainty has been resolved. The CAM shall immediately notify the Parties upon the occurrence of such event as well the details of such Reasonable Doubtful Entitlements. Upon the occurrence of any such event where CAM has reasonable doubt as to what actions it should take or is unable to carry out the payments because it lacks information or has received conflicting information from the Parties, CAM may commence an interpleader action, except that conflicts regarding Residuals and/or the Residuals Set-Aside shall be subject to the grievance and arbitration procedures pursuant to the applicable Basic Agreements, in accordance with clause 6.8. In the absence of material breach, gross negligence or willful misconduct on the part of the CAM, the CAM has no liability in respect of any decision taken and executed. For the avoidance of doubt, notice of, or the fact of, a bankruptcy, administration or other insolvency proceeding of one Party or Beneficiary, shall not create reasonable doubt as to the allocation, accounting or payment of Entitlement to other Party(ies) or Beneficiary(ies).

**5.4     No disbursement if unlawful, force majeure**

**5.4.1** This Agreement and all receipts, allocations and payments of Collected Gross Receipts hereunder by the CAM shall be subject to the requirements of all applicable present and future laws, regulations or directives including any and all withholding taxes or other taxes or duties, levies, fees or charges imposed by any international, national, multi-national, federal, state, local or other governmental or quasi-

governmental authority and the provisions of this Agreement shall be curtailed and limited to the extent necessary to comply with such requirements and the CAM has no obligation to make any payment to a Beneficiary if such payment may be unlawful in any way. CAM has the right to request and require any Beneficiary to provide CAM with any Distribution Agreement, any completed executed tax documents, any tax forms, certifications, supporting materials including any licences, any underlying agreements regarding the Project, including, but not limited to, any agreements for the provision of services, financing, and any other items reasonably requested by CAM. The Parties agree that CAM has the right to make any legally required tax withholding(s) and any other legally required deductions or retentions from any sums payable to any Beneficiary and may without any liability to any Party (or alternatively create a reasonable reserve from Collected Gross Receipts to) make any deposits, payment or other transfer of any such sums to any governmental or quasi-governmental authority.

**5.4.2** If it becomes illegal or impossible for reasons outside the CAM's control to carry out any of the provisions hereof ("Force Majeure"), it shall incur no liability as a consequence thereof, with respect to carrying out those specific provisions for as long as this situation continues and during such period it shall have no responsibility for the validity, effectiveness or enforceability as a consequence of those specific provisions. The CAM shall as soon as reasonably possible notify the other Parties hereto about the existence of any event of Force Majeure, and the Parties agree to act in good faith to reach an alternative arrangement for the payments of amounts hereunder on terms and conditions to be mutually agreed upon by the Parties.

**5.4.3** If a Force Majeure continues in excess of six (6) months, the Parties or the CAM may terminate this Agreement in accordance with clause 7 hereof.

**5.5 Prompt payment and accountings from Distributors**

The Sales Agent undertakes throughout the term of the Distribution Agreements to procure prompt payments from Distributors into the Collection Account as well as prompt and accurate distribution statements (via the Sales Agent) to the CAM.

**5.6 The CAM may rely on information**

The CAM shall be entitled to rely on information, reasonably believed by it to be correct, provided to it by any of the Parties or third parties and on any communication, document or correspondence reasonably believed by the CAM to be genuine and to have been made available, sent or signed by the Party by whom it purports to have been made available, sent or signed and the CAM shall not be obliged to inquire further as to the accuracy or authenticity of said communication, information or document. In the absence of material breach, gross negligence or willful misconduct on the part of the CAM, the CAM shall not be liable for any consequence of such reliance.

**5.7 The CAM shall upon request furnish information**

The CAM shall upon reasonable request furnish to a Party copies of all Distribution Agreements, statements and accountings received by it from the Sales Agent or the Distributors or other Parties, and answer reasonable questions raised by any Party in connection with this Agreement.

BR-CXP-01-00002.25

**5.8    Liability of the CAM**

No liability shall attach to the CAM on account of its payment of any monies received by it hereunder, provided that such monies are applied in accordance with this Agreement. If however the CAM makes an erroneous payment ("Erroneous Payment") in relation to an Accounting Period ("Applicable Period"), it will make good any direct loss (excluding consequential damages and lost profits) suffered by any of the Parties as a result of the Erroneous Payment, provided that the claim relating to the Erroneous Payment has been made within a term, commencing upon execution of the Erroneous Payment, equal to the Applicable Period less five (5) Business Days, with a maximum of three (3) months, whichever is the shortest. Notwithstanding anything to the contrary contained in this Agreement, CAM shall not be liable for erroneous calculations contained in the Payroll House Invoice and, furthermore, CAM can rely on the accuracy of the calculations contained in the Payroll House Invoice. With regard to any other obligations on the part of the CAM under this Agreement, no liability shall attach to the CAM in the absence of material breach, gross negligence or willful misconduct on its part.

