SCOTT KEITH WILSON, Federal Public Defender (#7347)
KRISTEN R. ANGELOS, Assistant Federal Public Defender (#8314)
ROBERT K. HUNT, Assistant Federal Public Defender (#5722)
ROBERT STEELE, First Assistant, Federal Public Defender (#5546)
OFFICE OF THE FEDERAL PUBLIC DEFENDER
DISTRICT OF UTAH
Attorneys for Defendant
46 West Broadway, Suite 110
Salt Lake City, Utah 84101
Telephone: (801) 524-4010
Email:  kris_angelos@fd.org, robert_hunt@fd.org, robert_steele@fd.org

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT AND SENTENCING MEMORANDUM** |
| **Plaintiff,** | |
| **v.** | |
| **ALLISON MARIE BAVER,** | **Case No. 2:21-cr-00520-001 JNP** |
| **Defendant.** | |

Defendant, Allison Marie Baver, ("Ms. Baver), by and through her attorneys of record,

Kristen R. Angelos, Robert K. Hunt, and Robert Steele, submits the following objections to the

Presentence Report ("PSR") and sentencing memorandum.

### OBJECTIONS TO PSR

**I.      Ms. Baver Objects to the Factual Recitation Outlined in Paragraphs 7-54.**

As the Court is aware, Ms. Baver took this case to trial arguing against these facts. While

the jury ultimately determined that Ms. Baver was guilty, she intends to appeal. Accordingly, Ms.

Baver objects to these facts to preserve any issues on appeal. Ms. Baver asks this Court to order

probation to put the first three sentences of this paragraph under the Offense Conduct section, prior to paragraph 7 in the PSR (without the language "[a]s the Court is aware").  Additionally, Ms. Baver asks that prior to *every* paragraph in the offense conduct section, the following language be added *in bold*: "Ms. Baver objects to the factual recitation in this paragraph."

II.   **Ms. Baver Asks the Following Factual Assertions Regarding the Offense Conduct Be Added After Paragraph 54.**

In 2019, Ms. Baver began pitching the idea of America's Angels, a reality television show focused on women entrepreneurs.  She began pitching this idea to different networks, and after several meetings, A & E network gave her a proposal to air "America's Angels" on the A & E Network in Q4 of 2020.

Based on this proposal, Ms. Baver formed Allison Baver Entertainment, LLC ("ABE"), in October of 2019.  She obtained an IRS EIN number shortly thereafter and hired a lawyer to aid with negotiations and agreements.  She also began discussions with Castel Studios in Romania to help with the production of a film called Dead Princesses which ABE wanted to film oversees.  And in early February 2020, ABE engaged in discussions with the executive producer of a film called Monsters.

Ms. Baver was new to the industry and was learning from others as she went.  Although she lacked knowledge of other industry insiders, and possibly the time necessary to move production into principal filming in 2020, she honestly believed she could make it happen.

Beginning in 2020, COVID-19 began to spread, and a potential investor Ms. Baver was taking meetings with grew concerned about investing with the virus spreading.   Pre-production momentum of Monsters, America's Angels, and Dead Princess stopped in Spring 2020 as COVID-19 halted the country.

2

In late March 2020, the CARES Act came out, and with it a lifeline for business owners. Known as the Paycheck Protection Program (or PPP), this newly created loan program allowed businesses to apply for a business loan for payroll and other eligible expenses. The loan could be forgiven if the business owner used the money as intended.

Ms. Baver became aware of the PPP program in April 2020 inadvertently. Ms. Baver had emailed a Small Business Administration ("SBA") representative based in San Diego and received a reply email informing her that he understood it was hard to get financing in the entertainment industry. He suggested that the PPP loan may be available to her and her company and attached a recently-created-SBA document entitled Paycheck Protection Information Sheet that was meant to provide some early guidance to borrowers.

After reviewing this Paycheck Protection Information Sheet, Ms. Baver believed she was eligible for the loan. Between April 13th and April 26th, Ms. Baver provided information to Lendio through a portal that was eventually forwarded to Northwest Bank in PPP application form. Additionally, she applied to Meridian Bank. Because this was a new loan program, Ms. Baver was unsure how to calculate her payroll and number of employees as she was requesting the loan for future planned projects that she believed had been disrupted by COVID-19. Accordingly, between April 13th and April 26th, Ms. Baver's application information changed as she tried to understand how to correctly input the information. With the information submitted to Lendio and the application submitted to Meridian, Ms. Baver provided a "Good Faith" letter and supporting documents for the three planned projects. She also spoke with Jason Kirkham at Lendio regarding the fact that these were future planned projects. However, this information was not relayed to Northeast Bank. Northeast Bank never contacted Allison Baver regarding her application except once by text to inquire if she still needed the loan. *See* attached, Exhibit 1,

*Transcript of Brian Pinheiro, pg. 258, lines 4-25, pg. 259, lines 1-25; pg. 260. Lines 1-6.*  In response to the text, Ms. Baver indicated no.

When applying with Meridian Bank, Ms. Baver (through another individual) sent an email to Rocco Perate that was forwarded to Nick Patel who handled Ms. Baver's Meridian Bank application.   The email informed Mr. Perate, and subsequently Mr. Patel, that Ms. Baver was a new business and that she "had only paid an attorney for the projects in operations" that she was requesting the loan amount for.   At trial, Mr. Patel testified that he didn't read through the full email, even though it was forwarded to his email by Mr. Perate.  *See* attached, Exhibit 2, *Transcript of Nick Patel, pg. 17-25.*

Ms. Baver applied on April 25, 2020, with Meridian Bank, mere weeks after the PPP loan came into existence.  She based her Meridian Bank loan application on future hires for Monsters, America's Angels and Dead Princess, and provided an ABE  "Payroll Budget" noting Spring 2020.  Additionally, she provided a "Season Payroll Audit" dated April 22. 2020.  Further, she provided a 7a Program Calculator that listed 2020 dates, suggesting future employment.  Finally, as discussed previously, she provided a "Good Faith" letter.

Ms. Baver believed she was eligible for the PPP program because in the "gig" industry (the entertainment industry), film and television production was essentially a "project based" business where the actual filming portion, where all the hiring occurs, is only about two to three months long – as is a season in a seasonal business model.   Luke Watson, a witness at trial, likened the "gig" industry to an accordion, something that expands and contracts depending on where the business is in the production.   *See* attached, Exhibit 3, *Transcript of Luke Watson. Pg. 469, line 25; pg. 470, lines 1-15.*

Ms. Baver also believed she was eligible because she was a new business.  As a new, seasonal business, she was applying for the PPP loan based on the hiring of future employees (when COVID-19 ended), for the productions of Monsters, Dead Princess, and America's Angels, productions and filming that she believed could have been happening in Spring 2020, but for COVID-19.  Ms. Baver did the best she could when applying.

