Michael Langford (9682)
Alexander E. Ramos (15234)
LANGFORD | RAMOS PLLC
8 East Broadway, Ste. 420
Salt Lake City, UT 84111
Telephone: (801) 328-4090
alex@langfordramos.com
mjl@langfordramos.com

Nicolas C. Wilde
Law Office of Nicolas C. Wilde LLC
40 S. 600 E.
Salt Lake City, UT 84102
Telephone: (801) 949-3088
Email: nick@ncwildelaw.com

*Attorneys for Allison Marie Baver*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALLISON MARIE BAVER,<br><br>Defendant. | **Motion to Vacate the Judgment and Grant a New Trial Under Rule 33 Based on Prior Counsel's Ineffectiveness or, In the Alternative, to Hold an Evidentiary Hearing to Determine Prior Counsel's Ineffectiveness**<br><br>Case No. 2:21-cr-00520<br><br>District Judge Jill N. Parrish |

Allison Marie Baver ("Ms. Baver") through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 33(a), moves the Court for a new trial based on prior counsel's ineffectiveness. Because the record establishes prior counsel's ineffectiveness, the Court should grant a new trial without an evidentiary hearing. But if the Court holds that Ms. Baver is not yet

1

entitled to a new trial, she moves the Court to hold an evidentiary because Ms. Baver has established a colorable claim of ineffective assistance of counsel.

## **Relevant Factual and Procedural Background**

Ms. Baver Forms Allison Baver Entertainment LLC in October of 2019.

According to the United States, Allison Baver Entertainment LLC ("ABE") "was a limited liability company that was registered in the State of Utah and began operations on October 9, 2019." (ECF No. 152 at 4.) According to the United States, "ABE was a single-member LLC, managed by" Ms. Baver. (ECF No. 152 at 4.)

In April of 2020, a SBA Representative Tells Ms. Baver that ABE "Might Be Able to Qualify" for a PPP Loan.

On April 9, 2020, at approximately 9:31 AM, Ms. Baver sent an email to "Utahgeneral@sba.gov" wherein she wrote, in relevant part, that her "company does not have prior payroll . . . ."

Later that same day, at approximately 9:57 AM, Ms. Baver wrote an email to Kenneth Luis, a lender relations specialist with the U.S. Small Business Administration—San Diego Office. (Government Exhibit 67.[1]) Mr. Luis responded the same day. (Government Exhibit 67.) Relevant here, he wrote: "With this new program that has been all over the news called **Paycheck Protection Program, you <u>might be able to qualify</u>** . . . To apply for this loan we are encouraging business owners to contact [their] lending institution. I've attached information on the program." (Government Exhibit 67 (bold added).)

---

[1] Not all exhibits were introduced at trial, so Ms. Baver provides the exhibits as attachments to this Motion.

At 1:21 PM on April 13, 2020, Ms. Baver sent an email to Jason Kirkham that provided: "My entertainment company was referred to you by the [Women's Business Center]. We need to apply for the PPP loan ASAP. I know that you are busy. Can you please call me?" (Defendant's Exhibit 408.)

That same day, at 1:25 PM, Kirkham responded: "Allison I am too busy processing applications at this time to take calls. You can apply on my website . . . Attached is how to calculate the amounts and the documents we need." (Defendant's Exhibit 409.)

On April 13, 2020, at 14:02:35, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government's Exhibit 13(l).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "100." (Government's Exhibit 13(l).)

On April 13, 2020, at 14:04:38, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government's Exhibit 13(k).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "100." (Government's Exhibit 13(k).)

On April 13, 2020, at 2:05 PM, Ms. Baver received an email from Lendio that provided, in relevant part: "Thanks for submitting your application . . . Our next step in the process is to submit your application to lenders . . . ." (Defendant's Exhibit 412.)

On April 13, 2020 at 2:10 PM, Ms. Baver sent an email to Kirkham that provided:

Hello Jason, I just submitted the application. My entertainment company had major projects scheduled to be in production right now. Just started the company October 2019. The sba told me to apply ASAP and find a lender to hopefully work with me. We are talking nearly 100 jobs and a majority of the production

costs labor and **will be paid within the first 8 weeks**. Included the proposal for A+E network for the show that was suppose[d] to air Q4. We had a tv show and two films that I am hoping to save and as CEO save these jobs . . . ." (bold added).

(Defendant's Exhibit 413 (bold added).)

On April 14, 2020, at 11:09 AM, Ms. Baver received an email from Lendio that provided, in relevant part: "Good news—we are ready to process your application and submit it to the SBA for approval, but we need your help on a few remaining items." (Defendant's Exhibit 414.)

On April 14, 2020, at 17:08, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit 13(j).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "105." (Government's Exhibit 13(j).)

On April 14, 2020, at 5:10 PM, Ms. Baver emailed Kirkham: "Hello Jason, I uploaded additional documents to the loan by 5 pm, but need until this evening to get you the 2 month budget. Thanks so much! Allison." (Defendant's Exhibit 415.)

On April 15, 2020, at 7:37 PM, Ms. Baver received an email from Lendio that provided, in relevant part: "If your file has not been submitted, it's likely that your application is not complete and ready for a lender." (Defendant's Exhibit 416.)

On April 16, 2020, at 0:36:54, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit 13(g).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "105." (Government's Exhibit 13(g).)

On April 16, 2020, at 1:31:49, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit

13(i).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "105." (Government Exhibit 13(i).)

On April 16, 2020, at 1:35AM, Ms. Baver sent Kirkham an email: "Hello Jason, I was able to upload all of the information that you may need to process the PPP loan. Please see my attached letter. If there is any additional information you need, please let me know." (Defendant's Exhibit 417.)

On April 16, 2020, at 1:55:04, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit 13(h).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "105." (Government Exhibit 13(h).)

On April 16, 2020, at 7:21 PM, Ms. Baver received an email from Lendio: "Unfortunately it appears your application was either missing data or had invalid information and we were not able to submit for approval." (Defendant's Exhibit 418 (bold removed).)

On April 21, 2020, at 6:01 PM, Ms. Baver received an email from Lendio that provided, in relevant part: "If you are receiving this email, you have either **(1)** started and not submitted a Paycheck Protection Program (PPP) loan application via Lendio.com or **(2)** have submitted your application to Lendio.com but there is incomplete information and *we cannot forward your application to our trusted lenders*." (Defendant's Exhibit 419 (italics added).)

On April 21, 2020, at 6:03 PM, Ms. Baver sent an email to Lendio's customer service that provided, in relevant part:

> How can I go about updating my PPP loan application? New business is eligible. I spoke with the SBA. The calculation is different tha[n] the past 13 months. I should be in your que[ue]. can you please help me T this up for the next round? I know time is of the essence.

(Defendant's Exhibit 420.)

On April 21, 2020, at 6:09 PM, Ms. Baver received an email from Lendio's customer service that provided, in relevant part: "If you are receiving this email, you have either **(1)** started and not submitted a Paycheck Protection Program (PPP) loan application via Lendio.com or **(2)** have submitted your application to Lendio.com but there is incomplete information and we cannot forward your application to our trusted lenders." (Defendant's Exhibit 422.)

On April 23, 2020, at 9:56:07, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit 13(f).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "430." (Government Exhibit 13(f).)

On April 23, 2020, at 9:58 AM, Ms. Baver sent an email to Lendio: "Dear Lendio, I just updated and submitted my information for Allison Baver Entertainment. Please help me get this pushed through. If you need additional information, which I don't think you will, please let me know." (Defendant's Exhibit 424.)

On April 23, 2020, at 10:03 AM, Ms. Baver sent an email to Jason Kirkham: that provided, in relevant part:

> Hello Jason, Can you please help me get our PPP loan application pushed through? I just finished submission on your website and really appreciate your help. It will help to continue operations on a TV show and films we had distribution scheduled for this year and projects that employ 430 people. You will find my good faith letter and Table of Contents uploaded to the file. I have attached them here as well.

(Defendant's Exhibit 425.)

On April 23, 2020, Ms. Baver Has a Phone Conversation with Kirkham Demonstrating that Kirkham Understood that Allison Baver Entertainment Had Virtually No Prior Payroll.

On April 23, 2020, Ms. Baver had a 32:31 minute phone conversation with Kirkham. (*See* FI-LE-ABE-01-00006.) At the outset of the conversation, Kirkham noted: "so the challenge

with you is that this is all **potential income that could come in this year** and it's not guaranteed or anything on there . . . (FI-LE-ABE-01-00006 at 0:00:33–0:00:55 (bold added).) Later, Kirkham told Ms. Baver: "well, [inaudible] new business you can use the payroll paid for the first quarter of this year . . . but you haven't had a lot of payroll expended this year though." (FI-LE-ABE-01-00006 at 0:06:41–0:06:52.) In response to this comment, Ms. Baver stated:

> No, cause if you look at the situation being like more of a seasonal perspective, the projects exist not on an annualized basis, so they were scheduled for the spring for only three months actually the one film only films in ten weeks, so because of the nature because yea from a start up company **we didn't have that** and therefore that's impossible for me to provide so I'm providing everything else that exists.

