FELICE JOHN VITI, Acting United States Attorney (#7007)
BRIGGS MATHESON, Assistant United States Attorney (#18050)
LUISA GOUGH, Assistant United States Attorney (#17221)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: briggs.matheson@usdoj.gov
        luisa.gough@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALLISON MARIE BAVER,<br><br>Defendant. | Case No. 2:21-cr-00520-JNP<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL**<br><br><br>Chief Judge Jill N. Parrish |

## TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ................................................................................ 2

   A.  Baver founds Allison Baver Entertainment, LLC to develop film and television projects ................................................................................................... 2

   B.  The Paycheck Protection Program ......................................................................... 3

   C.  Baver obtains a $10 million PPP loan after applying to multiple lenders .................... 4

       1.  Utah First Credit Union ............................................................................... 4

       2.  Meridian Bank ............................................................................................. 5

       3.  Northeast Bank ............................................................................................ 7

   D.  Baver invests $150,000 from her PPP funds in a third-party film production ............ 7

II.  PROCEDURAL HISTORY ................................................................................... 8

   A.  Indictment and subpoena for ABE's bank records ...................................................... 8

   B.  A jury convicts Baver of making false statements to a bank, money laundering,   and criminal contempt ....................................................................................... 9

1.  Counts 1 and 2: False Statements Designed to Influence a Bank (18 U.S.C. § 1014) .......................................................................................................... 9

2.  Count 3: Money Laundering (18 U.S.C. § 1957) .................................. 13

3.  Count 4: Contempt (18 U.S.C. § 401(3)) ............................................. 14

4.  Closing Arguments ............................................................................... 14

C.  Motion for a new trial ................................................................................ 16

III.  LEGAL STANDARDS ......................................................................................... 17

IV.  ARGUMENT ........................................................................................................ 20

A.  Baver waived any challenge to her contempt conviction ........................... 20

B.  Baver is not entitled to a new trial based on her trial counsel's closing argument ..... 21

1.  Baver fails to overcome the strong presumption that her trial counsel's closing argument was objectively reasonable ................................................... 22

a.  Claim 1: counsel's closing argument invited the jury to convict on less than beyond a reasonable doubt standard ................................. 23

b.  Claim 2: counsel "reinforced" the government's theme and undermined Baver's credibility ................................................................................. 25

c.  Claim 3: counsel "failed to explicitly reference the good faith instruction" .. 27

d.  Claim 4: counsel based "portions of his closing argument on his personal opinion" ............................................................................................. 28

e.  Claim 5: counsel "effectively conceded" the fourth element of a § 1014 charge ............................................................................................. 29

f.  Claim 6: counsel's closing "lacked any apparent strategy" ............... 30

2.  Baver cannot show prejudice resulting from any of her counsel's alleged errors during closing argument ....................................................................... 32

C.  The record shows a sound tactical basis for trial counsel to forgo calling Jason Kirkham as a witness, and Kirkham's testimony would not have changed the outcome of trial ........................................................................................................ 33

D.  It was not objectively unreasonable for Baver's trial counsel to decline to cross-examine Ken Luis, and Baver suffered no prejudice from that strategic decision ..... 36

E.  Counsel's cross-examination of Nikhil Patel did not violate the Sixth Amendment . 38

F.  Baver fails to demonstrate that counsel's performance with respect to Brian Pinheiro was deficient or that any deficiency prejudiced her defense ....................................... 40

G.  Baver suffered no prejudice from the "cumulative effect" of her trial lawyers' alleged errors ........................................................................................................ 43

H.  Baver is not entitled to an evidentiary hearing ........................................ 44

V.  CONCLUSION ..................................................................................................... 45

**INTRODUCTION**

Allison Baver was an aspiring film producer with dreams of starting a successful entertainment company.  Struggling to finance her early-stage projects at the onset of the COVID-19 pandemic, Baver saw an opportunity in the federal government's Paycheck Protection Program and got carried away.

Two years ago, a jury convicted Baver of two counts of making false statements to a bank, one count of money laundering, and one count of criminal contempt.  She offers in a Rule 33 motion nearly a dozen reasons why she believes the Court should vacate her false statement and money laundering convictions and order a new trial in this case—all based on trial counsel's allegedly deficient performance during her trial.  Baver's claims fall into four categories: (1) deficiencies in her counsel's closing argument; (2) her defense team's failure to call Jason Kirkham as a witness at trial; (3) ineffective cross-examinations of three government witnesses; and (4) a cumulative error claim.

None of Baver's claims entitles her to the extraordinary remedy of a new trial.  Baver's trial team faced an exceptionally difficult challenge: their client, in an effort to get a $10 million loan, told multiple banks that she had 430 employees and an average monthly payroll of $4.77 million, when she had neither of those things.  Baver's defense team made an admirable attempt to show reasonable doubt by trying to cast their client's statements in the best possible light. And while her attorneys did not prevail at trial, Baver cannot overcome the strong presumption that they acted in an objectively reasonable manner, and that their challenged actions could be considered sound trial strategy.  Nor can Baver prove, as she must, that it is reasonably likely the jury would not have convicted her were it not for her attorneys' alleged errors.  And because all

of that is clear from the trial record, the Court should deny her motion without holding an evidentiary hearing.

## I.    FACTUAL BACKGROUND

### A.  Baver founds Allison Baver Entertainment, LLC to develop film and television projects

In October 2019, Baver founded Allison Baver Entertainment, LLC (ABE), a startup company to produce movies and television programs.  ECF 194 at 83;[1] Trial Ex. 21(b); *see also* ECF 180 (Exhibit List).  Throughout 2020, ABE had between three and ten employees, including Baver, all of whom worked remotely from their homes.  ECF 194 at 93, 114; ECF 255 at 103-04.

At the start of 2020, ABE had three projects in the early stages of development—a television show titled *America's Angels* and two films: *Monsters* and *Dead Princesses*.  ECF 194 at 84-85.  Baver had obtained a letter of intent from the A&E network to distribute *America's Angels*, once ABE produced the show and purchased airtime on the network.  *Id.* at 86-87; *see also* ECF 255 at 92-93.  By September 2020, however, the project remained in the early development stage, with the A&E distribution arrangement still a "proposal."  ECF 255 at 92, 489; ECF 194 at 91.  *Monsters* was also "several stages away from hiring crew and getting into production"; ABE's small crew of employees was still "reworking the script" in May 2020.  ECF 194 at 85; *see also* ECF 255 at 88-90.  *Dead Princesses* was even further behind—by the fall of 2020, ABE still had not acquired the rights to the script.  ECF 194 at 99; ECF 255 at 106.  By then, ABE's handful of employees were either furloughed or had left the company.  ECF 194 at 90-91; ECF 255 at 107.  As 2020 came to a close, none of the three projects had moved into the production phase, when crew and talent would be hired.  ECF 194 at 79, 85, 91, 114, 118.

---

[1] Citations to the trial transcript throughout this brief reference the blue page numbers listed in the ECF-generated header of each document.

**B.  The Paycheck Protection Program**

At the end of March 2020, President Donald Trump signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  15 U.S.C. §§ 9001 *et seq*., P.L. 116-136.  Among other things, the CARES Act established the Paycheck Protection Program (PPP)—a temporary relief program administered by the Small Business Administration (SBA) "to provide financial assistance to businesses that were struggling at the beginning of the pandemic to help them retain their workers, pay their payroll, and some operating expenses to keep their doors open."  ECF 194 at 13-14.  Unlike traditional SBA loans, "PPP loans carried a 100 percent guarantee," meaning that in the event of default, the SBA would pay the lender "100 percent of the outstanding balance."  *Id.* at 19.

PPP loans differed from traditional SBA loans in other crucial ways.  PPP loans "were only authorized for very specific purposes," namely, "to retain workers and pay [applicants'] eligible payroll costs" and to cover "limited non-payroll costs," such as mortgage interest and lease payments.  *Id.* at 16; *see also* ECF 193 at 20-25.  With the goal of providing this specific relief came more lax eligibility rules and "astronomically faster" application processing for potential borrowers.  ECF 194 at 14.  While traditional SBA loans required borrowers to show on their application "an ability to repay" to qualify (ECF 193 at 22)—necessitating a "significant underwriting" and verification process (ECF 194 at 18-19)—PPP loans required only that borrowers show, by their own self-certification, "that they had payroll."  ECF 193 at 22.  Borrowers could do so by stating the "number of employees they had" and "the payroll calculations that they used" to determine the requested loan amount, along with supporting documentation.  ECF 194 at 18.  The CARES Act set forth three formulas for calculating past payroll based on the type of business: one for most borrowers whose businesses operated year-round and existed prior to February 15, 2020; one for "seasonal businesses" that only operated

during part of the year; and one for "new businesses" that were only in operation as of February 15, 2020. *Id.* at 22-24.

Once a borrower submitted the application and supporting documents to the lender, and certified that the information contained therein was true, "the lender was required to ensure that the certifications were made, perform a good faith review of the information and the supporting documentation," and decide whether to approve the loan. *Id.* at 29. As soon as the loan was approved and the lender entered the loan information into the SBA's electronic system, "the system would automatically issue an SBA loan number, and that meant the loan was guaranteed. And at that point the lender would then disburse the funds to the borrower." *Id.* At no point did the SBA review loan applications prior to issuing loan numbers and providing the guarantee. *Id.* at 30. And by placing "the burden on the borrower to say whether or not they qualified" (ECF 193 at 26)—*i.e.*, that they had "past payroll"—and authorizing lenders themselves to "rely on the borrower's self-certifications made in [their] application," the CARES Act significantly streamlined the disbursement of PPP loans. ECF 194 at 18. PPP funds were not limitless, however—funds dispersed to one borrower were no longer available for others. *Id.* at 15.