**5.9    Repayment of overpayment**

The CAM shall, upon becoming aware, immediately provide written notification of any overpayment of any Entitlement(s) to all Parties and any applicable third party Beneficiary(ies). Each Party (excluding the Guilds) agrees that in case it has received more than its Entitlement(s), it shall upon becoming aware thereof or upon request by the CAM, which request may also be addressed to any Beneficiary not being a Party, immediately pay or repay such amount into the Collection Account for correct distribution by the CAM in accordance with this Agreement. If and to the extent such amount remains unrepaid after ten (10) Business Days following CAM's aforementioned request, the amount shall, as of that moment, accrue interest at a rate of LIBOR+1% per annum, payable by the applicable Beneficiary (excluding the Guilds). The CAM's next Statement will, to the extent applicable, be an adjusted Statement showing the correct Entitlement(s). The CAM shall make no further payments to the relevant Party(ies) or Beneficiaries, as applicable, until such amount has been repaid in full, including fore-mentioned interest, and it may formally notify such Party(ies) or Beneficiary, as applicable, upon the occurrence of such situation. If feasible, with respect to overpayments made to a Guild or the Guilds, and after written notification to the Guilds, CAM will make an adjustment on the next distribution to such Guild or the Guilds to address the amount of the overpayment after written notification to the Guilds. In no event, however, will a Guild be required to return payments that have already been paid to a Guild-Represented Employee or a party on behalf of a Guild-Represented Employee.

**5.10   No risk of own funds and maintenance of operations**

Subject to clauses 3.4, 5.8 and 6 hereof, none of the provisions hereof shall be construed so as to require the CAM to expend or risk any of its own funds or otherwise incur any financial liability or personal liability of its employees, shareholders, directors, etc. in the performance of its obligations hereunder and the CAM shall be under no obligation to make any payment to any Beneficiary except out of the Collected Gross Receipts standing to the credit of the Collection Account. The CAM shall sufficiently maintain its operation to carry out its obligations hereunder.

**5.11   Indemnification of the CAM**

**5.11.1** If the CAM incurs any liability, loss (excluding consequential loss and lost profits), damage, costs or expense, including reasonable outside (legal) counsel's fees, reasonable outside (legal) counsel's costs or court or arbitration costs, either through a claim or action arising out of, or in connection with its acceptance or its performance under this Agreement (including third party claims) or otherwise ("Liability Costs"), the Parties hereto shall, upon first written request of the CAM, forthwith pay such Liability Costs to CAM, in proportion to their respective Entitlements on the basis of the total amount of Collected Gross Receipts at the time of such demand, provided that if no Collected Gross Receipts have been received at such time, for the purpose of calculating such proportion, an amount of USD2,250,000 of Collected Gross Receipts shall be assumed to have been received, and agree to hold the CAM safe, harmless, defended and indemnified against any such Liability Costs, which are being deemed CAM Expenses for the purposes hereof, provided that such Liability Costs were not caused by material breach, gross negligence or willful misconduct on the part of the CAM only, and shall not operate as a waiver of any right that any of the other Parties hereto may otherwise have, including the right to seek recovery for the Entitlements which were not received as a result of the foregoing indemnification obligation to CAM. For the avoidance of doubt, the CAM shall not withhold payment due to one Party because another Party has failed to make a payment to CAM under this clause. Notwithstanding the foregoing, no Party shall be liable to indemnify the CAM under this clause for any CAM Expenses incurred as a result of (i) CAM's gross negligence, material breach or willful misconduct in performing its obligations hereunder, or (ii) CAM's material breach of any representation warranty or obligation in this Agreement.

**5.11.2** If at any time the CAM shall in good faith determine that the monies standing to the credit of the Collection Account are not sufficient to discharge the CAM Expenses which have been incurred by the CAM, the CAM shall notify the other Parties, along with the details of any such CAM Expenses, and the Parties hereto shall, upon first written request of the CAM, forthwith pay such CAM Expenses to CAM, in proportion to their respective Entitlements on the basis of the total amount of Collected Gross Receipts at the time of such demand, the amount of such shortfall into the Collection Account, provided that if no Collected Gross Receipts have been received at such time, for the purpose of calculating such proportion, an amount of USD2,250,000 of Collected Gross Receipts shall be assumed to have been received, and provided that such CAM Expenses were not caused by material breach, gross negligence or willful misconduct on the part of the CAM. The Parties who paid such portion shall recoup the same pro rata and pari passu in first position from any Collected Gross Receipts, after payment of the CAM Expenses.

**5.11.3** The benefit of clause 5.11.1 shall extend to the officers, directors, employees, agents, advisers, representatives and affiliates of the CAM.

**5.11.4** The CAM shall have the discretionary right to require a specific indemnification from the Parties (excluding the Guilds) hereto before taking any legal action hereunder which might in its reasonable judgment involve any expense to or liability of the CAM.

**5.11.5** In the event that a Party is in material breach of this Agreement, the CAM shall, immediately upon becoming aware of such event, notify the other Parties in sufficient detail thereof. It is agreed that, in such an event, the CAM is not obligated to take any legal or other action hereunder other than as provided for in this

BR-CXP-01-00002.27

Agreement. Nothing in this provision shall excuse CAM's material breach, gross negligence, or wilful misconduct in connection with this Agreement, it being understood that, subject to clause 5.8, any payment not in compliance with the terms of this Agreement shall constitute a material breach.

**5.11.6** If any Party (excluding the CAM) incurs any third party liability, loss, damage, costs or expense, including reasonable outside (legal) counsel fees and costs or court or arbitration costs (excluding consequential damages and lost profits), either through a claim or action directly arising out of a material breach by the CAM of its representations, warranties, covenants or obligations in connection with this Agreement or the CAM's gross negligence or willful misconduct under this Agreement, the CAM hereby indemnifies such Party and agrees to hold such Party safe, harmless, defended and indemnified against any such liabilities, losses, damages, costs or expenses.