Indeed, Kandace Zelaya, an SBA employee who testified at trial and helped create the PPP loan applications with other SBA attorneys testified that the issuance of the rules was fast, rules were issued without the normal notice and public comment period, and the Frequently Asked Questions (FAQ's) that were provided by the SBA were being updated frequently.  *See* attached, Exhibit 4, *Transcript of Kandace Zelaya,* page ("pg.") 111-112.  Specifically, that there were updates on April 6th, April 8th, April 14th, April 23rd, and April 24th, with either new questions or answers or revisions of previous questions and answers during the time periods Ms. Baver was applying for the PPP loan on behalf of ABE.  *See* Exhibit 4, pg. 113-114.  Ms. Zelaya also testified that there was some confusion about how this PPP program worked and acknowledged that during this time period most SBA offices were closed.  *See* Exhibit 4, pg. 114, lines 11-25, pg. 115, lines 1-2.   She also testified that the Frequently Asked Questions ("FAQ") provided to borrowers were not law and conceded that the first interim rule clarifying how to calculate for a seasonal business was released on April 30th (after Ms. Baver had applied).  *See* Exhibit 4, pg. 119-120; *see also* pg. 125, lines 13-24 (interim rules are not the same as a law that is passed by Congress).  Further, she testified that there was a need for further clarification surrounding seasonal businesses because businesses were confused on how to calculate it. *See* Exhibit 4, pg. 120, lines 23-25; pg. 121, lines 1-4. Moreover, Ms. Zelaya acknowledged that what a lawyer intends to say when writing is not always understood by others who are reading it

– such that even if the SBA attorneys writing the FAQ's understood what they were saying --- a lay person may not.  *See* Exhibit 4, pg. 127, lines 16-25; pg. 128, lines 1-25; pg. 129, lines 1-29; pg. 131, lines 11-19.  Finally, Ms. Zelaya acknowledged that the boxes where borrowers were supposed to put the number of employees and payroll on the PPP loan application did not state: "number of employees have" or "number of employees had."  *See* Exhibit 4, pg. 134, lines 18-25; pg. 135, lines 1-24.

Shortly after Ms. Baver applied with Meridian Bank, she was approved for $10,000,000 after layers of review by Meridian Bank personnel.

After receiving this money, Ms. Baver began to try and move Monsters, America's Angels, and Dead Princess' productions along --- with anticipated filming sometime in late 2020 or Q1 of 2021 (barring COVID-19 issues).   She reached out almost immediately to A & E to reengage them regarding America's Angels and a new proposal.  She also engaged with the Monster's writer, hiring her to edit the script, and direct the film.  She also engaged the services of a line producer, Peter Phok, in order to try and get a tax credit with the State of California to film Monsters in the state.  That request was denied in July of 2020.   She also hired an accountant to keep spending records and hired an attorney to aid in the America's Angels' project.

Unfortunately, the entertainment industry was still shut down during the Spring and Summer of 2020, with COVID-19 protocols in place for those in production, with entertainment industry unions requiring productions to covid test actors, directors, and hair and makeup people frequently.  As a result, film and tv budgets increased substantially because of this requirement and many in the entertainment industry decided to wait out COVID-19 instead of paying for the extra COVID-19 protocols required.

During this waiting period, the producers of NO MAN OF GOD reached out to ABE about their dilemma surrounding the extra COVID-19 protocols placed on their production scheduled to begin filming and inquired if ABE would be willing to supplement the budget by $150,000. ABE agreed to provide this money with the intent that the money be used to hire COVID-19-protocol employees.  Ms. Baver later asked the producer for a letter confirming this.  Moreover, Luke Watson, an employee of ABE, testified that there were discussions within the company regarding this money, believing that providing it to the NO MAN OF GOD production would be in the "spirit" of the PPP loan because ABE believed it would be used for COVID-19 protocol employees.  *See* attached, Exhibit 5, *Transcript of Luke Watson*, pg. 483, lines 1-25; 484, lines 1-25; pg. 485, lines 1-6.

Pursuant to the PPP loan, Ms. Baver paid herself a W-2 wage of $41,666.65.  *See* attached, Exhibit 6, *Allison Baver W-2*.  She also paid $57,589.91 to Lash Media, a company Ms. Baver owned, which was for her executive producer services on America's Angels.  *See* attached, Exhibit 7, *Allison Baver Lash Media 1099*.  Both amounts were within the guideline limits on employee spending that the PPP program allowed for.[1]

ABE hired several employees during the Summer of 2020 to help aid in moving the three productions forward to principal filming.  ABE also paid 1099 employees including the accountant ($7875), an attorney from Greenburg Traurig ($5,000), an advertising and marketing specialist ($1350), and the line producer ($5,000).  However, most of the PPP money was saved and intended to be used when the three productions moved into principal filming where the bulk of the 430 employees would be hired.

---

[1] ABE also paid $18,558.00 to High Rise Realty, a property rental company which was associated with Ms. Baver at the time.

In October 2020, Ms. Baver was in California with Lauren Magura, an employee with ABE, meeting with the writer and director of Monsters, and also taking business meetings, when the Government seized around $9,500,000 of the PPP loan, essentially breaking ABE and halting any/all movement of the three productions, America's Angels, Monsters, and Dead Princess.

The Government thereafter indicted Ms. Baver on numerous counts of False Statement to a Bank, in violation of 18 U.S.C. §1014 and one count of Money Laundering, in violation of 18 U.S.C. §1957.   After indictment, the Government through the Grand Jury process subpoenaed ABE bank records.  On June 10, 2022, ABE filed a motion to quash the subpoena.  The district court denied ABE's motion on June 14, 2022.   Thereafter, Ms. Baver attempted to intervene in the matter, and on June 28, 2022, the district court denied her request and ordered her to produce the bank records by June 30, 2022, indicating that as a limited liability company, Ms. Baver was not entitled to the protections afforded a sole proprietor.

 ABE then filed a motion asking the Tenth Circuit Court to intervene on this issue. On August 30, 2022, the Tenth Circuit Court dismissed Ms. Baver's appeal on jurisdictional grounds, determining that ABE must first be held in civil contempt in order for the higher court to address the issue.   On September 14, 2022, the Court issued an order to Show Cause as to why Ms. Baver and ABE should not be held in contempt.  As the costs to Ms. Baver's and ABE's private counsel mounted, they filed a motion to stay the judge's orders on September 29, 2022, and filed a request to withdraw from the case on November 4, 2022.  Between these two motions, the Government indicted ABE and Ms. Baver on criminal contempt charges.  The indictment occurred prior to any civil contempt determination by the district court judge.