(FI-LE-ABE-01-00006 at 0:06:52–0:07:27 (bold added).) Kirkham then replies: "Yea. And so, I mean, I can put this together, we can, you know, see if we can get this out there to a lender and they'll take it and stuff on there but yeah, the interpretation, that's the challenge with a lot of these things, the SBA says we put out guidance but sometimes there needs to be more than guidance out there because . . . ." (FI-LE-ABE-01-00006 at 0:07:28–0:07:46.)

<u>After the April 23, 2020, Conversation, Ms. Baver Sends a Follow-Up Email to Kirkham.</u>

On April 23, 2020, at 5:31 PM, Ms. Baver sent Kirkham an email that provided, in relevant part: "Hi Jason, It was nice to speak with you. Thank you for assisting with the PPP loan for Allison Baver Entertainment. I have attached the application and loan package at the link below . . . ." (Defendant's Exhibit 426.)

On April 23, 2020, at 19:03:25, ABE allegedly caused a PPP Borrower Application Form to be submitted through Lendio seeking a loan of 10 million dollars. (*See* Government Exhibit 13(e).) The listed number of employees for "Allison Baver Entertainment" on the form ABE allegedly caused to be submitted is "430." (Government Exhibit 13(e).)

<u>On April 24, 2020, Allison Baver Sends an Email to Carl Kruelle Acknowledging That ABE Is a New Company.</u>

On April 24, 2020, at 1:46 PM, Ms. Baver sent an email to Carl Kruelle. (Government's Exhibit 22 at 3.) The subject of Ms. Baver's email was "Allison Baver Entertainment PPP Loan." (Government's Exhibit 22 at 3.) Relevant here, Ms. Baver wrote: "Right now most banks are only accepting existing customers and the ones I have spoken with require the past 12 months or Jan./Feb. 2020 payroll, **which does not apply to my new entertainment company because of the timeline, I had only paid an attorney for the projects in operations**." (Government's Exhibit 22 at 3 (bold added).) Ms. Baver also attached as exhibits a (1) Good Faith Statement and (2) Table of Contents.

The Table of Contents contained a timeline. (Defendant's Exhibit 437-A.) Relevant here, that document indicated that Allison Baver Entertainment was formed in October of 2019. (*See* Defendant's Exhibit 437-A.) Also relevant here, the document provided:

> **Allison Baver Entertainment Operations Disabled due to Covid-19**
> **430 Total Jobs**
> Budget: $13.4M -3 Projects (America's Angels, Dead Princess, Monsters)
> Project Timeline – 3 Months, Spring/Summer 2020
> PPP Loan Request: $10,000,000
> PPP Loan Calculation: Monthly Payroll Budget = $4,770,583 X 2.5 = $11,926,456

(Defendant's Exhibit 437-A.) By linking the "PPP Loan Request" to "430 Total Jobs" for the "Spring/Summer 2020," (a future date) the Table of Contents made clear that "430 Total Jobs" was forward looking.

The "Good Faith Statement" provided, in relevant part: "Our slate of projects include America's Angels and two films and **was scheduled** to begin productions in the spring of 2020, employing 430 people." (Government's Exhibit 21(b) (bold added)).

At 4:49 PM that same day, Mr. Kruelle forwarded Ms. Baver's email to Rocco Perate at "rperate@meridianbanker.com.[2]" (Government's Exhibit 22 at 2.) Relevant here, Mr. Kruelle wrote, in relevant part: "She's been informed by the SBA that her firm qualifies **which also seems to be borne out by SBA PPP web site criteria**." (Government's Exhibit 22 at 2 (bold added).)

ABE Allegedly Submits Application to Meridian Bank on April 25, 2020.

On April 25, 2020, ABE allegedly submitted a PPP Borrower Application Form to Meridian Bank seeking a loan of $11,926,457. (*See* Government Exhibit 16(c).) The listed number of employees for "Allison Baver Entertainment" is "430." (Government Exhibit 16(c).)

Lendio Allegedly Submits ABE's Application on or Around April 27, 2020.

On April 25, 2020, at 7:05 PM, Ms. Baver received an email from Lendio that provided, in relevant part: "Your application has been received and registered with Lendio. We will review your application for completeness and will let you know that your application either (1) has been submitted to one of our lender partners for funding or (2) needs additional information." (Defendant's Exhibit 429.)

On April 25, 2020, at 7:43 PM, Ms. Baver sent an email to Kirkham that provided in relevant part: "Since the **prior payroll is not applicable**, I used the payroll season affected by COVID-19 for the calculation." (Defendant's Exhibit 430 (bold added).)

On April 26, 2020, at 6:35, Ms. Baver received email from Lendio that provided: "Your PPP application has been reviewed by Lendio and is missing critical information. We cannot submit your application to our lenders until the missing information is supplied." (Defendant's Exhibit 431.)

---

[2] In April of 2020, Mr. Perate was a senior vice president of Meridian Bank. (ECF No. 198 at 63.)

On April 27, 2020, at 4:15 AM, Ms. Baver received an email from Lendio that provided: "Your PPP Application Has Been Submitted To A Lender." (Defendant's Exhibit 432.)

A September 2021 Interview of Brian Pinheiro Raises a Question About Whether Lendio May Have Been Submitting Applications to Northeast Bank Without ABE's Permission.

On or around September 22, 2021, an agent of the United States interviewed Brian Pinheiro, the Chief Risk Officer for Northeast Bank. (ECF No. 39-1 at 1.) Pinheiro was "involved with the processing of PPP loans for" Northeast Bank. (ECF No. 39-1 at 1.) Pinheiro stated that "Northeast received multiple applications from Lendio for ABE because as Pinheiro understands it, every time ABE made an update to the application, **a new Docusign document was created** and sent to the bank." (ECF No. 39-1 at 1 (bold added).)

A Grand Jury Returns the First Indictment on December 15, 2021.

On December 15, 2021, a grand jury returned a 9-count indictment against Ms. Baver. Eight of the counts were for alleged violations of 18 U.S.C. § 1014. Of those eight counts, two were for alleged false statements made to Meridian Bank and six were for alleged false statements made to Northeast Bank. (ECF No. 1 at 6–7.)

A Superseding Indictment Is Issued on June 29, 2022.

On June 29, 2022, a superseding indictment was issued that brought nine counts against Allison Baver and Allison Baver Entertainment. (ECF No. 35.)

A Second Superseding Indictment Is Issued on October 19, 2022.

A ten-count indictment was issued on October 19, 2022. (ECF No. 47.)

The Court Dismisses Counts 1-5 and Count 7 of the Second Superseding Indictment on June 20, 2023.

The Court dismissed counts one through five and count 7 on June 20, 2023. (ECF No. 157.)

<u>A Jury Trial Is Held Between June 26, 2023, and June 29, 2023.</u>

A jury trial was held between June 23, 2023, and June 29, 2023. (ECF Nos. 169–172.)

Ms. Baver was found guilty as to counts 6, 8, 9, and 10. (*See* ECF No. 172.)

<u>Government's Opening Statement</u>

The Government's first words to the jury in its opening statement were: "Allison Baver would not take no for an answer." (ECF No. 193 at 4.)

<u>Defense Counsel's Opening Statement Highlights that SBA Agent Luis Suggested that the PPP Loan May Be Available for ABE.</u>

In its opening statement, the defense team stated: "[a]fter emailing an SBA representative based in San Diego, she received a response from him suggesting that he was aware of how hard it was to get financing in the entertainment industry and *suggested that the newly created PPP loan may be available for her and her company*." (ECF No. 193 at 12 (emphasis added).)

<u>On Direct Examination, the SBA Agent Denies Giving "Any Opinions on Whether" Ms. Baver "Qualified for a PPP Loan."</u>

On the first day of trial, the United States called "Ken Luis." (ECF No. 193 at 70.) He explained that in April of 2020 he worked with the SBA in San Diego as "a lender relations specialist." (ECF No. 193 at 71.) The following exchange occurred during direct examination:

Q. Did you ever give her any opinions on whether she qualified for a PPP loan?
A. No, ma'am. This email is the only email I sent out.
Q. Okay.

(ECF No. 193 at 75.)

<u>The Defense Team Conducts *No Cross-Examination of Luis* and Fails to Impeach Him With His Prior Written Statement.</u>

Despite highlighting to the jury in its opening statement that "an SBA representative based in San Diego . . . suggested that the newly created PPP loan may be available for" Ms. Baver and her company, (ECF No. 193 at 12) the defense team elected to not cross examine Mr.

Luis. (ECF No. 196 at 75 ("No questions, your Honor. Thank you.").) Because the defense team did not conduct any cross-examination of Mr. Luis, it did not impeach him with his prior statement, wherein he wrote: "With this new program that has been all over the news called Paycheck Protection Program, you might be able to qualify." (Government Exhibit 67 at 1.)