### C. Baver obtains a $10 million PPP loan after applying to multiple lenders

#### 1. Utah First Credit Union

On April 16, 2020, Baver began communicating with Micah Stanford at Utah First Credit Union (UFCU) about applying for a PPP loan. ECF 193 at 30; *see* Trial Exs. 1-11. At first, Baver claimed that her company had "significant labor losses" due to the pandemic. Trial Ex. 1. Baver later clarified in an email to Stanford that her "company is a new business" with "no past payroll history, but nearly 200 jobs affected." Trial Ex. 4. Stanford explained to Baver that her description that she "h[ad] not paid any payroll to date" made her "ineligible" for a PPP loan. *Id.*; *see also* ECF 193 at 33. Stanford further informed Baver that UFCU could not "under any

4

circumstance, use future expected payroll to determine a loan amount."  Trial Ex. 4.  Baver

followed up with a phone call and told Stanford that "she had one or two employees."  ECF 193

at 35.  With appropriate documentation of those employees, Stanford estimated that Baver could

have qualified for a PPP loan of approximately $41,000.  *Id.*

On April 23, Baver submitted a PPP loan application to UFCU claiming an average

monthly payroll of exactly $4 million—the "maximum payroll amount to qualify" for a $10

million PPP loan—and stating that ABE had 430 employees.  *Id.* at 36; *see* Trial Exs. 7-8.  That

stood out to Stanford for several reasons, not the least of which was his prior exchange with

Baver in which she disclaimed having any past payroll and only two employees.  ECF 193 at 36-

37.  Baver's application was also "the largest application" UFCU "had seen to date," and lacked

any supporting documentation showing $4 million of payroll—itself an unusually "round

number" compared to typical average monthly payroll figures.  *Id.* at 36, 41.

Stanford denied Baver's application, explaining in an email that he could not process her

request because she had not "provided any documented payroll."  ECF 193 at 37-38; *see also*

Trial Ex. 9-10.  On April 24, Baver responded by claiming that she had "spoken with the SBA,"

who informed her that Stanford was "misinterpreting the rules."  ECF 193 at 39; Trial Ex. 11.

She also stated that she would be speaking "with the media . . . about this."  ECF 193 at 39; Trial

Ex. 11.

### 2. Meridian Bank

On April 24—the same day she threatened to go to the media after UFCU denied her loan

application—Baver submitted a new application to a different lender, Meridian Bank.  Trial Ex.

16(a)-(c); ECF 182 at 7-8.  Baver again requested the maximum $10 million loan based on her

certification that she had an average monthly payroll of approximately $4.77 million and 430

employees.  Trial Ex. 16(c).  Baver included with her application a payroll calculator

spreadsheet, in which she reported a total average monthly payroll of approximately $5.4 million from March to May 2019, and $4.77 million for March to May 2020.  Trial Ex. 21(c); *see also* ECF 182 at 10.  In a "Table of Contents" Baver submitted with her application, she indicated that her loan request totaled $8.3 million, despite her loan application for $10 million.  *See* Trial Ex. 21(a); ECF 182 at 12.  Baver also submitted a "Season Payroll Audit" dated April 22, 2020, listing various employees—mostly by title, e.g. "A Camera Assist. 1," "A Camera Assist. 2," etc.—their salaries and applicable withholdings, and a "Total Monthly" payroll of approximately $3.3 million.  *See* Trial Ex. 21(e); ECF 182 at 13.  Meridian Bank relied on these documents in processing Baver's application.  ECF 182 at 15-17.

Baver also attached a letter to her application, as a "good faith statement that the funds will be paid back in full according to the loan terms."  Trial Ex. 21(b) ("Good Faith Letter"); *see* ECF 182 at 13-14; ECF 198 at 120.  In the letter, Baver stated that ABE had a "slate of projects," including *America's Angels* and "two films" that were "scheduled to begin productions in the spring of 2020, employing 430 people."  Trial Ex. 21(b).  The COVID-19 pandemic, Baver wrote, hit "right as we were gearing up to start productions and caused drastic financial investment losses preventing planned employment of these respective teams."  *Id*.  Accordingly, Baver explained she was seeking an $8.3 million loan to "save these jobs" and "grow [ABE] beyond these transformational times."  *Id.*

Unlike her communications with Micah Stanford at UFCU, Baver did not explicitly mention to Meridian that, in fact, ABE had fewer than ten existing employees and no past payroll at the time.  *Id.*; *see also* ECF 255 at 15.  Meridian Bank approved Baver's application and disbursed $10 million into her account.  ECF 182 at 18; ECF 255 at 44-46.

### 3. Northeast Bank

Around the same time, Baver submitted a nearly identical application to another lender, Northeast Bank. Trial Exs. 13(a)-(l); ECF 198 at 5-7. Northeast received PPP loan requests through Lendio, a third-party company that sourced the applications, "gather[ed] all the documentation for the bank's review of PPP loans," then "pass[ed] along the applications to Northeast Bank." ECF 198 at 5, 18.

Like her application to Meridian, Baver's application to Northeast claimed an average monthly payroll of approximately $4.77 million and 430 total employees. *See, e.g.*, Trial Ex. 13(a)-(d); *see* ECF 198 at 8. Baver's application materials also included the payroll calculator and "Season Payroll Audit" with similar information that Baver had provided to Meridian. *See* Trial Exs. 14(c), 14(e); ECF 198 at 12-13. Northeast, like Meridian, relied on Baver's statement that she had 430 employees and $4.77 million in average monthly payroll in processing her application. ECF 198 at 14-15. However, Northeast did not approve Baver's request for a $10 million loan.[2] *Id.*

### D. Baver invests $150,000 from her PPP funds in a third-party film production

In July 2020, Lisa Whalen, a film producer and CEO of Company X Productions, sent ABE an "investment pitch" through one of her former employees who had recently joined ABE. ECF 255 at 21. Whalen was working to salvage the production of her film *No Man of God*, after her previous financial backer "walked away" due to the pandemic's impacts on his other businesses. *Id.* Whalen offered ABE a twenty percent return on its investment, plus three executive producer credits on *No Man of God*—one for each of ABE's three employees. *Id.* at

---

[2] This was not the first PPP application Baver sought to submit to Northeast. Earlier in April, she submitted an application claiming that ABE's average monthly payroll was exactly $4 million, and that it had 100 employees. *See* Trial Ex. 13(l); ECF 198 at 7.

22.  Baver also negotiated a term that would allow her to audition for a role in the film.  *Id.* at 23.

On July 23, 2020, two months after she received her $10 million PPP loan, Baver sent $150,000

from ABE's Meridian account to Company X.  Trial Exs. 27, 30, 46(a)-(b); ECF 255 at 23-24,

53.  Whalen was not aware that the money came from a PPP loan.  ECF 255 at 24.

## II.    PROCEDURAL HISTORY

### A.  Indictment and subpoena for ABE's bank records

On December 15, 2021, a federal grand jury in the District of Utah returned an

indictment charging Baver with making false statements to a bank, in violation of 18 U.S.C.

§ 1014.  ECF 1.  Baver was initially represented by attorneys Scott Garrett and Blake Hamilton.

ECF 9-10.

In May 2022, the grand jury issued a subpoena duces tecum requesting the production of

bank records from ABE.  Trial Ex. 70.  The Court denied ABE's and Baver's motions to quash

the subpoena and ordered ABE to comply with it immediately.  *See* Trial Exs. 71-73.  Baver's

attorneys made her aware of both the subpoena and the Court's order requiring compliance with

the subpoena.  ECF 198 at 96-104.  ABE did not comply with the subpoena at any point.  *Id.* at

104.

Baver and ABE were later charged in a Second Superseding Indictment with eight

violations of § 1014, arising from Baver's submission of PPP loan applications to Meridian and

Northeast on behalf of ABE.  ECF 47.  The Second Superseding Indictment also charged Baver

and ABE with one count of money laundering, in violation of 18 U.S.C. § 1957, based on

Baver's $150,000 transfer of ABE's PPP loan funds to Company X for the purpose of investing

in the *No Man of God* production.  *Id.*  Finally, the Second Superseding Indictment charged

Baver and ABE with one count of criminal contempt, in violation of 18 U.S.C. § 401(3),

stemming from the failure to comply with the grand jury subpoena for ABE's bank records.  *Id.*

The United States elected to proceed to trial on only two of the eight § 1014 charges, Counts 6 and 8 of the Second Superseding Indictment, which involved the last PPP applications submitted to Meridian and Northeast; the Court granted the government's motion to dismiss Counts 1-5 and 7. *See* ECF 157. With the money laundering and contempt charges, Baver faced a total of four counts at trial.

Meanwhile, defense attorneys Garrett and Hamilton withdrew from representing Baver, and the Court appointed Kris Angelos and Robert Hunt from the Federal Public Defender's Office to represent her. ECF 61.

### B. A jury convicts Baver of making false statements to a bank, money laundering, and criminal contempt

At trial, the United States presented testimony from a dozen witnesses, including multiple representatives from UFCU, Meridian, and Northeast, a former ABE employee, ABE's tax-filer, Lisa Whalen, and an IRS criminal investigator. For her case-in-chief, Baver called two witnesses: another former ABE employee, and a line producer ABE hired in June 2020 to work on securing California tax credits for *Monsters*. *See* ECF 255 at 83-124.

### 1. Counts 1 and 2: False Statements to a Bank (18 U.S.C. § 1014)

To convict Baver on the first two counts,[3] the United States had to prove that (1) the banks (Meridian and Northeast) were federally insured; (2) Baver made a false statement to each bank; (3) Baver knew the statement was false when she made it; and (4) Baver intended to influence the actions of the banks in connection with her PPP loan applications. *See* ECF 178 at 47-50.

---

[3] Counts 1 and 2, as listed in the verdict (*see* ECF 179 at 1), correspond to Counts 6 and 8 of the Second Superseding Indictment (*see* ECF 47 at 7-8).

With respect to the first element, uncontested testimony from Meridian and Northeast representatives established that their institutions were federally insured.  *See* ECF 198 at 4, 64.

As to the second, the government presented evidence that two statements in Baver's PPP loan applications to Meridian and Northeast were false: that ABE had 430 employees, and that ABE's average monthly payroll totaled $4.77 million.  Wage and tax records produced using ABE's payroll software for June through December 2020 showed only nine employees—including Baver—and wages totaling about $177,000.  *See* Trial Ex. 44; ECF 194 at 119-20, 125-26.  In addition, Jeff Neumeister, ABE's bookkeeper and tax-filer, testified about ABE's quarterly and annual tax filings reflecting the company's payroll in 2020.  *See generally* ECF 194 at 127-34; Trial Exs. 34-42.  As shown in those records, ABE often reported having paid zero wages to zero employees.  *See* ECF 194 at 128-129, 130-31; Trial Exs. 34-35, 37.  The records further indicated that the company had only a handful of employees at any point in 2020—never more than six—and total wages that never exceeded $100,000 in any given quarter.  *See* ECF 194 at 130-34; Trial Exs. 36, 38-42.