**5.11.7** The Guilds, and any Collected Gross Receipts required to fully fund the Residuals Set-Aside, excluding the excess funds in the Residuals Set-Aside, are excluded from paying Liability Costs under clause 5.11.1 and CAM Expenses under clause 5.11.2 unless an arbitrator under clause 6.8 finds that such Liability Costs or CAM Expenses were caused by a Guild. Only the Guild that is found to have caused such Liability Costs and CAM Expenses will be liable under this clause 5.11.7.

## 5.12 The CAM has no other duties

The CAM shall have no duties or obligations pursuant to this Agreement other than those specified in this Agreement.

## 5.13 Authority to the CAM

**5.13.1** Each Party authorizes the CAM to perform the CAM's services as set out in this Agreement and to take such action on its behalf and to exercise such powers as are specifically delegated to it by the provisions of this Agreement, including those that may reasonably increase the likelihood of the Beneficiaries receiving their pre-agreed (potential) Entitlements, together with all the powers reasonably incidental thereto.

**5.13.2** No Party shall interfere with, frustrate or take any action contrary to the terms of this Agreement.

## 5.14 Power to represent

Each Party hereby represents and warrants that the individual signing this Agreement has the power to sign on behalf of the Party he or she is representing.

## 5.15 Intentionally deleted

## 5.16 Termination of the Sales Agency Agreement

**5.16.1** Upon receipt by the CAM of notification by Producer that the Sales Agency Agreement has been terminated or that its term has expired, which notification shall be accompanied with a copy of the relevant contractual termination settlement arrangements, if any (including arrangements regarding current and future Sales Agent Commission and Sales Agent Expenses and any other fees payable pursuant to the Sales Agency Agreement) whereupon the CAM shall take all steps to

BR-CXP-01-00002.28

sufficiently verify the termination of the Sales Agency Agreement, provided that in the event the Sales Agency Agreement has been terminated following the going into administration, receivership or liquidation of the Sales Agent (together referred to as the "Sales Agent Insolvency Event"), or any applicable or equivalent process in Sales Agent's particular jurisdiction, Producer may jointly instruct CAM (but subject always to clause 5.2.3 above) of the settlement arrangements, if any (including arrangements regarding current and future Sales Agent Commission and Sales Agent Expenses and any other fees payable pursuant to the Sales Agency Agreement), whereupon the CAM shall take all steps to sufficiently verify the Sales Agent Insolvency Event (by obtaining unequivocal evidence of such Sales Agent Insolvency Event) and that the Sales Agency Agreement has been terminated in relation thereto, and the CAM shall perform such arrangements, if any and, subject to the terms and conditions of this Agreement, shall cease to make payments to the Sales Agent. The settlement arrangements, if any, shall be notified to the CAM as soon as agreed in writing and signed by all relevant Parties or the Administrator (subject always to clause 5.2.3 above).

**5.16.2** Upon notification by Producer to all the Parties that the Sales Agency Agreement has been terminated or that its term has expired, this Agreement shall be terminated as against the Sales Agent ("Sales Agent Termination"), subject to the contractual settlement arrangements, if any, notified to the CAM pursuant to clause 5.16.1, provided that the Sales Agent shall have the opportunity to disagree with the Sales Agent Termination by (1) so notifying all the Parties in writing within ten (10) Business Days of the notification triggering the Sales Agent Termination, and (2) requesting that the disagreement be arbitrated pursuant to clause 6 hereof, failing which the Sales Agent Termination shall automatically become final.

**5.16.3** Subject to compliance with the provisions of clause 5.16.1, Producer shall have the right to designate a new sales agent ("New Sales Agent") by giving notice to all the Parties of the identity of the New Sales Agent and of the detailed terms under which the New Sales Agent is appointed, provided that:

a. The Sales Agent Termination pursuant to clause 5.16.2 has become final;
b. Each of the Parties have failed to object to the appointment of the New Sales Agent within ten (10) Business Days of notification of such appointment by (1) giving notice to all the other Parties of its disagreement, and (2) requesting the disagreement be arbitrated pursuant to clause 6 hereof;
c. The aggregate of (1) the entitlements of the New Sales Agent and (2) payments made to the Sales Agent pursuant to this Agreement (including pursuant to a settlement agreement) do not exceed the Entitlement of the Sales Agent hereunder; and
d. The New Sales Agent agrees in writing for the benefit of the Parties to abide by the terms and conditions of this Agreement as if it had been the Sales Agent.

The New Sales Agent shall automatically (but no earlier than the Sales Agent Termination pursuant to clause 5.16.2 becoming final) become a Party to this Agreement and the CAM shall be entitled to deal with the New Sales Agent as if it had been the Sales Agent.

## 5.17 Invalid Clause(s)

The validity of remaining clauses of this Agreement shall not be affected, should one or more of the clauses hereof be invalid, impracticable or unenforceable. The Parties

BR-CXP-01-00002.29

shall, to the extent reasonably required, replace the inapplicable clauses by a clause or clauses, which come(s) as close as (legally) possible to the economic purpose pursued by the Parties through the original clause(s). The same shall apply to any gaps in the provisions or structure of this Agreement.

## 5.18 No waiver

Except as otherwise described hereunder, no failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by it of any right, power or privilege, exclude any further exercise thereof.

## 5.19 Cumulative rights and remedies

The rights and remedies herein provided are cumulative and not exclusive of any rights and remedies provided by law.