Unfortunately, Ms. Baver and ABE ran out of money and could not hire new counsel. See attached, Exhibit 8, *Transcript of Blake Hamilton*, pg. 351, lines 8-12.  Accordingly, Ms.

Baver and ABE could not pursue further arguments in the civil matter.  However, Blake

Hamilton, Ms. Baver and ABE's previous private counsel, testified during trial that ABE had

additional arguments that could have been pursued had ABE and Ms. Baver had the means to pay

private counsel.   *See* Exhibit 8, pg. 350, lines 13-24.

### III.     Ms. Baver Objects to the Two-Level Enhancement in Paragraph 67 for Obstruction of Justice for Ms. Baver's Contempt Conviction Since Contempt is Either a Misdemeanor or Sui Generis.

Courts have long struggled with how best to characterize contempt. As such, Ms. Baver

submits that contempt under §401 is a misdemeanor or sui generis.

The punishment makes the contempt. When the line between civil and criminal contempt

is difficult to draw, the punishment determines the type of contempt: the "critical features" in

determining whether contempt is criminal or civil are "the substance of the proceeding and the

character of the relief that the proceeding will afford." *Hicks on Behalf of Feiock v. Feiock*, 485

U.S. 624, 631, 108 S. Ct. 1423, 1429, 99 L. Ed. 2d 721 (1988).

The absence of a statutory maximum ordinarily has a different significance: "[T]he

sensible rule of statutory construction [is that] the absence of a specified maximum simply means

that the maximum is life imprisonment. By declining to limit the penalty, Congress gives

maximum discretion to the sentencing court."  *United States v. Turner*, 389 F.3d 111 (4th

Cir.2004). Authorizing a maximum penalty of life imprisonment ordinarily represents a

legislative determination that the offense warrants the most serious punishment: "In ordinary

criminal prosecutions, the severity of the penalty authorized, not the penalty actually imposed, is

the relevant criterion. In such cases, the legislature has included within the definition of the

crime itself a judgment about the seriousness of the offense." *Frank v. United States*, 395 U.S.

147, 149, 89 S. Ct. 1503, 1505, 23 L. Ed. 2d 162 (1969).  An offense with a statutory maximum

punishment of life typically represents a legislative judgment that the offense is of the most serious sort, a Class A felony. *See* 18 U.S.C. § 3559(a)(1) ("An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is life imprisonment, or if the maximum penalty is death, as a Class A felony.").

But the general rule does not apply to contempt; in this, as in other areas, contempt is sui generis. The absence of a statutory maximum gives judges sentencing discretion concomitant to the wide range of conduct captured by the contempt statute:

> [A] person may be found in contempt of court for a great many different types of offenses, ranging from disrespect for the court to acts otherwise criminal. Congress, perhaps in recognition of the scope of criminal contempt, has authorized courts to impose penalties but has not placed any specific limits on their discretion; it has not categorized contempts as 'serious' or 'petty.' 18 U.S.C. ss 401, 402.1. Accordingly, this Court has held that <u>in prosecutions for criminal contempt where no maximum penalty is authorized, the severity of the penalty actually imposed is the best indication of the seriousness of the particular offense.</u>

*Frank*, 395 U.S. at 149 (emphasis added). The extraordinarily wide net cast by the contempt statute means that it inevitably catches sins both venial and mortal: "[M]any contempts are not serious crimes but petty offenses not within the jury trial provisions of the Constitution." *Bloom*, 391 U.S. at 209. *See also United States v. Kozel*, 908 F.2d 205, 206 (7th Cir. 1990) ("But 'petty' crimes or offenses are not subject to the jury trial clauses, and criminal contempt can be a petty offense.").

Most circuits that have considered the question have followed *Bloom* and *Frank* in categorizing contempt convictions according to the punishment imposed. *See In re Solomon*, 465 F.3d 114, 119 (3d Cir. 2006) ("Most federal crimes are classified by felony or misdemeanor letter grades on the basis of the maximum sentence that can be imposed. <u>Contempt, however, cannot</u>

be classified in this manner because there is no maximum sentence imposed by statute. Instead, to classify Solomon's criminal contempt we look to the actual sentence imposed.") (citing *Frank*, 395 U.S. at 149); *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 661–62 (2d Cir. 1989) ("In ordinary criminal prosecutions, a relevant standard for gauging the severity of an offense is the maximum penalty authorized by law….[F]ederal courts have consistently looked to the maximum authorized punishment as the principal benchmark for distinguishing between petty and serious crimes. However, the Supreme Court has acknowledged that this measure of severity is inapplicable in federal criminal contempt cases because there are no statutory limits on the maximum allowable penalties. In criminal contempt prosecutions, courts "are to look to the penalty actually imposed as the best evidence of the seriousness of the offense.") (quoting *Bloom*, 391 U.S. at 211); *United States v. Linney*, 134 F.3d 274, 280 (4th Cir. 1998) ("[C]riminal contempt is unique in that legislative bodies frequently authorize punishment without stating the extent of the penalty which can be imposed. Thus, where no legislative penalty is specified and sentence is left to the discretion of the judge, as is often true in the case of criminal contempt, the penalties or seriousness of the contempt will be judged by the penalty actually imposed.") (quotation and citation omitted); *United States v. Soderna*, 82 F.3d 1370, 1380 (7th Cir. 1996) ("Note that 'when the legislature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty' (such as for criminal contempt), the Court 'look[s] to the penalty actually imposed as the best evidence of the seriousness of the offense.'") (quoting *Bloom*, 391 U.S. at 211)(emphasis added); *United States v. Time*, 21 F.3d 635, 642 (5th Cir. 1994) ("When no maximum penalty has been affixed through legislation, the courts look to the penalty actually imposed as the best evidence of the seriousness of the crime.") (citing *Bloom*); *United States v. Zakharia*, 418 F. App'x 414, 419 (6th Cir. 2011) ("The offense of misdemeanor contempt of

11

court, 18 U.S.C. § 401(1), is unique in that it carries no maximum penalty, either with regard to fines or imprisonment… Thus, the penalty actually imposed determines the seriousness of the offense.") (citing *Bloom*, 391 U.S. at 194) (emphasis added to all).

A court in this district has also observed that contempt "may be considered a felony, depending on the type of punishment imposed." *United States v. Bjarnson*, No. 2:22-CR-00481-DBB, 2023 WL 7413730, at *3 n. 29 (D. Utah Nov. 9, 2023) (citing *Bloom* and *Frank*) (emphasis added).