<u>The Defense Team Fails to Conduct Adequate Cross-Examination of Nikhil Patel.</u>

On the second day of trial, the United States called Nikhil Patel. (ECF No. 182 at 4.) Mr. Patel testified that ABE's PPP loan application represented that the company had 430 employees. (ECF No. 182 at 15 (citing Government's Exhibit 16(c).) In support of the Government's position that Ms. Baver misrepresented the number of employees at the time she submitted the application, the United States also asked Mr. Patel questions about two "program calculator" spreadsheets "provided from Allison" to Meridian Bank that the Government characterized as Ms. Baver having represented payroll for 2019 and 2020. (*See* ECF No. 182 at 10–13 (citing Government's Exhibit 21(c); *see also* Transcript at 453.)

Defense counsel conducted inadequate cross-examination of Mr. Patel. As the Court would eventually correctly note, Ms. Baver (1) had informed Meridian Bank in an email that her only expense had been for an attorney and (2) the timeline she provided made clear that her company had no employees. Defense counsel did ask Mr. Patel generally if he was "aware that there are two documents" submitted to Meridian Bank "that suggest that Ms. Baver doesn't have any employees." (ECF No. 182 at 24–25) But defense counsel did not specifically review the language from those documents demonstrating that Ms. Baver informed Meridian Bank that she had no employees. (*See* ECF No. 182 at 24–32.)

<u>The Defense Team Fails to Conduct Adequate Cross-Examination of Brian Pinheiro.</u>

On June 27, 2023, the Government called Brian Pinheiro for direct examination. (*See* ECF No. 198 at 4.) Mr. Pinheiro explained that in April of 2020, he worked as Northeast Bank's "chief risk officer." (ECF No. 198 at 4.) During this time, he oversaw or had "involvement with the PPP loan program." (ECF No. 198 at 5.) He also testified that Lendio was a "third-party fintech that Northeast Bank used to help source PPP loans." (ECF No. 198 at 5.)

Mr. Pinheiro testified that "Northeast Bank received a PPP loan application through Lendio from Allison Baver Entertainment in April of 2020." (ECF No. 198 at 5.) He also testified that Northeast Bank received multiple applications from Lendio for Allison Baver Entertainment because "when Allison Baver Entertainment would make an update to the application, a new DocuSign would be created and it would generate a new application **to the bank**." (*See* ECF No. 198 at 6 (bold added).)

The Government provided Mr. Pinheiro with exhibits 13(a) through 13(l) and asked if those documents were "official **Northeast Bank** records," to which he responded "Yes, I believe so." (ECF No. 198 at 6–7.)

Defense counsel did not confront Pinheiro with evidence that none of ABE's alleged applications were submitted to any lender until April 26. Nor did defense counsel cross-examine Pinheiro to determine specifically how and when Northeast Bank received the applications from Lendio. Nor did defense counsel confront Pinheiro with the Kirkham telephone recording— which demonstrated that Lendio understood that ABE had virtually no historical payroll.

<u>The Defense Team Fails to Conduct Adequate Cross-Examination of Blake Hamilton.</u>

On June 27, 2023, the Government called Blake Hamilton for direct examination. (ECF No. 198 at 93.) Mr. Hamilton testified that when he represented Ms. Baver, his office provided a

court order to Ms. Baver to comply with a grand jury subpoena. (ECF No. 198 at 101.) And he testified that his law partner provided Ms. Baver with a copy of a November 21, 2022, court order. (ECF No. 198 at 102–104.) On cross-examination, defense counsel did not ask Mr. Hamilton when he had reviewed the relevant emails sent to Ms. Baver or how he specifically remembered that she had received those emails. (*See* ECF No. 198 at 104–108.)

<u>The Defense Team Fails to Call Jason Kirkham as a Witness.</u>

Despite the Jason Kirkham telephone recording demonstrating Ms. Baver's good faith, the defense team failed to call Kirkham as a witness.

<u>The Court Denies Motion for a Directed Verdict but Recognizes Evidence Upon Which a Jury Could Have Returned an Acquittal.</u>

On June 28, 2023, the defense moved for a directed verdict. (Transcript at 444.) After the defense team moved for a directed verdict, the Court engaged in an exchange with the United States. Relevant here, the Court discussed much of the evidence that—if properly presented to the jury—would have resulted in a reasonable doubt of Ms. Baver's guilt:

1. "Well, the e-mail to Meridian said, 'I'm a new company, I have no employees.'" (Transcript at 453.)

2. "The table of contents that accompanied all of the loan filings gave a timeline of the company and it was clear from that timeline that there were no employees." (Transcript at 453.)

3. "Well, but Micah Stanford isn't the SBA, and there was an e-mail and I don't have the exhibit number at my fingertips in which she indicated that she **had no payroll** but thought she might qualify any way and that it was up to the bank to determine that, that the SBA person had told her you need to work with the bank to figure that out." (Transcript at 454.)

4. "Well, again, but -- but he is a guy at a bank and I suppose there may be guys at other banks that have different opinions. I mean what he says is not gospel and it appeared that she was doing research to figure out if he was in fact correct or if he was not correct." (Transcript at 455.)

5. "But Meridian Bank had that information. They had the e-mail where she said we're a brand new company, I -- the only expense I have is a 1099 to an attorney." (Transcript at 456.)

6. "And is that information sent as a whole or can we go through a very large amount of information and nitpick for one tiny thing that makes no sense in the context of the entire submission?" (Transcript at 458.)

7. "But it has to be a false statement that was intended to influence the bank. So if I say to the bank I have zero employees and then here's a payroll calculator, and I am putting a bunch of changing numbers in the payroll calculator and I send that in with a cover sheet that says I have no current employees." (Transcript at 458–459.)

The Court Finds Sufficient Evidence to Include Good Faith Defense Instruction.

On June 29, 2023, the Court held that there was "sufficient evidence to support" the good faith "defense" and indicated that it would include a "very short, two-sentence instruction" of that good faith instruction. (ECF No. 196 at 5–6.)

The Defense Team Prejudices Ms. Baver During Its Closing Argument.

The defense team made numerous statements during its closing argument that prejudiced Ms. Baver's defense:

- "Ms. Muyskens wants to portray this as greed. **What really happened was Ms. Baver, no doubt, wanted that $10 million.** But why? She had three projects in the making that could save a ton of jobs, that could provide a ton of work for people, and she never lied

about that. And the banks had all the documents in front of them to know that." (ECF No. 196 at 27 (emphasis added).)

- This case begins with a five-foot-three powerhouse, over here, Allison Baver, Olympic champion, lived her whole life as a go-getter. **And I couldn't agree more with Ms. Thomas that she <u>doesn't want to take no for an answe</u>r** and she's going to try to make things happen. I take that as a compliment more than anything. (ECF No. 196 at 29 (emphasis added).)

- "So she learns about a program, she learns about it quickly, and she's trying her best to come up to speed on it. She knows a couple of things. **And I think that the government wants it to look like she's just trying to <u>*cobble together* whatever she can</u> to get $10 million. <u>I don't disagree with that</u>**, but what I do disagree with was the methodology that she used was a lie. She knew that her budget well exceeded the maximum $10 million. In fact, you'll see on one of the documents it was around 13 million. And she was trying to figure out how many jobs she could save and how many jobs would be involved. (ECF No. 196 at 31 (emphasis added).)

- "So she's trying her best to fit her **square company into this round hole**, that is the application, to do her best. And she is not precluded from trying. So she's trying her best to meet the rules." (ECF No. 196 at 33 (bold added).)

- "Now 16(c), let's look at -- well, let's start --first off, let's look at the -- the two numbers you'll see at the top are literally the two numbers that you are to find in the indictment. **If you believe that she intentionally and she knew -- she intentionally falsified those, then you've <u>got to find her guilty. The government is right</u>**." (ECF No. 196 at 34 (emphasis added).)

- "**I think** there is -- **in my mind**, there is no doubt she's talking about forward." (ECF No. 196 at 39 (bold added).)

- "Now **I think** without a doubt, in **my mind**, that she's talking forward looking at that point." (ECF No. 196 at 40 (bold added).)

Further, during his closing argument, defense counsel failed to even mention the good

faith jury instruction.

<u>At the October 2024 Sentencing Hearing, the Court Questions Whether Ms. Baver Received
Effective Assistance of Counsel.</u>

On October 9, 2024, the Court set a sentencing hearing for October 15, 2024. (ECF No.

234.) On October 15, 2024, a hearing was held. (ECF No. 238.) Before turning to the sentencing

issues, the Court raised concerns that Ms. Baver had received ineffective assistance of counsel at

trial, stating, in relevant part:

> And this is very unusual, but I decided I just need to be honest about what I
> observed during the trial. And what I observed is that for reasons I don't
> understand, one of the members of the defense team, something was wrong.
> Something was off. The closing argument was not really a closing argument, at
> least it **wasn't a constitutionally effective closing argument**. Some of the **cross-
> examinations** would fall into that same category . . .