Testimony from ABE's former employees Lauren Magura and Lucas Watson confirmed that ABE never had more than ten employees throughout 2019 and 2020.  ECF 194 at 93 (Magura); ECF 255 at 89 (Watson).  The jury also learned about Baver's own statements—in loan applications, emails, and telephone communications with bank representatives—indicating that ABE did not have 430 employees or a $4.77 million average monthly payroll at the time she sought a $10 million PPP loan from Meridian and Northeast.  *See, e.g.*, Trial Ex. 13(l) (application listing 100 employees); ECF 193 at 35 (phone call with Micah Stanford claiming two employees).

For the third element, the jury heard testimony from several witnesses indicating that Baver knew the foregoing statements (430 employees, $4.77 million average monthly payroll) were false. Micah Stanford testified that he told Baver that she was ineligible for a $10 million PPP loan because she lacked past payroll documentation and had previously told him that ABE only had "one or two" existing employees. ECF 193 at 31-35; *see* Trial Exs. 10-11. Brandt Keuhne, Stanford's superior at UFCU, testified that he reiterated the point to Baver. ECF 193 at 64-65; Trial Ex. 12. Nikhil Patel, the Meridian analyst who helped process ABE's PPP loan application, then testified that, unlike the conversations with UFCU, Baver did not make it clear to Meridian that she had no employees and no past payroll to justify a $10 million PPP loan. ECF 182 at 15. Patel conceded that Meridian had received several materials that accompanied Baver's application, including at least "two documents" that—as one of Baver's trial attorneys put it—"explain[ed] that [she] didn't have any employees at the time." ECF 182 at 24-25. But Patel confirmed during his redirect testimony that the documents Baver submitted did not "say that she had no payroll and no prior payroll history or employees," and that he did not know Baver had "no prior payroll" at the time he processed the loan. ECF 255 at 15.

Testimony by Kenneth Luis, an SBA financial analyst, cast further doubt on Baver's assertion that someone at the SBA told her that "my company is eligible for the loan[.]" Trial Ex. 11. Luis had previously sent Baver an email in which he noted that there was a "new program that has been all over the news called Paycheck Protection Program," and that she "might be able to qualify" for a loan. Trial Ex. 67; *see* ECF 193 at 73. But he explained to the jury that SBA personnel were not "allowed to tell an individual whether or not they qualify for a PPP loan," and confirmed that he did not give Baver any "opinions on whether she qualified." ECF 193 at 72, 75. Kandace Zelaya, an SBA attorney who helped prepare PPP loan application

11

materials, including the agency's Frequently Asked Questions for lenders and applicants, likewise testified that SBA employees did not review PPP loan applications. ECF 194 at 28.

The jury also learned about Baver's own statements regarding the number of people employed by ABE and the company's past payroll, which conflicted with her statements on the Meridian and Northeast loan applications. For example, in one of ABE's initial applications to Northeast, Baver stated that the company employed 100 people. *See* Trial Ex. 13(l). In another email with Micah Stanford at UFCU, Baver stated that 200 ABE jobs had been "affected" by the COVID-19 pandemic. Trial Ex. 2. And ABE's quarterly and annual payroll tax forms, which Baver—the sole owner of ABE—provided to her bookkeeper, showed that ABE had (at most) ten employees in 2020, and an average monthly payroll in the (at most) tens of thousands. *See* Trial Exs. 34-42.

As to the last element—Baver's intent to influence Meridian and Northeast—the jury heard testimony regarding Baver's multiple PPP loan applications and her modifications to the number of employees and average monthly payroll to arrive at the maximum $10 million loan amount. *See, e.g.*, ECF 193 at 42, ECF 198 at 24-25; *compare also, e.g.*, Trial Ex. 13(l) (100 employees) *with* Trial Ex. 2 (200 employees) *and* Trial Ex. 7 (430 employees). The jury also received "payroll audit[s]" that Baver submitted to Meridian and Northeast that purportedly reflected ABE's payroll as of April 22, 2020, with specific payroll figures for March, April, and May 2020 to support the claimed average monthly payroll of $4.77 million. *See* Trial Exs. 14(e), 21(e).

In addition, the jury heard from Nikhil Patel that Meridian specifically relied on Baver's representations about ABE's "average monthly payroll, as well as number of employees" in making its decision to issue the $10 million loan. ECF 182 at 17. Brian Pinheiro, the chief risk

officer at Northeast who reviewed ABE's loan application, likewise testified that Northeast relied on Baver's statements that she had 430 employees and $4.77 million in average monthly payroll when processing her loan application.  ECF 198 at 14-15.

### 2.  Count 3: Money Laundering (18 U.S.C. § 1957)

To prove the money laundering count, the government had to show that (1) Baver knowingly engaged, or attempted to engage, in a monetary transaction in and affecting interstate commerce; (2) the transaction involved criminally derived property of a value greater than $10,000; (3) the property was derived from a false statement to a bank; (4) Baver acted knowingly, that is, with knowledge that the transaction involved the proceeds of a criminal offense; and (5) the transaction took place in the United States.  ECF 178 at 51.  The United States agreed with the Court that the money laundering count was contingent upon the false-statement charges, because without a "false statement to the bank on either [count 1 or 2], there are zero ill-gotten proceeds that can provide a basis for a money laundering charge."  ECF 194 at 161.

Testimony at trial from Lisa Whalen and IRS Special Agent Jeffrey Kirkwood established that Baver transferred $150,000 from ABE's Meridian bank account to Company X in late July 2020 for the film *No Man of God*.  ECF 255 at 23-24 (Whalen) and 53 (Kirkwood).  Kirkwood further explained to the jury that these funds came from ABE's $10 million PPP loan.  *Id.* at 53; *see also* Trial Ex. 30.  As detailed above, the government presented testimony and evidence that Baver knowingly made false statements to Meridian Bank to obtain the $10 million.  It was clear from the evidence presented, and Baver did not dispute, that the transaction took place in the United States and that it affected interstate commerce.

### 3.  Count 4: Contempt (18 U.S.C. § 401(3))

Count four required the government to prove that (1) the court entered a reasonably specific order; (2) Baver had actual knowledge of the court order; (3) Baver disobeyed or disregarded the order; and (4) Baver acted willfully in doing so.  ECF 178 at 53.

The United States introduced at trial multiple orders issued by Judge Ted Stewart in this case: a June 14, 2022 order denying ABE's motion to quash the subpoena, and a June 28, 2022 order denying Baver's motions to intervene and quash.  Trial Exs. 71, 72.  The United States also introduced a November 21, 2022 order denying Baver's and ABE's motion to stay the subpoena, in which Judge Stewart observed that (i) the Court had "continually rejected Ms. Baver and ABE's various requests for orders of the Court allowing noncompliance with the subpoena," and (ii) Baver and ABE "continue[d] to ignore the subpoena and defy the orders of the Court" despite the Court's prior "direct[] order[s]" to "comply with the subpoena."  Trial Ex. 73.

The jury heard testimony from Blake Hamilton—Baver's and ABE's former counsel. Hamilton testified that: (i) Baver personally received the May 6, 2022 subpoena and the three court orders denying the motions to quash or stay compliance with the subpoena; (ii) Hamilton acted at Baver's direction in filing ABE's and Bavers' motions to quash; (iii) the motions to quash were legal attempts to avoid timely compliance with the subpoena; (iv) the June 28, 2022 order explicitly required immediate compliance with the subpoena; and (v) Baver did not comply with that order and never complied with the subpoena.  ECF 198 at 96-104; *see* Trial Exs. 70-73.

### 4.  Closing Arguments

At closing argument, the United States contended that the evidence showed that Baver made two statements to Meridian and Northeast that were not true: that she had "430 employees," and "$4.77 million a month in payroll."  ECF 196 at 13.  Baver knew those were false, the government argued, as evidenced by her statements, first to UFCU admitting that she

had no past payroll, then to Meridian and Northeast claiming otherwise. *Id.* at 13-14; *see also id.* at 19-20 (arguing that Baver "learned exactly from Micah Stanford . . . what not to put in" her communications with the banks). The government emphasized that the "chang[ing]" numbers in Baver's multiple loan applications showed that she "knew exactly what she was doing," and further demonstrated her criminal intent to influence Meridian and Northeast. *Id.* at 18. The same was true, the government argued, with respect to the various documents Baver submitted along with her applications, including payroll calculators and purported audit spreadsheets designed to influence the bank into approving her loan. *Id.* at 20-21.

As to the money laundering count, the government pointed to the evidence showing that ABE "had no other money" than the $10 million PPP loan disbursement, and the bank records showing that she paid $150,000 of those funds to Company X for the *No Man of God* investment. *Id.* at 21-22. Finally, the government argued that the evidence—in particular, the various subpoenas, court orders, and testimony from Baver's prior attorney—established each element of the contempt charge. *Id.* at 22-24.

Defense attorney Robert Hunt's closing argument on Baver's behalf centered on her contention that she "never lied" and did "her best to be honest about where she[ was] going to use her money," despite the ambiguous "rules" governing "what documents a bank could rely on in making their determination." *Id.* at 27-28. Hunt focused on Baver's lack of criminal intent as reflected in the documentary evidence admitted during the trial, arguing that she did not knowingly submit false statements to Meridian or Northeast, and that she did not intend to influence their decisions through lies. *Id.* at 28-29. In doing so, Hunt pressed two themes. First, he argued that PPP loan eligibility was an ambiguous question that was open to interpretation by the individual banks. *Id.* at 32. The banks therefore had "discretion" to determine what mattered

15

for processing any given loan application. *Id.* at 38. The PPP loan application, counsel argued, spoke in terms of "retaining" employees, making Baver's understanding that she could use loan proceeds to "save jobs" for "projects that [were] in existence when COVID clobber[ed them]" reasonable under the circumstances. *Id.* at 35. That was especially true, Hunt asserted, given the unique nature of Baver's entertainment business. *Id.* at 39.

Second, Hunt "focus[ed]" on several exhibits that, he argued, "explain this story perfectly . . . as to why Ms. Baver never intended to defraud the banks and the banks knew exactly where she was coming from when she applied." *Id.* at 30. In particular, Hunt highlighted the various materials Baver submitted along with her loan applications, including the "Good Faith Letter," "Table of Contents," and "payroll budget," which, he argued showed that Baver had disclosed to the banks the "forward looking" nature of business. *Id.* at 37, 39-43. Those documents, he argued, made it clear that Baver did not "try and exclude any information" or otherwise lie to the lenders about ABE's business and her expected labor costs. *Id.* at 42. Counsel further argued that the evidence proved that "those numbers that [Baver] provided could be legitimized," which prevented the government from carrying its burden to prove beyond a reasonable doubt that Baver knowingly submitted false statements with the intent to influence the banks. *Id*. at 46. As Hunt summarized: "The supporting documents tell the story," because they demonstrated Baver's lack of criminal intent "at the time she wrote down" the challenged figures. *Id.* at 51.