## 5.20 Written amendments

**5.20.1** No provision of this Agreement may be amended, modified, waived, discharged or cancelled other than by the express written consent of the Parties affected by it, nor may any breach of any provision of this Agreement be waived or discharged except with the express written consent of the Parties affected by it.

**5.20.2** Notwithstanding anything to the contrary herein, in the event a third party is to be added as a Party to this Agreement (each, a "Potential Party"), it is hereby acknowledged and agreed that such Potential Party shall become a Party upon the notification thereof by CAM to all other Parties, provided that (i) CAM has not received any written objections from any of the Parties with potential Entitlement within 5 Business Days after CAM has sent the aforementioned notification, and (ii) the Potential Party has assumed in writing all rights and obligations of a Party under this Agreement. If CAM has received any objections against adding the Potential Party as a Party, which objection must be copied to all Parties and the reason for the objection clearly specified, such Potential Party shall only become a Party upon an executed written amendment to this Agreement, the approval of which amendment shall not be unreasonably withheld or delayed by any Party. Notwithstanding the foregoing, the Producer or the Sales Agent shall only be replaced as a Party to this Agreement by a new party upon the execution of an Amendment among all other Parties required for a binding agreement under clause 9.2, and the new Party.

## 5.21 Clause headings not relevant

The clause headings in this Agreement are provided for convenience only and shall not affect the construction, the interpretation or the effect of this Agreement.

## 5.22 No partnership, joint venture, no other obligations of CAM

Nothing herein shall constitute a partnership between or joint venture by the Parties or any two or more of them. The CAM shall not have any obligations or responsibilities to the Beneficiaries or otherwise, except as expressly set out in this Agreement. Without limitation to the foregoing, the CAM shall not have any other obligations towards Beneficiaries whether implied or imposed as a matter of law or equity, except as expressly set out in this Agreement.

BR-CXP-01-00002.30

**5.23 This Agreement is principal agreement and Warranty Entitlements**

In relation to (administering) the receipt, allocation and disbursement of Gross Receipts, (Deemed) Collected Gross Receipts and Collection Account Interest from the Project, each Party hereby agrees that, subject to the security interests described in clause 2.5 hereof, this Agreement sets out the entire agreement and understanding between the Parties hereto and that this Agreement shall supersede and prevail over all and any previous agreement(s), arrangement(s) and/or understanding(s) between them and warrants that the Entitlements as described herein or in the Exhibits hereto are correct, except in the event that, while administering this Agreement, the CAM encounters any conflict between the provisions hereof and the Basic Agreements regarding the calculation or payment of Residuals, the Basic Agreements shall prevail (unless the Guilds have agreed otherwise in a separate writing) and all rights and remedies under the Basic Agreements are expressly reserved and concurrently available to the Guilds, with the understanding that at all times clauses 5.8 and 3.4.3 shall prevail over the Basic Agreements. The Parties expressly agree that nothing in this Agreement shall be deemed a waiver of Producer's obligations under the Basic Agreements, including, without limitation, the reporting, calculation or payment of Residuals, as may be enforced through any grievance or arbitration proceeding with the Guilds in accordance with clause 6.8 below.

**5.24 CAM's credit on Project**

Producer shall procure that CAM shall receive a credit on the Project in the form: "Collection Account Management by Fintage Collection Account Management B.V.".

**5.25 Intentionally deleted**

**5.26 Third Party Rights**

A person or (legal) entity that is not a Party to this Agreement has no right to enforce any term of this Agreement.

**5.27.1 Representations and Warranties**

Each Party hereby makes the following representations and warranties:

(a) The Party is an organization duly organized, validly existing and in good standing under any and all of the laws applicable to it and it has all requisite corporate power and authority to enter into this Agreement and to carry out the terms hereof;

(b) All corporate and other actions and proceedings required to be taken to authorize the execution, delivery, and consummation of this Agreement by the Party has been or will be taken;

(c) The Party has the absolute right to enter into, to execute and deliver this Agreement, and to perform its obligations hereunder;

(d) This Agreement constitutes valid and binding obligations of the Party enforceable in accordance with its terms;

BR-CXP-01-00002.31

(e)     The Party does not require the consent or approval of any other person to enter into and perform this Agreement;

(f)     The execution and delivery of this Agreement is not, and the performance of this Agreement will not, constitute or result in:

(i)     a breach or violation of any provisions of the articles of incorporation, bylaws or minutes (collectively, "Corporate Documents") of the Party or any amendment thereto;

(ii)    a breach of any of the material terms, conditions or provisions of, or a default under, any agreement, instrument, understanding, indenture, mortgage, deed of trust, credit arrangement, note, evidence of indebtedness or other document to which the Party is a party or by which it or its properties are bound;

(iii)   to the best of the Party's knowledge in the exercise of reasonable prudence, a violation of any statute, decree, judgment, rule, regulation or writ or other order of any court of federal, state, county, municipal, regulatory or governmental authority, board, body or agency; or

(iv)    to the best of the Party's knowledge in the exercise of reasonable prudence, an act of bankruptcy, preference, insolvency, or fraudulent conveyance under any bankruptcy act or other law for the protection of debtors and/or creditors;

(g)     The Party shall not change its business or organizational objectives during the Term of this Agreement;

(h)     To the best of the Party's knowledge in the exercise of reasonable prudence, there are no threatened or actual claims, causes of action or disputes which would in any way affect the Party's ability to satisfy all of its obligations under this Agreement; and

(i)     Other than the security interests acknowledged herein, including, but not limited to, those acknowledged in clause 2.5, the Party shall not encumber or mortgage the Collection Account or any proceeds therein, nor allow any security interest, lien or encumbrance over the Collection Account, any proceeds therein, or the Party's rights under this Agreement, other than as agreed herein.