Two circuit decisions warrant special mention.[2] The Eleventh Circuit has concluded that § 3559 does not apply to the federal contempt statute. *United States v. Cohn*, 586 F.3d 844 (11th Cir. 2009) (per curiam). Section 3559 increases the level of felony with the increasing seriousness of conduct. But the range of conduct and the range of permissible penalties for contempt are both too wide to be captured by 3559's broad categories. *Id*. at 848. *Cohn* also observed that there is no single sentencing guideline for contempt: "Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the

---

[2] The Ninth Circuit has staked out yet another approach. The Ninth Circuit concluded that it would be unreasonable to assume Congress meant to make all contemnors felons and (pre-*Booker*) determined the seriousness of a contempt with reference to the range for the most analogous offense under the Sentencing Guidelines. *United States v. Carpenter*, 91 F.3d 1282, 1284 (9th Cir.1996) (per curiam). After *Booker*, the Ninth Circuit partially overruled *Carpenter*, linking the severity of the contempt to the statutory maximum penalty of the most analogous offense. *United States v. Broussard*, 611 F.3d 1069 (9th Cir.2010). While the Ninth Circuit has the virtue of recognizing that contempt comes in many varieties, its attempt to substitute a mechanical process linked to the Guidelines is unmoored from both the statute and common law. Nor is it clear that the most analogous guideline will invariably be easy to determine; indeed, there may not be one. Moreover, "maximum penalties are established by statute, not the Sentencing Guidelines. It is far from clear whether a district court, in classifying a criminal contempt, should use the maximum penalty called for by the base offense level or the total offense level, including all possible enhancements." *Cohn*, 586 F.3d at 847 n. 7.

administration of justice, and the need to vindicate the authority of the court are highly context dependent." 586 F.3d at 848 (citing U.S.S.G. § 2J1.1, comment. (n.1). As such, contempt is a sui generis offense and is best characterized as such "rather than a felony or misdemeanor." *Cohn*, 586 F.3d at 848. And as such, the federal contempt statute does not fall "within the ambit of § 3559's classification scheme." *Id. See also Cheff v. Schnackenberg*, 384 U.S. 373, 380, 86 S. Ct. 1523, 1526, 16 L. Ed. 2d 629 (1966) (contempt is "an offense sui generis.").

The First Circuit has since come to the opposite conclusion. *United States v. Wright* concludes that the plain meaning of § 3559 means that contempt is a Class A felony. 812 F.3d 27 (1st Cir. 2016). *Wright* is based on a simple syllogism: "Under the plain reading of the statute, the maximum penalty for criminal contempt should … be life imprisonment. Under 18 U.S.C. § 3559(a), that makes it a Class A felony." *Wright*, 812 F.3d at 32. *Wright* makes only a passing reference to the Supreme Court's treatment of contempt as sui generis: "[W]e find no basis to conclude from the fact that the Supreme Court has referred to an offense as 'sui generis' that Congress could not have intended for an offense with a maximum term of life imprisonment to be classified as a Class A felony for § 3559(a) purposes. *Id*. at 34.

But that is precisely what the Supreme Court does mean by designating contempt as sui generis:

> In ordinary criminal prosecutions, the severity of the penalty authorized, not the penalty actually imposed, is the relevant criterion…Accordingly, this Court has held that in prosecutions for criminal contempt <u>where no maximum penalty is authorized, the severity of the penalty actually imposed is the best indication of the seriousness of the particular offense</u>.

*Frank*, 395 U.S. at 149 (emphasis added). Ordinary crimes are categorized under § 3559(a); contempt is not.

Moreover, *Wright's* approach ignores the Supreme Court's express treatment of contempt in favor of a plain-language approach to § 3559. But Congress "legislates against a background of common-law adjudicatory principles." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10, 134 S. Ct. 1224, 1232, 188 L. Ed. 2d 200 (2014). And the contempt and its peculiarities are of venerable antiquity:

> For laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power…in the supreme courts of justice to suppress such contempts, by an immediate attachment of the offender, results from the first principles of judicial establishments…Accordingly we find it actually exercised, as early as the annals of our law extend.

William Blackstone, *Commentaries on the Laws of England*, Vol. IV, 186 [282–83]. The procedures associated with contempt are similarly venerable—and unique: "this method…is  not agreeable to the genius of the common law in any other instance." *Id*. at 187 [284]. Contempt is unique, and there was ample historical evidence—and caselaw—saying as much when Congress drafted § 3559.

Finally, designating an offense as a Class A felony has real consequences for a judge's sentencing discretion:

> Subjecting § 401 to § 3559 actually deprives [district courts] of the ability to flexibly sentence contempt. Forcing a district court to pigeonhole a criminal contempt into a felony or misdemeanor category would impinge on its ability to impose appropriate sentences. Pursuant to § 3559, different classifications prescribe various periods of imprisonment and supervised release and fines. Due to the variety of conduct which may be punished as criminal contempt, it is important that the district courts have flexibility in sentencing. For example, a court may be inclined to impose a short period of imprisonment but a lengthy term of supervised release or a steep fine. Section 3559's classification system would not permit this flexibility.

*Cohn*, 586 F.3d 844, 848 n. 9 (11th Cir. 2009). *Wright*'s approach thus deprives district courts of sentencing flexibility precisely where they need it most, in sentencing a crime with an extraordinarily broad reach. *See Frank*, 395 U.S. at 149 ("[A] person may be found in contempt

of court for a great many different types of offenses, ranging from disrespect for the court to acts otherwise criminal. Congress, perhaps in recognition of the scope of criminal contempt, has authorized courts to impose penalties but has not placed any specific limits on their discretion; it has not categorized contempts as 'serious' or 'petty.' 18 U.S.C. ss 401, 402.1.").[3]

Clearly courts have struggled to deduce the proper classification of contempt under §401. Recently, in *United States v. Jessop*, District Court Judge Shelby granted the defendant's motion --- a motion stipulated by the government – to remove the felony designation from the charging document and judgment. See *United States v. Don Carlos Jesso*p, 4:22-CR-00085-RJS, Doc. 38, December 18, 2023 ("Order Granting Stipulated Motion to Amend Judgment to Remove Reference to the Conviction as a Felony"). In addition, Judge Shelby at sentencing for contempt under § 401(3)—the same statutory provision at issue here—imposed a special assessment fee of $25, the amount applicable to misdemeanors. This reinforces Ms. Baver's position that courts as well as prosecutors have struggled to treat contempt consistently.