(Transcript at 7 (bold added).) Relevant here, the Court also stated: "I know what I witnessed

during the trial, and I am **struggling to see how there was any strategy** in what went on."

(Transcript at 11 (bold added).)

Relating to the *Strickland* standard, the Court stated, in relevant part: "I truly believe that

there are cases where you can have evidence that would in fact support a jury verdict of guilty,

but you also understand that it is a close call and that with effective assistance of counsel, the

**jury could very easily return an acquittal**." (Transcript at 10–11 (bold added).)

<u>**Argument**</u>

Rule 33(a) of the Federal Rules of Criminal Procedure provides, in relevant part: "Upon

the defendant's motion, the court may vacate any judgment and grant a new trial if **the interest**

**of justice** so requires." Fed. R. Crim. P. 33(a) (bold added). "Although Rule 33 does not define

'interest of justice,'" *United States v. Sayers*, No. 2:22-CR-480, 2024 WL 624329, at *3 (D. Utah

Feb. 14, 2024) the "Tenth Circuit has previously recognized that ineffective assistance of counsel

may serve as the foundation for a motion for new trial under Rule 33." *United States v. Green*,

17

No. CR 09-311 MCA, 2012 WL 12023805, at *3 (D.N.M. Feb. 14, 2012) (citing *United States v. Meacham,* 567 F.3d 1184, 1187 (10th Cir.2009)).

Further, "courts have determined that any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial." *United States v. Thomas*, No. 13-CR-01874 MV, 2016 WL 9819560, at *7 (D.N.M. Aug. 5, 2016). "For example, the Court may not order a new trial for 'harmless error.'" *Id*. But "multiple errors that may be 'harmless' on their own may, under the 'cumulative error' doctrine, be considered sufficient to warrant a new trial." *Id*.

The Tenth Circuit has held that when a defendant files a motion for a new trial based on ineffective assistance of counsel, a district court is "required" to hold an evidentiary hearing on the defendant's motion "when the defendant's ineffectiveness claim is 'colorable.'" *United States v. Meacham*, 567 F.3d 1184, 1187 (10th Cir. 2009) (quoting *United States v. Sands,* 968 F.2d 1058, 1066 (10th Cir.1992).

As explained below, **(I)** the Court should vacate the judgment and grant Ms. Baver a new trial based on prior counsel's ineffectiveness—without holding an evidentiary hearing—because the record establishes that prior counsel was constitutionally ineffective. Alternatively, **(II)** at a minimum, the Court must hold an evidentiary hearing on Ms. Baver's Motion because she has established a colorable claim of ineffective assistance.

## I.     The Court Should Grant a New Trial Based on Prior Counsel's Ineffectiveness.

As explained below, the Court should GRANT Ms. Baver's Rule 33 Motion and order a new trial due to prior counsel's ineffectiveness.

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653, 104 S. Ct. 2039, 2043, 80 L. Ed. 2d 657 (1984). "Their presence is essential because they are the means through which the

other rights of the person on trial are secured." *Id*. "Without counsel, the right to a trial itself would be 'of little avail,' . . . ." *Id*. at 653–54. "'Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.'" *Id*. at 654 (citation omitted).

"That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the [Sixth Amendment's] constitutional command." *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674 (1984). "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id*. "An accused is entitled to be assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair." *Id*. For that reason, the Supreme Court "has recognized that 'the right of counsel is the right to the **effective** assistance of counsel.'" *Id*. (bold added) (citation omitted). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.

"Generally, claims of ineffective assistance of counsel are evaluated under a two-prong analysis announced in *Strickland*." *McDowell v. Kingston*, 497 F.3d 757, 761 (7th Cir. 2007). "Under the traditional *Strickland* test," *Snell v. United States*, No. CIV.A. 10-2072 GEB, 2011 WL 149868, at *7 (D.N.J. Jan. 14, 2011) "to prevail on a claim of ineffective assistance of counsel," a defendant "must show (1) 'that counsel's performance was deficient' and (2) 'that the deficient performance prejudiced the defense.'" *See Lopez-Casillas v. United States*, No. 2:20-CV-00236-JNP-DAO, 2023 WL 6377512, at *2 (D. Utah Sept. 29, 2023) (quoting

*Strickland*, 466 U.S. at 687. "These elements have been termed the 'performance prong' and the 'prejudice prong,' respectively . . . ." *Id*. (citation omitted).

"To satisfy the performance prong," a defendant must establish that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See id*. (quoting *Strickland*, 466 U.S. at 687). "To be deficient, the performance must be 'outside the wide range of professionally competent assistance.'" *Hooks v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010) (citation omitted).

"As for *Strickland*'s prejudice prong," a defendant "must establish that but for counsel's errors, there is a reasonable probability 'the result of the proceeding would have been different.'" *Id*. at 724 (quoting *Strickland*, 466 U.S. at 694). That is, a defendant "must show 'counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable.'" *Id*. (quoting *Strickland*, 466 U.S. at 687). "Establishing a reasonable probability of a different outcome requires something less than a showing 'counsel's deficient conduct more likely than not altered the outcome in the case.'" *Id*. (quoting *Strickland*, 466 U.S. at 693). "Instead, a reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Id*. (quoting *Strickland*, 466 U.S. at 694).

"Under *Strickland*, a defendant bears the burden of satisfying a two-pronged test." *United States v. Rodarmel*, No. 15-CR-10105-2-JTM, 2017 WL 4882666, at *2 (D. Kan. Oct. 30, 2017).

Here, **(A)** Ms. Baver can meet her burden of satisfying the two-pronged *Strickland* test.

## A. Ms. Baver Can Meet Her Burden Under *Strickland*.

As explained below, the Court should hold that prior counsel was ineffective because Ms. Baver can establish (1) that she was prejudiced by each of her prior counsel's individual acts

constituting deficient performance or (2) she can establish that she was prejudiced by the combined effect of her prior counsel's deficient performance.

1. Trial Counsel's Deficient Performance Prejudiced Ms. Baver.

Ms. Baver can meet her burden and establish that she was prejudiced by her trial counsel's deficient performance when trial counsel (a) delivered a closing argument with the apparent intention to weaken Ms. Baver's case; (b) failed to call Lendio's Jason Kirkham as a witness; (c) failed to cross examine Ken Luis; (d) conducted deficient cross-examination of Nikhil Patel; (e) failed to object to testimony that Northeast Bank received a "new application" each time Ms. Baver made a change to the Lendio application; and (f) conducted deficient cross-examination of Brian Pinheiro.

a. *Ms. Baver Was Prejudiced by Trial Counsel's Deficient Closing Argument.*

District "courts are capable of distinguishing clearly frivolous ineffective-assistance allegations from those with potential merit . . . ." *United States v. Munoz*, 605 F.3d 359, 373 n. 8 (6th Cir. 2010). And, as this Court previously noted: "The closing argument was not really a closing argument, at least it **wasn't a constitutionally effective closing argument**." (ECF No. 241 at 7 (bold added).)

This Court was correct in recognizing the importance of a closing argument in a criminal trial. "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case." *Herring v. New York*, 422 U.S. 853, 862 (1975). "For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole." *Id*. "Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions." *Id*. "And for the defense, closing argument is the last clear chance to persuade the

trier of fact that there may be reasonable doubt of the defendant's guilt." *Id*. "The very premise

of our **adversary system** of criminal justice is that partisan advocacy on both sides of a case will

best promote the ultimate objective that the guilty be convicted and the innocent go free." *Id*.

(bold added). "In a criminal trial, which is in the end basically a factfinding process, no aspect of

such advocacy could be more important than the opportunity finally to marshal the evidence for

each side before submission of the case to judgment." *Id*. It is because of the importance of

closing argument that the Supreme Court has held that the "right to effective assistance extends

to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

Ms. Baver acknowledges that normally, "deference to counsel's tactical decisions in his

closing presentation is particularly important because of the broad range of legitimate defense

strategy at that stage." *Id*. at 6. And she recognizes that normally, judicial "review of a defense

attorney's summation is . . . highly deferential . . . ." *Id*. But here, trial counsel's closing

argument is not entitled to judicial deference because a close examination of the closing

argument reveals that trial counsel abandoned the required duty of loyalty to Ms. Baver and

reveals that trial counsel acted with an apparent interest to weaken Ms. Baver's case.

As explained below, trial counsel's deficient closing argument prejudiced Ms. Baver.

i.    *Defense Counsel's Closing Argument Prejudiced Ms. Baver Because it Invited the*
      *Jury to Find Ms. Baver Guilty Based Lower Standard than Due Process Requires.*

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due

Process Clause." *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 2080, 124 L. Ed. 2d

182 (1993). "The prosecution bears the burden of proving all elements of the offense charged

and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish

each of those elements[.]" *Id* at 277–78 (cleaned up) (citations omitted). Indeed, "[d]ue process

commands that no [woman] shall lose [her] liberty unless **the Government has borne the**

**burden of producing the evidence and convincing the factfinder of [her] guilt.**" *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (bold added).