The jury deliberated for six hours and found Baver guilty on all counts. ECF 172, 179.

### C. Motion for a new trial

Sixteen months after her conviction, Baver moved for an extension of time to file a motion for a new trial pursuant to Fed. R. Crim. P. 33, arguing that good cause and excusable neglect justified the delay. ECF 248. The Court granted the motion over the United States'

16

objection and set the motion deadline for January 6, 2025.  ECF 253.  That deadline was extended, again over the government's objection, to March 7, 2025.  ECF 257, 258.

Following additional stipulated extensions, *see* ECF 264-65, 268-72, on July 21, 2025, Baver's current counsel-of-record filed a motion to withdraw from representing her, along with a Notice of Explanation regarding the status of Baver's Rule 33 motion.  ECF 276, 277.  The Court held hearings on counsels' motion to withdraw on August 11 and 20, 2025, and denied the motion.  ECF 281, 283.

Baver filed her motion for a new trial on September 9, 2025.  ECF 291.  In it, she asserts a dozen grounds for relief, all based on her trial counsel's allegedly ineffective assistance at trial.  Specifically, Baver contends that her trial counsel (1) delivered a constitutionally deficient closing argument; (2) erroneously declined to call Jason Kirkham as a witness; (3) unreasonably decided not to cross-examine Ken Luis; (4) performed a constitutionally inadequate cross-examination of Nikhil Patel; and (5) fell below an objective standard of reasonableness by failing to object during Brian Pinheiro's direct examination testimony and inadequately cross-examining him.  Baver maintains that she was prejudiced by each of these alleged errors, and, in the alternative, that their cumulative effect altered the outcome of her trial.[4]

## III.    LEGAL STANDARDS

Rule 33 of the Federal Rules of Criminal Procedure authorizes district courts to grant new trials if "require[d]" in "the interest of justice."  Fed. R. Crim. P. 33(a).  But "the Tenth Circuit has cautioned courts to grant motions of this nature only under the most extraordinary

---

[4] Baver's motion largely concerns the actions and advice she received from Hunt, though she often does not identify which of her trial attorneys are the subject of her claims.  *See, e.g.*, ECF 291 at 31 (arguing that "[T]rial counsel performed deficiently in failing to call [Jason] Kirkham to the stand," but not identifying whether she faults Hunt, Angelos, or both).

circumstances, noting '[m]otions for new trial are disfavored . . . and granted only with great caution.'" *United States v. Dermen*, No. 2:18-CR-00365-JNP, 2021 WL 515883, at *17 (D. Utah Feb. 10, 2021), *aff'd*, 143 F.4th 1148 (10th Cir. 2025) (quoting *United States v. Mounkes*, 204 F.3d 1024, 1027 (10th Cir. 2000)); *accord United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir. 2007). Such motions are "based on the presumption that the verdict against the defendant is valid." *United States v. Velarde*, 860 F. App'x 132, 137 (10th Cir. 2021) (unpublished) (citation omitted). Accordingly, the defendant bears the burden of overcoming this presumption and establishing grounds for a new trial. *See id.*

A defendant may seek a new trial under Rule 33 for ineffective assistance of counsel. *See United States v. Sands,* 968 F.2d 1058, 1066 (10th Cir. 1992). While such claims generally "should be brought on collateral review," a "narrow exception" applies where the record allows for a "fair evaluation of the merits of the claim." *United States v. Crowe*, 735 F.3d 1229, 1244 (10th Cir. 2013). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The two-part *Strickland* test requires a defendant to show (1) that her attorney's performance was deficient and fell below an objective standard of reasonableness, and (2) that prejudice resulted. *Id.* at 687.

The first prong does not ask courts "to measure attorneys against the Platonic ideal of the best possible performance," *Meadows v. Lind*, 996 F.3d 1067, 1079 (10th Cir. 2021), nor is it satisfied by a showing that an "attorney's strategy was merely wrong, or his actions unsuccessful," *King v. Parker*, 443 F. App'x 369 (10th Cir. 2011); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not

perfect advocacy judged with the benefit of hindsight."). Instead, "the overriding question under the first prong of *Strickland* is whether, under all the circumstances, counsel performed in an objectively unreasonable manner." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002). Answering that question "always start[s]" with a "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 1044-46 (quotation omitted); *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("Counsel's competence . . . is presumed."). And because there are "countless ways to provide effective assistance in any given case," the Sixth Amendment gives considerably "wide latitude" to counsel in making tactical decisions. *Ellis v. Raemisch*, 872 F.3d 1064, 1083-84 (10th Cir. 2017). To "surmount" this "strong presumption of reasonable professional assistance, a criminal defendant bears the burden of proving, by a preponderance of the evidence, that his trial counsel acted unreasonably." *Sallahdin v. Mullin*, 380 F.3d 1242, 1248 (10th Cir. 2004). "Put another way, the Supreme Court has explained, the general presumption of objective reasonableness requires a [defendant] to 'overcome the presumption that, under all the circumstances, the challenged action '*might* be considered sound trial strategy.'" *Bullock*, 297 F.3d at 1046 (emphasis in original) (quoting *Strickland*, 466 U.S. at 689).

The test gets no easier under the second prong. To establish the requisite prejudice "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Frost v. Pryor*, 749 F.3d 1212, 1224 (10th Cir. 2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). "Rather, the 'likelihood of a different result must be substantial.'" *Id.* (quoting *Richter*, 562 U.S. at 112). In other words, "the question is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Id.* at

19

1224-25 (emphasis added) (quoting *Richter*, 562 U.S. at 111).  The question is "whether it is 'reasonably likely' the result would have been different."  *Id.* at 1225 (quoting *Strickland*, 466 U.S. at 696).  And while answering that question does not necessarily "require a showing that counsel's actions 'more likely than not altered the outcome,'" the "difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"  *Id.* (quoting *Strickland*, 466 U.S. at 693).

## IV.    ARGUMENT

Baver's ineffective-assistance claims do not surmount *Strickland*'s high bar and consequently cannot qualify her for relief under Rule 33.  She raises four categories of claims: (1) deficiencies in closing argument; (2) failing to call a witness; (3) ineffective cross-examinations; and (4) cumulative error.  A thorough review of the trial record makes clear that, as to each of these claims, trial counsel's performance was constitutionally effective and there is no reasonable probability of a different outcome.  And because the trial record is sufficiently developed, there is no need for an evidentiary hearing.

### A.  Baver waived any challenge to her contempt conviction

Before turning to Baver's specific claims of error, it is important to note what her motion does *not* say.  In particular, Baver does not adequately challenge her conviction for criminal contempt under 18 U.S.C. § 401(3).  *Cf. Utah Env't Cong. v. Bosworth*, 439 F.3d 1184, 1194 & n.2 (10th Cir. 2006) (an issue "vaguely" asserted in a party's opening brief, but not addressed, is deemed waived).  In a single paragraph in the "Relevant Factual and Procedural Background" section of her motion, Baver states that her trial attorneys did not "conduct adequate cross-examination of Blake Hamilton"—Baver's prior defense attorney who testified that his office provided Baver with the relevant subpoena and court orders underlying the contempt charge.  ECF 291 at 13.  But she makes "nothing that would pass for a legal argument with regard to" that

issue in her motion. *United States v. Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009). She does not, for instance, show that her trial counsel was objectively unreasonable, nor does she allege that it is reasonably likely the outcome of her trial would have been different had her trial counsel cross-examined Hamilton any differently.

Tellingly, Baver omits Hamilton's cross-examination whenever she lists her trial counsel's various alleged errors in her motion. *See* ECF 291 at 21, 41. And other than her brief reference to it in the background section, Baver's *only* mention of the contempt charge comes on the last page of her motion, in the final bullet point of issues she wishes to "probe" at an evidentiary hearing. *See* ECF 291 at 44. That is not enough. *Bosworth*, 439 F.3d at 1194 & n.2. Baver's underdeveloped allegations "are the very kind of inadequately presented theories" this Court "traditionally deem[s] waived." *United States v. Martinez*, 92 F.4th 1213, 1233 n.4 (10th Cir. 2024); *see also, e.g.*, *Burrell v. Armijo*, 603 F.3d 825, 835 (10th Cir. 2010) (declining to address "issues nominally raised but inadequately briefed"); *United States v. Banks*, 884 F.3d 998, 1024 (10th Cir. 2018) (the Court will not "fill in the blanks of a litigant's inadequate brief"). To the extent Baver seeks to challenge her contempt conviction on ineffective-assistance grounds, that claim is waived.

### B. Baver is not entitled to a new trial based on her trial counsel's closing argument

Baver contends that one of her trial attorneys delivered a constitutionally deficient closing argument and that there is a reasonable probability that the jury would not have convicted her otherwise. ECF 291 at 22-30. For the reasons discussed below, Baver's various claims of error fail both prongs of *Strickland's* test.

### 1. Baver fails to overcome the strong presumption that her trial counsel's closing argument was objectively reasonable

Baver alleges six categories of error with respect to her trial counsel's closing argument: (i) Hunt's misstatement of the prosecution's burden; (ii) his statements that "reinforced" the prosecution's "theme"; (iii) his failure to explicitly reference the "good faith" jury instruction; (iv) counsel's use of the phrase "I think . . . in my mind" ; (v) his concession of the "intent to influence" element of a § 1014 charge; and (vi) counsel's lack of "any apparent strategy."  ECF 291 at 22-30.  Each of Baver's allegations lacks merit.

As a threshold matter, Baver maintains that the "highly deferential" review courts apply under *Strickland*'s performance prong, *see Sands*, 968 F.2d at 1065, simply does not apply in her case.  According to Baver, Hunt's errors during closing argument "reveal[] that [he] abandoned [his] required duty of loyalty," and therefore his actions are "not entitled" to any "judicial deference."  ECF 291 at 22.  Baver cites no authority for this supposed exception, and longstanding Supreme Court and Tenth Circuit precedent holds otherwise.  As noted above, courts "*always* start the analysis" by "presuming, absent a showing to the contrary, that an attorney's conduct is objectively reasonable because it *could* be considered part of a legitimate trial strategy."  *Bullock*, 297 F.3d at 1046, 1047 (emphasis added); *see also Strickland*, 466 U.S. at 691 (noting the "heavy measure of deference to counsel's judgments" that applies "[in] *any* ineffectiveness case" (emphasis added)).  Baver cannot circumvent that starting point, especially for claims based on counsel's closing argument.  As the Tenth Circuit has explained, "the decision of what content to include in closing argument falls within an attorney's trial strategy."  *Love v. Roberts*, 259 F. App'x 58, 65 (10th Cir. 2007) (unpublished).  So to prove that Hunt's closing argument was objectively unreasonable, Baver must demonstrate that his tactics were "so bizarre or unwarranted that they fell outside the broad range of reasonable professional

assistance that could be considered 'sound trial strategy.'" *Ferguson v. Williams*, 139 F.3d 911, at *6 (10th Cir. 1998) (unpublished).  As discussed below, her allegations of error fall well short of satisfying that standard.