### 5.27.2 The Guilds' Representations and Warranties

Each Guild makes the representations described in clause 5.27.1, provided that clauses 5.27.1(f) and 5.27.1(g) shall not apply to the Guilds.

## 6.     ARBITRATION

**6.1**   Subject to clause 6.8 below and excluding the Guilds, the Parties agree that any and all disputes or disagreements arising out of, relating to, or based upon the

performance or interpretation of this Agreement or of any provision hereof shall, subject to providing the other Party or Parties with written Notice of the alleged breach or dispute and granting a cure period of no less than fifteen (15) Business Days, be irrevocably solved by way of binding final and exclusive arbitration before the International Film & Television Alliance ("IFTA") in Los Angeles County, California, United States of America, without the right of any appeal. The arbitration shall apply the IFTA Rules for International Arbitration and shall be governed by the substantive laws of the State of California under the rules then in force, without regard to its choice of laws provisions. Each Party hereby submits to the exclusive jurisdiction of IFTA.

**6.2** The CAM shall only be involved as an Arbitration Party if the dispute being the subject of the arbitration relates to the CAM's performance of its duties under this Agreement.

**6.3** No intended or unintended Beneficiary to this Agreement, other than the Parties hereto, shall have a right to initiate any proceeding under this Agreement.

**6.4** Any Party shall have the right to notify all the other Parties and third party Beneficiaries in writing of a disagreement by written notice ("Arbitration Notice") which shall (1) state the subject of the disagreement, (2) the identity of the Parties whose interest hereunder is the subject of such disagreement and who are requested to be represented in the arbitration (together with the Party making notice, the "Arbitration Parties"), and (3) grant a cure period of no less than fifteen (15) Business Days. Except for the Guilds, any Party that is not named as an Arbitration Party will automatically become an Arbitration Party upon notification in writing to such Party within ten (10) Business Days of the Arbitration Notice.

**6.5** The arbitrator (the "Arbitrator") shall be selected pursuant to the procedure then in effect at IFTA provided that the arbitration shall be conducted by a single arbitrator, who has at least fifteen (15) years of experience in the motion picture industry and at least five (5) years of service as an arbitrator in such matters.

**6.6** Immediately after the Arbitrator pursuant to this clause 6 has issued a final written award (the "Final Written Award"), the Arbitration Parties shall forthwith execute the Final Written Award and, if so required, transfer any monies payable by them into the Collection Account. The CAM shall allocate and disburse those monies as well as the Collected Gross Receipts in accordance with the Final Written Award. Notwithstanding the foregoing, the Parties agree that, in case Collected Gross Receipts are to be disbursed pursuant to the Final Written Award, it shall occur after fully funding the Residual Set-Aside.

**6.7** Notwithstanding anything to the contrary contained herein, upon receipt of an Arbitration Notice, the CAM may cease to pay any of the disputed Entitlements until either (1) the Arbitrator has provided the CAM with the Final Written Award, or (2) one or more of the Arbitration Parties has/have provided the CAM with a copy of the Final Written Award or a written notification that the arbitration was abandoned. The costs, charges and expenses incurred by the CAM in relation to the proceeding of the arbitration and the implementation of the Final Written Award (inclusive of the time spent by the CAM at a reasonable hourly rate) shall be deemed uncapped CAM Expenses, except that if the CAM is an Arbitration Party, payment of such costs shall be subject to any award of costs made by the Arbitrator.

**6.8** Notwithstanding anything to the contrary contained in this Agreement, each of the Parties hereto agree that any dispute to which any Guilds are parties in interest arising under this Agreement shall be submitted to final and binding arbitration in Los Angeles, California in accordance with the arbitration provisions set forth in the applicable Basic Agreements. Each Party further agrees that any legal action or proceeding to execute or otherwise enforce any arbitration award or judgment obtained hereunder by any Guild against any Party to this Agreement shall be governed by the laws of the State of California (without regard to its laws in respect of conflict of laws) and brought exclusively in the Federal or State courts located in Los Angeles, California, and by execution and delivery of this Agreement, each Party hereto irrevocably submits to such exclusive jurisdiction and consents to the service of process in any such action or proceeding by personal delivery, first-class mail, or any other method permitted by law, and waives any and all rights to transfer or change of venue of such action or proceeding to any court located outside Los Angeles, California. Notice of any such action or proceeding shall be deemed to have been duly given or made (a) immediately upon personal delivery, (b) five (5) Business Days from the date of mailing within the United States of America, or (c) seven (7) Business Days from the date of mailing across national borders. Notwithstanding the foregoing, in the event of any dispute, action or proceeding arising under this Agreement to which any Guild is not a party in interest, the provisions of clauses 6.1 through 6.7 shall apply.

## 7.    TERMINATION

**7.1** The CAM may at any time terminate this Agreement subject to a thirty (30) Business Days prior written notice to all Parties, provided that the CAM's notice shall specify the arrangements proposed to be made by the CAM to pay the Entitlements which, prior to such termination, would have been payable to the Beneficiaries under the provisions of this Agreement.