There is uncertainty in contempt law. As such, this Court should apply the well-established doctrine that ambiguities in criminal statutes must be resolved in favor of lenity. *Rewis v. United States*, 401 U.S. 808, 812 (1971); *see also United States v. Rentz*, 777 F.3d 1105

---

[3] *Wright* also runs headlong into one of the well-understood dangers of the contempt power: 'That contempt power over counsel, summary or otherwise, is capable of abuse is certain. Men who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir.'" *Bloom*, 391 U.S. at 202 n.4. (string cite omitted). *See also Bloom*, 391 U.S. at 203 ("This open-ended authority to deal with contempt, limited only as to mode of punishment, proved unsatisfactory to Congress. Abuses under the 1789 Act culminated in the unsuccessful impeachment proceedings against James Peck, a federal district judge who had imprisoned and disbarred one Lawless for publishing a criticism of one of Peck's opinions in a case which was on appeal. The result was drastic curtailment of the contempt power in the Act of 1831."). Every offense against the dignity of the court is not a Class A Felony. Indeed, according to the Supreme Court, some are petty offenses.

(en banc) (Gorsuch, J.) (if Congress's directions "are unclear, the tie goes to the presumptively free citizen and not the prosecutor."). This principle applies to sentencing as well as substantive provisions. *Simpson v. United States*, 435 U.S. 6, 14-15 (1978). Based on the rule of lenity, this Court must find that § 401(3) does not constitute a felony nor is it punishable by life imprisonment and sentence Ms. Baver accordingly.[4]

### IV. Ms. Baver Objects to The Two-Level Enhancement In Paragraph 67 Since United States Sentencing Guidelines (USSG) §3C1.1, Application Note 7, Indicates That It Is Not To Be Applied To The Offense Level If The Defendant Is Convicted Of An Offense Covered By §2J1.1 (Contempt).

USSG, §3C1.1, Application Note 7 provides:

> Inapplicability of Adjustment in Certain Circumstances – If the defendant is convicted of an offense covered by §2J1.1 (Contempt) . . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g. if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

*Id*. In the present instance, Ms. Baver was convicted of Contempt, in violation of 18 U.S.C. §401. According to the guidelines, 18 U.S.C. §401's guidelines are determined pursuant to USSG §2J1.1. *See* USSG, Appendix A.

Thereafter, looking at USSG §2J1.1, this section informs that §2X5.1 (Other Offenses) should be applied. *See* USSG §2J1.1. §2X5.1 provides:

> If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. §3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable.

*Id*.

---

[4] If this Court declines to deem § 401(3) a felony, there is no need to seek out the most analogous guideline since guideline provisions only apply to felonies.

Relooking at USSG §2J1.1, there does appear to be an analogous guideline --- §2J1.2. USSG §2J1.1, Application Note 1, provides that "[i]n certain cases, the offense conduct will be sufficiently analogous to §2J1.2 (Obstruction of Justice) for that guideline to apply." *Id.* §2J1.2 "Background" section indicates:

> [t]his section addresses the obstruction of justice generally prosecuted under the above statutory provisions [including 18 U.S.C. §1001, 1591, etc.]. Numerous offenses of varying seriousness may constitute obstruction of justice [including] . . .obstructing a criminal investigation . . .

*Id.* This would be the most analogous to Ms. Baver's conduct since she refused to provide ABE bank records to the Grand Jury.[5]

With the above in mind, USSG §2J.2 provides a base offense level 14. The additional special enhancements do not appear to apply to Ms. Baver's conduct. Thereafter, since Ms. Baver was convicted of four counts including wire fraud, money laundering, and contempt, multiple counting rules must come into play. *See* USSG §3D1.1-§3D1.5.

Currently, Ms. Baver's PSR, without the 2 levels for obstruction of justice pursuant to §3C1.1, would provide for a total offense level of 28 (adding paragraphs 63, 64, and 65). Under multiple counting rules, if this Court finds that Ms. Baver's offense level falls under §2J.2 for the Contempt conviction, Ms. Baver's total offense level for that conduct would be 14. Pursuant to USSG §3D1.4, there is a difference of 14 levels between the separate counts and the Court must disregard any group that has "9 or more levels less serious than the Group with the highest

---

[5] §2J1.2 Application Note 2(A) also suggests that §3C1.1 (Obstructing or Impeding the Administration of Justice) does not apply, unless the defendant obstructed the investigation, prosecution, or sentencing "of the obstruction of justice count," i.e., unless Ms. Baver obstructed the Government's prosecution of the Contempt count – which she did not.

level." *See* USSG, §3D1.4(c). [6]   Accordingly, Ms. Baver's Offense Level is 28 (before the 0-point offender reduction is added).

## SENTENCING MEMORANDUM

### REQUESTED SENTENCE

*Ms. Baver asks this Court to sentence her to CTS and three years of supervision to follow.*  This takes into consideration 18 U.S.C. §3553 factors including: 1) Ms. Baver's history and characteristics; 2) the nature and circumstance of the offense; 3) Ms. Baver is likely to continue her law-abiding life and is unlikely to reoffend; 4) to provide just punishment for the offense; and 5) to afford adequate deterrence to criminal conduct.   This requested sentence also takes into consideration ███████████████████████████ ███████████████ ███████ ███████████████████, that this was aberrant behavior under §5K2.20, and that there are extraordinary circumstances not considered pursuant to §5K2.0.

### 18  U.S.C. §3553 FACTORS

#### I.    Background Law

As required by the Sentencing Reform Act, courts must 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558, 570 (2007) (quoting 18 U.S.C. § 3553(a)). In determining a sentence that is "sufficient, but not

---

[6] Ms. Baver would concede that she may be subject to an additional three-level enhancement because the Contempt charge was committed while she was on pretrial release pursuant to U.S.S.G. §3C1.3.   However, if these three-levels were added, Ms. Baver's total offense level would be 17, which is still 9 or more levels less serious than the group with the highest level.

greater than necessary," 18 U.S.C. §3553 further directs the sentencing court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the sentencing range and any pertinent policy statements issued by the Sentencing Commission, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *accord Kimbrough,* 128 S.Ct. at 570.

## II.    History and Characteristics.

Ms. Baver was born on August 11, 1980.  *See PSR*, ¶ 84.  Ms. Baver's biological father appears to have left the family when she was just a baby, and unfortunately it appears that Ms. Baver and her biological father have no relationship.  *See* PSR, ¶ 84.   Ms. Baver was lucky though, as she was adopted by her stepfather, who with her mother have been consistent figures in her life, encouraging her and her life endeavors, especially in sports.  *See* PSR, ¶ 84-85.

Ms. Baver was a natural at sports, excelling in rollerblading, inline skating, and ice-skating, she had a natural talent that her parents allowed to flourish, sacrificing for her, often working two jobs to make sure Ms. Baver could compete in her beloved sports.   *See* PSR, ¶ 85.