During his closing argument, trial counsel invited the jury to find Ms. Baver guilty based on a standard or proof lower than due process requires:

> Now 16(c), let's look at -- well, let's start --first off, let's look at the -- the two numbers you'll see at the top are literally the two numbers that you are to find in the indictment. **If you believe that she intentionally and she knew -- she intentionally falsified those, then you've got to find her guilty. The government is right**.

(ECF No. 196 at 34 (bold added).) Here, trial counsel was deficient because no reasonable strategy can explain trial counsel's statement to the jury that "you've got to find her guilty. The government is right."

First, no reasonable trial strategy can explain why any defense attorney would ever invite the jury to find his client guilty.

Second, no reasonable trial strategy exists that explains why trial counsel misstated the prosecution's burden. The prosecution was required to persuade the jury "beyond a reasonable doubt," of **each of the elements** of the charged offense. Here, defense counsel misstated the law in more than one way.

First, trial counsel misstated the law by arguing that the jury could find Ms. Baver guilty if they simply "believed" that she intentionally falsified a document. This was an incorrect statement of the law because the jury could only find Ms. Baver guilty if the prosecution had persuaded them, *beyond a reasonable doubt*, that Ms. Baver knew the statement was false. No reasonable trial strategy exists for trial counsel to argue a standard less than the beyond a reasonable doubt standard. Trial counsel's deficient argument resulted in a violation of Ms. Baver's due process rights.

Second, trial counsel invited the jury to find Ms. Baver guilty based on only some of the elements of 18 U.S.C. Section 1014. As the Court previously noted, Ms. Baver was charged with—among other things—"violating 18 U.S.C. § 1014 (False Statement to a Bank), which consists of the following elements: 1) defendant 'made a false statement' 2) 'to a federally insured bank' 3) 'knowing the statement was false' and 4) 'intending to influence the bank.'" *United States v. Baver*, No. 2:21-CR-520-JNP-CMR, 2023 WL 4138319, at *3 (D. Utah June 22, 2023). Trial counsel's invitation to the jury to find Ms. Baver guilty if they "believe[d] that she intentionally" "falsified" figures on the borrower application form failed to address the second and fourth elements of the charged offense. No reasonable trial strategy existed for trial counsel to invite the jury to find Ms. Baver guilty based on a finding of only some of the required elements of 18 U.S.C. Section 1014.

Ms. Baver was prejudiced by trial counsel's deficient performance. There is a reasonable probability that the jury would not have found Ms. Baver guilty of the Section 1014 charges if defense counsel had not invited the jury to find her guilty based on their "belief" that she intentionally falsified certain figures. Considering the evidence that ABE's figures were based on projected future payroll, there is a reasonable likelihood that the jury would have returned not guilty verdicts if defense counsel had not invited the jury to find Ms. Baver guilty based on their "belief" that she falsified figures. Indeed, if defense counsel had instead properly argued the high reasonable doubt standard throughout his closing argument and had correctly explained that the Government had to persuade the jury of the facts necessary as to each of the required elements of the offenses, there is a reasonable likelihood that the jury would have returned not guilty verdicts.

Ms. Baver was prejudiced by trial counsel's deficient performance.

*Trial Counsel's Closing Argument Prejudiced Ms. Baver Because it Consistently Reinforced the Government's Theme, Bolstered the Government's Explanation of Ms. Baver's Motives, and Undermined Ms. Baver's Credibility.*

"In the opening statement, a lawyer should provide the jury with a theme that will serve as a framework for every piece of evidence the jury hears during the case." https://www.law.uh.edu/center4clp/streetlaw/Mock%20Trial/Mock%20Trial%20AY%202017-18/Handouts%20&%20Activities/Opening%20Statements%20Handout%202.pdf (last visited January 13, 2025). "The theme should communicate how the evidence will fit together, and why [a] client's position in the case is the right one." *Id.* As noted above, the Government's first words to the jury in its opening statement were: "Allison Baver would not take no for an answer" and Ms. Baver "was so desperate for money that she would lie to get it." (ECF No. 193 at 4.)

Defense counsel's closing argument was deficient because it consistently reinforced the Government's theme, bolstered the Government's explanation of Ms. Baver's motives, and undermined Ms. Baver's credibility.

Early in his closing argument, defense counsel explicitly endorsed the Government's theme when he stated: "This case begins with a five-foot-three powerhouse, over here, Allison Baver, Olympic champion, lived her whole life as a go-getter. And I couldn't agree more with [the prosecutor] that **she doesn't want to take no for an answer** and she's going to try to make things happen." (ECF No. 196 at 29 (bold added).) No reasonable trial strategy exists for defense counsel to agree with the prosecutor's theme.

Defense counsel again reinforced the Government's narrative when he stated:

So she learns about a program, she learns about it quickly, and she's trying her best to come up to speed on it. She knows a couple of things. **And I think that the government wants it to look like she's just trying to cobble together whatever she can to get $10 million. <u>I don't disagree with that</u>,** but what I do disagree with was the methodology that she used was a lie. She knew that her budget well exceeded the maximum $10 million. In fact, you'll see on one of the

25

documents it was around 13 million. And she was trying to figure out how many jobs she could save and how many jobs would be involved.

(ECF No. 196 at 31 (emphasis added).) Trial counsel's statement reinforces the Government's narrative that Ms. Baver "was desperate to get money to make [her] dreams come true." (ECF No. 193 at 4.) No reasonable trial strategy existed for trial counsel to agree with the Government's narrative.

Defense counsel again reinforced the Government's narrative when he agreed that "Ms. Baver, no doubt, wanted that $10 million." (ECF No. 196 at 27.) He also reinforced the Government's theme that Ms. Baver does not take no for an answer when he argued:

So she's trying her best to **fit her square company into this round hole**, that is the application, to do her best. And she is not precluded from trying. So she's trying her best to meet the rules.

(ECF No. 196 at 33 (bold added).) No reasonable trial strategy existed for defense counsel to embrace the Government's theme.

Defense counsel also made statements undermining Ms. Baver's credibility when he stated:

As we come down further on the document, she does identify that she includes in here the payroll budget and the payroll audit. The government's made some hay out of this audit. Fine. **I don't know why Ms. Baver used the term audit.** I believe that to be irrelevant. I'm looking more of what's included in the document rather than what the document is entitled, because I'm going to look at that document in a minute.

(ECF No. 196 at 42 (bold added).) Here, defense counsel highlighted the Government's argument about Ms. Baver's actions without providing any explanation for those actions. No reasonable trial strategy exists for defense counsel to highlight the prosecution's argument that Ms. Baver was making a misrepresentation without providing any explanation for those actions.

By endorsing the Government's theme while simultaneously undermining Ms. Baver's credibility, defense counsel was deficient. Ms. Baver was prejudiced by this deficient closing argument. Trial counsel's decision to embrace the Government's theme undermined Ms. Baver's defense. There is a reasonable likelihood that if defense counsel had not undermined Ms. Baver's credibility—and had instead focused his argument on the evidence of Ms. Baver's good faith—the jury would have returned not guilty verdicts.

iii.    *Trial Counsel's Closing Argument Prejudiced Ms. Baver Because it Failed to Explicitly Reference the Good Faith Instruction.*

The Court found that there was "sufficient evidence to support" a "good faith defense" and held that it was "going to give [a] very short, two-sentence [jury] instruction." (ECF No. 196 at 5–6.) The Court provided the following final jury instruction: "If the defendant acted in good faith, then she lacked the intent to influence a bank through a false statement. The defendant acted in good faith, if at the time, she honestly believed in the truthfulness of the statements that the government has charged as being false." (ECF No. 178 at 56.) As discussed above, there was ample evidence of Ms. Baver's good faith.

Trial counsel performed deficiently by failing to explicitly mention the good faith instruction in his closing argument. (*See* ECF No. 196 at 26–51.) Despite the ample evidence of Ms. Baver's good faith, trial counsel did not explicitly argue that Ms. Baver lacked the intent to influence the banks because of her good faith. (*See* ECF No. 196 at 26–51.)  Where the Court found "sufficient evidence to support [the] defense," and wondered "what the jury does with it," (ECF No. 196 at 5) no reasonable trial strategy can explain trial counsel's decision to not explicitly tie his argument to the good faith defense.