### a.  Claim 1: counsel's closing argument invited the jury to convict on less than beyond a reasonable doubt standard

Baver first takes issue with the following statement from her attorney's closing argument:

> Now 16(c), let's look at -- well, let's start --first off, let's look at the -- the two numbers you'll see at the top are literally the two numbers that you are to find in the indictment. If you believe that she intentionally and she knew – she intentionally falsified those, then you've got to find her guilty. The government is right.

ECF 291 at 23 (quoting ECF 196 at 33-34).  That statement, Baver argues, "misstated the prosecution's burden" and invited the jury to convict her based on a standard lower than beyond-a-reasonable-doubt.  *Id.*  Not so.

Hunt repeatedly argued to the jury that the government had "the burden to prove *beyond a reasonable doubt*" that Baver knowingly submitted false statements to the banks, and that the government could not meet its burden.  ECF 196 at 46 (emphasis added); *see also, e.g.*, *id.* ("[W]e don't have that burden, the government does, to show these numbers are false, which they have not."); *id.* at 47 ("We don't have the burden to prove beyond a reasonable doubt that those numbers aren't correct.  And I submit to you that the government never did.  They never met their burden[.]"); *id.* at 48-49 ("The only issue is whether she lied in order to get the money. And the government has not met their burden on those two issues, because Allison Baver proved her intent.").

Baver ignores all of that and skips over the context in which Hunt made the challenged statement.  *See United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995) (explaining that, "regardless of how one characterizes defense counsel's statements," the court must view

them "in light of the entire record"). Counsel's excerpted comment about Trial Exhibit 16(c)—part of the loan application Baver submitted to Meridian—was part of his larger argument that, contrary to what the government said in closing, the documentary evidence showed that Baver did *not* "kn[o]w or th[ink]" that she was "making a false statement to the bank to try and influence them in the wrong way to get a loan." ECF 196 at 33. Hunt's "If you believe" statement was nothing more than a summation of the government's thesis in the indictment—*i.e.*, that Baver intentionally and knowingly falsified the numbers in the application and was guilty of knowingly making a false statement to a bank. *Id.* at 33-34. And although not included in Baver's selective excerpt, Hunt then went on to argue to the jury *that the government failed to prove its thesis*. Specifically, he argued that Baver included the challenged employment figures in her loan application because she was looking at the application from the perspective of a film producer with "forward looking" projects in the gestational stage, and not because she was "trying to hide something to get money for herself." *Id.* at 35-37. In short, Hunt told the jury what the prosecution's theory of the case was, then argued that the government was wrong based on the evidence. That was a textbook and "eminently reasonable" approach to closing argument. *Ferguson*, 139 F.3d at *6.

Nor did Hunt "invite the jury to find his client guilty." ECF 291 at 23. He merely adopted a dyed-in-the-wool rhetorical framework that recited the government's position and then explained why the evidence showed otherwise. That is a "far cry from a statement by counsel that there was no reasonable doubt" that Baver was guilty. *Williamson*, 53 F.3d at 1511.

Baver also argues that her attorney, in making the challenged statement, "failed to address the second and fourth elements" of a § 1014 charge, and thereby "invited the jury to find [her] guilty based on only some of the elements." ECF 291 at 24. Again, the record shows

24

otherwise.  The second element of § 1014—that the banks were "federally insured"—was never in dispute.  Representatives from each of the banks testified that the institutions were federally insured.  *See* ECF 198 at 4, 64.  Baver does not contend that there was any evidentiary basis to dispute that.  It was objectively reasonable for Hunt to focus his time and the jury's attention on more pertinent and contested issues.  *See Williamson*, 53 F.3d at 1512 (observing that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments" during closing argument (quotation and citation omitted)).  Contrary to Baver's assertion, Hunt repeatedly and explicitly argued that the government had failed to satisfy the fourth element of a § 1014 offense.  *See* ECF 196 at 29 ("What documents [can you] look at to determine whether she knew she was making a false statement with the intent to influence?  That's what we're going to talk about today."); *id.* at 30 ("I think there are five documents which explain this story perfectly to you as to why Ms. Baver never intended to defraud the banks and the banks knew exactly where she was coming from when she applied."); *id.* at 35-36 (arguing about "the way [Baver] look[ed] at" the loan application and how her responses showed her "intent as to what she was using her money for").  That he did not specifically address that element in Baver's selective excerpt does not entitle her to a new trial.

### b.  *Claim 2: counsel "reinforced" the government's theme and undermined Baver's credibility*

Baver next asserts that her counsel "reinforced" the government's theme that she "would not take no for an answer" by unreasonably emphasizing that she was a "go-getter" who tried "to make things happen."  ECF 291 at 25.  There is no merit to this argument.

Hunt's decision to co-opt the prosecutor's rhetoric was a time-honored and inherently strategic choice to reframe the government's thematic emphasis so that it supported the defense's theory of the case.  Far from reinforcing the government's theme, Hunt recast Baver's

determination as a positive attribute that would help the jury understand her actions. *See* ECF 196 at 31-32 (describing the "painstaking lengths" Baver went to in her efforts to "save" as many jobs as possible "by getting this money"). Counsel's reformulation was wholly consistent with the defense's broader strategy to depict Baver as a dedicated entrepreneur who was "doing her best" under challenging circumstances to keep her company afloat. *Id.* at 29. And while that strategy did not prevail with the jury, it certainly did not violate Baver's constitutional rights. Baver's conclusory assertion otherwise is insufficient to rebut the strong presumption that Hunt acted strategically and reasonably.

Baver also takes issue with her counsel's statement regarding her efforts to "cobble together whatever she can to get $10 million." ECF 291 at 25 (quoting ECF 196 at 31). Hunt's comment that he didn't "disagree with that," Baver argues, unreasonably reinforced the government's "narrative." *Id.* Again, this statement attempts to take something from the government's argument and cast it in Baver's favor. Indeed, Baver never disputed that she wanted and applied for a $10 million PPP loan or that she worked very hard to get one—the question was whether she knowingly lied when she did so. And her significant efforts to "explain" the details of her business to the banks was a central theme of her defense throughout trial. *See, e.g.*, ECF 196 at 44 (arguing that Baver was "doing her darn best to explain" her situation by "submit[ing] documents that weren't even . . . asked for by the banks in order to explain her position"). It was entirely reasonable—expected, in fact—that defense counsel would not dispute that Baver made a concerted effort to obtain a $10 million PPP loan, and focus instead on arguing to the jury why the government was wrong to assert that she lied when she did so. ECF 196 at 31 ("what I *do disagree with* was the methodology that she used was a lie" (emphasis added)). That is something attorneys do "all the time": strategically ceding points

"that cannot be rebutted so that counsel has credibility to challenge evidence where challenge is fruitful." *United States v. Dago*, 441 F.3d 1238, 1252 (10th Cir. 2006).

The same is true of Hunt's comment that he did not know "why Ms. Baver used the term audit" in one of the documents she submitted to the banks along with her loan applications. ECF 196 at 42. According to Baver, that statement "highlight[ed] the prosecution's argument that [she] was making a misrepresentation without providing any explanation for those actions." ECF 291 at 26. Notably, Baver does not offer any explanation for her use of the word. In any event, she once again ignores the context for Hunt's statement—namely, responding to the *prosecutor's* argument that Baver's use of word "audit" was significant. *See* ECF 196 at 16-17. Hunt rebutted that point by arguing that the word itself was "irrelevant," and that the jury should instead focus on the substance of the document as a whole and in connection with the other materials Baver submitted to the banks. *Id.* at 42; *see also id.* at 47 (arguing that Baver submitted additional documents to the banks including the "audit" to explain her business). Hunt's tactical decision to downplay Baver's use of the word "audit" to make a substantive point about her lack of criminal intent was intrinsically strategic and objectively reasonable.

### c. Claim 3: counsel "failed to explicitly reference the good faith instruction"

Baver's third allegation of error fares no better. Baver faults Hunt for not "explicitly argu[ing] that [she] lacked the intent to influence the banks because of her good faith." ECF 291 at 27. But he did. In fact, Baver's "good faith" and concomitant lack of criminal intent was the central theme of Hunt's closing argument. He repeatedly emphasized to the jury that Baver had been forthright and "looking forward" with respect to the employment and payroll figures she included in her application, and that she "never lied" about what the money was for. ECF 196 at 27, 37; *see also, e.g., id.* at 30 (arguing that Baver never "intended to defraud the banks and the

27

banks knew exactly where she was coming from when she applied").  He stressed that Baver had done "her best to be honest" in her efforts to "save jobs" based on her understanding of the ambiguous "rules" governing PPP loans, which left ultimate discretion to the banks.  *Id.* at 28-29, 31.  And he argued that the documentary evidence admitted at trial demonstrated Baver's lack of criminal intent under § 1014.  *Id.*

True, Hunt did not specifically call out the good faith jury instruction during his argument.  But that hardly amounts to a violation of Baver's Sixth Amendment rights, and Baver cites no authority to the contrary.  As the Supreme Court has recognized, there are good—and soundly strategic—reasons counsel may often wish to "count on the judge's charge to remind" the jury of the instructions, and thereby "preserve [a] strategy of appearing as the friend of jury autonomy."  *Yarborough*, 540 U.S. at 10.  There was nothing objectively unreasonable about Hunt's approach arguing the theme of good faith with references to the trial evidence, while leaving the instructions to the Court.  Baver's conclusory assertion that counsel "performed deficiently" simply by not "mention[ing] the good faith instruction" (ECF 291 at 27) is precisely the type of hindsight-driven second-guessing that *Strickland* forbids.  *Yarborough*, 540 U.S. at 8.