**7.2** The majority of the Parties, excluding the CAM and subject to the Producer and the Guilds being part of that majority, shall jointly have the right to terminate this Agreement at any time upon a thirty (30) Business Days prior written notice to all Parties, subject to a term of twenty-four (24) months after the issuance of the first Statement. Notwithstanding the foregoing, if the CAM commits a material breach of the terms of this Agreement which is not remedied within twenty (20) Business Days of written notice given to the CAM by a majority of the Parties including Producer, the twenty-four (24) months term shall not apply. The Parties may at any time terminate this Agreement if the CAM is unable to pay its debts as and when they fall due or has a liquidator, receiver or other external administrator appointed to its assets or business or ceases or threatens to cease carrying on its business by giving to the other Parties not less than five (5) Business Days' notice, the Party or Parties giving notice shall have the right to terminate this Agreement by written notice to the CAM and the other Parties.

**7.3** In the event of termination pursuant to clause 7.1 or 7.2 above ("Termination"), a majority of the Parties, subject to Producer and the Guilds being part of that majority, shall instruct the CAM in writing within ten (10) Business Days from the date of Termination, to transfer the relevant administration relating to this Agreement to a properly specified successor collection account manager and CAM agrees to transfer any balance standing to the credit of the Collection Account to an account to be designated by the replacement collection account manager without

any set off or deduction (except for actual, third party bank transfer charges) and to close the Collection Account no later than one (1) month after the date of Termination. If such instruction has not been received within the aforementioned period, the Guilds may (but are not obligated to) issue instructions to CAM with respect to transferring administration to a successor collection account manager within the next ten (10) Business Days. If such instruction has not been received within the aforementioned period, the CAM may close the Collection Account without further notice. Following any Termination, the Parties expressly agree that the material business terms of this Agreement, including, without limitation, the allocation of Collected Gross Receipts set forth in Exhibit A, shall, subject to any applicable amendments of this Agreement, remain in full force and effect.

**7.4**    As of the date of Termination pursuant to clause 7.1, the CAM shall no longer perform its obligations hereunder (but, notwithstanding such Termination, CAM shall, to the extent reasonably required, do whatever is reasonably necessary to effect a transition to a successor collection account manager as set out in clause 7.3 above) and, following the transfer of all sums in the Collection Account to the successor collection account, shall be automatically released and discharged there from in full, subject to claims made by the Parties under this Agreement during the Term and under clause 3.4, without prejudice to any rights and obligations of the Parties in respect of the period prior to the date of Termination, including, without limitation of the foregoing, the CAM's right to be paid the CAM Fee and its CAM Expenses up to and including the date of Termination. Any monies related to the Project, received by the CAM after the date of Termination and not payable to the CAM shall, upon receipt by the CAM, be transferred immediately, and without any set off or deduction (except for customary and actual bank transfer charges), to the properly specified successor collection account manager.

**7.5**    It is expressly agreed that any Party who shall have no further obligation under this Agreement and who is not entitled to receive any (further) Entitlement hereunder, shall no longer receive Statements, Incoming Payment Notifications and Notices from the CAM or have the right to agree (or disagree as the case may be) on or be a party to amendments hereto or terminate this Agreement as described in this clause 7, and such Party's consent shall thereafter no longer be required where its consent is required hereunder.

## 8.    NOTICES, STATEMENTS AND INCOMING PAYMENT NOTIFICATIONS

(i)    Any notice ("Notice") given under this Agreement, other than Statements and Incoming Payment Notifications, shall be in writing and shall be sent by registered letter or by electronic mail (excluding under clause 6.8), to the (email) address of the Party as set out on page 1 hereof and/or as set out in Exhibit C or alternatively such other address as notified by such Party to the other Parties pursuant to this Notice provision, or, with respect to a Beneficiary who is not a Party to this Agreement, such other address as notified to the CAM or the Parties by such Beneficiary pursuant to this Notice provision. A Notice shall be deemed to have been given (a) if posted, when delivered or received at the above mentioned addresses, on the date at which they would be received in the normal course of posting, and (b) if sent by electronic mail, when a "Delivery Receipt" has been received by the sender; and

(ii)     Statements and Incoming Payment Notifications shall be sent by the CAM by electronic mail and shall be deemed to have been given when no notification has been received to the contrary.

## 9.    EXECUTING PARTIES AND COUNTERPARTS

9.1   Subject to clause 9.2, in no circumstances will any prospective party shown as a Party to this Agreement have, or be recognized as having, any rights and obligations under this Agreement unless such Party has executed this Agreement.

9.2   This Agreement shall be binding and in full force and effect as of the day and the year first above written, subject to the CAM, Producer, the Sales Agent, the Guilds, and RLJ duly having executed this Agreement, but only in respect of the Parties that have signed. The Entitlement(s) of the prospective Parties who did not sign the Agreement (the "Prospective Parties") will be retained in the Collection Account until the earlier of (a) thirty-six (36) months after the date of this Agreement, or (b) until such time the relevant Party has duly signed the Agreement and the CAM has received such duly signed Agreement. In the event that after thirty-six (36) months after the date of this Agreement, one or more of the Prospective Parties have not signed this Agreement (and subject to the latter being in force), their Entitlement(s) will be allocated and paid out pursuant to this Agreement, whereby, from thereon, such Prospective Parties will be considered as third party Beneficiaries.

9.3   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Electronic signatures shall have the same force and effect as original signatures.