With grit, determination, and drive, success came early for Ms. Baver, and she moved up the national rankings in the United States, qualifying for the US Olympic Junior Team in short track speed skating in 2000.  Thereafter, she moved to Michigan to train with the US Olympic Development Team and first secured a spot on the United States Olympic Team in 2002. Continuing this trend of success, she secured a spot on the United States Olympic team in 2006 and 2010 also, winning a bronze medal at the Olympics in Vancouver, Canada in 2010.   *See* PSR, ¶ 86-89.

Winning a bronze medal in 2010 was not assured, as Ms. Baver broke her leg in an international competition one year prior to the 2010 Vancouver Olympics.  She began recovery one day after the break, and during the next year, continued to train with one thing in mind – an Olympic gold medal as her goal.  *See* https://www.denverpost.com/2009/08/08/broken-leg-cant-shatter-bavers-spirit/.  Although others doubted her, Ms. Baver believed that if she worked and trained hard enough, anything was possible.  In the sports arena, this motto was certainly true for Ms. Baver.

This motto has not always been true for Ms. Baver during the years after retiring from her sport.  That dedication and drive that she showed so aptly in her sport, that brought her immense success and accolades - that persistence that if you try hard enough anything is possible ----  has not always paid off professionally and has actually hurt her in the instance offense.   Unlike sports, where listening to detractors or individuals say something can't be done, is a positive motivation to work harder to prove the nay-sayers wrong, in professional life and work, suggestions of caution or concern about certain actions, must oftentimes be listened to in order to comport with rules, regulations, and fiduciary responsibilities that surround work and life. Unfortunately, Ms. Baver, because of this narrow understanding of how one attains success, lacks the ability to see those cautions through an objective lens.  No does not necessarily mean no.

In the context of the PPP loan, Ms. Baver reviewed the program FAQ's, determined that she fell under a new-seasonal business model, and determined that she was eligible for the loan for three projects that she believed would be in production, but for COVID-19.  This belief became unwavering, and Ms. Baver's entire focus became getting the loan for ABE through

persistence, determination, and an unwavering commitment, applying lessons learned in sport to her professional life – unfortunately, it appears based on the jury decision, to her detriment.

### III.     Nature and Circumstances of the Offense.

Ms. Baver applied within two weeks of the CARES Act and PPP loan being enacted. During the time Ms. Baver applied, all that was required by the CARES Act was that the business be in operation on February 15, 2020, the business owner have employees for whom the business paid salaries and payroll taxes or paid independent contractors as reported on a 1099-MISC, and the business must have less than 500 employees. *See* Jury Instruction No. 24, Docket 178.

The SBA was charged with implementing the PPP loan program under the CARES Act. *See* Jury Instruction No. 24, Docket 178.   As discussed previously, between April 7, 2020, and April 24, 2020, the SBA provided numerous updates to FAQ's that were sent to borrowers and lenders to try and understand the PPP program and how to apply.  As noted previously, these FAQs were not law and the interim rules also released by the SBA during this time period had not gone through the notice and comment period usually required prior to an agency rule becoming effective.  Moreover, SBA attorneys were designing the PPP application, often using words such as retain and maintain, that may have had different meanings to them than to the lay business owners who were trying to decipher their meaning.  *See* Exhibit 4, pg. 136, lines 9-25; pg. 137, lines 1-7.

Not only were borrowers confused, so were lenders:

I want to be very clear here – I do not know – I can take a guess, but like you I am in the dark.  Each bank is interpreting things differently.  Each payroll provider is giving people different report totals.  This is a mess and none of what follows is gospel or is being shared for any reason other than we are in crisis.

*See* attached, Exhibit 10, *Information provided by Jason Kirkham with Lendio to Ms. Baver.*

Interim rules for seasonal businesses did not come out until April 30, 2020, after ABE had applied. *See* Exhibit 4, pg. 120, lines 2-25, pg. 121, lines 1-4. Moreover, there were about 3100 new lenders who were being exposed to SBA rules and guidance when trying to help businesses apply. *See* Exhibit 4, pg. 124, lines 2-14. Finally, as discussed previously, the PPP application in effect from April 2020 to June 2020, in the box where employees went, did not say "number of employees had" or "number of employees have." The PPP loan application was ambiguous.

During all this confusion and chaos, Ms. Baver, on behalf of ABE, applied as a new-seasonal business, with information and documents submitted to Lendio and Meridian Bank between April 13, 2020, and April 26, 2020. Ms. Baver provided a "Good Faith" letter to Lendio (which forwarded it to Northeast Bank). Ms. Baver also discussed the submitted information with Jason Kirkham with Lendio, however, Northeast Bank never reached out to Ms. Baver regarding the specifics of her application once it was forwarded from Lendio to Northeast. Additionally, Ms. Baver provided a "Good Faith" letter and email to Rocco Perate (forwarded to Nick Patel), informing Meridian that at the time of ABE submitting the PPP application, the company had only hired one attorney. Unfortunately, Nick Patel testified that he did not remember reviewing the email that was forwarded to him. *See* attached, Exhibit 2, *pg. 17-25.*

ABE received $10,000,000 after Meridian Bank funded the PPP loan. Ms. Baver and ABE began trying to move the productions forward that the PPP loan was based on, but the pandemic precluded any production in Summer of 2020. The entertainment industry was subjected to COVID-19 protocols that increased budgets for those wanting to film during the pandemic. When the Government seized the money in October of 2020, Ms. Baver was in

California meeting with the director of Monsters and taking meetings in order to move production forward.   The Government seized over $9,500.000 of the PPP loan.   The remaining amount went to employees ($177,000), to Ms. Baver as an employee of ABE (W-2 wage of $41,666) and as an executive producer of America's Angels ($57,589.81), and to 1099 employees including a lawyer for ABE and a line producer for Monsters.   In short, Ms. Baver spent the money how it was intended – to hire employees for pre-production and saved the remaining money to hire future employees for the three projects when the entertainment industry allowed – similar to an accordion, expanding employee hires when in actual production.

### IV.   Mr. Baver Is Likely to Continue Her Law-Abiding Life and Is Unlikely to Re-Offend.

As Congress mandated in Section 3553(a), a court must consider the defendant's likelihood of recidivism when determining an appropriate sentence.[7]   Considering that Ms. Baver was a law-abiding citizen prior to the instant offense, there is every reason to believe that she will continue to be a contributing member of society and will not recidivate in the future.   Ms. Baver has no prior criminal history and has no history of alcohol or drug abuse.   Moreover, she has been on pretrial release since January 18, 2022, maintaining a stable residence, traveling outside the state only after obtaining permission from probation, and ████████████ was employed with a retail business for most of last year.