Ms. Baver was prejudiced by defense counsel's failure to explicitly tie his argument to the good faith defense. If trial counsel had presented all of the evidence of Ms. Baver's good

27

faith (including the phone call with Kirkham), and if trial counsel had explicitly tied this favorable evidence to the good faith jury instruction, there is a reasonable likelihood that the jury would have found that she lacked the intent to influence the banks.

iv. *Ms. Baver Was Prejudiced by Defense Counsel Deficiently Basing Portions of His Closing Argument on His Personal Opinion.*

Utah Rule of Professional Conduct 3.4(e) provides, in relevant part: "A lawyer shall not . . . in trial . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused . . . ." UT R RPC Rule 3.4(e). Here, trial counsel was deficient because he, on multiple occasions, expressed his personal opinion about Ms. Baver's intent:

- This is a good faith letter that went to—that explains at the time what she was concerned with. Now this document the government makes a lot of hay with because there is some vagueness involved, and it wasn't written well. But I'm going to point out some parts **that I think**—and I'll leave it to you to decide where you think she's talking about forward or back. I think there is –**in my mind**, there is no doubt she's talking about forward.

- So look at those two paragraphs together, please, when you're looking at the document. She says Allison Baver Entertainment is completely devastated and right when we're going to gear up. This money will help us with employees and with production, utilities, other costs. **Now I think without a doubt, in my mind**, that she's talking forward looking at that point.

(ECF No. 196 at 39–40 (bold added).)

Here, trial counsel's personal vouching for Ms. Baver constituted deficient performance because personal vouching is categorially unpersuasive advocacy. Further, the personal vouching followed many of trial counsel's statements undermining Ms. Baver's credibility, such as (1) the statement inviting the jury to find Ms. Baver guilty based on a lower standard of proof than due process requires, (ECF No. 196 at 34); (2) the statement agreeing with the prosecution that Ms. Baver "doesn't want to take no for an answer," (ECF No. 196 at 29); (3) the statement that "Ms. Baver, no doubt, wanted that $10 million," (ECF No. 196 at 27) and (4) the statement that Ms.

Baver was trying "to fit her square company into this round hole," (ECF No. 196 at 33.) When considered as a whole, trial counsel's personal vouching for Ms. Baver undoubtedly rang hollow because it followed so many of trial counsel's statements undermining his own client's credibility.

Instead of basing his argument on personal opinion, defense counsel instead should have emphasized to the jury the governing beyond a reasonable doubt standard and argued that the Government could not meet its burden of establishing each element of the charged offenses beyond a reasonable doubt. And defense counsel should have also tied his argument to the evidence of Ms. Baver's good faith. Defense counsel's personal vouching constituted deficient performance.

Ms. Baver was prejudiced by trial counsel's vouching. If trial counsel had instead focused his argument on the evidence of Ms. Baver's good faith, there is a reasonable likelihood that the jury would have returned a verdict of not guilty.

    v.     *Ms. Baver Was Prejudiced by Defense Counsel's Deficient Closing Argument, Which Effectively Conceded a Required Element of the False Statement Charges.*

As the Court previously noted, Ms. Baver was charged with "violating 18 U.S.C. § 1014 (False Statement to a Bank), which consists of the following elements: 1) defendant 'made a false statement' 2) 'to a federally insured bank' 3) 'knowing the statement was false' and 4) 'intending to influence the bank.'" *United States v. Baver*, No. 2:21-CR-520-JNP-CMR, 2023 WL 4138319, at *3 (D. Utah June 22, 2023). During trial counsel's closing argument, he effectively conceded the fourth element of the false statement charges when he stated: "And I think that the government wants it to look like she's just trying to cobble together whatever she can to get $10 million. **I don't disagree with that**, but what I do disagree with was the methodology that she used was a lie." (ECF No. 196 at 31 (bold added).) Here, trial counsel's

statement that he did not disagree with the Government that Ms. Baver's actions were designed to obtain ten million dollars (from a bank) effectively conceded the fourth element of the false statement charges.

No reasonable trial strategy existed for trial counsel to concede this element. No reasonable trial strategy existed for defense counsel to relieve the Government of its burden to prove, beyond a reasonable doubt, this required element of the offense. Defense counsel was deficient.

Ms. Baver was prejudiced by this deficient performance. There is a reasonable likelihood that if trial counsel had instead spent his time arguing the evidence of Ms. Baver's good faith, that the jury would have returned not guilty verdicts.

vi. *Ms. Baver Was Prejudiced by Trial Counsel's Closing, Which Lacked Any Apparent Strategy.*

As the Court previously stated: "I know what I witnessed during the trial, and I am struggling to see how there was any strategy in what went on." (ECF No. 241 at 11.) The Court's critique applies to trial counsel's closing argument. Ms. Baver was deprived of an opportunity to adequately "marshal the evidence for [her] side before submission of the case to judgment." *Herring*, 422 U.S. at 862.

Effective counsel would have had an actual strategy for his closing argument. Effective counsel would not have invited the jury to find Ms. Baver guilty. Effective counsel would have explicitly tied favorable evidence to the good faith instruction. Ms. Baver was prejudiced by trial counsel's constitutionally ineffective closing argument. *C.f., Stouffer v. Reynolds,* 214 F.3d 1231, 1234 (10th Cir. 2000) ("Both defense counsel presented closing arguments which were ineffective at proffering any semblance of a defense theory.").

b. _Ms. Baver Was Prejudiced by Trial Counsel's Deficient Performance in Failing to Call Jason Kirkham as a Witness._

No reasonable trial strategy existed for trial counsel to fail to call Jason Kirkham as a witness. As discussed above, on April 23, 2020, Ms. Baver had a 32-minute telephone conversation with Kirkham. (_See_ FI-LE-ABE-01-00006.) And as discussed above, that conversation demonstrates that Kirkham understood that Ms. Baver's company had no prior payroll. (FI-LE-ABE-01-00006 at 0:00:33–0:00:55 ("so the challenge with you is that this is all **potential income that could come in this year** and it's not guaranteed or anything on there . . . .").) And as discussed above, when Kirkham told Ms. Baver that she had not "had a lot of payroll expended this year," Ms. Baver made no attempt to deny Kirkham's understanding. (FI-LE-ABE-01-00006 at 0:06:52–0:07:27.) Instead, she confirmed her company "didn't have that and therefore that's impossible for [her] to provide . . . ." (FI-LE-ABE-01-00006 at 0:06:52–0:07:27.).

Trial counsel performed deficiently in failing to call Kirkham to the stand and cross-examine him about his understanding of Baver's applications. The Government bore the burden to prove that Ms. Baver made a false statement to Northeast Bank. (_See_ ECF No. 178 at 49.) Kirkham's understanding of Ms. Baver's application demonstrates that Lendio understood that Ms. Baver had no prior payroll. And Ms. Baver's response to Kirkham's statement demonstrates that she was truthful. In other words, Ms. Baver's response was evidence that would have bolstered her good faith defense.

No reasonable trial strategy existed in failing to call Kirkham. The phone conversation with Kirkham proved that (1) Lendio understood Ms. Baver's company had no prior payroll but submitted the application to Northeast Bank anyway and (2) Ms. Baver admitted to having no prior payroll. Both of these facts should have been used by defense counsel to argue that the

Government could not meet its burden of proving all elements of the Section 1014 offense. And both of these facts would have bolstered Ms. Baver's good faith defense. Trial counsel was deficient for failing to call Kirkham.

Ms. Baver was prejudiced by trial counsel's decision not to call Kirkham to the stand. With the telephone recording in hand, trial counsel would have been able to elicit testimony from Kirkham that Lendio understood that Ms. Baver had no prior payroll but submitted her application to Northeast Bank anyway. And trial counsel could have elicited testimony demonstrating that Ms. Baver openly admitted to not having prior payroll. Both of these facts, if heard by the jury, would likely have resulted in the jury finding that the Government had not met its burden to prove that Ms. Baver "knowingly" made a false statement to Northeast Bank. (*See* ECF No. 178 at 47.) Indeed, if the jury heard evidence that a Lendio representative had a conversation with Ms. Baver wherein it was understood that she had little past payroll, the jury very likely would not have decided that Ms. Baver "submit[ted] [a] false statement to" Lendio, "**knowing** that the third party will submit the false statement to" (ECF No. 178 at 47 (bold added),) Northeast Bank because Ms. Baver and Kirkham (the Lendio representative) did not consider her application to contain a false statement.

Ms. Baver was unquestionably prejudiced by trial counsel's failure to cross examine Jason Kirkham and introduce evidence which would have undermined the Government's argument that Ms. Baver knowingly made a false statement. Failure to call a witness that "goes directly to the defense theory" is unquestionably prejudicial. *C.f. Stouffer*, 214 F.3d at 1234 (where the defense failed to call a defense investigator to testify about "factual inconsistencies with the State's theory of the case" that went "directly to the defense theory.").)

c. *Ms. Baver Was Prejudiced by Trial Counsel's Deficient Decision to Not Cross Examine Ken Luis.*

No reasonable trial strategy existed for trial counsel to highlight, during her opening

statement, remarks made in Ken Luis's email and then fail to cross-examine him.