### d.   Claim 4: counsel based *"portions of his closing argument on his personal opinion"*

Baver next takes aim at Hunt's use of the phrase "I think . . . in my mind" when discussing the trial evidence, arguing that he improperly "vouch[ed]" for her by injecting his "personal opinion" into the argument.[5]  ECF 291 at 28.  Baver misses the mark.

---

[5] In connection with this claim, Baver also asserts that her trial counsel "should have emphasized to the jury the governing beyond a reasonable doubt standard and argued that the Government could not meet its burden."  (ECF 291 at 29).  As detailed above, counsel did exactly that.  *See* ECF 196 at 44, 46; *see also supra* Part IV.B.1.a.

Hunt did not improperly vouch or otherwise opine about "the credibility of a witness" or "the guilt or innocence of [the] accused" during his closing argument. *Id.* (quotation omitted). Rather, he commented on what he thought the jury should infer from the Good Faith Letter that was admitted into evidence. *See* ECF 196 at 39-40 (discussing defense exhibit 439B). It was neither improper nor objectively unreasonable for counsel to argue the evidence in closing.[6]

Besides, courts, including the Tenth Circuit, "have recognized a distinction between personal comments that are testimonial in nature and those that can perhaps best be characterized as a 'mannerism' in [an attorney's] presentation." *United States v. Gabriel*, 715 F.2d 1447, 1451 (10th Cir. 1983) (quotation omitted). Hunt's limited use of the phrase "I think . . . in my mind" falls into the latter category and does not supply a basis for vacating the jury's guilty verdict. *Cf. United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006) (rejecting defendant's due process challenge to "the prosecutor's use of 'I' and 'we' in closing arguments," and instructing courts to focus on "the content of such statements" and "not the form").[7]

### e. Claim 5: counsel "effectively conceded" the fourth element of a § 1014 charge

Baver's fifth claim again takes issue with Hunt's comment that he "agree[d]" with the government that Baver was "trying to cobble together whatever she can" to obtain a $10 million PPP loan. *See* ECF 291 at 29-30; ECF 196 at 31. In making that statement, Baver argues, her

---

[6] Indeed, it is difficult to see how the challenged statements were anything other than counsel's efforts to do exactly what Baver accuses him of *failing* to do just one page earlier in her motion—*i.e.*, "explicitly [tying] his argument to the good faith defense." ECF 291 at 27.

[7] *Gabriel* and *Jones* both involved allegations of error based on the *prosecutor's* use of personal pronouns during closing argument. The government is not aware of any authority—and Baver cites none—in which defense counsel's performance was held to have fallen below an objectively reasonable standard because he said what he "thinks" the trial evidence showed. Nor does Baver cite any authority to support her suggestion that "personal vouching" by defense counsel on behalf of the defendant necessarily satisfies *Strickland*'s performance prong because it is "categorially [sic] unpersuasive advocacy." ECF 291 at 28.

attorney "effectively conceded" the "intent to influence" element under § 1014. ECF 291 at 29-30. Like Baver's second ground for relief, that argument is impossible to square with the record.

As Baver herself notes, Hunt immediately followed up the challenged statement by explaining what he *did* "disagree with"—namely, that Baver had lied to obtain the loan. ECF 196 at 31. Again, that Baver sought to obtain a $10 million PPP loan was not in dispute. That she was "doing her best" to "lay[] out every possible detail that she could possibly think of" was a central theme of her defense. ECF 196 at 29, 41. The question for the jury was whether Baver had knowingly submitted false statements to the banks with the intent to influence their decisions. Hunt focused his closing argument on those highly contested issues relating to her criminal intent. And that included repeatedly arguing to the jury that the government had failed to prove the "intent to influence" element. *See* ECF 196 at 29, 30, 35-36, 50. Once again, Baver cannot overcome the strong presumption that her counsel acted reasonably when he strategically conceded a point that was not contested (whether Baver wanted a $10 million PPP loan) to retain credibility to argue the points that were in dispute (her criminal intent). *See Dago*, 441 F.3d at 1252.

### f. Claim 6: counsel's closing "lacked any apparent strategy"

Baver's final closing-argument claim fails at the outset because she does not "point to any specific improper comments in the closing argument." *DeLozier v. Sirmons*, 531 F.3d 1306, 1329 (10th Cir. 2008). Instead, she offers a "general assertion of error" (*id.*)—namely, that Hunt had no "actual strategy for his closing argument." ECF 291 at 30. That is not a separate claim on which relief can be granted. *DeLozier*, 531 F.3d at 1329. To the extent Baver contends that her counsel's closing argument fell below an objective standard of reasonableness based on the foregoing allegations of error, that claim fails for the reasons discussed above. None of the challenged statements was "so bizarre or unwarranted that [it] fell outside the broad range of

reasonable professional assistance that could be considered 'sound trial strategy.'" *Ferguson*, 139 F.3d at *6.

In any event, the "entire record" refutes Baver's assertion and confirms that Hunt "remained a legal advocate" on her behalf, and "acted with undivided allegiance and faithful, devoted service" to her throughout his closing argument. *Williamson*, 53 F.3d at 1511 (quotation omitted). As detailed earlier, counsel's argument centered on Baver's good faith and lack of criminal intent. Hunt argued that Baver did not "knowingly" submit false statements to the banks with the intent to influence their decisions, and instead was "doing her best" to be transparent about her business and how it would spend the loan proceeds. ECF 196 at 29-31, 35-36, 50. In pursing that strategy, counsel

- explained how the jury should interpret the evidence that was introduced during the trial;[8]

- highlighted the evidence he argued was lacking in the government's case;[9]

- argued the weight and credibility of witness testimony;[10] and

- emphasized the government's burden of proof.[11]

---

[8] *See, e.g.*, ECF 196 at 37 (discussing audit spreadsheet, exhibit 21(c)); *id.* at 38 (discussing the frequently asked questions, exhibit 485); *id.* at 39 (discussing the Good Faith Letter, exhibit 439(b)); *id.* at 41 (discussing the table of contents included with Baver's application, exhibit 437(a)); *id.* at 42 (discussing the budget attachment, exhibit 21(d)); *id.* at 50 ("I believe this case comes down to those five documents I mentioned because they show Allison Baver's intent[.]").

[9] *See, e.g.*, *id.* at 27-28 (arguing that the government "has not shown that" Baver lied because the government's evidence focuses exclusive on "the past" and not Baver's "forward looking" materials); *id.* at 46-47 (arguing that the government did not meet its "burden to show that the ten million was a lie, the 430 number was a lie"); *id.* at 48-49 (arguing that the government did not "meet its burden" to prove Baver intended to influence the banks).

[10] *See, e.g.*, *id.* at 30-31 (discussing Micah Stanford's testimony regarding the ambiguities in the "Frequently Asked Questions" about the PPP loan program); *id.* at 47 (discussing Nikhil Patel's demeanor).

[11] *See, e.g.*, *id.* at 46-49; *see also supra* Part IV.B.1.a.

In short, Hunt's argument was "replete with argumentative statements demonstrating [his] adversarial representation of [Baver's] interests before the jury."[12] *Williamson*, 53 F.3d at 1511. And "[a]n objective assessment of counsel's representations reveals he did not cease to function as an advocate" on Baver's behalf. *Id.* at 1512.

### 2. Baver cannot show prejudice resulting from any of her counsel's alleged errors during closing argument

Baver's various allegations of error concerning her trial counsel's closing argument also fail at *Strickland*'s second step. To establish prejudice, Baver must demonstrate that Hunt's challenged statements actually "made a difference in the trial's outcome." *Green v. Snedeker*, 355 F. App'x 146, 151 (10th Cir. 2009) (unpublished). That is too high a bar for Baver to clear. Her conclusory assertions that the jury would not have convicted her were it not for her counsel's challenged statements are "insufficient to satisfy the *Strickland* standard." *Zajac v. United States*, 154 F. Supp. 3d 1230, 1236 (D. Utah 2015), *aff'd*, 680 F. App'x 776 (10th Cir. 2017) (unpublished). And there is no reasonable likelihood that any of the excerpts that Baver cherry-picks from the trial transcript affected the jury's verdict. For instance, it is not "conceivable"—

---

[12] *See, e.g.*, *id.* at 30 ("There are five documents which explain this story perfectly to you as to why Ms. Baver never intended to defraud the banks and the banks knew exactly where she was coming from when she applied"); *id.* at 31 ("what I do disagree with was the methodology that she used was a lie"); *id.* at 32 ("The real issue is did she lie, not whether she was, as they described her, as being greedy and audacious."); *id.* at 33 ("She literally tells everyone else that it's forward looking"); *id.* at 39 (discussing the "good faith letter . . . that explains at the time what she was concerned with"); *id.* at 41 (arguing how the documentary evidence will help the jury "understand her state of mind at the time she filled out those applications" because she "l[aid] out every possible detail that she could possible think of and imagine about her business"); *id.* at 42 ("She doesn't try and exclude any information at all about the projects"); *id.* at 44 ("she submitted documents that weren't even provided—or weren't even asked for by the banks in order to explain her position"); *id.* at 46 (arguing that the government has the burden "to show these numbers are false, which they have not"); *id.* at 47 ("she was trying to provide as much information as she possibly could to get a loan . . . she supplied the documentation trying to explain why"); *id.* at 51 ("The supporting documents tell the story, and that's all that matters.").

much less "substantial[ly]" likely (*Richter*, 562 U.S. at 112)—that the jury would have returned a different verdict, were it not for Hunt's strategic decisions to rhetorically coopt the government's theory of the case (to explain why it was wrong), and to cast Baver as an ambitious entrepreneur who lacked criminal intent. Nor would the outcome have been any different had Hunt explicitly referenced the good faith instruction or refrained from using the phrase "I think . . . in my mind" when discussing the Good Faith Letter. It is even more difficult to see how Hunt's statement that he agreed that Baver sought a $10 million PPP loan, while emphatically disagreeing that she had lied to get it, prejudiced Baver. The Court should deny Baver's closing argument claims.

### C. The record shows a sound tactical basis for trial counsel to forgo calling Jason Kirkham as a witness, and Kirkham's testimony would not have changed the outcome of trial

Baver further asserts that her trial counsel's failure to call Jason Kirkham as a witness warrants granting a new trial. But the record demonstrates ample reason to avoid calling Kirkham as a defense witness.