## 10.    LAW

This Agreement shall be governed and construed in accordance with the laws of the State of California, USA without regard to that State's choice of law or conflict of law provisions and the Parties, subject to clause 6 hereof, submit to the exclusive jurisdiction of the state and federal courts located in the State of California in the County of Los Angeles.

BR-CXP-01-00002.36

**Fintage Collection Account Management B.V.**

Per:  ...................................................
        Authorized Signatory

**No Man of God LLC**

Per:  ...................................................
        Authorized Signatory

**Company X Productions, Inc.**

Per:  ...................................................
        Authorized Signatory

**XYZ Films, LLC**

Per:  ...................................................
        Authorized Signatory

**RLJ Entertainment, Inc.**

Per:  ...................................................
        Authorized Signatory

**Amber Sealey Films, Inc.**

Per:  ...................................................
        Authorized Signatory

BR-CXP-01-00002.37

**Fintage Collection Account Management B.V.**

Per: ................................................
Authorized Signatory

**No Man of God LLC**

Per: ................................................
Authorized Signatory

**Company X Productions, Inc.**

Per: ................................................
Authorized Signatory

**XYZ Films, LLC**

Per: ................................................
Authorized Signatory

**RLJ Entertainment, Inc.**

Per: ................................................
Authorized Signatory

**Amber Sealey Films, Inc.**

BR-CXP-01-00002.38

**Fintage Collection Account Management B.V.**


Per: ......................................................
        Authorized Signatory

**No Man of God LLC**


Per: ......................................................
        Authorized Signatory

**Company X Productions, Inc.**


Per: ......................................................
        Authorized Signatory

**XYZ Films, LLC**


Per: ......................................................
        Authorized Signatory

**RLJ Entertainment, Inc.**

DocuSigned by:

*Jessica De Leo*

Per: ...........4E7DFF1F282440A...............
        Authorized Signatory

**Amber Sealey Films, Inc.**

DocuSign Envelope ID: 40207296-421A-488A-86EE-777C7C9D8A75

Per:  ...................................................
        Authorized Signatory

**Screen Actors Guild-American Federation of Television and Radio Artists**

Per:  ...................................................
        Authorized Signatory

**Directors Guild of America, Inc.**

Per:  ...................................................
        Authorized Signatory

**Writers Guild of America, West, Inc. for itself and on behalf of Writers Guild of America, East, Inc.**

Per:  ...................................................
        Authorized Signatory

BR-CXP-01-00002.40

DocuSign Envelope ID: 30B2BC81-4576-4E38-BD4A-1E77E075AD1D

**Screen Actors Guild-American Federation of Television and Radio Artists**

Per: ...................................................
    Authorized Signatory

**Directors Guild of America, Inc.**

Per: ...................................................
    Authorized Signatory

**Writers Guild of America, West, Inc. for itself and on behalf of Writers Guild of America, East, Inc.**

DocuSigned by:

Per: DT Matías ...................................................
    Authorized Signatory

BR-CXP-01-00002.41

Per: ....................................................
       Authorized Signatory

**Screen Actors Guild-American Federation of Television and Radio Artists**

Per: ....................................................
       Authorized Signatory

**Directors Guild of America, Inc.**

Per: _LK OBO Stephanie Lee_
       Authorized Signatory

**Writers Guild of America, West, Inc. for itself and on behalf of Writers Guild of America, East, Inc.**

Per: ....................................................
       Authorized Signatory

BR-CXP-01-00002.42

**EXHIBIT A**

**Allocation and Distribution of Collected Gross Receipts**

The Collected Gross Receipts, as well as the Collection Account Interest, shall be allocated and paid out by the CAM at the times set out in the following manner and in the following order (to the extent said amounts have not already been (partly) paid under this Exhibit A or from any other source, in which latter case the relevant Party shall as soon as reasonably possible notify this to CAM, and with respect to Residuals, those Residuals that have been paid to the Guilds from another source, which shall, upon request by any Party, be confirmed to the CAM in writing by the Guilds):

1. To CAM in payment of the CAM Fee and the CAM Expenses; thereafter

2. To create a Residuals Set-Aside for the payment of Residuals in accordance with, but not limited to, clause 4.3 of this Agreement; thereafter

3. To Sales Agent in payment of the Sales Agent Commission from Collected Gross Receipts derived from the ROW Territory; thereafter

4. To Sales Agent in payment of the Sales Agent Expenses and the Sales Agent Market Charge from Collected Gross Receipts derived from the ROW Territory; thereafter

5. To RLJ in payment of the RLJ Covid Loan from the Collected Gross Receipts derived from the ROW Territory; thereafter

6. Pro rata pari passu to Producer and ASF in payment of the Participations and the Sealey Award Bonuses, if any, from the Collected Gross Receipts derived from the ROW Territory; thereafter

7. To RLJ in payment of the RLJ Commission from Collected Gross Receipts derived from the ROW Territory; thereafter

8. To Allison Baver Entertainment in payment of USD180,000 from the Collected Gross Receipts derived from the ROW Territory; thereafter

9. The remainder, which shall be considered Net Profits, shall be allocated pari passu and be payable from of the Collected Gross Receipts derived from the ROW Territory as follows:

   