---

[7] *See* 18 U.S.C. §3553(a) (court shall consider "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."); *United States v. Estrada-Lozano*, 221 Fed. Appx. 742 (10th Cir. 2007)(considering need for sentence to promote respect for the law); *United States v. Nellum*, 2005 WL 30073 (N.D. Ind. 2005)(basing, in part, defendant's 60-month departure on defendant's unlikelihood of recidivating).

Indeed, even before being indicted, she actively engaged with the government discussing her conduct involving the PPP loan. In 2020, Ms. Baver and her first attorney met with the Government and provided several items to the Government including emails, phone records, information regarding people she had talked with regarding the PPP loan, and any other information the Government requested in an effort to explain her understanding and belief surrounding the PPP loan.

Moreover, Ms. Baver prior to this current offense, has spent much of her life giving back to the community and country whose colors she proudly wore in the Olympics.  For example, Ms. Baver served as one of the Vice Presidents of the Olympic and Paralympic Association, served on the Athlete Advisory Council, Athlete Support and Resource Allocation Task Force, and served on the U.S. Speedskating Board of Directors.  *See* PSR, ¶ 105.   Ms. Baver also founded the Allison Baver Foundation ----Off the Ice Program in 2010 – a non-profit organization that provides skating and sports and educational programs for youth.  *See* https://www.charitybuzz.com/support/allisonbaver.

With the above in mind, it is clear that Ms. Baver will continue her law-abiding life and is not likely to re-offend.  As such, a lesser sentence is warranted.

## V.      Provide Just Punishment for the Offense

The sentence must provide punishment that is tailored to the offense and the defendant. Retribution is one of the classic justifications for punishment.  *See* Toni M. Massaro, *Shame, Culture, and American Criminal Law*, 89 Mich L. Rev. 1880, 1890 (June 1991).   18 U.S.C. § 3553(a)(2)(A); "promotes this goal, requiring that each sentence 'reflect the seriousness of the offense . . . [and] provide just punishment for the offense . . . .'"  *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1173 (N.D. Iowa 2014).  The retributive focus is a backward look at the

crime itself and the loss that an offender has inflicted on society. *Massaro* at 1891. Retribution is the price an offender must pay to rejoin society and enjoy its full protections once again. If "an individual deserves punishment[,] when he engages in behavior that conveys disrespect for important values," then retributive justice helps the offender reaffirm those values to the satisfaction of society. *See* Dan M. Kahan, *What do Alternative Sanctions Mean?* 63 U. Chi. L. Rev. 591, 602 (1996). Therefore, loss of economic opportunities through the payment of fines or restitution, loss of freedom through incarceration, or loss of absolute liberty through probation are both the  punishments for an offender's behavior and the mechanism by which that offender hopes to regain his place in society.

In the present instance, Ms. Baver is asking for CTS with supervision to follow. If the Court grants Ms. Baver's request, this certainly doesn't mean that Ms. Baver will not suffer "just punishment." She will continue to suffer the loss of absolute liberty with the imposition of supervised release. Further, in repaying restitution or forfeiting the monies based on the current preliminary forfeiture court order, she will both lose economic opportunities and repay society for the loss it suffered when she took money with the PPP loan.

Moreover, the very public process of being brought into court, of being on supervised pretrial release with all of its time demands and intrusion into her personal life, of publicly being found guilty, and being sentenced brings its own retributive punishment, in the form of public shaming. *Massaro* at 1933-34. It is sometimes described as 'losing face' and involves the loss of social value leading to a fear of abandonment or isolation. *Massaro* at 1902-03.

Ms. Baver has already been publicly shamed and continues to be publicly shamed based on the notoriety this case has had in the media. Ms. Baver's reputation in the fashion and entertainment industry has been forever harmed. All that a prospective investor or entertainment

executive need do is google Ms. Baver's name and several stories regarding Ms. Baver being charged and found guilty of this federal offense can be found.[8]  Accordingly, it is likely that any future work in the entertainment industry will be severely limited, if at all.  Defense counsel also understands that Ms. Baver has been removed as Vice-President of the Olympic and Paralympic Committee as a result of her conviction.

Moreover, Ms. Baver has been punished for the past four years as she had had to fight this matter on several fronts, including an In Rem civil forfeiture proceeding,[9] litigating quashing Grand Jury subpoenas,[10] and this current criminal charge.  When the Government seized the $9,500,000 in ABE's accounts, Ms. Baver used her own money and borrowed money from her family to hire private counsel for the litany of civil litigation that transpired prior to the criminal case that is before this Court.  She also hired private counsel prior to an indictment in this matter, and hired new private counsel once an indictment was returned against her and ABE.  Where the Government has had an unlimited amount of money to spend, Ms. Baver has been left with using the entirety of her savings and her parents retirement income.  At this juncture, Ms. Baver has very little left.

With the above just punishment already served, it is reasonable for this Court to order CTS and a period of supervision in lieu of incarceration as the above losses felt by Ms. Baver serves as a part of retributive justice that the Court must consider under 3553(a)(2)(A).

---

[8] *See* https://www.abc4.com/news/crime/utah-olympian-speedskater-convicted-for-nearly-10-million-fraud/  https://kutv.com/news/local/utah-olympian-found-guilty-of-10m-worth-of-ppp-loan-fraud-allison-marie-baver-allison-baver-entertainment-llc-covid-19-2020; https://www.readingeagle.com/2023/07/05/berks-county-native-and-former-olympian-found-guilty-of-pandemic-loan-fraud/.
[9] *See* Case No. 2:22-cv-00070.
[10] *See* Case No. 2:22-sc-00091 (Sealed).

### VI.     To Afford Adequate Deterrence to Criminal Conduct

There is very little general deterrent effect to be gained from lengthy prison sentences.  It is the certainty of punishment, not "increases in the severity of punishments" that has a general deterrent effect.  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); and *see* Cesare Beccaria, *Dei Dvincetti e delle Pene* (On Crimes and Punishment) (first published in 1764 it remains to this day a vital work on the subject)

> No one doubts that having a system of punishment has crime-preventive effects.  The important question is whether changes in punishments have marginal deterrent effects [. . . .]   Imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects.

*Tonry* at 28-29*, citations omitted.*  Even the Department of Justice acknowledges that certainty of punishment has a greater general deterrent effect than severity of punishment in a fact sheet that summarizes current social science data regarding general deterrence. This fact sheet makes four points that are relevant here: 1) The certainty of being caught is a vastly more powerful deterrent than the punishment; 2) Sending an individual convicted of a crime to prison isn't a very effective way to deter crime; 3) Police deter crime by increasing the perception that criminals will be caught and punished; and 4) Increasing severity of punishment does little to deter crime. U. S. Department of Justice, Office of Justice Programs, National Institute of Justice, Five Things About Deterrence (2016), available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf; *see also United States v. Staats*. 2020 U.S. Dist. LEXIS 219946 at page 8.