As noted above, in its opening statement, the defense team stated: "[a]fter emailing an

SBA representative based in San Diego, she received a response from him suggesting that he was

aware of how hard it was to get financing in the entertainment industry and *suggested that the*

*newly created PPP loan may be available for her and her company*." (ECF No. 193 at 12

(emphasis added).)

And, as noted above, on the first day of trial, the United States called "Ken Luis." (ECF

No. 193 at 70.) Luis explained that in April of 2020 he worked with the SBA in San Diego as "a

lender relations specialist." (ECF No. 193 at 71.) The following exchange occurred during direct

examination:

Q. Did you ever give her any opinions on whether she qualified for a PPP loan?
A. No, ma'am. This email is the only email I sent out.
Q. Okay.

(ECF No. 193 at 75.)

As noted above, the defense team elected to not cross examine Luis. (*See* ECF No. 193 at

75 ("You may cross examine the witness." MR. HUNT: No questions, your Honor. Thank

you.").) Because the defense team did not conduct any cross-examination of Luis, it did not

impeach him with his prior statement, wherein he wrote: "With this new program that has been

all over the news called Paycheck Protection Program, **you might be able to qualify**."

(Government Exhibit 67 at 1 (bold added).)

Here, no reasonable trial strategy existed for defense counsel to assure the jury in its

opening statements that a "SBA representative based in San Diego" "suggested" to Ms. Baver

"that the newly created PPP loan may be available for her and her company" and then completely fail to cross-examine and impeach that witness about his statement that Ms. Baver "might be able to qualify." Defense counsel's failure to cross-examine Luis left the jury with the impression that Luis never suggested to Ms. Baver that her company "might be able to qualify"—even though he made that statement in an email.

Where, as here, the jury received a good faith instruction, defense counsel's failure to elicit testimony bolstering Ms. Baver's good faith defense constituted deficient performance. This deficient performance prejudiced Ms. Baver. By failing to cross-examine Luis, the trial team failed to make good on the promise it made in its opening statement—leaving the jury with the impression that Luis never opined on whether Ms. Baver's company "might be able to qualify." If properly presented to the jury along with the other evidence of Ms. Baver's good faith, there is a reasonable likelihood that the jury would have found that the Government could not meet its burden of proving that Ms. Baver knowingly submitted a false statement to the banks.

d. *Ms. Baver Was Prejudiced by Trial Counsel's Deficient Cross-Examination of Nikhil Patel.*

Defense counsel's cross-examination of Mr. Patel was deficient because it failed to specifically highlight Ms. Baver's favorable statements indicating she had no prior payroll.

As noted in the background section above, on April 24, 2020, Ms. Baver sent an email to Kruelle where she wrote, in relevant part: "Right now most banks are only accepting existing customers and the ones I have spoken with require the past 12 months or Jan./Feb. 2020 payroll, **which does not apply to my new entertainment company** because of the timeline, **I had only paid an attorney** for the projects in operations."(Government's Exhibit 22 at 3 (bold added).) The bolded language makes clear that in her communication with Kruelle, Ms. Baver was honest

that she had no prior payroll. Kruelle forwarded this email to Rocco Perate of Meridian Bank. (*See* Government's Exhibit 22 at 2 ("Please see Allison's email below . . . ."). And, as noted in the background section above, Ms. Baver included in her email (a) a Good Faith Statement and (b) a Table of Contents. (Government's Exhibit 22 at 3.) The Table of Contents' timeline indicated that her projects were forward looking—to begin in "Spring/Summer 2020." (Defendant's Exhibit 437-A.) And the Good Faith Statement made clear that the slate of projects "was scheduled **to begin** productions in the spring of 2020, employing 430 people." (Government's Exhibit 21(b) (bold added)).

Defense counsel's cross-examination of Patel was deficient because it failed to specifically highlight the favorable language found in (1) the April 24, 20220 email; (2) the Table of Contents; and (3) the Good Faith Statement. Rather than establish the favorable language of these documents through cross-examination, defense counsel instead simply *asserted* their favorable contents:

> **Q.** So at the time Ms. Baver—we just established that at the time Ms. Baver came to Meridian Bank . . . with a couple of documents explaining that she didn't have any employees at the time. We've already established that.
>
> **A.** (Inaudible).
>
> **MS. MUYSKENS:** Objection. Mischaracterizes the evidence.

(ECF No. 198 at 132.) Indeed, defense counsel *referenced* the relevant documents but failed to specifically review the favorable language with Mr. Patel:

> **Q.** Okay. So it looks like that you—that she sent you that information and it went to Meridian  Bank. I think that it's clear that both of those documents went to Meridian Bank. One was in an email from Mr. Kruelle, and another one was in a good faith letter, okay? Do you agree with that? Do you understand the two documents I'm talking about?
>
> **A.** The good faith letter—

**Q.** Yeah. And also the email from Mr. –it was from Allison Baver, but from Mr. Kruelle.

**A.** The long email chain?

**Q.** Yeah.

**A.** Do I recall the full email?

**Q.** No, not do you recall it, do you just recall receiving it?

**A.** Receiving it, yeah. I believe that's how the intro was made.

**Q.** Okay.

**A.** But I didn't read through the full email at the time. I mean, there was a lot going on . . . .

(ECF No. 198 at 134.)

Defense counsel's cross-examination of Patel was deficient because defense counsel failed to confront Patel with the specific materials that were favorable to Ms. Baver. Instead of having Patel read the favorable materials and then confronting Patel with that favorable evidence, defense counsel instead vaguely referenced the favorable materials and asked that Patel assume those materials were favorable to Ms. Baver. If defense counsel had required Patel to read the favorable language into the record, it would have been clear to the jury that Ms. Baver had provided materials to Meridian Bank indicating she had virtually no past payroll.

Ms. Baver was prejudiced by defense counsel deficiently failing to confront Patel with Ms. Baver's favorable statements because that evidence would have bolstered her good faith defense and would have provided evidence from which the jury could decide that the Government could not meet its burden as to all required elements of the Section 1014 offenses.

e. *Ms. Baver Was Prejudiced by Defense Counsel Having Deficiently Failed to Object to Pinheiro's Testimony that Northeast Bank Received a "New Application" Each Time Ms. Baver Made a Change to Her Application.*

On June 27, 2023, the Government called Brian Pinheiro for direct examination. (*See* ECF No. 198 at 4.) Mr. Pinheiro explained that in April of 2020, he worked as Northeast Bank's "chief risk officer." (ECF No. 198 at 4.) During this time, he oversaw or had "involvement with the PPP loan program." (ECF No. 198 at 5.) He also testified that Lendio was a "third-party fintech that Northeast Bank used to help source PPP loans." (ECF No. 198 at 5.)

Mr. Pinheiro testified that "Northeast Bank received a PPP loan application through Lendio from Allison Baver Entertainment in April of 2020." (ECF No. 198 at 5.) He also testified that Northeast Bank received multiple applications from Lendio for Allison Baver Entertainment because "when Allison Baver Entertainment would make an update to the application, a new DocuSign would be created and it would generate a new application **to the bank**." (*See* ECF No. 198 at 6 (bold added); *see also* ECF No. 198 at 10 ("**Q.** So to follow up on that, though, every time the applicant made any change to the application, it would just generate a new application that **was sent to Northeast Bank** system; is that correct? **A.** Correct.").)

The Government provided Mr. Pinheiro with exhibits 13(a) through 13(l) and asked if those documents were "official **Northeast Bank** records," to which he responded "Yes, I believe so." (ECF No. 198 at 6–7.) The Government then moved for admission of Government Exhibits 13(a) through 13(l). (ECF No. 198 at 7.) After the Court asked "[a]ny objection?" defense counsel stated "[n]o objection." (ECF No. 198 at 7.) The Government then asked Mr. Pinheiro if Exhibit 13(l) was "submitted on April 13th of 2020 and signed by Allison Baver" and he responded "[b]ased on the time, stamp, yes." (ECF No. 198 at 7.) The Government then asked the same question for Government Exhibit 13(k) and then implied that each of the exhibits was

37

"submitted" and "signed" by Ms. Baver on the date present on each of the time stamps for the documents. (*See* ECF No. 198 at 8.)

Defense counsel was deficient for failing to object to Pinheiro's testimony that a new application was "generate[d]" "to the bank" each time Ms. Baver made a change to the application because record evidence raises serious questions about the veracity of that testimony. As outlined above, Ms. Baver received multiple emails in April of 2020 suggesting that her application was *not* submitted to *any* banks prior to April 27, 2020.

Indeed, on April 26, 2020, Ms. Baver received an email that provided, in relevant part: "We cannot submit your application to our lenders until the missing information is supplied." (Defendant's Exhibit 431.) Similarly, on April 21, 2020, Ms. Baver received an application from Lendio that provided, in relevant part: "Hi Allison, If you are receiving this email, you have either **(1)** started and not submitted a Paycheck Protection Program (PPP) loan application via Lendio.com or **(2)** have submitted your application to Lendio.com but there is incomplete information and we *cannot forward your application to our trusted lenders*." (Defendant's Exhibit 422 (italics added).) Similarly, on April 16, 2020, Ms. Baver received an email that provided, in relevant part: "Unfortunately, it appears your application was either missing data or had invalid information and we were not able to submit it for approval." (Defendant's Exhibit 418.)