To start, the Tenth Circuit has "repeatedly held that whether to call a particular witness is within the sound discretion of trial counsel." *Ellis*, 872 F.3d at 1087 (collecting cases). "'[T]he decision of which witnesses to call is quintessentially a matter of strategy'" that courts "do not second guess." *United States v. Creighton*, 786 F. App'x 743, 747-48 (10th Cir. 2019) (quoting *Boyle v. McCune*, 544 F.3d 1132, 1139 (10th Cir. 2008)) (unpublished); *see Strickland*, 466 U.S. at 699 (determining as reasonable trial counsel's decision not to introduce a character witnesses). Trial counsel's "performance was not deficient simply because [they] did not call [Kirkham] to testify." *See Hill v. Allbaugh*, 735 F. App'x 969, 972 (10th Cir. 2018) (unpublished).

Setting that aside, the record provides numerous reasonable and strategic explanations for trial counsels' decision not to call Kirkham as a defense witness. Indeed, at trial, the government repeatedly stressed that Baver's "progression of statements" to various lenders showed her

knowledge of falsity and intent to influence the banks.  ECF 196 at 14; *see id.* at 18 ("The defendant knew exactly what she was doing.  She knew this because you can see it.  You can see it as those applications changed[.]").  The government pointed to Baver's conversation with a bank employee—where she said, "I have no past payroll"—to argue that Baver deliberately misled the banks after "learn[ing] what not to say" and "what not to put in" her applications.  *Id.* at 19-20.  Kirkham's testimony would have strongly reinforced that narrative.  After speaking with Baver about her PPP loan application and lack of past payroll, Kirkham told Baver that he was unaware of other similarly situated businesses obtaining PPP funds.  (FI-LE-ABE-01-00006 at 14:00-14:30).  He further explained she could submit her application through Lendio to "see if it gets out there to a lender," but with her situation being "different," the banks may not approve it.  *Id.* at 7:30-8:15.  Shortly after this conversation with Kirkham, Baver submitted an application to Northeast bank through Lendio with documentation of a "Season Payroll Audit" claiming 430 employees and an average monthly payroll of approximately $4.77 million.  *See, e.g.*, Trial Exs. 13(a)-(d), 14(c), 14(e); *see* ECF 198 at 8, 12-13.  It's easy to see the wisdom in trial counsel's decision not to call Kirkham as a witness.

Still, Baver asserts she was prejudiced by trial counsel's failure to call Kirkham because his testimony could have shown that Baver "openly admitted to not having prior payroll," and despite knowing this, Lendio "submitted her application to Northeast Bank anyway."  ECF 291 at 31.  These facts, Baver argues, "would have undermined the Government's argument that Ms. Baver knowingly made a false statement."  *Id.* at 32.  But the trial evidence already established that Baver had admitted to having little-to-no prior payroll (*see* ECF 193 at 35), so Kirkham's testimony would have added little to her defense.  *See* Trial Ex. 4.  Worse, as noted, Kirkham's testimony would have bolstered the government's theory that Baver knew her statements to

Northeast were false, because she *didn't* tell the bank what she had told Kirkham—*i.e.*, that she had no past payroll.  *See* ECF 198 at 6 (testimony of Brian Pinheiro that Northeast did not "have any communications with Allison Baver about the PPP loan application").

Even assuming *arguendo* that Kirkham understood that ABE had no prior payroll,[13] that does not mean that *Lendio* knew about ABE's lack of prior payroll.  And, more fundamentally, Lendio's knowledge on that issue is irrelevant.  The question for the jury was whether Baver knowingly made a false statement to Northeast bank.  *See* 18 U.S.C. § 1014.  Regardless of what Baver told Kirkham (or Lendio) about ABE's employment and payroll figures, her application to Northeast claimed 430 employees and an average $4.77 million in monthly payroll—no qualifiers, no caveats.  *See, e.g.*, Trial Ex. 13(a)-(d); *see* ECF 198 at 8.

Finally, there is no reasonable probability this argument would have affected the outcome of Baver's trial.  *See Strickland,* 466 U.S. at 694.  Her attempt to tie Kirkham's knowledge of her true payroll and employment numbers, and by association, Lendio, to Northeast Bank is not new—similar arguments were raised and ultimately unsuccessful at trial.  *See* ECF 198 at 15-21. And if anything, Kirkham's statements to Baver would have been particularly unhelpful to her, because he made clear that the bank was the ultimate decisionmaker and Lendio, as the "middleman," had no lending authority.

---

[13] Without testimony, Baver's assertions regarding Kirkham's comprehension is speculative at best.  And courts have expressed a reluctance to upset jury verdicts based on "complaints of uncalled witnesses" because "allegations of what the witness would have testified are largely speculative."  *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

**D.  It was not objectively unreasonable for Baver's trial counsel to decline to cross-examine Ken Luis, and Baver suffered no prejudice from that strategic decision**

Baver next faults her trial attorneys for declining to cross-examine SBA financial analyst Ken Luis.[14]  During his direct examination, Luis testified that he did not give Baver "any opinions on whether she qualified for a PPP loan."  ECF 193 at 75.  Baver contends that her trial counsel should have impeached Luis on cross-examination with an email he sent to Baver, where he stated: "With this new program that has been all over the news called Paycheck Protection Program, you might be able to qualify."  Trial Ex. 67 at 1.  Because Hunt said during his opening statement that an SBA representative had "suggested" to Baver "that the newly created PPP loan may be available for her and her company," Baver argues that her defense team's failure to cross-examine Luis "l[eft] the jury with the impression that Luis never opined on whether Ms. Baver's company might be able to qualify."  ECF 291 at 34 (quotation omitted).  Had counsel cross-examined Luis and impeached him with that email, Baver argues, there is a reasonable likelihood the jury would not have convicted her.  *Id.*  Two responses.

First, Baver cannot overcome the strong presumption that her attorneys' decision not to cross-examine Luis was objectively reasonable. The Tenth Circuit "has repeatedly stated that counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy."  *DeLozier*, 531 F.3d at 1326.  So has the Supreme Court.  *See Yarborough*, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").  And here, counsel could have reasonably concluded that there was little to be gained by cross-examining Luis.  After all, Luis did not say in his email *whether* ABE could qualify for a PPP loan—only

---

[14] Baver faults both of her trial attorneys for this allegedly unreasonable choice.  *See* ECF 291 at 33 (asserting that "the defense *team* elected not to cross examine Luis.") (emphasis added).

that it "might be able to qualify" for "this new program that has been all over the news." Trial Ex. 67 at 1. In other words, the email said exactly what counsel suggested in his opening statement—that the PPP program "may be available" to ABE. ECF 193 at 12. And because the prosecutor had already introduced Luis' email into evidence during his direct examination, it was unnecessary for Baver's attorneys to cross-examine Luis simply to have him repeat his prior statement. *Id.* at 73.

On top of that, any attempted cross-examination of Luis could have resulted in more damaging testimony that further reinforced the government's point that SBA officials had no responsibility for determining PPP loan eligibility. *See, e.g.*, ECF 194 at 28-30 (testimony of Kandace Zelaya that SBA did not engage in any review of PPP loan applications). "[T]he prospect of potentially damaging testimony is among the reasons that strategic or tactical decisions on the part of counsel are presumed correct unless they were completely unreasonable, not merely wrong, so that they bear no relationship to a possible defense strategy." *Hill*, 735 F. App'x at 972 (cleaned up) (unpublished); *see also United States v. Voigt*, 877 F.2d 1465, 1468 (10th Cir. 1989) (rejecting defendant's claim based on counsel's alleged "failure to cross-examine a witness" because it "could simply have been part of trial counsel's strategy"). Given the potential downside risk of cross-examining Luis, and the marginal-at-best upside, it would have been reasonable for Baver's attorneys to conclude that cross-examining Luis would have added nothing to Baver's defense. The issue raised in the opening statement had been proven. The decision not to ask further questions is entitled to deference, and Baver has not provided any sound basis for this Court to second guess it.

Second, even spotting Baver the first *Strickland* prong, she cannot demonstrate any prejudice stemming from her lawyers' tactical decision not to cross-examine Luis. Luis was a

minor witness for the government—his testimony spans just four pages of the trial transcript and included only one exhibit: his email with Baver that was introduced during his direct examination. ECF 193 at 71-75. Baver cannot show—as she must to satisfy *Strickland*'s second prong—that cross-examining him to elicit testimony about a prior statement already before the jury "might have changed the outcome of the trial." *Voigt*, 877 F.2d at 1468.

### E. Counsel's cross-examination of Nikhil Patel did not violate the Sixth Amendment

Baver contends that Hunt's cross-examination of Nikhil Patel was deficient because he "failed to confront" him with three documents: (1) an email Baver sent to Patel's superior at Meridian Bank, (2) the "Table of Contents" she included with her application materials, and (3) her "Good Faith Letter." ECF 291 at 34-35 (discussing Trial Exs. 22, 437-A, and 21(b), respectively). According to Baver, Hunt should have "required Patel to read the favorable language" from each of these documents "into the record." *Id.* at 36. Had he done so, her argument goes, it "would have been clear to the jury" that the prosecution could not satisfy the elements of a § 1014 offense. *Id.* There are several problems with this argument.

The first is that Baver's allegations fall well short of overcoming the "presumpt[ion]" that her counsel's "decisions regarding how best to cross-examine" Patel "ar[o]se from sound trial strategy." *DeLozier*, 531 F.3d at 1326 (quotation omitted); *see also Long v. Roberts*, 277 F. App'x 801, 804 (10th Cir. 2008) ("We have previously concluded that counsel's cross-examination method is a matter of trial strategy subject to the strong presumption that the counsel acted reasonably." (citing *Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005))) (unpublished). That is especially true given that—as Baver acknowledges—Hunt specifically referenced the documents at issue, and "asserted their favorable contents" in his exchange with Patel. ECF 291 at 35. Baver's contention that a more extensive examination was required

misconstrues *Strickland*'s first prong, which does not ask whether counsel "could have done more"; it asks only whether counsel's challenged actions were objectively unreasonable. *Erickson v. United States*, No. 2:05-CR-521 TS, 2011 WL 1226113, at *2 (D. Utah Mar. 28, 2011). Hunt's cross-examination of Patel was not.

There were good strategic reasons not to prolong Patel's cross-examination. Hunt had already secured an admission from Patel that there were "two documents" that were "provided to Meridian Bank . . . before the loan was processed" that explained "that Ms. Baver didn't have any employees at the time." ECF 182 at 24-25. Hunt could have reasonably concluded that there was little to be gained by having Patel "read the favorable language" from the documents "into the record" on cross-examination. ECF 291 at 36. On the other hand, further "confront[ation]" (*id.*) would have risked eliciting more confusing testimony from Patel, who at times appeared nervous or uncomfortable on the witness stand. *See* ECF 182 at 26; ECF 196 at 47 (discussing Patel's demeanor). A "more thorough cross-examination" therefore "was not constitutionally compelled, given the possible outcomes of that course of action[.]" *Leyland v. United States*, No. 2:07CV680DAK, 2011 WL 3328693, at *2 (D. Utah Aug. 2, 2011).