   Cast:
   -
   -
   -
   -

   Producers:
   -
   -
   -
   - 10% to Allison Baver Entertainment
   -
   -

BR-CXP-01-00002.43

- 

Director:
- 

Others:
- 
- 

Remainder:
- 

BR-CXP-01-00002.44

**EXHIBIT B**

**Irrevocable Instructions to and Notice of Acknowledgement by Distributor**

Distributor is hereby irrevocably instructed by Sales Agent (which instruction can only be changed or revoked by an original written and duly signed document by Fintage Collection Account Management B.V., tel. +31 71 565 9999, e-mail balazs.boltresz@fintagehouse.com) to pay all proceeds on "No Man Of God" due and payable to Sales Agent under the Distribution Agreement dated [../../….], directly and without diversion or deduction, into the following Collection Account:

| | |
|---|---|
| Account name | Fintage Collection Account Management B.V. re: "No Man Of God" |
| Account number | 4877 |
| Bank | City National Bank 400 N. Roxbury Drive, 4th Floor Beverly Hills, CA 90210, USA |
| ABA # | 122016066 |
| Swift Code | CINAUS6L |

Sales Agent and Distributor agree that they shall not alter the payment authority and direction contained herein without the prior written consent of Fintage Collection Account Management B.V. and Distributor and Sales Agent agree that in the absence of Sales Agent providing a copy of such consent to Distributor, Distributor shall continue to make payments solely into the Collection Account as provided for herein.

The Distributor agrees that it will not invoke any rights of set-off, cross-collateralization, counter-claim or defense or any other rights or make any withholding or deduction, save as required by law or as a result of customary bank transfer charges or deduction of applicable withholding tax (unless recovered), so as to extinguish or reduce any payments due to be made by the Distributor under the Distribution Agreement.

## EXHIBIT C

**Parties, other than individuals, within the EU must provide CAM with their Value Added Tax number, in order to enable CAM to pay out their Entitlements without deduction of VAT. Dutch Parties shall at all times be subject to deduction of VAT.**

Company name: **Company X Productions, Inc.** ("**CX**")

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:          Stacy Jorgensen
Telephone:
E-mail:          _____

With a copy to

Name:          Lisa Whalen
Telephone:
E-mail:

Company name: **No Man of God LLC** ("**SPE**")

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:          Stacy Jorgensen
Telephone:
E-mail:

With a copy to

Name:          Lisa Whalen
Telephone:
E-mail:

Company name: **XYZ Films, LLC** ("**Sales Agent**")

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:          Nick Spicer, Maxime Cottray
Telephone:
Facsimile:
E-mail:

Company name: **RLJ Entertainment, Inc.** ("**RLJ**")

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:          Legal Counsel

Telephone:
E-mail:

Company name: **Amber Sealey Films, Inc.**

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:        Amber Sealey
Telephone:
E-mail:

Company name: **Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA")**

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Name:        Rashan Hall
Address:

             Los Angeles, California 90036 USA

Telephone:
Fax:
E-mail:

Company name:  **Directors Guild of America, Inc. ("DGA")**

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Attn.:       CAMA Residuals Administrator
Address:

             Los Angeles, California 90046 USA

Telephone:
E-mail:

Company name: **Writers Guild of America, West, Inc. for itself and on behalf of Writers Guild of America, East, Inc. ("WGA")**

**Contact person** to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed:

Attn.:       Residuals Department
Address:     Writers Guild of America, West, Inc.

Telephone:
Facsimile:

E-mail:

Notifications to the Guilds shall be copied to:

Bush Gottlieb
Bush Gottlieb, A Law Corporation
                                Glendale, CA 91203, USA
Telephone:
Facsimile:
Email:
Attention: Joseph Kohanski, Esq.
.

BR-CXP-01-00002.48

**EXHIBIT C-1**

**Information on Project; Title, main cast, director, budget, etc.**

Title:          No Man of God
Main Cast:
Director:
Budget:

© 2020 - Fintage Collection Account Management B.V.

BR-CXP-01-00002.49

**EXHIBIT D**

[LETTERHEAD OF THE COMPANY]

Fintage Collection Account Management B.V
Attn:

The Netherlands

Date: [                    ]

Ref: "No Man of God"/Confirmation of bank account details

To whom it may concern,

We hereby confirm that the following bank account details apply to the entitlements payable to [Company name] regarding "No Man of God":

Account Name:
Account Number (IBAN):
ABA No./Sort Code:
Swift/BIC Code:
Bank:
Address of Bank:
Tel:
Reference:

Best regards,

_____
Authorized signature

BR-CXP-01-00002.50

**EXHIBIT E**

[LETTERHEAD OF THE PRODUCER OR THIRD PARTY BENEFICIARY]

Fintage Collection Account Management B.V
Attn:

The Netherlands

Date: [          ]

Ref: "No Man of God"/Confirmation of bank account details

Dear,

We hereby confirm that the following contact and bank account details apply to the entitlements payable to [Company name / name of Individual] regarding "No Man of God":

**Contact person** [to whose attention Statements, Incoming Payment Notifications and any other Notices need to be addressed (if applicable)]:

Name:                          .....
Telephone:                 .....
E-mail:                        .....
Full address              ......
VAT Number:             ..... (if based in the EU)

**Bank account details**

Account Name:
Account Number (IBAN):
ABA No./Sort Code:
Swift/BIC Code:
Bank:
Address of Bank:
Tel:
Reference:

Best regards,

_____

BR-CXP-01-00002.51

Authorized signature

© 2020 - Fintage Collection Account Management B.V.

BR-CXP-01-00002.52