Given the restrictive nature of an extended period of supervision "it is difficult to imagine, let alone readily apparent, that other offenders will adopt a cavalier attitude" to such a sentence.  *United States v. Stall,* 581 F.3d 276, 286 (6th Cir. 2009).  Anyone in a situation similar

to Ms. Baver will be deterred by the fact of a conviction alone, which by itself can have a life altering effect. Ms. Baver's arrest, prosecution, and inevitable sentence serve as adequate warning to others that such activity has a serious consequence.

**<u>DOWNWARD DEPARTURES</u>**

[redacted]

[redacted]

> [redacted]

[redacted]. [redacted].” [redacted]. [redacted] “[redacted]” [redacted].

> [redacted]







[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

██████████████████████████████████

████

**ADDITIONAL DEPARTURES**

**I.       §5k2.20 – Aberrant Behavior.**

The Sentencing Guidelines allow for a departure where a defendant's criminal conduct shows a marked deviation from an otherwise law-abiding life, and the Tenth Circuit has found that "the aberrance of a criminal act is an encouraged factor for departure."  U.S.S.G. §5K2.2; *United States v. Benally*, 215 F.3d 1068, 1072 (10th Cir. 2000).   Under the guideline section, there are several requirements, including that the offense was committed without significant planning, was of limited duration, did not involve serious bodily injury or death, and was not a serious drug trafficking offense; the defendant did not discharge or use a firearm, and does not have more than one criminal history point.  U.S.S.G.   §5K2.20(b)-(c).  This court may also consider the defendant's ███████████████, employment record, prior good works, motivation for committing the offense, and efforts to mitigate the effects of the offense.  U.S.S.G. §5K2.20, Application Note 3.  However, even if the defendant does not meet these specific requirements, a departure for aberrant behavior is still available, under 18 U.S.C. §3553(a), when considering the history and characteristics of a defendant.  *United States v. McCarthy*, 840 F.Supp. 1404, 1407 (D. Colo. 1993)(included in court's consideration of history and characteristics of the defendant is defendants aberrational acts); *United States v. Howard*, 2008 WL 5459194 (E.D.N.Y. 2008)(considering aberrant nature of defendant's actions in 3553(a) analysis).

Ms. Baver has no criminal history and for her entire life has been a law-abiding citizen. She has always been an extremely hard worker, showing her work ethic by making the 2002, 2006, and 2010 U.S. Olympic Team in short-track speed skating.  *See PSR*, ¶ 87-88.  She has

served in leadership positions throughout her adult years including serving as a Vice President of the Olympic and Paralympic Association, on the U.S. Speedskating Board of Directors, Safety Commission, and serving on the Athlete Advisory Council, Athlete Support and Resource Allocation Task Force.   *See PSR*, ¶ 105.

Further, family members and friends have suggested that Ms. Baver has always tried to be a good role model, has done a lot of work in the community, has a work ethic and level of commitment that is extraordinary, and has been a great influence on the younger female generation, specifically in relation to one family friend's daughters. *See PSR*, ¶ 90-93.

Rather than committing offenses throughout her life, Ms. Baver has instead been a functioning member of society, always working and always willing to help and influence others through sports and other endeavors.  As such, the instant offense is completely aberrant in nature. Accordingly, a departure or variance is warranted.

## II.    §5K2.0 – Circumstances of a Kind Not Adequately Taken into Consideration.

Pursuant to §5K2.0(a)(3):

> A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

*Id*.

In the present instance, Ms. Baver's guideline offense level calculation is based on intended loss, application of USSG §2B1.1, and Tenth Circuit caselaw.  "USSG" §2B1.1(b)(1) provides that if loss exceeded $6,500, increase the offense level based on the amount of the loss. *Id*. The guideline itself does not define what constitutes loss. *See* USSG §2B1.1. However,

application notes associated with the guidelines indicate that the general rule is that "loss is the greater of actual loss or intended loss."   USSG §2B1.1, Application Note 3.

Notwithstanding this rule, "[t]he court shall use the gain resulted from the offense as an alternative measure of loss only if there is a loss, but it reasonably cannot be determined." USSG §2B1.1, Application Note 3(B).   Unfortunately, in the present instance, intended loss can reasonably be determined such that this Court cannot go to "gain" in determining the appropriate offense level.   In spite of this, this Court could consider that Ms. Baver's actual gain be considered a circumstance of a kind not adequately considered which warrants a downward departure.

In the present instance, this Court has just entered a preliminary order of forfeiture of over $9,650,000 against Ms. Baver.   Assuming a final order of forfeiture, the SBA will be receiving this money back from the PPP loan.  The SBA has already made Meridian Bank whole.  Of the remaining monies, $177,000 was used for payroll to employees.

The only monies Ms. Baver personally received from ABE's $10,000,000 loan was $41,666.65 which Ms. Baver earned as a W-2 employee, $57,589.81 which Lash Media received for Ms. Baver's executive producer fee for America's Angels, and $18,558 to High Rise Realty, a company associated with Ms. Baver.  Applying §2B1.1, Ms. Baver's offense level would be an 8 based on gain (more than $95,000, but less than $150,000).   With a base offense level 7, a specific offense level of 8 based on gain, an additional 1 level based on the money laundering count, Ms. Baver's total offense level (without the two-level adjustment for obstruction based on the above arguments), with the two-level reduction for 0- point offender, would be 14.  With a criminal history category of I, Ms. Baver's guidelines would be 15-21 months.   If this Court considers this circumstance, a downward departure is warranted under §5K2.0.[11]

---

[11] This could also be considered under 18 U.S.C. §3553 factors.

## <u>CONCLUSION</u>

With the above in mind, Ms. Baver asks this Court to sentence her to CTS and three years of supervision to follow.  This takes into consideration 18 U.S.C. §3553 factors including Ms. Baver's history and characteristics, the nature and circumstances of the offense, that she is likely to continue her law-abiding life and is unlikely to reoffend, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.  This requested sentence also takes into consideration ███████████████████ ████, ██████████████████████ ██████████████████████, that this was aberrant behavior under §5K2.20 and that there are extraordinary circumstances not considered pursuant to §5K2.0.

RESPECTFULLY SUBMITTED this 30th day of September, 2024.

*/s/ Kristen R. Angelos*
KRISTEN R. ANGELOS
Assistant Federal Public Defender


*Robert K. Hunt*
ROBERT K. HUNT
Assistant Federal Public Defender


*Robert L. Steele*
ROBERT L. STEELE
Assistant Federal Public Defender