Further, during Ms. Baver's April 23, 2020, conversation with Kirkham, Kirkham made a statement suggesting no application had been submitted to any lender as of that date: "Yea. And so, I mean, I can put this together, we can, you know, **see if we can get this out there to a lender** and they'll take it and stuff on there but yeah . . . ." (FI-LE-ABE-01-00006 at 0:07:28–0:07:46.)

As can be seen, there was ample record evidence to question Pinheiro's testimony that a "new application" was "generate[d]" "to the bank" each time "Allison Baver Entertainment would make an update to the application." (ECF No. 198 at 6.) Considering this record evidence, no reasonable trial strategy existed to permit Pinheiro to testify that an application was submitted to Northeast Bank each time Ms. Baver made a change to the application. Defense counsel was deficient for failing to object.

f. *Ms. Baver Was Prejudiced by Defense Counsel's Deficient Cross-Examination of Pinheiro.*

Trial counsel's cross-examination of Pinheiro was deficient because the questioning (1) failed to utilize Kirkham's phone conversation with Ms. Baver wherein he acknowledges submitting Ms. Baver's application to a lender despite his understanding that she had almost no prior payroll and (2) failed to adequately question Pinheiro's testimony that a new application was sent to Northeast Bank every time Ms. Baver made a change to the application.

As discussed above, Kirkham's phone conversation demonstrates that he understood that Ms. Baver's company had not "had a lot of payroll expended this year" (FI-LE-ABE-01-00006 at 0:06:41–0:06:52.) Despite having doubts about whether a lender would approve the loan application for the amount requested, Kirkham nevertheless decided to "get this out there to a lender . . . ." (FI-LE-ABE-01-00006 at 0:07:28–0:07:46.) Defense counsel was deficient for failing to question Pinheiro about these specific statements. These statements would have demonstrated that Kirkham understood from Baver's submissions that her company had virtually no prior payroll. This information should have been used to demonstrate to the jury that Ms. Baver did not make a false statement in her application or to bolster her good faith defense. Further, Kirkham's statements could have been used to shift blame to Lendio. Lendio submitted

39

Ms. Baver's application to Northeast Bank despite Kirkham understanding that her company had little prior payroll.

Defense counsel was also deficient for failing to question Pinheiro's representations that that a new application was sent to Northeast Bank every time Ms. Baver made a change to the application. Record evidence raises serious questions about the veracity of that testimony. Defense counsel was deficient for failing to undermine the credibility of one of the Government's key witnesses.

Ms. Baver was prejudiced by trial counsel's deficient performance. If trial counsel had confronted Pinheiro with the Kirkham telephone recording, there is a reasonable likelihood that the jury would have returned a not guilty verdict as to the Northeast Bank false statement charge. This is even more likely had trial counsel undermined Pinheiro's credibility by confronting him with the record evidence to undercut his sworn testimony that Northeast Bank received a copy of the application each time Ms. Baver made a change to the application. Indeed, failure to elicit discrepancies in a prosecution witness's testimony is prejudicial. *C.f. Stouffer*, 214 F.3d 1234 ("No evidence was elicited during defense cross-examination to bring out the discrepancy between the number of shots the State claimed were fired and the thirteen shots claimed by the defense investigator to have been fired.").

2. <u>Ms. Baver Was Prejudiced by the Combined Effects of Her Trial Counsel's Deficient Performance.</u>

As argued above, trial counsel provided deficient performance and any one of trial counsel's single errors was sufficiently prejudicial to warrant a new trial based on trial counsel's ineffectiveness under *Strickland*. But if the Court disagrees, Ms. Baver moves for a new trial based on the combined prejudicial effect of her trial counsel's deficient performance.

As discussed above, trial counsel (1) delivered a closing argument with an apparent intention of weakening Ms. Baver's case; (2) failed to call Kirkham to the stand despite Kirkham possessing critical evidence to support Ms. Baver's good faith defense; (3) failed to cross examine Ken Luis and elicit testimony from him that was promised in the opening statement; (4) failed to directly confront Nikhil Patel with the specific exhibits that were favorable to Ms. Baver; (5) failed to confront Brian Pinheiro with evidence that would have undermined his credibility; (6) failed to confront Pinheiro with the Kirkham telephone recording; and (7) as the Court already recognized—failed to have any discernable trial strategy at all. (*See* ECF No. 241 at 11 ("I know what I witnessed during the trial, and I am struggling to see how there was any strategy in what went on.").) No reasonable attorney would have done these things. Ms. Baver was prejudiced.

The Government will no doubt argue that it will "win on the second prong of *Strickland*" because "even if counsel was ineffective, the evidence in this case is substantial enough that she was not prejudiced by any ineffectiveness . . . ." (ECF No. 241 at 10.) "But prejudice under *Strickland* does not turn on a sufficiency-of-the-evidence analysis." *Newmiller v. Raemisch*, 877 F.3d 1178, 1204 n. 3 (10th Cir. 2017). "Rather, to establish prejudice, a [defendant] must [simply] show 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (citation omitted). "As [the Tenth Circuit's] sister circuits have recognized, whether there was enough evidence to legally support a conviction **does not answer** whether there was a reasonable probability of a different result arising from counsel's deficient performance." *Id*. Indeed, "*Strickland* prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes." *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 599 (3d Cir. 2015).

"In this case, it cannot be fairly said that the omissions and failures of trial counsel . . . do not raise a reasonable doubt in the guilty verdict." *Stouffer*, 214 F.3d at 1234. "It is conceivable that had counsel performed those duties they failed to do, had they been able to lay proper foundations for the introduction of relevant evidence, had they taken the time to prepare for and challenge the [Government's] evidence, had they taken the opportunity to set forth for the jury the defendant's theory of the case, and had they introduced the contradictory evidence found" in the Kirkham telephone recording, "reasonable doubt would have been created in the minds of the jury." *See id*. "Because none of these things were done, [Ms. Baver] was deprived of [her] Sixth Amendment right to effective counsel." *Id*. The Court was therefore correct to recognize that "there are cases where you can have evidence that would in fact support a jury verdict of guilty, but . . . with effective assistance of counsel, the jury could very easily return an acquittal." (ECF No. 241 at 11.)

## II. In the Alternative, at a Minimum, the Court Should Hold an Evidentiary Hearing Because Ms. Baver Has Established a Colorable Claim of Ineffective Assistance of Counsel.

As noted above, in the Tenth Circuit, a district court is "required" to hold an evidentiary hearing on the defendant's motion for a new trial "when the defendant's ineffectiveness claim is 'colorable.'" *United States v. Meacham*, 567 F.3d 1184, 1187 (10th Cir. 2009) (quoting *United States v. Sands,* 968 F.2d 1058, 1066 (10th Cir.1992). As this Honorable Court already noted, (*See* ECF No. 241 at 7) and for the reasons argued above, Ms. Baver was deprived of her constitutional right to effective counsel. Ms. Baver's ineffectiveness claim is more than colorable. At a minimum, the Court should hold an evidentiary hearing to allow Ms. Baver's current counsel to probe prior counsel about:

- Why they did not call Jason Kirkham as a witness;

- Why they failed to introduce the Kirkham telephone recording;

- Why they failed to mention the good faith defense in their closing argument;

- Whether they investigated how information was transferred from Lendio to Northeast Bank and when—including whether a Docusign was created simply by virtue of Ms. Baver having made a change to her application;

- Why they failed to confront Nikhil Patel with specific evidence favoring Ms. Baver's defense;

- Whether, during their investigation, trial counsel independently verified Blake Hamilton's claim that his office had provided Ms. Baver with a copies of the materials that formed the basis of Ms. Baver's contempt charges.

## Conclusion

Pursuant to Federal Rule of Criminal Procedure 33(a), the Court should hold a new trial based on prior counsel's ineffectiveness. Because the record establishes prior counsel's ineffectiveness, the Court should grant a new trial without an evidentiary hearing.

But if the Court holds that Ms. Baver is not yet entitled to a new trial, the Court should hold an evidentiary because Ms. Baver has established a colorable claim of ineffective assistance of counsel.

Dated this 9th day of September, 2025.

Nicolas C. Wilde (15768)
**Law Office of Nicolas C. Wilde LLC** 40 S. 600 E.
Salt Lake City, Utah 84102
801-949-3088
nick@ncwildelaw.com

*/s/ Nicolas C. Wilde*

Michael Langford (9682)
Alexander E. Ramos (15234)   **LANGFORD | RAMOS PLLC**
8 East Broadway, Ste. 420
Salt Lake City, UT 84111 Telephone: (801) 328-4090
Email: alex@langfordramos.com

*/s/ Alexander E. Ramos*