Besides, the documents Baver references in her motion were already admitted during Patel's direct examination, enabling Hunt to argue their contents to the jury in closing argument. He did just that. *See, e.g.*, ECF 196 at 39 (discussing the Good Faith Letter and arguing that it "explains at the time what [Baver] was concerned with"); *id.* at 41 (arguing that the Table of Contents showed Baver's lack of criminal intent). And because having Patel read those same documents into the record would have been cumulative and accomplished little other than "wasting the jury's time," there was a "reasonable strategic bas[i]s" for counsel's more limited approach. *Rodriguez v. LaValley*, No. 13 CV 5811 (RJD), 2019 WL 3718022, at *12 (E.D.N.Y.

Aug. 7, 2019) (concluding that counsel reasonably determined that it was not "worth" it to cross-examine witnesses on "the minutiae of ballistics and forensics in a case that consisted principally of the compelling eyewitness accounts").

Even if counsel erred by not "requir[ing] Patel to read the favorable language into the record," (ECF 291 at 36), Baver cannot show prejudice as a result. As noted, further cross-examination would have added little to the defense, given that Hunt already elicited the admission from Patel that at least two documents showed Baver "didn't have any employees" when she applied for the loan. ECF 182 at 24-25. And there is "no reason why listening to" Patel read the documents, which were already in evidence, "would have caused the [jury] to reach a different decision." *United States v. Madrid*, 620 F. App'x 664, 667–68 (10th Cir. 2015) (holding that the Sixth Amendment did not require counsel to conduct "additional cross-examination" of a witness from whom he had "already elicited" a favorable "concession") (unpublished).

### F. Baver fails to demonstrate that counsel's performance with respect to Brian Pinheiro was deficient or that any deficiency prejudiced her defense

Baver also claims trial counsel provided ineffective assistance during Brian Pinheiro's testimony in two respects: 1) allowing testimony about multiple loan applications without objection, and 2) constitutionally deficient cross-examination. ECF 291 at 37-40. She argues that "there was ample record evidence to question Pinheiro's testimony that a new application was generated to the bank" each time she updated the application, and that counsel could have cross-examined Pinheiro more effectively on this issue, including by using Kirkham's testimony and emails with Baver. *Id.* (cleaned up). Both arguments fail.

As an initial matter, Baver again does not meet her "burden of showing that counsel's action or inaction was not based on a valid strategic choice." *Bullock*, 297 F.3d at 1047

(quotation omitted).  Both choices are presumed to be part of a reasonable trial strategy.  *See id.*
Baver generally asserts, without any support, that "no reasonable trial strategy existed" to allow
Pinheiro's testimony of multiple loan applications, and fails to explain how counsel's cross-
examination of Pinheiro was not sound strategy.  ECF 291 at 37-40.  That is enough to deny her
claim.

Even if it weren't, the record supplies valid tactical reasons for counsel's approach to
Pinheiro's testimony.  *See United States v. Holder,* 248 F. App'x 863, 869 (10th Cir. 2007) ("The
proper measure of attorney performance is that of reasonably effective assistance under
prevailing professional norms, considering all of the surrounding circumstances." (quotation
omitted)) (unpublished).  Given the government's theory that Baver's attempts to modify and
resubmit her application showed her intent to influence the banks, it makes sense that trial
counsel would seek to avoid drawing attention to Pinheiro's direct testimony on that point.  *See*
ECF 196 at 18, 20.  On cross-examination, counsel elicited testimony from Pinheiro to downplay
the significance of Baver's resubmissions.  Pinheiro conceded that her multiple submissions
were "basically treat[ed] as one application and "it is essentially the same application that's
being updated."  ECF 198 at 15-16.  Pinheiro further agreed that potentially "a lot of individuals
that were applying for bank loans may have adjusted their applications after learning . . . more
information about how to calculate and those kind of things[.]"  *Id.* at 16-17.  And in closing,
Hunt again downplayed these applications and told the jury the crux of the case rested on five
other documents, "because they show Allison Baver's intent."  ECF 196 at 50-51, *see id.* ("It
doesn't matter whether the bank looked at the documents or if they considered her theory to be
legitimate.").  Trial counsel's approach to Pinheiro's testimony was objectively reasonable.

Contrary to Baver's assertion (ECF 291 at 38), it was not unreasonable for her trial counsel to decline to cross-examine Pinheiro using Baver's emails with Jason Kirkham about her various submissions to Lendio. Pinheiro did not work for Lendio and was not included on Baver's correspondence with Kirkham. It was reasonable for counsel to decide against questioning Pinheiro regarding hearsay statements about which he lacked personal knowledge.[15] That is especially true given that, as discussed above, Kirkham's proffered testimony posed a significant risk of reinforcing the government's argument that Baver selectively disclosed her true employment figures, which demonstrated that she knew she was lying in her applications to the banks. *See supra* Part IV.C.

Had trial counsel approached Pinheiro's testimony the way Baver now proposes, there still would be no basis for finding prejudice. Baver fails to show that the result of the proceeding would have been different had trial counsel objected during Pinheiro's direct examination testimony. *See* ECF 291 at 37-38 (mentioning prejudice only in the heading and not in the body of the argument). And she would be hard-pressed to do so. Whether a "new application was sent to Northeast" each time Baver modified her application (ECF 291 at 37) was hardly material to the question for the jury whether Baver knowingly lied when she told the bank she had 430 employees and $4.77 million in average monthly payroll. Baver was charged with making those false statements to Northeast "on or about" April 26, 2020. ECF 47 at 7-8. She does not dispute that she caused a loan application to be sent to Northeast—that she signed as of April 26, 2020— that contained those statements. ECF 291 at 13; *see* Trial Ex. 13(a). That application—and *only* that application—was the subject of Count 2 at trial. *See* ECF 196 at 67. Eliciting testimony

---

[15] It is not clear, moreover, how any of the applications referenced in Lendio's form emails to Baver correspond to the specific applications to Northeast that were introduced at trial. *See* Trial Exs. 13(a)-(l).

from Pinheiro that other applications Baver modified and tried to submit—and that often contained the same or similar false statements—were not passed along to Northeast from Lendio would not have affected the jury's analysis of the elements of that charged offense.  After all, Baver does not dispute that she made the modifications or sought to submit them.

Besides, on cross-examination, trial counsel undermined Pinheiro's testimony that a new application was generated to the bank each time it was resubmitted.  ECF 198 at 15-16 (admitting that multiple submissions were treated as one and "it is essentially the same application").  Her claim that better cross-examination of Pinheiro, using Kirkham's proffered testimony (itself something counsel reasonably decided not to present for the reasons discussed above) would have elicited key discrepancies in Pinheiro's testimony likewise falls short of establishing prejudice.  To succeed on this claim, Baver must demonstrate "the omitted evidence creates a reasonable doubt that did not otherwise exist."  *Stouffer v. Reynolds*, 214 F.3d 1231, 1234-35 (10th Cir. 2000) (quotation omitted).  Trial counsel's alleged failures during Pinheiro's testimony do not come close to meeting that standard.  The jury already heard conflicting testimony concerning Baver's repeated application modifications and her communications with lenders over past payroll and employment numbers. There is no reason to think (and Baver offers none) that pressing Pinheiro further on this minor issue would have affected the jury's determination that Baver knowingly lied when she submitted an application to Northeast that falsely claimed ABE had 430 employees and $4.77 in average monthly payroll.

### G.  Baver suffered no prejudice from the "cumulative effect" of her trial lawyers' alleged errors

Baver's last stand is to argue that the "combined prejudicial effect of her trial attorneys' deficient performance" satisfies *Strickland*'s second prong.  ECF 291 at 40.  That argument fails to get off the ground because, as discussed above, there was nothing objectively unreasonable

43

about any of the challenged actions by Baver's former counsel. Even if there were, those alleged errors did not alter the outcome of Baver's trial. The case against Baver was straightforward and based almost entirely on her own written statements: Baver said she had 430 employees and $4.77 million in average monthly payroll when she plainly didn't. She created documents supporting those figures, knowing they weren't true, to convince the banks they should give her a $10 million loan. The jury rejected Baver's good faith defense and properly concluded, based on the evidence at trial, that Baver was guilty of making false statements to a bank and money laundering.

There is no likelihood—much less a reasonable one—that the jury would have reached a different verdict, but for the nitpicky "errors" Baver alleges in her motion. Even if her attorneys had done everything she claims they should have—*e.g.*, avoided characterizing her as a "go getter" during closing argument; explicitly referenced the good faith jury instruction; avoided saying "I think" when discussing the evidence; called Jason Kirkham as a witness; cross-examined Ken Luis with trial exhibit 67; ventriloquized Nikhil Patel into reading the substance of Baver's Table of Contents and Good Faith Letter into the record, etc.—the overwhelming weight of the evidence still would have shown that Baver knowingly lied about her employment and payroll figures to convince the banks to give her a $10 million loan. The jury still would have convicted her.

### H. Baver is not entitled to an evidentiary hearing

Finally, Baver maintains that "at a minimum," she is entitled to an evidentiary hearing on her ineffective-assistance claims. ECF 291 at 42. The Court should decline that invitation. The "broad sweep of discretion in trial strategy forecloses" each and every one of Baver's allegations of error. *Hill*, 735 F. App'x at 972 n.1. And the merits of her ineffectiveness claims, including *Strickland*'s prejudice prong, can "be resolved on the basis of the trial record alone." *Crowe*,

735 F.3d at 1244. As a result, she is not entitled to an evidentiary hearing. *Id.*; *see also Hill*, 735 F. App'x at 972 n.1; *United States v. Carbajal-Moreno*, 136 F. App'x 163, 166 (10th Cir. 2005) (noting that district courts are not "require[d] . . . to hold evidentiary hearings whenever they are presented with motions for new trials based on ineffective assistance") (unpublished).

V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Baver's motion for a new trial.

DATED this 10th day of November, 2025.

FELICE JOHN VITI
Acting United States Attorney

*/s/Briggs Matheson*
BRIGGS MATHESON
LUISA GOUGH
Assistant United States Attorneys